**THE DUGGER LAW FIRM, PLLC**
**Cyrus E. Dugger**
**154 Grand St.**
**New York, New York 10013**
**Tel: (646) 560-3208**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
EVA AGERBRINK, individually          :
and on behalf of all others similarly situated,   :         Case No. 14 Civ. 7841 (JPO) (JCF)
                                    :
           Plaintiff,                :                **AMENDED**
v.                                    :     **CLASS AND COLLECTIVE**
                                   :         **ACTION COMPLAINT**
MODEL SERVICE LLC d/b/a MSA Models and  :
SUSAN LEVINE,                   :       **Demand for Trial by Jury**
                                   :
           Defendants.             :
—————————————————————————:

Plaintiff Eva Agerbrink ("Plaintiff"), individually, and as class representative on behalf of all others similarly situated, by her attorney, Cyrus E. Dugger, makes the following allegations against Model Service LLC d/b/a MSA Models ("MSA Models" or "MSA") and Susan Levine ("Levine") (collectively "Defendants").

## <u>INTRODUCTION</u>

1.      A fit model is a person who works with members of the apparel manufacturing industry to check the fit, drape, and visual appearance of a design on a real human being.

2.      Essentially, fit models are used by the apparel manufacturing industry as human mannequins during the clothing design process.

3.      MSA Models describes itself as the "premiere fit modeling agency in New York City."

4.      Many, if not all, New York City ("NYC") modeling agencies, including MSA Models, operate without regard for the various applicable labor laws covering models' work. These NYC

modeling agencies' wage and hour violations arise from the near industry-wide misclassification of NYC models as independent contractors.[1]

5.      Through this misclassification, many, if not all, NYC modeling agencies seek to avoid application of the minimum wage, overtime, non-deduction, and timely payment requirements of federal and/or state wage and hour laws applicable to the models they employ.

6.      The result is a NYC modeling industry in which models with low bargaining power are frequently not paid all of their earned wages, are paid wages late, are paid wages only after complaining about non-payment, and/or are simply not paid at all.

7.      Although many, if not all, NYC modeling agencies maintain that their models are independent contractors, this nearly industry-wide imposed label is often legally incorrect.

8.      As a result of NYC modeling agencies' near industry-wide misclassification of models as independent contractors, many, if not all, NYC modeling agencies are liable to their past and current models for unpaid minimum wages, unpaid overtime wages, unpaid earned wages, late payment of wages, and illegal deductions, as well as associated liquidated damages and interest.

9.      Accordingly, these NYC modeling agencies' collective evasion of wage and hour protections has resulted in millions of dollars in lost wages to these agencies' models and, in turn, millions of dollars in illegal profits for these NYC modeling agencies.

10.      As a result, although modeling is often seen as a glamorous career in New York City, it is often quite the opposite.

11.      Most models receive modest wages for their work: the U.S. Bureau of Labor Statistics' *Occupational Outlook Handbook* lists the median pay for U.S. models in 2012 as $18,750 per year and $9.02 per hour.

---

[1]      *See generally* Alexandra R. Simmerson, *Note: Not So Glamorous: Unveiling the Misrepresentation of Fashion Models' Rights as Workers in New York City*, 22 Cardozo J. Int'l & Comp. L. 153 (Nov. 2013).

12.     Accordingly, models that have provided a service that has enriched NYC modeling agencies and the apparel industry clients that require fit models' services to design clothing are only marginally compensated, or not compensated at all, within an apparel manufacturing industry grossing millions of dollars.

13.     MSA Models is no exception with respect to the misclassification of fit models as independent contractors and resulting responsibility for illegal wage and hour practices.

14.     MSA Models has uniformly misclassified its models as independent contractors.

15.     Upon information and belief, MSA Models has implemented a policy and/or practice of failing to pay fit models minimum wages, failing to pay fit models overtime wages, failing to pay fit models all of their earned wages, failing to pay fit models' wages promptly, failing to pay fit models unless and until they specifically request payment of their wages, and/or making illegal deductions to fit models' wages.

16.     MSA and many, if not all, NYC modeling agencies' misclassification of their models as independent contractors has similarly resulted in MSA and NYC modeling agencies' failure to pay unemployment benefits, obtain workers' compensation insurance, or pay applicable social security taxes with respect to their models.

17.     In addition to misclassifying their models as independent contractors, many, if not all, NYC modeling agencies, including MSA, go one step further to increase their profits at the expense of both NYC models and apparel industry clients.  While these modeling agencies hold themselves out to the public as organizations that will obtain employment and/or engagement for models, and while the primary purpose and activities of these organizations *is* to obtain employment and/or engagements for models, these agencies have nonetheless "re-classified" themselves as "not employment agencies."

18.     As chronicled in *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (SDNY), in which a model alleged violations of the Sherman Antitrust Act, there is substantial evidence that many, if not all, NYC modeling agencies jointly sought to "re-classify" themselves by simultaneously

3

maintaining that they were no longer "employment agencies" within the meaning of General Business Law ("GBL") § 171(2).

19.     The alleged purpose of this coordinated effort for many, if not all, NYC modeling agencies, was to collectively evade application of a 10% cap on the fees these modeling agencies may charge their models for obtaining employment and/or engagements.  GBL §§ 171(8-a) and 185(1)(b), (4), (8) (class C employees).  General Business Law section 185(8) limits the fee employment agencies may charge models for their services to 10% of the employee's income from the position, but these NYC modeling agencies, including MSA, contend that this cap does not apply to the commissions they charge against models' wages.

20.     These NYC modeling agencies, including MSA, also contend that they may levy these fees against models' pay even where the agency did not obtain the associated employment for the model. However, General Business Law section 185(1)(b) prohibits employment agencies from charging a fee unless the agency referred the model to the paying employer or actually represented the model in negotiating the applicable employment contract.

21.     Thus, by "re-classifying" themselves as "not employment agencies," these NYC modeling agencies, including MSA, circumvent both the statutory 10% cap on the fees or commissions they may charge against models' wages (GBL § 185(8)), and the statutory requirement that the agency must actually assist the model to obtain employment and/or an engagement before it may charge the model a commission or fee on wages derived therefrom (GBL § 185(1)(b)).

22.     In addition, GBL § 185 caps the fee an employment agency may charge the apparel industry client at 10%.  These NYC modeling agencies likewise seek to avoid this limit by a "re-classification" as "not employment agencies."  GBL § 185(1)(b).

23.     Many, if not all, NYC modeling agencies, including MSA, attempt to contract around GBL § 185, by including non-negotiable language in their employment agreements unilaterally labeling themselves as "not employment agencies."

4

24.     Under that cover, NYC modeling agencies, including MSA, typically impose a 20% contractual "commission" on the wages earned by their models.  Indeed, many, if not all, NYC modeling agencies, including MSA, include provision for payment of this 20% commission in their employment contracts, even when a model finds work without the assistance or involvement of their modeling agency.  Both of these practices explicitly violate the plain language of GBL § 185.  GBL § 185(1)(b), (4), (8) (class C employees).

25.     Many, if not all, NYC fit modeling agencies, including MSA, charge *an additional* 20% "service fee" to the apparel industry client when they book the fit model with the client, in violation of GBL § 185(1)(b).

26.     In the case of MSA Models, if the apparel industry client refuses to pay the "service fee," Defendants simply deduct this "service fee" fee from their models' wages.  As a result, Defendants' deductions to models' wages in commissions can be as high as 40%.

27.     This action seeks to recover for Plaintiff, and similarly situated MSA fit models, minimum wages, wages currently due, late wages, unlawful deductions, and associated liquidated damages, including but not limited to, minimum wages for time spent during go-sees (initial meetings with potential apparel industry clients) and required in-person meetings with MSA Models owner Susan Levine, payment of all unpaid earned wages, liquidated damages for all wage payments that were eventually made but were not made promptly within the meaning of the FLSA, as well as Defendants' unlawful deductions of commissions from MSA fit models' wages, all pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and/or the New York Labor Law ("NYLL"), Article 6 §§ 190 *et seq*. and Article 19, §§ 650 *et seq.*

28.     This action also seeks a declaratory judgment that Defendants' employment contract is prospectively unenforceable, because of Defendants' illegal operation as an unlicensed employment agency in violation of GBL § 172, and charging of illegal fees in violation of GBL § 185, with respect to Defendants' prospective contractual right to payment of commissions from Plaintiff and similarly

situated MSA fit models' wages, above the 10% amount permitted by GBL § 185, and/or for

commissions against wages earned from work Plaintiff and similarly situated MSA fit models obtained

without MSA's assistance.

## JURISDICTION AND VENUE

29.    The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331

and the FLSA, 29 U.S.C. § 216(b).

30.    The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Plaintiff's state law claims are so closely related to Plaintiff's claims under the FLSA that they form part

of the same case or controversy under Article III of the United States Constitution.

31.    The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-

2202.

32.    Defendants are subject to personal jurisdiction in New York.

33.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1),

because at least one Defendant resides in this judicial district and all Defendants are residents of New

York state, and § 1391(b)(2), because a substantial part of the events or omissions giving rise to the

claims occurred within this judicial district.

## PLAINTIFF

34.    Plaintiff Eva Agerbrink is an adult individual who resides in Jersey City, New Jersey.

35.    Plaintiff was employed and/or jointly employed by Defendants as a fit model from March

2013 through June 2014.

36.    Plaintiff is a covered employee within the meaning of the FLSA and the NYLL.

## DEFENDANTS

**Defendant Susan Levine**

37.    Defendant Susan Levine is, and was at all times relevant to the complaint, the owner,

President, and CEO of MSA Models, and a resident of New York.

38.    Levine is an employer within the meaning of the FLSA and the NYLL.

39.    At all times relevant, Levine employed and/or jointly employed Plaintiff and similarly situated MSA fit models.

40.    Levine has purposefully directed her activities in interstate commerce and knew, or should have known, that her actions would have an impact upon New York residents.

41.    Upon information and belief, Levine has uniformly misclassified MSA fit models as independent contractors.

42.    In uniformly misclassifying MSA fit models as "independent contractors," Levine has denied them the benefits that the law affords to employees, including minimum wages, overtime wages, timely payment of wages, and protections against deductions.

43.    In misrepresenting herself as "not an employment agency" within the meaning of GBL § 171(2), Levine has illegally sought to avoid application of a 10% cap on fees chargeable on the wages of MSA fit models, as mandated by GBL § 185.  Levine has similarly and illegally sought to avoid application of the requirement that an agency actually assist the model in obtaining employment and/or an engagement in order to charge the model a commission on wages derived therefrom.

44.    Although Levine attempts to contract around the requirements of GBL § 172 (licensing requirement for employment agencies) and GBL § 185 (fee cap), and additional aspects of Article 11, she is nonetheless an "employment agency" within the meaning of GBL § 171(2).

45.    MSA explicitly operated as an employment agency subject to the licensing requirement of GBL § 172 and the 10% fee cap of GBL § 185 from approximately March 2001 until November 1, 2010, when it surrendered its employment agency license.  In the letter from Levine surrendering the license Levine stated: "Please find enclosed our Employment Agency License.  We will no longer be operating as an employment agency."

46.    Levine's initial March 2001 application for MSA to operate as an employment agency identified Levine as "the individual who will actually direct and operate the placement activities of the

proposed agency."

47.    Levine signed MSA's March 2002, March 2004, March 2006, and March 2008 employment agency license renewals.

48.    Upon information and belief, Levine has been an "agency manager" within the meaning of GBL § 171, for all, or the majority, of MSA's explicit operation as an employment agency.  An "agency manager" is "the person designated by the applicant for a license who is responsible for the direction and operation of the placement activities of the agency at the premises covered by the license." GBL § 171(4).

49.    At all times relevant, Levine has had power over personnel decisions at MSA Models, including with respect to Plaintiff and similarly situated fit models.

50.    At all times relevant, Levine has had power to, and/or has exercised the power to, hire and fire (and/or constructively discharge) Plaintiff and similarly situated MSA fit models.

51.    At all times relevant, Levine has had the power to, and/or has exercised the power to, set Plaintiff and similarly situated MSA fit models' wages.

52.    At all times relevant, Levine has had the power to, and/or has exercised the power to, withhold and/or delay Plaintiff and similarly situated MSA fit models' wages.

53.    At all times relevant, Levine has had the power to, and/or has exercised the power to, make deductions from Plaintiff and similarly situated MSA fit models' wages.

54.    Levine has personally signed Plaintiff's paychecks, and upon information and belief, signed the paychecks of similarly situated MSA fit models.

55.    At all times relevant, Levine has required MSA fit models to meet with her in person at MSA Models, at least bi-weekly, so that Levine can inspect them and/or their size.

56.    Levine has directly corresponded with Plaintiff regarding potential or scheduled go-sees and/or bookings.

57.    At all times relevant, Levine has controlled, or has had the potential power to control,

Plaintiff and similarly situated MSA fit models' schedules, including, *inter alia*, the scheduling of go-sees, bookings, and/or required in-person meetings with Levine.

58.    Levine has required Plaintiff and MSA fit models to report in-person to MSA's office to receive their paychecks in order to, as stated to Plaintiff, "keep an eye on them."

59.    At all times relevant, Levine has controlled the schedules and/or conditions of employment of Plaintiff and similarly situated MSA Model fit models, including, but not limited to, by misclassifying them as independent contractors, requiring availability for bookings, requiring availability for go-sees, requiring bi-weekly in-person meetings with Levine, determining and/or negotiating their rate of pay, requiring the use of a voucher, requiring compliance with myriad policies described below, and/or imposing sanctions for failure to comply with MSA's policies or instructions.

60.    As of March 2001, Levine owned 95% of MSA Models.

61.    Upon information and belief, at all times relevant, Levine has had overall financial control of MSA Models.

62.    Upon information and belief, at all times relevant, Levine has had the power to make ultimate decisions as to how MSA Models is run.

63.    Upon information and belief, at all times relevant, Levine could have dissolved MSA models if she decided the company should not remain in business.

64.    At all times relevant, Levine exercised formal and/or operational control over Plaintiff and similarly situated MSA fit models.

**Defendant Model Service LLC (d/b/a MSA Models)**

65.    Defendant Model Service LLC d/b/a MSA Models is, and was at all times relevant, a limited liability company organized under the laws of the State of New York, with its principal place of business located at 570 Seventh Avenue, New York, New York.

66.    MSA Models has purposefully directed its activities in interstate commerce and knew, or should have known, that its actions would have an impact upon New York residents.

67.     MSA Models is an employer within the meaning of the FLSA and NYLL.

68.     At all times relevant, MSA Models employed and/or jointly employed Plaintiff and similarly situated MSA fit models.

69.     MSA Models has uniformly misclassified its fit models as independent contractors.

70.     In misclassifying its models as "independent contractors," MSA Models has denied them the benefits that the law affords to employees, including minimum wages, overtime, timely payment of wages, and protections against deductions.

71.     MSA Models' unilaterally-imposed provision in its employment contract forces MSA models to "agree" with the legal conclusion that they are independent contractors.

72.     In misrepresenting itself as "not an employment agency" within the meaning of GBL § 171, MSA Models has illegally sought to avoid application of the 10% cap on the fees chargeable to MSA fit models imposed by GBL § 185.

73.     MSA has similarly illegally sought to avoid application of the GBL § 185 requirement that an agency actually assist the model obtain employment and/or an engagement in order to charge the model a commission on wages derived therefrom.

74.     At all times relevant, MSA Models has had the power to hire and fire (and/or constructively discharge) Plaintiff and similarly situated fit models.

75.     At all times relevant, MSA Models has had the power to, and/or has exercised the power to, set Plaintiff and similarly situated MSA fit models' wages.

76.     At all times relevant, MSA has had the power to, and/or has exercised the power to, withhold and/or delay Plaintiff and similarly situated MSA fit models' wages.

77.     At all times relevant, MSA has had the power to, and/or has exercised the power to, make deductions from Plaintiff and similarly situated MSA fit models' wages.

78.     At all times relevant, MSA has controlled and/or had the potential power to control, Plaintiff and MSA fit models' schedules and/or conditions of employment including, but not limited to,

by misclassifying them as independent contractors, determining which model's information to send to which client, scheduling go-sees, requiring availability for go-sees, scheduling bookings, requiring availability for bookings, requiring bi-weekly in-person meetings with Levine, determining and/or negotiating their rate of pay, requiring the use of a voucher, requiring compliance with myriad policies, and/or threatening and/or imposing sanctions for failure to comply with MSA's policies or instructions.

79.     At all times relevant, MSA Models has otherwise controlled the conditions of employment of Plaintiff and similarly situated MSA models.

80.     Upon information and belief, at all times relevant, the majority of MSA's models were and are fit models.

81.     Upon information and belief, at all times relevant, fit modeling provided and provides the majority of MSA's revenue.

82.     Upon information and belief, at all times relevant, all, or the vast majority of MSA's revenues, have been derived from the commissions it deducts from MSA fit models' wages and/or the related additional service fees it charges apparel industry clients and/or MSA fit models.

83.     MSA Models changed its name from "Model Service Agency, LLC" to "Model Service LLC" during approximately December 2000.

84.     Upon information and belief, MSA Models did not make any changes to its operations and/or business practices when it changed its name from "Model Service Agency, LLC" to "Model Service LLC" during approximately December 2000.

85.     Although MSA Models attempts to contract around the requirements of GBL §§ 172 (licensing requirement) and 185 (fee cap), at all times relevant, it has nonetheless been an "employment agency" within the meaning of GBL § 171(2), despite its surrender of its employment agency license in November 2010.

86.     Since at least November 2010, if not earlier, MSA Models has required all MSA fit models, by way of MSA Model's employment contract, to "agree" with the legal conclusion that MSA

Models is not an "employment agency" and/or a "theatrical employment agency."

87.    At all relevant times, the primary purpose of the work of MSA Models has been to, for a fee, obtain, or attempt to obtain, employment and/or engagements for Plaintiff and/or similarly situated fit models.  In the alternative, the primary business of MSA has been to render vocational guidance or counseling services and to directly or indirectly: (1) procure or attempt to procure or represent that it can procure employment or engagements for persons seeking employment or engagements; (2) represent that it has access, or has the capacity to gain access, to jobs not otherwise available to those not purchasing its services; and/or (3) provide information and/or service purporting to promote, lead to, or result in, employment for fit models with other employers.

88.    MSA Models employs numerous bookers whose primary, or sole duty, is to obtain go-sees and bookings for MSA fit models with apparel industry clients.

89.    Despite being an "employment agency" within the meaning of GBL § 171(2), upon information and belief, since November 2010, MSA Models has applied a deduction of (at least) 20% on all wages earned by its models, which exceeds the 10% fee permitted by GBL § 185.  GBL § 185(1)(b), (4), (8).

90.    The business of MSA does not only incidentally involve the seeking of employment for fit models and/or models generally.

91.    Despite being an "employment agency" within the meaning of GBL § 171(2), upon information and belief, since November 2010, MSA Models has applied commissions to wages earned by its models even when MSA did not assist the model in obtaining the employment the commission was charged against, in violation of GBL § 185(1).

92.    Since at least November 2010, MSA Models has operated as an unlicensed employment agency in violation of GBL § 172, as well as, upon information and belief, charged illegal commissions beyond the 10% commission permitted by GBL § 185 for models (as Class C employees).  As a result, its employment contracts are illegal and prospectively unenforceable, by Defendants, against Plaintiff

and similarly situated MSA fit models, with respect to Defendants' contractual right to deduct a commission from wages, as to commissions beyond the 10% fee permitted by GBL § 185.

93.     In addition, MSA Models' deductions of 20% (or higher) commissions, and/or withholding of additional monies, from Plaintiff and similarly situated MSA fit models' wages, are illegal deductions prohibited by NYLL § 193.

94.     At all times relevant, MSA Models exercised formal and/or operational control over Plaintiff and similarly situated MSA fit models.

## COLLECTIVE ALLEGATIONS

95.     Plaintiff brings the First and Second Causes of Action on behalf of herself and the following collective:

96.     An opt-in collective pursuant to 29 U.S.C. § 216(b) of all persons who, at any time within the three years prior to opting into the instant action (as tolled) worked as a fit model for Defendants (the "Fit Model Collective").

97.     Plaintiff and the Fit Model Collective claim that Defendants (and/or their predecessors) had a policy and/or practice of misclassifiying them as independent contractors who are not covered by the FLSA and that, as a consequence of this misclassification: (1) Defendants are liable for payment of minimum wages as required by the FLSA, as well as associated liquidated damages; and (2) Defendants are liable for the failure to pay minimum wages promptly, as required by the FLSA, inclusive of liquidated damages for all minimum wages that Defendants eventually paid but that were not paid promptly.

98.     Plaintiff and the Fit Model Collective further allege that Defendants have had and/or have a policy or practice of failing to pay Plaintiff and the Fit Model Collective their minimum wages and/or not paying minimum wages promptly as required by the FLSA, inclusive of a policy or practice of not paying wages and/or minimum wages for more than a month after the wages were earned by the performance of fit modeling services.

99.     The Fit Model Collective consists of many similarly situated individuals to whom Defendants have not paid the federal minimum wage, or to whom they have not paid minimum wages promptly, within the meaning of the FLSA, and who would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.

100.     Those similarly situated collective members are known to Defendants, are readily identifiable, and can be located through Defendants' records.

101.     Notice should be sent to the members of the Collective pursuant to 29 U.S.C § 216(b).

## CLASS ACTION ALLEGATIONS

102.     Plaintiff brings the Third, Fourth, Fifth, Sixth, and Seventh Causes of Action under Rule 23 of the Federal Rules of Civil Procedure.

103.     Plaintiff brings these causes of action as a Class Action pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and (c)(4) on behalf of a class of all fit models employed by Defendants (and/or their predecessors) within six years of the filing of the initial Class and Collective Action Complaint in this action through the resolution of their NYLL and Declaratory Judgment Act claims ("the Fit Model Class").

104.     Excluded from the Fit Model Class are Defendants, Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; all current or former MSA fit models with claims against Defendant(s) filed in state or federal court prior to the filing of the initial Class and Collective Action Complaint; and all persons who will submit timely and otherwise proper requests for exclusion from the Fit Model Class.

105.     Plaintiff is a member of the class she seeks to represent.

106.     The members of the Fit Model Class identified herein are so numerous that joinder of all members is impracticable.  Although Plaintiff does not know precisely how many fit models Defendants

have employed during the relevant time period, upon information and belief, their number is far greater than can be feasibly addressed through joinder.

107.    There are questions of law and fact common to the Fit Model Class, and these questions predominate over any questions affecting only individual members.  Common questions include, but are not limited to: (1) whether MSA Models is an employer and/or joint employer within the meaning of the NYLL; (2) whether Levine is an employer and/or joint employer within the meaning of the NYLL; (3) whether Plaintiff and the members of the Fit Model Class are employees within the meaning of the NYLL; (4) whether Defendants have and/or have had a policy or practice of not paying Plaintiff and the members of the Fit Model Class their minimum wages as required by the NYLL, not paying these fit models' earned wages as required by NYLL § 191, deducting commissions from these fit models' earned wages in violation of NYLL § 193, and/or intentionally withholding fit models' wages; (5) whether Plaintiff and the Fit Model Class's attendance at go-sees and/or required in-person meetings with Levine was compensable work and/or work Defendants "permitted or suffered" within the meaning of the NYLL; (6) whether Plaintiff and the members of the Fit Model Class were "manual workers" or "clerical or other workers" within the meaning of NYLL § 191; (7) whether all or some categories of Defendants' deductions from the wages of Plaintiff and the Fit Model Class violated NYLL § 193; (8) whether Defendants are liable for violation of NYLL with respect to the failure to pay minimum wages, the failure to pay earned wages, and/or for illegal deductions; (9) whether liquidated damages are justified pursuant to the NYLL because of Defendants' willful and/or bad faith conduct; (10) whether Defendants are an "employment agency" within the meaning of GBL § 171; (11) whether Defendants' employment contract is prospectively unenforceable, by Defendants, against Plaintiff and the members of the Fit Model Class, with respect to payment of commissions above the 10% fee permitted by GBL §185; (12) whether declaratory relief for the Class is warranted with respect to Plaintiff and the Fit Model Class's NYLL claims; (13) whether declaratory relief for the Class is warranted with respect to Plaintiff and the Fit Model Class's Declaratory Judgment Act claim; (14) whether the non-enforceability

15

of MSA's contractual right to commissions above the limits imposed by GBL § 185 would be a disproportionate punishment for Defendants' unlicensed operation as an employment agency in violation of GBL § 172, and related excessive and illegal commissions in violation of GBL § 185; (15) whether equitable and injunctive relief for the Class is warranted; (16) the resulting total amount of unpaid wages to be awarded; (17) the resulting total amount of illegal deductions to be awarded; (18) the resulting total amount of liquidated damages to be awarded; and (18) the resulting amount of accrued interest.

108.    The Representative Plaintiff's claims are typical of the claims of the Class.  Plaintiff and the Fit Model Class were subject to the same or very similar compensation policies and practices and have sustained the same or similar types of damages as a result of Defendants' violations of the NYLL.

109.    The Representative Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in complex class actions, wage and hour litigation, independent contractor misclassification, and the intersections thereof.

110.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Class, making declaratory and/or injunctive relief appropriate with respect to Plaintiff and the Class as a whole.  The Class members are entitled to injunctive relief as to Defendants' misclassification of the Fit Model Class and resulting wage and hour violations.

111.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the Class have been injured and are entitled to recovery as a result of common illegal practices.

112.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(c)(4) because the resolution of additional common issues would reduce the range of issues in dispute and promote judicial

economy.  Resolution of whether Defendants are liable pursuant to the NYLL, in the first instance, would reduce the range of issues in dispute and promote judicial economy by initially determining whether any remedial damages proceedings are required at all.  Similarly, resolution of any one of the issues referenced above, even where such issue(s) are not appropriate for resolution pursuant to Fed. R. Civ. P. 23(b)(3), would nonetheless reduce the range of issues in dispute and promote judicial economy if resolved as an issues class pursuant to Fed. R. Civ. P. 23(c)(4).

113.    The members of the Class have been injured and are entitled to damages, necessitating the resolution of common issues regarding the calculation of class damages.

## PLAINTIFF'S FACTUAL ALLEGATIONS

114.    On or about March 5, 2013, Defendants and Plaintiff signed an employment contract with respect to fit modeling, attached hereto as **Exhibit A**.  The initial term of the agreement was until March 5, 2016, after which the employment contract was subject to potentially indefinite automatic renewals of one-year increments.

115.    Before Plaintiff signed the MSA employment contract, Levine told Plaintiff that MSA Models works with fit models only under an "exclusive" contract.

116.    Defendants hired Plaintiff to perform fit modeling services for Defendants' apparel industry clients.

117.    Levine personally hired and/or approved the hiring of Plaintiff.

118.    Defendants misclassified Plaintiff as an independent contractor.

119.    During her employment by Defendants, Plaintiff was instructed to perform, and in fact performed, approximately 30 go-sees for Defendants' apparel industry clients.  Each of these go-sees lasted approximately one hour (exclusive of travel time).

120.    Defendants did not pay, and have not paid, Plaintiff any wages at all for work performed during at least ten workweeks in which Plaintiff attended a go-see, but did not have a booking with an apparel industry client and/or was not compensated for their work at all, including but not limited to the

following days and workweeks: (1) on April 25, 2013, during the workweek of April 21, 2013, Plaintiff attended a go-see with Hanes for approximately one hour, but was not paid any wages for attending the go-see, and was not otherwise paid any wages for this workweek, resulting in a minimum wage violation for this week of approximately $7.25 under the FLSA, and $7.25 under the NYLL; (2) on May 14, 2013, during the workweek of May 12, 2013, Plaintiff attended a go-see with Kazu for approximately one hour, but was not paid any wages for attending the go-see, and was not otherwise paid any wages for this workweek, resulting in a minimum wage violation for this week of approximately $7.25 under the FLSA, and $7.25 under the NYLL; (3) on May 20, 2013, during the workweek of May 19, 2013, Plaintiff attended a go-see with TKO for approximately one hour, but was not paid any wages for attending the go-see, and was not otherwise paid any wages for this workweek, resulting in a minimum wage violation for this week of approximately $7.25 under the FLSA, and $7.25 under the NYLL; (4) on June 25, 2013, during the workweek of June 23, 2013, Plaintiff attended a go-see with Kohl's for approximately one hour and JC Penney for approximately one hour, but was not paid any wages for attending these go-sees, and was not otherwise paid any wages for this workweek, resulting in a minimum wage violation for this week of approximately $14.50 under the FLSA, and $14.50 under the NYLL; (5) on July 1, 2013, during the workweek of June 30, 2013, Plaintiff attended a go-see with Carole Hochman for approximately one hour, but was not paid any wages for attending this go-see, and was not otherwise paid any wages for this workweek, resulting in a minimum wage violation for this week of approximately $7.25 under the FLSA, and $7.25 under the NYLL; (6) on September 20, 2013, during the workweek of September 15, 2013, Plaintiff attended a go-see with Ann Taylor for approximately one hour, but was not paid any wages for attending this go-see, and was not otherwise paid any wages for this workweek, resulting in a minimum wage violation for this week of approximately $7.25 under the FLSA, and $7.25 under the NYLL; and (7) on September 23, 2013, during the workweek of September 22, 2013, Plaintiff attended a go-see with QVC for approximately one hour, but was not paid any wages for attending this go-see, and was not otherwise paid any wages

for this workweek, resulting in a minimum wage violation for this week of approximately $7.25 under the FLSA, and $7.25 under the NYLL.

121.   Plaintiff was not paid any wages at all and/or the minimum wage during the above workweeks for time spent performing fit modeling services on go-sees.

122.   Levine required Plaintiff to meet with her in person at MSA at least bi-weekly.  These meetings, including time spent waiting for Levine, lasted approximately half an hour.  During these meetings, which were not voluntary, Levine inspected Plaintiff's size and/or appearance.

123.   Defendants did not pay, and have not paid, Plaintiff any wages at all for work performed during at least ten workweeks in which Plaintiff attended a required in-person meeting with Levine, but did not have a booking with an apparel industry client and/or was not compensated for her work at all, including but not limited to the following days and workweeks: (1) Plaintiff was not paid the FLSA minimum wage of $7.25 or the NYLL minimum wage of $7.25 for attendance at a required in-person meeting with Levine that occurred on June 24, 2013 or June 25, 2013, during the workweek of June 23, 2013; and (2) Plaintiff was not paid the FLSA minimum wage of $7.25 or the NYLL minimum wage of $7.25 for minimum wage for attendance at a required in-person meeting with Levine that occurred on July 1, 2013 or July 2, 2013, during the workweek of June 30, 2013.

124.   Upon information and belief, Plaintiff was also not paid the minimum wage during the following workweeks because she received no compensation for attendance for approximately half an hour spent at a required in-person meeting with Levine, in each case resulting in a minimum wage violation of approximately $3.625 under the FLSA, and $3.625 under the NYLL: (1) April 7, 2013; (2) April 14, 2013; (3) April 21, 2013; (4) April 28, 2013; (5) May 5, 2013; (6) May 12, 2013; (7) May 19, 2013; (8) May 26, 2013; (9) June 2, 2013; (10) June 9, 2013; (11) June 16, 2013; (12) June 23, 2013; (13) June 30, 2013; (14) July 14, 2013; (15) July 21, 2013; (16) August 4, 2013; (17) August 18, 2013; (18) August 25, 2013; (19) September 15, 2013; (20) and/or October 6, 2013.

125.   Defendants made significant deductions from Plaintiff's wages, including for

Defendants' asserted right to deduct 20%-40% of MSA fit models' wages as a "commission" and/or "service charge."

126.    The employment contract Defendants required Plaintiff to sign to work for MSA Models purports to require agreement with the legal conclusion that MSA is "not an employment agency" and/or "not a theatrical employment agency."

127.    The employment contract Defendants required Plaintiff to sign to work for MSA Models purports to require agreement with the legal conclusion that Plaintiff was and/or is an independent contractor.

128.    Defendants required Plaintiff to comply with the policies, practices, and/procedures described below.

129.    Plaintiff frequently communicated with MSA bookers each day regarding the scheduling of go-sees and bookings.

130.    Defendants deducted 35% of Plaintiff's wages from the provision of fit modeling services to apparel industry client QVC and/or Defendants, which deductions exceeded $9,000.

131.    Defendants deducted 20% of Plaintiff's wages from the provision of fit modeling services to designer client Carole Hochman and/or Defendants, which deductions exceeded $440.

132.    Defendants also charged apparel industry client Carole Hochman a 20% "service fee." This fee, although ostensibly a charge to Carole Hochman was, upon information and belief, taken as an additional deduction against Plaintiff's wages from the provision of fit modeling services to Carole Hochman, which deductions exceeded $440.

133.    Plaintiff typically worked for QVC on a semi-regular schedule of approximately 9:00 am to 4:00 pm Wednesdays and Thursdays, and 9:00 am to 2:30 pm Fridays, from approximately October 2013 through June 2014.

134.    Plaintiff typically worked for Carole Hochman on a semi-regular schedule of every other Tuesday, for one hour, from approximately September 2013 through March 2014.

135.    Plaintiff's employment contract states that MSA will maintain a "reserve account" funded by deductions of 20% from Plaintiff's wages.  The deductions were deposited in a non-interest bearing "reserve" account controlled by MSA, up to a balance of $5,000 at any time, for, *inter alia*, payment of commissions due to MSA and payment of other monies due to MSA.

136.    Defendants have also illegally deducted Plaintiff's wages by withholding at least $17,946.41 of Plaintiff's wages as liquidated damages and/or a "security," despite NYLL providing no provision for such deductions.

137.    Defendants' above-described deductions to Plaintiff's wages were not for the benefit of Plaintiff.

138.    MSA failed to pay Plaintiff promptly within the meaning of the FLSA, which resulted in Plaintiff receiving less than the federal minimum wage throughout her employment with MSA.

139.    Defendants frequently paid Plaintiff at least one month after she earned her wages including, but not limited to the following: (1) payment for 16 hours of fit modeling services during the workweek of January 18, 2014 was paid by check dated February 26, 2014; (2) payment for one hour of fit modeling services during the workweek of November 17, 2013 was paid by check dated February 24, 2014; (3) payment for two hours of fit modeling services during the workweek of November 10, 2013 was paid by check dated February 24, 2014; (4) payment for seven and a half hours of fit modeling services during the workweek of October 27, 2013 was paid by check dated February 24, 2014; (5) payment for seven and a half hours of fit modeling services during the workweek of October 27, 2013 was paid by check dated February 24, 2014; (6) payment for twenty-one and a half hours of fit modeling services during the workweek of December 15, 2013 was paid by check dated January 29, 2014; (7) payment for nineteen hours of fit modeling services during the workweek of December 8, 2013 was paid by check dated January 29, 2014; (8) payment for nine hours of fit modeling services during the workweek of November 24, 2013 was paid by check dated January 29, 2014; (9) payment for twenty-three hours of fit modeling services during the workweek of November 3, 2013 was paid by check dated

January 29, 2014; (10) payment for one hour of fit modeling services during the workweek of August

11, 2013 was paid by check dated October 23, 2013; (11) payment for one hour of fit modeling services

during the workweek of September 1, 2013 was paid by check dated October 23, 2013; and (12)

payment for one hour of fit modeling services during the workweek of September 8, 2013 was paid by

check dated October 23, 2013.

140.    The above-referenced payments were not paid promptly as required by the FLSA, and

each such late payment was a minimum wage violation resulting in liquidated damages of $7.25 for each

hour of work.

141.    As a result of these late payments, which were not prompt within the meaning of the

FLSA, and despite providing approximately seventy hours of fit services for Defendants during this time

period, Plaintiff received no wages at all for this work from approximately November 20, 2013 through

January 29, 2014, which resulted in Plaintiff receiving less than the minimum wage and/or non-prompt

payment for her work during these months and workweeks.

142.    During June 2014, Plaintiff found an advertisement on LinkedIn for an In-House Fit

Model/Administrative Assistant position with Cache.

143.    Plaintiff applied to the position during June 2014 without the assistance or involvement

of MSA Models.

144.    Plaintiff was offered and accepted the position with Cache during June 2014.

145.    On June 30, 2014, Defendants sent Plaintiff correspondence demanding payment of

"commissions" of 20% on all of Plaintiff's wages associated with fit modeling with Cache, or any other

apparel industry client, through March 2016.  The letter referenced MSA's position that it was

exercising its "exclusive rights" under the MSA employment contract.  Defendants' demand for

payment of these commissions was in violation of GBL § 185 because it exceeded the 10% cap and the

requirement that any commission be the result of Defendants assisting Plaintiff in obtaining the related

employment with Cache and/or additional apparel industry clients imposed by GBL § 185.

146.    MSA Models' correspondence further stated that Defendants were withholding $17,946.41 in Plaintiff's earned wages for work performed between April through June 2014.  Such withholding violated the earned wages payment requirement of NYLL § 191 and the deductions prohibition of NYLL § 193.

147.    In addition, Defendants withholding of these wages has resulted in Defendants failing to pay Plaintiff any wages at all (inclusive of failure to pay minimum wages), for over two hundred hours of fit modeling services performed between April 2, 2014 through June 2014, resulting in a minimum wage violation of at least $1,500 under the FLSA and $1,600 under the NYLL.

### CLASS-WIDE AND COLLECTIVE-WIDE FACTUAL ALLEGATIONS

148.    At all times relevant, Defendants have uniformly misclassified Plaintiff and the members of the Fit Model Collective and Fit Model Class as independent contractors.

149.    At all times relevant, Defendants have exerted substantial control over Plaintiff and the members of the Fit Model Collective and Fit Model Class.

150.    At all times relevant, Defendants have controlled Plaintiff, and the members of the Fit Model Collective and the Fit Model Class', terms and conditions of employment.

151.    At all times relevant, Defendants have imposed numerous rules, policies, practices, procedures, and/or requirements that Plaintiff and the members of the Fit Model Collective and Fit Model Class must comply with, or face sanction, including, but not limited to: (1) prohibiting them from discussing their compensation or other terms and conditions of their employment with MSA Models' apparel industry clients; (2) limiting them to a maximum of three fittings during go-sees; (3) requiring them to attend at least bi-weekly-in person meetings (*i.e.* fit inspections) with Levine; (4) requiring them to be available to attend go-sees on a few hours' notice; (5) penalizing those who turn down go-sees; (6) penalizing those who turn down bookings; (7) requiring them to request vacation; (8) requiring them to limit vacations or periods of unavailability to one or two weeks; (9) requiring them to at all times maintain their sizes; (10) requiring them to keep and not re-schedule go-sees and bookings; (11)

penalizing them if they are late to a go-see or booking; (12) requiring them to call or otherwise contact Defendants if they cannot work because of illness or personal reasons, at which point Defendants contact the apparel industry client to identify a replacement fit model (the originally-scheduled model is not permitted to arrange for her own replacement); (13) requiring them to utilize a voucher payment system and submit vouchers to receive their wages; (14) requiring them to be classified as independent contractors; (15) requiring them to refer all inquiries for employment to MSA; (16) requiring MSA to negotiate the fit model's rate of pay with apparel industry clients; (17) prohibiting them from discussing their rate of pay and other terms and conditions of employment with apparel industry clients (i.e. "talk business" with clients); (18) requiring them to pick up their checks in-person at MSA's NYC office; (19) requiring them to maintain, gain, and/or lose weight as instructed by MSA or face sanction; (20) requiring them to pay MSA's commissions through an illegal deduction from their wages; (21) requiring them to use MSA's strict template for comp cards (*i.e.* portfolios); (22) prohibiting them from using personal business cards regarding fit modeling and otherwise prohibiting them from directly providing contact information to potential apparel industry clients; (23) intentionally omitting fit model contact information from the MSA website so as to require apparel industry clients to contact MSA regarding engagement with Plaintiff or any Collective or Class member; (24) requiring that they stop working with an apparel industry client if they stopped working with MSA, and thereafter, prohibiting them from working with such clients without the permission of MSA and/or payment of commission to MSA; (25) requiring them to agree to MSA's maintenance of a non-interest-bearing costs account from which MSA could deduct any monies it deemed it was owed at any time; (26) contractually requiring them to "use their best efforts to further their career"; (27) contractually requiring them to "conduct themselves professionally" when providing fit modeling services to apparel industry clients; (28) requiring that they sign "exclusive" contracts prohibiting them from working as fit models with other modeling agencies; (29) prohibiting them from working with apparel industry clients without Defendants' permission and/or involvement; (30) requiring payment of a 20% commission from their wages even where they obtained

fit modeling work without any assistance from MSA; and (31) controlling whether and when Plaintiff or another specific Collective or Class member's services were offered to a specific apparel industry client; (32) controlling and coordinating their schedules regarding go-sees and bookings on a daily basis; and (33) requiring frequent communications with MSA bookers regarding go-sees and bookings.

152.    At all times relevant, Defendants have had the power to hire MSA fit models.

153.    At all times relevant, upon information and belief, Levine personally hired and/or approved the hiring of each member of the Fit Model Class.

154.    At all times relevant, Defendants have had the power to fire (and/or constructively discharge) MSA fit models.

155.    At all times relevant, Defendants have selected which MSA fit models' information to send to a particular apparel industry client, which fit models it would attempt to obtain go-sees and/or bookings for, and/or which MSA fit models to send to a particular go-see and/or apparel industry client, and when.

156.    At all times relevant, Defendants have scheduled and/or coordinated MSA fit models' work schedules through Defendants' booking staff, which staff frequently (often several times a day) communicate with MSA fit models concerning, *inter alia*, the scheduling of go-sees and bookings.

157.    At all times relevant, Levine has required MSA models to be available to meet in-person at the MSA Models office in New York City upon her request, and in any case, to meet in-person at least bi-weekly at the MSA Models office.

158.    At all times relevant, Defendants directly paid MSA fit models their wages, or portions thereof.

159.    At all times relevant, Defendants set the method of payment for MSA fit models by requiring use of the MSA voucher system for models to obtain payment of their earned wages.

160.    At all times relevant, Defendants set the rate of pay for MSA fit models by directly negotiating their rate of pay for fit model work with apparel industry clients.

161.    At all times relevant, Defendants set the rate of pay for MSA fit models by imposing a 20%-40% deduction on their wages as a "commission" to MSA Models.

162.    At all times relevant, Defendants also determined the rate and/or method of payment of MSA fit models by unilaterally misclassifying all MSA fit models as independent contractors not subject to minimum wage and overtime laws, or to protections from illegal deductions.

163.    At all times relevant, Defendants directly invoiced apparel industry clients for MSA fit models' services.

164.    At all times relevant, apparel industry clients contacted Defendants, not MSA fit models, with all or most complaints regarding the performance of MSA fit models.

165.    At all times relevant, Defendants required MSA fit models to sign "exclusive" multi-year contracts, which automatically renew, potentially indefinitely.

166.    At all times relevant, Defendants strictly prohibited MSA fit models from working with other modeling agencies as fit models during the multi-year terms of their employment contracts.

167.    Defendants' vouchers contain a signature line for signature by the apparel industry client as "employer."

168.    At all times relevant, MSA fit models were not permitted to and/or were discouraged from soliciting fit modeling work on their own.  In addition, if they did so, Defendants threatened or pursued litigation and/or required payment of (at least) a 20% "commission" from their wages from such work, even where Defendants had no involvement in obtaining the relevant employment.  At all times relevant, MSA has also maintained it is entitled to an additional 20% "service charge" from the wages of the fit model and/or from the apparel industry client even where it had no involvement in arranging the model's employment with that client.

169.    At all times relevant, Defendants have vigorously sought to enforce their interpretation of the MSA employment contract against MSA fit models by threatening litigation and pursuing litigation against fit models Defendants contend owe MSA Models a "commission" on their wages under the

MSA contract, and/or MSA fit models performing fit modeling services without MSA's permission.

170.    At all times relevant, MSA fit models have not had significant opportunities for profit or loss and/or the chance to invest in their own businesses.

171.    At all times relevant, MSA fit models have been more akin to wage earners toiling for a living than independent entrepreneurs seeking a return on risky capital investments.

172.    At all times relevant, Defendants have restricted MSA fit models from acting like independent business people by, *inter alia*, prohibiting them from: (1) working for more than one modeling agency as fit models; (2) performing fit modeling services for an apparel industry client without MSA's permission; and/or (3) obtaining employment without a 20%-40% "commission" to MSA from their wages from fit modeling work, in violation of GBL § 185.

173.    At all times relevant, MSA fit models' employment prospects have been controlled largely by Defendants' decisions concerning which fit models to promote to which apparel industry clients, which fit models to send to which apparel industry client, and the "go-sees" that Defendants schedule, attempt to schedule, and/or decline to schedule for each fit model, and not on MSA fit models' own initiative.

174.    At all times relevant, Defendants controlled all advertising for Plaintiff and fit models' services.

175.    At all times relevant, if Defendants decided not to provide a fit model's information to apparel industry clients, that decision exerted substantial, if not total, control over whether the fit model would attend go-sees with apparel industry clients and/or the volume of go-sees they receive with apparel industry clients.

176.    Defendants' advertisements for fit modeling with MSA state no prior experience is necessary to become a fit model with MSA Models.

177.    Defendants permit the fit models it hires with no prior fit modeling experience to begin working for apparel industry clients after a few weeks of training.

27

178.    At all times relevant, MSA fit models have been integral to Defendants' business.

179.    Upon information and belief, at all times relevant, the majority of MSA's revenues have been obtained through the work of MSA's fit models.

180.    Upon information and belief, at all times relevant MSA Models has not obtained revenue through any means other than "commissions," "service fees," and/or usage fees associated with its models and/or fit models.

181.    At all times relevant, Defendants have imposed appearance and figure standards on all MSA fit models.  MSA fit models are expected to maintain their proportions and appearance, which policy has been enforced by Levine during bi-weekly in-person inspections of MSA fit models at MSA Models' New York City office.

182.    Defendants' employment contract requires MSA fit models to "at all times perform [fit modeling] services to clients in a professional manner."

183.    Defendants' employment contract requires MSA fit models to "use [their] best efforts to further [their] career in the [fit model field]."

184.    Defendants' employment contract requires MSA fit models to "seek MSA's counsel regarding all matters concerning Model's endeavors in [fit modeling]."

185.    Defendants' employment contract requires MSA fit models to "advise MSA of all offers of employment submitted to the model" with respect to fit modeling.

186.    Defendants' employment contract requires MSA fit models to "refer any inquiries regarding the model's services to MSA."

187.    At all times relevant, Defendants have maintained employment records through their voucher payment system and related records concerning hours worked and rates of pay for bookings. Upon information and belief, Defendants do not maintain complete records regarding MSA fit models' attendance at go-sees, and have not maintained records regarding required bi-weekly in-person meetings with Levine, neither of which required vouchers because they were unpaid.  In the alternative,

Defendants have maintained such records.

188.    At all times relevant, Defendants have required MSA fit models to use the MSA composite card (collection of photos) to show the model's portfolio of pictures. A composite card is a model's equivalent of a business card.

189.    At all times relevant, Defendants have prohibited MSA fit models from using any composite cards other than MSA's composite card and/or otherwise prohibited the use of business cards regarding their fit modeling work.

190.    At all times relevant, MSA models have performed a discrete line-job integral to Defendants' business by providing fit modeling services, the focus of Defendants' "premiere" business.

191.    At all times relevant, MSA models have been tied by their employment contract to MSA rather than to apparel industry clients.

192.    At all times relevant, when an MSA fit model's employment contract with Defendants terminated, MSA maintained that the fit model's relationship with the apparel industry clients for whom they were providing fit modeling services automatically terminated. Defendants have not allowed fit models to continue working with such apparel industry clients after their contract terminates without Defendants' permission and/or payment of a 20% commission to Defendants from the fit model's wages. MSA models that defied MSA's rules have been threatened with and/or pursued in litigation.

193.    At all times relevant, Defendants have controlled and/or supervised MSA fit models' work through the implementation and enforcement of formal and informal policies as described above.

194.    Under the FLSA and the NYLL more than one employer may be responsible for the failure to pay wages.

195.    At all times relevant, Defendants have been joint employers of MSA fit models within the meaning of the FLSA and NYLL: they (1) had the power to fire and hire Plaintiff and the members of the Fit Model Class and the Fit Model Collective; (2) supervised and controlled the schedules and conditions of employment of Plaintiff and the members of the Fit Model Class and the Fit Model

Collective; (3) determined the rate and method of payment of Plaintiff and the members of the Fit Model Class and the Fit Model Collective; and (4) maintained employment records of Plaintiff and the members of the Fit Model Class and the Fit Model Collective, with respect to, *inter alia*, their rates of pay, hours worked, and deductions from wages.

196.    At all times relevant, Defendants have established and applied eligibility criteria, including appearance criteria, for hiring MSA fit models.

197.    At all times relevant, Defendants have had the power to fire and/or constructively discharge MSA fit models by declining to renew their contracts, terminating their contracts (under its terms) based on a model's alleged breach of the MSA contract, directing MSA personnel to stop attempting to book them on go-sees, and/or removing them from MSA's website (also known as "the board").

198.    At all times relevant, Defendants also had the power to hire, fire, and/or reassign all MSA staff, including MSA fit models' bookers, which could affect the conditions of employment of MSA fit models by, *inter alia*, affecting whether and how often they were promoted to apparel industry clients, scheduled for go-sees, and/or booked for work, as well as how much they earned.

199.    At all times relevant, MSA fit models did not work at their own convenience, but instead were expected by MSA to be available for go-sees at all times during business hours, and frequently on only a few hours' notice.

200.    At all times relevant, MSA fit models were not free to engage in other employment as fit models because Defendants prohibited them from working as fit models with other modeling agencies. Similarly, MSA fit models were not free to engage in other employment because Defendants prohibited them from working for apparel industry clients after the termination of the model's contract without the permission of MSA and/or payment of a 20% commission.

201.    At all times relevant, Defendants' requirement that MSA models be available for go-sees at all times during business hours severely restricted the types of additional non-modeling employment

available to MSA fit models, frequently limiting such work to part-time work, night-work, and/or weekend-work.

202.    At all times relevant, MSA fit models were on Defendants' payroll and/or were on Defendants' payroll to the extent permitted by their misclassification as independent contractors.

203.    MSA fit models that were booked for fit modeling work following a go-see typically worked on a semi-fixed schedule with an apparel industry client.

204.    Upon information and belief, MSA has a policy or practice of not paying MSA fit models promptly, within the meaning of the FLSA, inclusive of paying such models more than a month after they performed fit modeling work, which has resulted in Plaintiff and similarly situated MSA fit models receiving less than the federal minimum wage.

205.    Upon information and belief, MSA has a policy or practice of failing to pay MSA fit models for all wages earned.

206.    Upon information and belief, Defendants have still not paid members of the Fit Model Class and Fit Model Collective hundreds of thousands, if not millions, of dollars in earned wages.

207.    Upon information and belief, Defendants have a policy and/or practice of paying overdue wages only when MSA fit models complain about underpayments.

208.    Upon information and belief, the delays in payment of wages to Plaintiff, and similarly situated fit models, were intentional and increased Defendants' profits through additional accrued interest to Defendants (*i.e.* "the float"), and/or because these delays in payment otherwise financially benefited Defendants.

209.    Upon information and belief, Defendants' non-payment of earned wages to MSA's fit models was intentional, and financially benefited Defendants, by permitting Defendants to obtain payment for the full value of its models' services from apparel industry clients at no cost to MSA.

210.    There is no reasonable business justification for Defendants' substantial delays in paying wages and/or non-payment of wages to Plaintiff and similarly situated MSA fit models.

211.    Defendants use several mechanisms to enforce compliance with their above-described rules, policies, practices, procedures, and/or requirements, and/or to sanction those MSA fit models that do not comply, including but not limited to threatening, and in some instances, they would in fact: (1) stop attempting to book a model on go-sees: (2) prohibit a model from working for a specific apparel industry client; and/or (3) remove the model from MSA's website (*i.e.* the board).

212.    Defendants also use several contractual mechanisms to enforce compliance with Defendants' above-described policies, including but not limited to, the following employment contract provisions, which Defendants use to deter MSA models from leaving MSA or pursuing any dispute with MSA, and to threaten and pursue MSA models when they leave or pursue a dispute with MSA.

213.    MSA's employment contract states: "in the event Model breaches this Agreement or otherwise refuses to fulfill Model's obligations hereunder . . . MSA may at its sole election, (i) retain as liquidated damages *all funds then held and/or subsequently received by MSA on Model's behalf*, or (ii) seek all legal and/or equitable remedies then available to MSA, in which event MSA shall, pending the resolution of MSA's claims, be entitled to hold the funds referred to in the preceding clause (i) as security for any judgment MSA may obtain against Model in connection with such claims." (Emphasis added.)  MSA utilizes this clause to threaten and/or punish MSA fit models that do not comply with its requirements, and/or by actually withholding their wages, leaving these models without any immediate recourse to gain access to their income until they comply with MSA's wishes.

214.    MSA's employment contract states: "Model shall be responsible for paying all reasonable outside attorney's fees' and other collection costs (including, without limitation, any percentage-based and/or other third party fees) incurred by MSA in the enforcement of this agreement and/or its rights and remedies hereunder, whether or not an arbitration or other legal action is initiated or filed."  MSA utilizes this clause to threaten models that do not comply with its requirements, and/or pursue disputes with MSA, with financial ruin.

215.    Article 11 was passed to protect vulnerable workers from unscrupulous employment

agencies, in support of health and public welfare.

216.    MSA is an "employment agency" within the meaning of GBL Article 11, § 171(2).

217.    MSA holds itself out to the public, and to potential MSA fit models, as an organization that, for a fee, will obtain or attempt to obtain employment and/or engagement for models, and whose primary purpose and activities are to obtain employment and/or engagements for models.

218.    Defendants' primary business activity is to, for a fee, obtain and/or attempt to obtain, employment and/or engagements for models.

219.    In addition, or in the alternative, Defendants' primary business activity is to, for a fee, render vocational guidance or counseling services (as explicitly acknowledged in the MSA contract) and directly or indirectly: (1) procure or attempt to procure or represent that they can procure employment or engagements for persons seeking modeling employment or engagements; (2) represent that they have access, or have the capacity to gain access, to modeling jobs not otherwise available to those not purchasing their services; and/or (3) provide information or services purporting to promote, lead to or result in modeling employment for the applicant with any employer other than himself.

220.    To the extent Defendants' services in fact involved the business of managing models, these services have not incidentally involved the seeking of employment for such models.  Instead, the seeking of employment for models has been the primary activity and goal of Defendants' business generally, as well as the focus of the services they have provided to the Fit Model Class.

221.    Defendants employ numerous bookers whose primary, or sole, duty is to obtain go-sees and bookings for MSA fit models with apparel industry clients.  As of 2007, more than 30% of MSA's employees were bookers.

222.    Plaintiff and similarly situated MSA fit models are "artists" within the meaning of GBL § 171(8-a) because they are models.

223.    MSA is not presently licensed, and has not been licensed as an employment agency by the NYC Department of Consumer Affairs since November 2010, as required by GBL § 172.  MSA has

therefore been operating in violation of GBL § 172 as an unlicensed employment agency for more than four years.

224.    The operation of an unlicensed employment agency is a misdemeanor punishable by imprisonment not to exceed one year pursuant to GBL § 190.

225.    Defendants have also, as a matter of course, violated GBL § 185, by charging its models a commission of at least 20% of their wages from modeling employment, regardless of whether Defendants assisted in obtaining the relevant employment.  GBL § 185 imposes a 10% fee cap on the amount of wages that employment agencies, such as Defendants, may charge for obtaining employment.

226.    Upon information and belief, MSA Models has failed to comply with any of the requirements for employment agencies stated in Article 11 of the GBL.

227.    Defendants previously operated as an employment agency from 2001 to November 2010, when MSA surrendered its employment agency license in November 2010.

228.    Because the MSA employment contract violates the licensing requirement of GBL § 172, as compounded by Defendants additional violation of GBL § 185 by charging a 20% commission against models' wages, Defendants may not prospectively enforce their contractual right to commissions above the 10% amount permitted by GBL § 185.

229.    Such non-enforcement is not out of proportion to the requirements of public policy or appropriate individual punishment, and the public interest in the enforcement of MSA's illegal contract for commissions is clearly outweighed by the public policy behind GBL § 185.  This is particularly so given MSA's previous acknowledgment that its operations required an employment agency license until November 2010.

230.    Defendants have a policy and/or practice of deducting wages and/or charging MSA fit models commissions higher than the 10% fee described in GBL § 185 (for class C employees).

231.    Defendants have a policy and/or practice of charging its apparel industry clients commissions above the 10% fee permitted by GBL § 185.

34

232.    Defendants have a policy and/or practice of making illegal deductions of "commissions," contractual liquidated damages, and/or a contractual "security" from MSA fit models' wages in violation of NYLL § 193.  These illegal policies and practices are explicitly stated in Plaintiff's, and upon information and belief, similarly situated MSA fit models', MSA employment contracts.

233.    Defendants' deductions from Plaintiff's and similarly situated MSA fit models' wages were not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency.

234.    In the alternative, to the extent GBL § 185 authorizes deductions of commissions from Plaintiff and similarly situated MSA fit models' wages, Defendants have deducted more than the 10% fee authorized by GBL § 185(8), and/or deducted such fees from wages related to employment Defendants did not assist the fit model in obtaining, and all deductions of commissions above the 10% amount permitted by GBL § 185 have been violations of NYLL § 193.

235.    Defendants' deductions of commissions from MSA fit models' wages were not for the benefit of Plaintiff or similarly situated MSA fit models.

236.    Defendants' deductions of contractual "liquidated damages" and/or contractual "security" were not for the benefit of Plaintiff or similarly situated MSA fit models.

237.    Defendants' deductions of its commissions were, *inter alia*, for the purpose of paying Defendants' administrative costs, which is explicitly prohibited by NYLL § 193 and supporting New York State Department of Labor Regulations.

238.    The provision in Defendants' employment contract for the authorization of deductions from MSA fit models' wages was not entered into voluntarily, within the meaning of NYLL § 193(1)(b) and related regulations, by Plaintiff and similarly situated fit models.

239.    Defendants' deductions for any and all "expenses," as described in the MSA employment contract, is not authorized by NYLL § 193 and supporting New York State Department of Labor Regulations.

240.    Defendants' use of a non-interest-bearing "reserve account," as described above, is an unlawful deduction from wages prohibited by NYLL § 193, and supporting New York State Department of Labor Regulations.

241.    The MSA employment contract Plaintiff signed and, upon information and belief, those signed by the Fit Model Class, explicitly describe and/or refer to the above-referenced wage deductions related to the "reserve account" as "deductions."

242.    Defendants have also deducted wages in violation of NYLL § 193 by taking Plaintiff, and similarly situated MSA fit models' wages, based on the MSA employment contracts' liquidated damages and "security" provisions.  The withholding of Plaintiff and the Fit Model Class' earned wages based on these contractual provisions are illegal deductions that are not authorized by NYLL § 193.

243.    Upon information and belief, Defendants failed to make, keep, and preserve complete and/or accurate records with respect to Plaintiff and the members of the Fit Model Collective, as to workweeks, hours spent during required in-person meetings with Levine, and/or hours spent at go-sees, resulting in incomplete records of all hours worked each workday and all hours worked each workweek, as required by the FLSA at 29 U.S.C. § 211(c), and supporting federal regulations.  In the alternative, Defendants have maintain such records.

244.    Upon information and belief, Defendants failed to make, keep, and preserve accurate and/or complete records with respect to Plaintiff and the members of the Fit Model Class, as to workweeks, hours spent during required in-person meetings with Levine, and/or hours spent at go-sees, resulting in incomplete records of all hours worked each workday and all hours worked each workweek, as required by NYLL § 650 *et seq*., and supporting regulations.  In the alternative, Defendants have maintained such records.

245.    Defendants have had and have a widespread pattern, policy, and/or practice of failing to provide Plaintiff and the Fit Model Class the notice required by NYLL § 195(1) and/or the Guidelines Regarding Notice and Acknowledgement of Wage Rate/Temporary Help Firms.

36

246.    Upon information and belief, Defendants are a "temporary help firm" within the meaning of NYLL § 916(5).

247.    Defendants did not inform Plaintiff, or the members of the Fit Model Class, in writing, at the time of the initial interview and/or hire, of: (1) the range of hourly wages he or she would likely earn based upon his/her qualifications and assignment suitability, based on a good faith, non-overbroad estimate of the typical wage earned by similarly qualified employees working at assignments similar to those for which the applicant-employee was eligible and likely to be assigned; (2) the designated pay day and/or notice that the pay day may vary depending upon the usual practice at the assignment; and/or (3) the employee's rights, in general, to overtime compensation.

248.    Defendants did not provide Plaintiff, or the members of the Fit Model Class, with the Department of Labor "Notice and Acknowledgement of Wage Rate(s)/Temporary Help Firms" form (LS 51) and/or other notice required by NYLL § 195(1).

249.    Defendants did not obtain the signature of Plaintiff, or, upon information and belief, of the members of the Fit Model Class, on form LS 51 and/or other notice required by NYLL § 195(1).

250.    Defendants did not provide Plaintiff, or the members of the Fit Model Class, a copy of the signed Notice and Acknowledgement of Wage Rate(s)/Temporary Help Firms (LS 51) and/or other notice required by NYLL § 195(1), or keep the original signed form in Defendants' files.

251.    Defendants failed to notify Plaintiff and the members of the Fit Model Class, orally or in writing, at the time they were booked with an apparel industry client, of: (1) the specific designated pay day for the particular assignment; and/or (2) the overtime rate of pay he or she would receive; or, if applicable, inform Plaintiff and the members of the Fit Model Class that the position is exempt from additional overtime compensation and the basis for the overtime exemption.

252.    Defendants did not establish, maintain and preserve, for not less than six years, the original signed copy of the form Notice and Acknowledgement of Wage Rate(s)/Temporary Help Firms (LS 51) and/or other notice required by NYLL § 195(1) and/or the Guidelines Regarding Notice and

37

Acknowledgement of Wage Rate/Temporary Help Firms.

253.    Defendants have also had a widespread pattern, policy, and/or practice of failing to

comply with the payment notice requirements of NYLL § 195(3) and/or the Guidelines Regarding

Notice and Acknowledgement of Wage Rate/Temporary Help Firms, by failing to provide Plaintiff and

the members of the Fit Model Class with a statement, along with each paycheck, listing the number of

hours worked reflected in the wages contained in the paycheck, and/or the regular and overtime wage

rate paid for the hours worked for each go-see, booking, and/or fit modeling assignment.

254.    In the alternative, if Defendants are not a "temporary help firm" within the meaning of

NYLL § 916(5), Defendants have had a widespread pattern, policy, and/or practice of failing to comply

with the payment notice requirements of NYLL § 195(3), because the wage statements Defendants

provided with paychecks have failed to describe: (1) the dates of work covered by each payment of

wages; (2) rate or rates of pay and basis thereof; (3) accurate gross wages; and/or (4) deductions from

Plaintiff and the members of Fit Model Class' wages.  Similarly, if Defendants are not a "temporary

help firm" within the meaning of NYLL § 916(5), they have had a widespread pattern, policy, and/or

practice of failing to comply with the payment notice requirements of NYLL § 195(1) by failing to

provide Plaintiff and the members of the Fit Model Class with notice of the regular pay date designated

by the employer, in accordance with NYLL 191.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act – Minimum Wages**
**(Brought on behalf of Plaintiff and the Members of the Fit Model Collective)**

255.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding

paragraphs.

256.    At all times relevant, Plaintiff and the members of the Fit Model Collective were

employed and/or jointly employed by Defendants within the meaning of the FLSA.

257.    At all times relevant, Defendants have had a widespread pattern, policy, and/or practice

of violating the FLSA, as detailed in this Class and Collective Action Complaint, including

misclassifying Plaintiff and the members of the Fit Model Collective as independent contractors, and

failing to pay them the minimum wage for all hours Defendants suffered or permitted them to work,

inclusive of a policy or practice of not paying for time spent performing fit modeling services on go-sees

and/or attending in-person meetings with Levine, which failures resulted in minimum wage violations

for time spent on go-see and meetings with Levine, during workweeks when such fit models did not

have a booking with an apparel industry client, and/or did not otherwise receive payment from

Defendants for any other work.

258.    The minimum wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq*., and the

supporting federal regulations, apply to Defendants and protect Plaintiff and the members of the Fit

Model Collective.

259.    At all times relevant, Defendants failed or refused to pay Plaintiff and the members of the

Fit Model Collective at a rate equal to or greater than the federal minimum wage for all weeks worked,

which violated the FLSA.  29 U.S.C. § 206.

260.    At all times relevant, Plaintiff and the members of the Fit Model Collective were engaged

in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(b)

and 206.

261.    At all times relevant, Defendants have been employers engaged in commerce and/or the

production of goods for commerce within the meaning of 29 U.S.C. §§ 203(b), (d), 206.

262.    At all times relevant, Plaintiff and the members of the Fit Model Collective were

employees within the meaning of the FLSA, including 29 U.S.C. § 203(e).

263.    Defendants have failed to pay Plaintiff and the members of the Fit Model Collective the

minimum wages to which they were entitled under the FLSA.

264.    Defendants have not made a good faith effort to comply with the FLSA with respect to

their compensation of Plaintiff and the members of the Fit Model Collective and/or their non-

compliance has been willful.

265.    As a result of the unlawful acts of Defendants, Plaintiff and the members of the Fit Model

Collective have been deprived of minimum wage compensation and other wages in amounts to be

determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment

interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

266.    As a result of Defendants' willful violations of the FLSA, Plaintiff and the members of

the Fit Model Collective have suffered damages by being denied minimum wages in accordance with 29

U.S.C. §§ 201 *et seq*.

267.    The members of the Fit Model Collective are entitled to collectively participate in this

action by choosing to "opt in" and submitting written Consents to Join this action.  29 U.S.C. §216(b).

**SECOND CAUSE OF ACTION**
**Fair Labor Standards Act – Failure to Pay Wages Promptly**
**(Brought on Behalf of Plaintiff and the Members of the Fit Model Collective)**

268.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding

paragraphs.

269.    At all times relevant, Plaintiff and the members of the Fit Model Collective were

employed and/or jointly employed by Defendants within the meaning of the FLSA.

270.    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or

practice of violating the FLSA, as detailed in this Class and Collective Action Complaint, including

misclassifying Plaintiff and the members of the Fit Model Collective as independent contractors and

failing to pay them the minimum wage for all hours Defendants suffered or permitted them to work,

271.    At all times relevant, Plaintiff and the members of the Fit Model Collective were engaged

in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. § 206.

272.    At all times relevant, Defendants have been employers engaged in commerce and/or

production of goods for commerce within the meaning of 29 U.S.C. § 206(a).

273.    The minimum wage provisions set forth in the FLSA, 29 U.S.C. § 201 *et seq*. and the

40

supporting federal regulations, apply to Defendants and protect Plaintiff and the members of the Fit Model Collective.

274.    Defendants failed to pay Plaintiff and the members of the Fit Model Collective promptly after their wages were earned, including failing to pay them any wages within a month of their wages being earned through providing fit modeling services, during numerous workweeks, in violation of the FLSA.  As a result, Plaintiff and the members of the Fit Model Collective were paid less than the minimum wage during these workweeks.

275.    Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiff and the members of the Fit Model Collective and/or their non-compliance has been willful.

276.    As a result of the failure to pay wages promptly, Plaintiff and the members of the Fit Model Collective have suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts and/or liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

277.    The members of the Fit Model Collective are entitled to collectively participate in this action by choosing to "opt in" and submitting written Consents to Join this action.  29 U.S.C. § 216(b).

**THIRD CAUSE OF ACTION**
**New York Labor Law Article 19 – Minimum Wage**
**(Brought on behalf of Plaintiff and the Members of the Fit Model Class)**

278.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

279.    Defendants failed to pay Plaintiff and the members of the Fit Model Class all of the minimum wages to which they are entitled under the NYLL.

280.    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating the NYLL, as detailed in this Class and Collective Action Complaint, including misclassifying Plaintiff and the members of the Fit Model Class as independent contractors, and failing

to pay them the minimum wage for all hours Defendants suffered or permitted them to work, inclusive of a policy or practice of not paying for time spent performing fit modeling services on go-sees and/or attending required in-person meetings with Levine, which failures resulted in minimum wage violations for time spent on go-sees and meetings with Levine, during workweeks when such fit models did not have a booking with an apparel industry client, and/or did not otherwise receive payment from Defendants for any other work.

281.    At all times relevant, Plaintiff and the members of the Fit Model Class have been employees and Defendants have been employers within the meaning of NYLL §§ 190, 651, and 652, and the supporting New York State Department of Labor Regulations.

282.    At all times relevant, the minimum wage provisions of Article 19 of the NYLL, and the supporting New York State Department of Labor Regulations, have applied to Defendants and protected Plaintiff and the members of the Fit Model Class.

283.    At all times relevant, Defendants were required to pay Plaintiff and the members of the Fit Model Class a minimum wage for all hours worked in a workweek at a rate of: (1) $7.25 per hour for all hours worked from July 24, 2009 through December 30, 2013; (3) $8.00 per hour for all hours worked from December 31, 2013 through December 30, 2014; (4) $8.75 per hour for all hours worked from December 31, 2014 to the present under NYLL § 652 and the supporting New York State Department of Labor Regulations.

284.    Within the relevant time period, Defendants failed to pay Plaintiff and members of the Fit Model Class minimum wages for all hours worked to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations.

285.    By Defendants' knowing and/or intentional failure to pay Plaintiff and the members of the Fit Model Class minimum wages for all of the hours they worked, Defendants have willfully violated NYLL § 650 *et. seq.* and the supporting New York State Department of Labor regulations.

286.    Due to Defendants' violations of the NYLL, Plaintiff and the members of the Fit Model

Class are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

### FOURTH CAUSE OF ACTION
### New York Labor Law – Failure to Pay Wages Due
### (Brought on behalf of Plaintiff and the Members of the Fit Model Class)

287.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

288.    At all times relevant, Defendants have been employers and/or joint employers within the meaning of the NYLL.

289.    At all times relevant, Plaintiff and the members of the Fit Model Class have been employees and Defendants have been employers within the meaning of NYLL §§ 190, 651, and 652.

290.    At all times relevant, Plaintiff and the members of the Fit Model Class were "clerical or other workers" or "manual workers" within the meaning of NYLL § 191.

291.    At all times relevant, Plaintiff and the members of the Fit Model Class were entitled to weekly and/or bi-weekly payment of their wages pursuant to NYLL § 191.

292.    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating NYLL § 191, as detailed in this Class and Collective Action Complaint, inclusive of a widespread pattern, policy, and/or practice of failing to pay wages within the time periods required by NYLL § 191.

293.    At all times relevant, Defendants willfully failed to pay Plaintiff and the members of the Fit Model Class all of their wages on a weekly or bi-weekly basis.

294.    By Defendants' knowing and/or intentional failure to pay Plaintiff and the members of the Fit Model Class, Defendants have willfully violated the NYLL and the supporting New York State Department of Labor regulations.

295.    These unpaid earned wages are still due to Plaintiff and the members of the Fit Model Class.

296.    Due to Defendants' violations of the NYLL, Plaintiff and the members of the Fit Model Class are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

**FIFTH CAUSE OF ACTION**
**New York Labor Law – Unlawful Wage Deductions**
**(Brought on behalf of Plaintiff and the Members of the Fit Model Class)**

297.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

298.    At all times relevant, Defendants have been employers and/or joint employers within the meaning of the NYLL.

299.    At all times relevant, Plaintiff and the members of the Fit Model Class have been employees and Defendants have been employers within the meaning of NYLL §§ 190, 651(5), and 652.

300.    The wage deduction provisions of NYLL § 193, and the supporting New York State Department of Labor Regulations, apply to Defendants and protect Plaintiff and the members of the Fit Model Class.

301.    Defendants have willfully and/or intentionally reduced the wages of Plaintiff and the members of the Fit Model Class by making unlawful deductions from their wages.

302.    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating NYLL 193, as detailed in this Class and Collective Action Complaint, inclusive of a widespread pattern, policy, and/or practice of applying illegal deductions to Plaintiff and the members of the Fit Model's Class' wages from fit modeling employment.  Defendants have had a widespread pattern, policy, and/or practice of making deductions to the wages of Plaintiff, and the members of the Fit Model Class, with respect to Defendants' 20% "commission," 20% "service charge," withholding of wages as "liquidated damages" and/or a "security," and/or other expenses asserted by MSA.

303.    Defendants' deductions were not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency.

304.    In the alternative, to the extent GBL § 185 has authorized deductions from the wages of Plaintiff and the members of the Fit Model Class, that authorization was limited to deductions totaling a maximum fee of 10% of models' wages, and deductions above this amount were not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency.

305.    Defendants' deductions for "commissions," "service charges," "liquidated damages" and/or "security," and/or additional payments to Defendants from the wages of Plaintiff and the members of the Fit Model Class, were not for the benefit of Plaintiff and/or the members of the Fit Model Class.

306.    Plaintiff and the members of the Fit Model Class did not receive written notice, at any point, and/or prior to the execution of the initial authorization and/or prior to a deduction being made, of all terms and conditions of the above-described deductions, their benefit(s) to Plaintiff and/or the members of the Fit Model Class, and/or the details of the manner in which deduction(s) would be made, as required by NYLL § 193 and its supporting regulations, 12 NYCRR § 195-4.2, to be an authorized deduction within the meaning of NYLL § 193.

307.    Defendants' deductions for any and all generalized "expenses," as set forth in the MSA employment contract, are not authorized by NYLL § 193 and supporting New York State Department of Labor Regulations.

308.    Some or all of Defendants' deductions for "commissions" were made for the purpose of paying Defendants' administrative costs, which is explicitly prohibited by NYLL § 193 and supporting New York State Department of Labor Regulations.

309.    Defendants' maintenance of a "reserve account," as described above, is an unlawful deduction from wages prohibited by NYLL § 193 and supporting New York State Department of Labor Regulations.

310.    The MSA employment contracts signed by Plaintiff and the members of the Fit Model Class explicitly describe and/or refer to the above-referenced deductions of commissions and other

45

monies from the "reserve account" as "deductions."

311.    Defendants' violations of NYLL § 193, as described herein, have been willful, intentional, and/or not in good faith.

312.    Due to Defendants' violations of the NYLL, Plaintiff and the members of the Fit Model Class are entitled to recover from Defendants deductions from their wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

**SIXTH CAUSE OF ACTION**
**New York Labor Law – Recordkeeping Violations**
**(Brought on behalf of Plaintiff and the Members of the Fit Model Class)**

313.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

314.    Upon information and belief, Defendants failed to make, keep, and preserve accurate and/or complete records with respect to Plaintiff and the members of the Fit Model Class, as to Plaintiff and the members of the Fit Model Class, as to workweeks, hours spent during required in-person meetings with Levine, and/or hours spent at go-sees, for all hours worked each workday and total hours worked each workweek, as required by NYLL § 650 *et seq.*, and supporting regulations.

315.    Defendants have intentionally, willfully, in bad faith, and/or not in good faith failed to supply Plaintiff and the Fit Model Class, and otherwise engaged in a widespread pattern, policy, and/or practice of failing to supply, the notice required by NYLL § 195(1) and/or the New York Department of Labor Guidelines for Notice and Acknowledgment of Wage Rates for Temporary Help Firms at their time of hire and/or on or before February 1 of each subsequent year.

316.    Due to Defendants' violations of NYLL § 195(1), the New York Plaintiffs are entitled to recover from Defendants fifty dollars for each day and/or workweek that the NYLL § 195(1) violations occurred, or continue to occur, up to a total of twenty-five hundred dollars and/or five thousand dollars, as provided for by NYLL § 198(1-b), in addition to reasonable attorneys' fees, costs, and injunctive and declaratory relief.

317.    Defendants have intentionally, willfully, in bad faith, and/or not in good faith failed to supply Plaintiff and the Fit Model Class, and otherwise engaged in a widespread pattern, policy, and/or practice of failing to supply, the notice required by NYLL § 195(3) and/or the Guidelines Regarding Notice and Acknowledgement of Wage Rate/Temporary Help Firms, by failing to provide Plaintiff and the members of the Fit Model Class with a statement, along with each paycheck, listing the number of hours worked reflected in the wages contained in the paycheck, and/or the regular and overtime wage rate paid for the hours worked for each go-see, booking, meeting with Levine, and/or fit modeling assignment.

318.    In the alternative, if Defendants are not a "temporary help firm" within the meaning of NYLL § 916(5), they have intentionally, willfully, in bad faith, and/or not in good faith, and otherwise engaged in a widespread pattern, policy, and/or practice of failing to supply the notice required by NYLL § 195(3), because Defendants' wage statements provided with paychecks have failed to describe: (1) the dates of work covered by each payment of wages; (2) rate or rates of pay and basis thereof; (3) accurate gross wages; and/or (4) deductions from Plaintiff and the members of Fit Model Class' wages, and/or failing to comply with the payment notice requirements of NYLL § 195(1) by failing to provide Plaintiff and the members of the Fit Model Class with notice of the regular pay date designated by the employer, in accordance with NYLL 191.

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment Act – Declaratory Relief**
**(Brought on behalf of Plaintiff and the Members of the Fit Model Class)**

319.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

320.    Defendants have operated as an unlicensed employment agency since November 2010 in violation of GBL § 172.

321.    Defendants' employment contracts with Plaintiff and the members of the Fit Model Class contain a contractual provision entitling Defendants to charge Plaintiff and the members of the Fit

Model Class commissions of (at least) 20% of their wages from fit modeling work, whether or not Defendants assist in obtaining such fit modeling work. This contractual provision explicitly violates GBL § 185.

322.    Since November 2010, during its operation as an unlicensed employment agency, Defendants have charged illegal commissions exceeding the 10% fee permitted by GBL § 185, against the wags of Plaintiff and the members of the Fit Model Class.

323.    Upon information and belief, Defendants intend to continue to enforce their illegal contractual commission provision of (at least) 20%, against Plaintiff and the members of the Fit Model Class, with respect to their wages from fit modeling work, with respect to fit modeling work that occurred during Defendants' unlicensed operation as an employment agency since November 1, 2010, exceeding the 10% fee authorized by GBL § 185.

324.    There is a substantial and continuing controversy between Defendants on the one hand, and Plaintiff and the members of the Fit Model Class on the other, and a declaration of rights is both necessary and appropriate to establish whether, and/or to what extent, Defendants may prospectively enforce the illegal contractual commission provision of their employment contracts, against Plaintiff and the members of the Fit Model Class, with respect to fit modeling work that occurred during Defendants' unlicensed operation as an employment agency since November 1, 2010, exceeding the 10% fee authorized by GBL § 185.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of all other similarly situated persons, seeks the following relief:

A.    That at the earliest possible time, Plaintiff be allowed to give notice of this collective action, or that the Court issue such notice, to the members of the Fit Model Collective, as defined above. Such notice shall inform them that this civil

action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

B.   Unpaid minimum wages, and an additional equal amount as liquidated damages, pursuant to the FLSA and the supporting United States Department of Labor regulations;

C.   Liquidated damages in the amount of unpaid minimum wages that were eventually paid, but not paid promptly within the meaning of the FLSA;

D.   Unpaid minimum wages pursuant to NYLL § 650 and the supporting New York State Department of Labor regulations, and an additional equal amount as liquidated damages, pursuant to NYLL § 663;

E.   Unpaid wages due pursuant to NYLL § 191, and the supporting New York State Department of Labor regulations, and an additional and equal amount as liquidated damages, pursuant to NYLL § 663;

F.   Compensation for unlawful deductions from their wages pursuant to NYLL § 191, and an additional equal amount as liquidated damages, pursuant to NYLL § 663;

G.   Certification of the Fit Model Class set forth above pursuant to Rule 23 of the Federal Rules of Civil Procedure;

H.   Designation of Plaintiff as class representative and counsel of record as Class Counsel;

I.   Pre-judgment interest and post-judgment interest;

J.   Issuance of a declaratory judgment that the practices complained of in this Class and Collective Action Complaint are unlawful under the FLSA;

K.   Issuance of a declaratory judgment that the practices complained of in this Class and Collective Action Complaint are unlawful under the NYLL;

L.    Issuance of a declaratory judgment that Defendants are joint employers pursuant to the FLSA and NYLL;

M.    Issuance of a declaratory judgment that Plaintiff, the Fit Model Collective, and the Fit Model Class are employees within the meaning of the FLSA and NYLL;

N.    Issuance of a declaratory judgment that Defendants violated NYLL § 191 by failing to pay Plaintiff and the members of the Fit Model Class their wages as required by NYLL § 191;

O.    Issuance of a declaratory judgment that all or some categories of Defendants' deductions from the wages of Plaintiff and the members of the Fit Model Class violated NYLL § 193;

P.    Issuance of a declaratory judgment that Defendants are "employment agencies" within the meaning of GBL § 171;

Q.    Issuance of a declaratory judgment that Defendants have operated as unlicensed "employment agencies" in violation of GBL § 172 since November 1, 2010;

R.    Issuance of a declaratory judgment that Defendants have violated GBL § 185 by charging Plaintiff and the members of the Fit Model Class excessive fees above the 10% fee permitted by GBL § 185;

S.    Issuance of a declaratory judgment that, as a result of their unlicensed operation in violation of GBL § 172, and charging of excessive fees in violation of GBL § 185, Defendants may not prospectively enforce their contractual right to commissions, against Plaintiff and/or the members of the Fit Model Class, above the 10% amount permitted by GBL § 185;

T.    Fifty dollars for each day and/or work week that the violations of NYLL §195(1) occurred or continues to occur, up to a total of twenty-five hundred dollars and/or five thousand dollars, as provided for by NYLL § 198(1-b), and/or one hundred

dollars and/or two hundred and fifty dollars, for each workweek that the NYLL §

195(3) violations occurred or continue to occur, up to a total of twenty-five

hundred dollars and/or five thousand dollars, as provided for by NYLL § 198(1-

d);

U.    An injunction requiring Defendants to pay all statutorily required wages pursuant

to the FLSA;

V.    An injunction prohibiting Defendants from continuing their unlawful policies and

practices as described herein;

W.    An injunction requiring Defendants to pay all statutorily required wages pursuant

to the NYLL, and an order enjoining Defendants from continuing their unlawful

policies and practices as described herein;

X.    Reasonable attorneys' fees and costs; and

Y.    Such other relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by

jury on all questions of fact raised by this Complaint.

Dated: January 2, 2015
        New York, New York

                                    Respectfully submitted,

                        By:     _____/s/ Cyrus E. Dugger_____
                                Cyrus E. Dugger

                        **THE DUGGER LAW FIRM, PLLC**
                        154 Grand St.
                        New York, NY 10013
                        Tel:  (646) 560-3208

                        *Attorney for the Plaintiff, the Collective, and the*
                        *Putative Class*

51