

# MANAGEMENT AGREEMENT

__EVA AGERBRINK__ ("**Model**") and Model Service, LLC d.b.a MSA Models ("**MSA**") hereby agree as follows (this "**Agreement**"):

1. Model hereby engages MSA's services, and MSA accepts such engagement, to act as Model's Manager throughout the world (the "**Territory**") for the term of this Agreement in the following field(s) (check (a) or all that apply other than (a)):

   |   |   | Exclusive | Non-Exclusive |   |
   |---|---|---|---|---|
   |   | a. | ☐ | ☐ | All areas, including all media and on camera, including, without limitation, modeling, print, live guest appearances, video, voiceovers, and film for all mediums and purposes. |
   | ✓ | b. | ✗ |   | Fit modeling |
   |   | c. | ☐ | ☐ | Fashion modeling |
   |   | d. | ☐ | ☐ | Lifestyle modeling |
   |   | e. | ☐ | ☐ | Other: _____ |

2. MSA agrees to use commercially reasonable efforts to advise and counsel Model regarding: (i) publicity and public relations matters and the general practices of the modeling, entertainment, and advertising industries, as applicable, with respect to MSA's representation in the fields selected in Section 1 above (the "**Representation Field(s)**"); (ii) the proper formats for Model to present himself/herself to third parties, including aspects of makeup, hair, photo composites, and portfolio formation, as applicable; and (iii) in the event that MSA serves as Model's "mother agent" (as described in Section 9 below), placements or referrals to secondary agencies in the United States or elsewhere, as MSA deems appropriate in its sole discretion. MSA further agrees to send invoices and statements of balance due to Model's clients and to use commercially reasonable efforts to collect fees for Model.

3. Model hereby appoints MSA as Model's lawful Attorney-in-Fact with regard to transactions with MSA and authorizes MSA to collect and receive monies on Model's behalf, to endorse Model's name upon and deposit checks and other money transfers in MSA's account with any bank, and to retain therefrom all sums due MSA at any time. Model also authorizes MSA to approve and permit the use of Model's name, photograph, likeness, and/or voice, and sign releases for the use of same on Model's behalf. This authorization shall include the use of Model's name, photograph, likeness, and/or voice on all materials used by MSA to promote itself, including, without limitation, headsheets, books, and

1                              ✓ Model's Initials: _____

electronic media (including, without limitation, materials disseminated over the internet or by CD-ROM). This power of attorney is coupled with an interest and is irrevocable during the Term (as defined in Section 3 below), and thereafter with respect to any matter for which MSA is entitled to compensation hereunder. Model hereby assigns to MSA the proceeds of all assignments performed by Model, against which MSA has advanced payment to Model. If in accordance with MSA's voucher system, MSA does not receive payment from a client that employs Model within six (6) months of Model's completion of an assignment, Model will, upon request, promptly reimburse MSA for the sums advanced to Model by MSA in connection with such assignment. Monies owed to Model from clients or advertising agencies, including, without limitation, monies owed for cancellation fees, expenses, and foreign billings, will be paid to Model after payment is received by MSA. MSA will take all reasonable steps to collect the amounts due from clients for Model's services, and Model agrees that any claim against a client for monies owed for those services will belong to MSA, which shall remit to Model the net due to Model after deductions of MSA's entitlements (i.e., the Commission and any expenses or other monies owing to MSA hereunder) and MSA's collection costs, including, without limitation, attorneys' fees and collection agency fees. The risk of non-collection of fees and expenses due Model from clients and/or advertising agencies in connection with Model's vouchers, and the legal costs associated with attempts to collect such fees and expenses, shall be borne entirely by Model, and MSA agrees to waive its Commission on the fees and expenses that Model obtains as a result of Model's own collection efforts.

4. Model agrees to use best efforts to further Model's career in the Representation Field(s), and to seek MSA's counsel regarding all matters concerning Model's endeavors in such Representation Field(s). Model agrees to advise MSA of all offers of employment submitted to Model in the Territory with respect to the Representation Field(s) and to refer any inquiries concerning Model's services to MSA. Model agrees to communicate promptly to MSA with respect to all information that MSA may reasonably request, as well as all questions or concerns that Model may have, in connection with MSA's representation hereunder. Model acknowledges that Model's failure to maintain her or his physical appearance, including weight, hair style, and hair color, may negatively affect MSA's ability to effectively represent Model hereunder, and may result in Model having to incur additional expenses for new photographs, comp cards, etc. Model shall at all times perform services to clients (the "**Services**") in a professional and timely manner.

5. MODEL ACKNOWLEDGES THAT MSA IS NOT, AND IS NOT LICENSED AS, AN EMPLOYMENT, THEATRICAL, OR TALENT AGENCY IN ANY JURISDICTION. MODEL FURTHER AGREES THAT MSA SHALL NOT BE REQUIRED OR EXPECTED TO OBTAIN OFFERS OF EMPLOYMENT FOR MODEL. It is further understood that MSA does not in any manner supervise the professional activities of Model, nor does MSA control the terms and conditions of the Services. Such supervision and control is the subject of the relationship between Model and client that employs Model to render services. The compensation or compensation rate for the Services shall be determined by Model after consultation with MSA.

6. MODEL IS AN INDEPENDENT CONTRACTOR, AND NOTHING HEREIN SHALL CREATE A PARTNERSHIP OR FIDUCIARY OR EMPLOYER/EMPLOYEE RELATIONSHIP BETWEEN MSA AND MODEL. MODEL WARRANTS THAT MODEL WILL BE WHOLLY RESPONSIBLE FOR THE PAYMENT OF ANY TAXES OWED BY MODEL TO ANY GOVERNMENT OR AGENCY, AND MODEL WILL NOT LOOK TO MSA TO PROVIDE ANY

Model's Initials: _____

INSURANCE COVERAGE, INCLUDING WITHOUT LIMITATION WORKER'S COMPENSATION, STATE DISABILITY, AND STATE UNEMPLOYMENT, OR SATISFY ANY OF MODEL'S IMMIGRATION OBLIGATIONS. It is further understood that Model is solely responsible for all such coverage and that the responsibility therefore has been assumed and continues to be assumed by Model commencing as of the date MSA was appointed as Model's manager and continuing until the end of the Term. Model hereby releases, indemnifies, and holds harmless MSA from and against any and all claims and responsibility with respect to Workers' Compensation, State Disability, or State Unemployment coverage or benefits relating to Model.

7. In consideration of MSA's entering into this Agreement and as compensation for the services to be rendered by MSA hereunder, Model agrees to pay MSA an amount equal to twenty percent (20%) of any and all gross monies or other consideration that Model receives as a result of any agreements (and any renewals or renegotiations thereof, including for internet usage), throughout the Territory, that are entered into during the Term (as applicable, the "**Commission**"). Model acknowledges that the Commission percentage is not established as a matter of law. Model agrees to pay the Commission to MSA in connection with any monies that Model earns for services that Model provides to or for any third party to which Model was introduced by MSA, and for which Model provided services, during the Term, for a period of two (2) years following the expiration of the Term or other termination of this Agreement for any reason, regardless of when Model actually receives such earnings. Model hereby authorizes MSA to collect the Commission directly from any such third party in the event that Model does not make such payment to MSA. MSA, as manager, shall be entitled to receive such percentage in connection with all reuse fees, and any modifications, additions, options, extensions, renewals, substitutions for, and replacements of such engagements or contracts directly or indirectly. It is understood that substitution and replacement do not extend to include the shooting of material for a new campaign.

8. Notwithstanding anything to the contrary herein, MSA's compensation for services rendered to Model under the jurisdiction of the Screen Actors Guild, Inc. ("**SAG**"), the American Federation of Television and Radio Artists ("**AFTRA**"), and the Actors' Equity Association ("**AEA**") shall be ten percent (10%) of any and all gross monies or other consideration, which Model may receive from rendering such services. Model acknowledges that Model may be required to enter into a separate agency agreement with a franchised agent pursuant to which Model may be required to pay such agent a separate commission for services rendered under the jurisdiction of SAG, AFTRA, or AEA and the commission to such franchised agent will not be deducted from or offset against the compensation to MSA.

9. Model also authorizes MSA to collect a ten percent (10%) "mother agency" commission from other agencies in those instances in which MSA acts as Model's mother agent. Model acknowledges and agrees that unless Model has indicated in the appropriate space on the signature page hereof that he/she already has a mother agent, MSA shall automatically become Model's mother agent.

10. Model understands and acknowledges that MSA shall not be responsible or obligated to pay for any of Model's expenses, including without limitation travel, lodging, entertaining, wardrobe, makeup, photography, messenger service, overnight delivery service, digital promotions such as online services and web-based portfolios, or the likes thereof (collectively, the "**Model Expenses**"). In the event that MSA, at its sole discretion, advances payment for any of the Model Expenses, Model

3                                                         Model's Initials: ___

agrees that MSA may recoup such advances through deductions to any monies due Model hereunder, or MSA may demand reimbursement directly from Model if Model does not have sufficient money on account with MSA to cover such Model Expenses, in which case Model agrees to reimburse MSA within ten (10) days following receipt of such demand. A schedule of the amounts charged by MSA for certain items is annexed hereto (the items and amounts listed are subject to change from time to time).

In addition to the foregoing, Model acknowledges and agrees that MSA may deduct up to twenty percent (20%) of the monies that MSA collects on behalf of Model, which MSA will deposit into a non-interest bearing reserve account, which shall not exceed a balance of Five Thousand Dollars ($5,000.00). MSA may use the funds in the reserve account for reimbursement to itself of the Model Expenses, repayment of advances, payment of commissions due MSA, and payment to MSA of any other monies owed by Model hereunder. Upon Model's written request, MSA shall provide Model with an accounting of the reserve account. Upon payment of all amounts owed to MSA and the termination of this Agreement, MSA will distribute to Model the funds remaining in the Model's reserve account, if any.

11. Model hereby agrees that in the event Model breaches this Agreement or otherwise refuses to fulfill Model's obligations hereunder, all obligations and liability, of any type, nature, or description, of MSA to Model shall cease and terminate (unless an authorized representative of MSA agrees otherwise in writing), and in such event, MSA may, at its sole election, (i) retain as liquidated damages all funds then held and/or subsequently received by MSA on Model's behalf, or (ii) seek all legal and/or equitable remedies then available to MSA, in which event MSA shall, pending the resolution of MSA's claims, be entitled to hold the funds referred to in the preceding clause (i) as security for any judgment MSA may obtain against Model in connection with such claims. Model shall be responsible for paying all reasonable outside attorneys' fees and other collection costs (including, without limitation, any percentage-based and/or other third-party fees) incurred by MSA in the enforcement of this Agreement and/or its rights and remedies hereunder, whether or not an arbitration or other legal action is initiated or filed.

12. The term of this Agreement (the "**Term**") shall be for a period of three (3) years commencing as of the date hereof (the "**Initial Period**"), and it will be automatically renewed for successive one- (1-) year periods (each, an "**Additional Period**") unless and until Model or MSA gives written notice to the other of the intention to terminate by registered or certified mail at least ninety (90) days prior to the end of the Initial Period, or at least thirty (30) days prior to the end of the Additional Period, as applicable.

13. Any contracts for future usage (as such term is customarily used) of Model's modeling services, name, photograph, likeness, or voice, including for use on the internet, shall be handled by MSA and MSA shall receive its Commission in connection therewith, until the termination of such usages, regardless of the sooner expiration, termination, or modification of this Agreement.

14. Model is aware and agrees that MSA is entitled to receive a service charge from all of the clients who utilize Model's services, and that such service charge at present equals 20% of the gross monies or other consideration that Model receives from such clients as a result of agreements relating to Model's services. Model further acknowledges and agrees that (i) MSA's receipt of a service charge or fee

4                                            Model's Initials: _____

shall be an additional inducement for MSA to act on Model's behalf, and that MSA's receipt of the service charge or fee is not, and shall not be deemed to be, a violation of any duty of loyalty or any other obligation or duty owed to Model, and (ii) MSA may collect a service charge from any such client in connection with services that Model provides to or for such third party following the expiration of the Term or other termination of this Agreement.

15. This instrument sets forth the entire agreement between Model and MSA with respect to the subject matter hereof and no modification, amendment, waiver, termination, or discharge of any provision hereof shall be binding upon the parties unless confirmed by a written instrument executed by the parties. No waiver by either party of any term or provision hereof or of any default hereunder shall affect the right of either party hereafter to enforce such term or provision, or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement shall not become effective until accepted and executed by both parties. The parties hereby represent and warrant that no statement, promise, representation, or inducement, except as herein set forth, has been made on any party's behalf, or by any of such party's employees or representatives. Should any provision of this Agreement be void or unenforceable, such provision shall be deemed severed and this Agreement with such provision severed shall remain in full force and effect to the extent permitted by law; provided, however, that in the event such severance shall materially affect MSA's right to receive compensation hereunder, MSA shall have the right to elect to treat its obligations under this Agreement as terminated. This Agreement shall inure to the benefit of the parties hereto and to their respective successors, permitted assigns, and heirs. In case of any uncertainty regarding the language of this Agreement, the language shall be construed in accordance with its fair meaning rather than interpreted against the party who caused the uncertainty to exist.

16. No breach of this Agreement by MSA shall be considered material unless within ten (10) days after Model acquires knowledge thereof or facts sufficient to put Model upon notice of any such breach, Model serves written notice thereof upon MSA in accordance with Section 15 below, and MSA fails to cure such breach within thirty (30) days after receipt of such notice.

17. Model acknowledges and agrees that Model is executing this Agreement voluntarily and without any duress or undue influence by MSA or any third party. Model further acknowledges and agrees that Model has carefully read this Agreement and has asked any questions needed to fully understand its terms, consequences, and binding effect. Model hereby acknowledges that Model has been afforded an opportunity to consult with an attorney of Model's choosing, and that Model has either consulted with such attorney or has knowingly waived such right prior to entering into this Agreement.

18. Each party represents and warrants that such party is wholly free to enter into this Agreement and to grant the rights herein granted, and that such party is not a party to any agreements, and such party has no obligations, which conflict with any of the provisions hereof. Each party agrees to indemnify the other party against such party's breach of the foregoing representations and warranties. Model further warrants and represents that Model is at least eighteen (18) years of age, provided that if Model is not at least eighteen (18) years of age, Model understands and agrees that Model's parent or guardian must also execute this Agreement on Model's behalf.

19. Except as otherwise stated herein, any notices that are required or permitted to be given in writing under this Agreement shall be deemed given on the day such notice is delivered personally or sent via

5                                Model's Initials: ___

facsimile (upon the sender's receipt of a successful transmission report), or the next day after given to Federal Express or similar express courier for overnight delivery with receipt received, or five (5) days after being sent by first-class registered or certified mail, return receipt requested, and addressed to the parties at the addresses or fax numbers set forth below (as such may be changed in accordance herewith). No form of notice other than those forms expressly provided in the immediately preceding sentence (or elsewhere in this Agreement, if any) shall be valid, whether or not the receiving party of such other form of notice has received actual notice.

20. The parties hereto agree that all actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in the State and Federal courts located in the County of New York, State of New York. The aforementioned choice of venue is intended by the parties to be mandatory and not permissive in nature, thereby precluding the possibility of litigation between the parties with respect to or arising out of this Agreement in any jurisdiction other than that specified in this Section. Each party hereby waives any right it may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this Section, and stipulates that the State and Federal courts located in the County of New York, State of New York shall have in personam jurisdiction and venue over each of them for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to this Agreement. Each party hereby authorizes and accepts service of process sufficient for personal jurisdiction in any action against it as contemplated by this Section by registered or certified mail, return receipt requested, postage prepaid, to its address for the giving of notices as set forth in this Agreement. Any final judgment rendered against a party in any action or proceeding shall be conclusive as to the subject of such final judgment and may be enforced in other jurisdictions in any manner provided by law. The substantially prevailing party in any legal action or proceeding arising out of or relating to this Agreement shall be entitled to recover its reasonable attorneys' fees, court and witness costs, and other related expenses.

21. MSA may assign this Agreement, or any part of MSA's rights hereunder, to any person, firm, corporation, or other entity that acquires all or substantially all of MSA's assets or that is owned or controlled by MSA. Model may not assign this Agreement.

22. This Agreement may be executed via facsimile (with originals to follow promptly by mail) or PDF (or similar electronic format), and in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

* * * * *

[Signature Page Follows]

Model's Initials: ___

ACCEPTED AND AGREED ON THIS _3-5-_____, 201_3_

MSA MODELS
570 7TH Avenue, Suite 1000
New York, NY 10018
Fax: 212-944-8899

By: _____
Name: _____
Its: _____

MODEL

_____
Model signature

Legal Name: __EVA AGERBRINK__
Stage Name: __REDACTED__

MODEL'S PARENT/GUARDIAN
(If Model is less than 18 years old)

Name: _____

Address: _____

Fax: _____

My introduction to MSA Models was arranged by:
_____

If other than MSA Models, my mother agency is:
_____

7                                    Model's Initials: ___

## Schedule of Chargebacks

In practice, MSA will make every attempt to keep your charges to a minimum or zero. Most clients are satisfied with electronic submission. Some still require delivery of comp cards with same or next day delivery. MSA will make best efforts to notify you of charges that must be incurred to market you to the best of our abilities.

Web/marketing portfolio: $240 per year
Comp cards and show cards $163.00 per 100
Messenger service: $2 - $25
Portfolio book – scuba finish $35
FedEx: $12.00 - $25.00.  Extra for international