**RONALD M. GREEN**
**EVAN J. SPELFOGEL**
**MARGARET C. THERING**
**EPSTEIN BECKER & GREEN, P.C.**
250 PARK AVENUE
NEW YORK, NEW YORK 10177
(212) 351-4500
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| EVA AGERBRINK, individually and on behalf of all others similarly situated, : | |
| Plaintiff, : | **ECF Case** |
| : | |
| vs. : | 14 CV 7841 (JPO) |
| : | |
| MODEL SERVICE LLC d/b/a MSA MODELS and SUSAN LEVINE, : | |
| : | |
| Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

January 20, 2015

FIRM:27984962v1

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    ARGUMENT ................................................................................................ 3

    A.     Plaintiff's Article 11 Claims Should Be Dismissed With
        Prejudice Because There Is No Private Right of Action for
        Article 11 Claims ................................................................................ 3

    B.     Plaintiff's Claims About The Modeling Industry Generally
        Must Be Dismissed Because The Modeling Industry, In General,
        Is Not A Defendant In This Case ........................................................ 12

    C.     Plaintiff's Claim Alleging Violations of FLSA Recordkeeping
        Provisions Should Be Dismissed Because There Is No Private
        Right Of Action for FLSA Record-Keeping Claims ........................... 15

    D.     Plaintiff's Class And Collective Allegations Should  Be Dismissed
        Because They Do Nothing More Than  Parrot The Elements Of The
        Implicated Statute ............................................................................... 16

III.   CONCLUSION ............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................12, 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................12, 16

*Chen v. Major League Baseball*,
    6 F. Supp. 3d 449, 460 ...................................................................................................15

*Chestnut v. Wells Fargo, N.A.*,
    No. 11-cv-5369, 2012 U.S. Dist. LEXIS 27473 (E.D.N.Y. Feb. 22, 2012) .............................4

*Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.*,
    No. 1:05-cv-07314-LBS, 2008 U.S. Dist. LEXIS 74377
    (S.D.N.Y. Sept. 23, 2008) ...............................................................................................3

*Creech v. Reinke*,
    No. 1:12-cv-00173-EJL, 2012 U.S. Dist. LEXIS 77915 (D. Id. June 4, 2012) ........................4

*Cunningham v. Elec. Data Sys. Corp.*,
    579 F. Supp. 2d 538 (S.D.N.Y. 2008) ...............................................................................15

*Davis v. Abington Mem'l Hosp.*,
    765 F.3d 236 (3d Cir. 2014) ............................................................................................16

*DeJesus v. HF Mgmt. Servs., LLC*,
    726 F.3d 85 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 918 (2014) ...........................................16

*Duit Constr. Co. v. Bennett*,
    No. 4:13-cv-00458-KBG, 2014 U.S. Dist. LEXIS 86362
    (E.D. Ark. June 25, 2014) ................................................................................................4

*Durr v. Strickland*,
    602 F.3d 788 (6th Cir. 2010) ...........................................................................................4

*Gaalla v. Citizens Med. Ctr.*,
    No. V-10-14, 2010 U.S. Dist. LEXIS 65147 (S.D. Tex. June 30, 2010) .................................5

*Gisomme v. Healthtex Corp.*,
    No. CV 13-2541, 2014 U.S. Dist. LEXIS 67588 (E.D.N.Y. May 15, 2014) ...........................24

*Glen v. Club Mediterranee S.A.*,
    365 F. Supp. 2d 1263 (S.D. Fla. 2005), *aff'd*, 450 F.3d 1251 (11th Cir. 2006) .......................5

*Hinds Cnty. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009)....................................................................12

*Irick v. Ray*,
   No. 3:10-1004, 2010 U.S. Dist. LEXIS 123274 (M.D. Tenn. Nov. 19, 2010),
   *aff'd*, 628 F.3d 787 (6th Cir. 2010)......................................................................5

*Johnson v. Equinox Holdings, Inc.*,
   No. 13 Civ. 6313, 2014 U.S. Dist. LEXIS 91786 (S.D.N.Y. July 2, 2014) ...........................17

*Johnson v. Parker Hughes Clinics*,
   No. Civ. 04-4130 PAM/RLE, 2005 U.S. Dist. LEXIS 741
   (D. Minn. Jan. 13, 2005) ....................................................................................5

*Jones v. Hobbs*,
   745 F. Supp. 2d 886 (E.D. Ark. 2010) ...................................................................4

*Landers v. Quality Commc'ns, Inc.*,
   771 F.3d 638 (9th Cir. 2014) ...............................................................................16

*Lundy v. Catholic Health Sys. of Long Island, Inc.*,
   711 F.3d 106 (2d Cir. 2013).........................................................................16, 17, 24

*Mariano v. Town of Orchard Park*,
   No. 09-cv-916S, 2011 U.S. Dist. LEXIS 135915 (W.D.N.Y. Nov. 18, 2011)......................15

*Masters v. Wilhelmina Model Agency, Inc.*,
   No. 02 Civ. 4911, 2003 U.S. Dist. LEXIS 698 (S.D.N.Y. Jan. 16, 2003) ..............................6

*Mylan Pharms, Inc. v. Thompson*,
   268 F.3d 1323 (Fed. Cir. 2001)............................................................................6

*Nakahata v. New York Presbyterian Healthcare Sys., Inc.*,
   723 F.3d 192 (2d Cir. 2013).........................................................................16, 25

*Pruell v. Caritas Christi*,
   678 F.3d 10 (1st Cir. 2012)................................................................................16

*Qwest Commc'ns Corp. v. Maryland Nat'l Capital Park & Planning Comm'n*,
   No. RWT 07cv2199, 2010 U.S. Dist. LEXIS 47009 (D. Md. May 13, 2010) .......................5

*Ramos v. City of New York Fire Dep't*,
   No. 13 Civ. 9225, 2014 U.S. Dist. LEXIS 66449 (S.D.N.Y. May 9, 2014)..........................24

*Rhodes v. Herz*,
   27 Misc. 3d 722 (Sup. Ct. N.Y. Cty 2010), *aff'd*, 84 A.D.3d 1 (1st Dep't 2011).....................3

*Sigall v. Zipcar, Inc.*,
No. 13 Civ. 4552, 2014 U.S. Dist. LEXIS 22976 (S.D.N.Y. Feb. 24, 2014),
*aff'd*, 582 F. App'x 18 (2d Cir. 2014) ........................................................................4

*Webb v. Robert Lewis Rosen Assocs.*,
No. 03 Civ 4275, 2003 U.S. Dist. LEXIS 23160 (S.D.N.Y. Dec. 23, 2003),
*aff'd*, 128 F. App'x 793 (2005) .................................................................................3

*West v. Ray*,
No. 3:10-0778, 2010 U.S. Dist. LEXIS 101834 (M.D. Tenn. Sept. 24, 2010),
*aff'd*, 401 F. App'x 72 (6th Cir. 2010) ......................................................................5

*Zhong v. August August Corp.*,
498 F. Supp. 2d 625 (S.D.N.Y. 2007) ......................................................................17

**Rules**

Fed. R. Civ. P. 12 ...........................................................................................1, 3, 12, 15

Defendants Model Service LLC d/b/a MSA Models ("MSA") and Susan Levine ("Levine") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff, Eva Agerbrink's ("Plaintiff" or "Agerbrink") Amended Class and Collective Action Complaint ("Am. Cplt.") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## I.   PRELIMINARY STATEMENT

Plaintiff is attempting to bring a class and collective action on behalf of herself and all other similarly situated "fit models." (Am. Cplt.) A "fit model" is a person who models clothing for designers during the apparel production process. As part of this process, designers retain fit models to assist them with perfecting sample garments before those garments are produced *en masse*. Designers select fit models who have measurements and body proportions the designer has chosen as its sample size for a particular line of apparel. Designers also select and retain fit models based on the designer's subjective assessment of how well the fit model represents the designer's target customer. By observing the clothing on a fit model and getting that fit model's feedback about the clothing, the designers can assess changes needed to the clothing based on, *inter alia*, look, comfort, ease of movement, and adherence to the designers' brand standards. In simplest terms, fit models help designers make decisions regarding changes to the construction of sample garments by modeling the garments and providing feedback about the garments to the designer. Designers then modify the garments accordingly and approve the sample garments for mass production (sometimes after more consultations with the fit model). (Am. Cplt. ¶ 1-2). Fit modeling is a specialized skill because of the need for the model to communicate aspects of fit and drape to the designer or manufacturer.

Founded in 1947, MSA is a reputable model management company that provides services to the global fashion industry. MSA has provided services to over 2,000 models since its inception. Among other services, MSA: provides career advice to fit models; helps fit models

build their image and specification portfolios; offers nutrition and exercise consulting; offers hygiene and physical appearance consultations; helps models market themselves; assists models with locating and securing living quarters in New York City; helps nurture professional relationships between models, photographers, and apparel companies; creates and executes marketing campaigns; publicizes models via media outlets; secures agent representation in markets across the globe and works with models' agents within and outside of New York City; assists models with international travel and lodging; negotiates discounts from photographers, stylists, and gyms that models can take advantage of if they so choose; and maintains a web presence models can use through a fashion-industry-focused website that is professionally designed and managed. MSA does not employ any fit models. Rather, MSA provides services that fit models may use if the fit models think doing so would be helpful to their careers. Models who wish to use MSA's services enter into a management agreement with MSA.

Plaintiff's Amended Complaint should be dismissed because: (1) Plaintiff attempts to bring claims under statutes that do not provide for private rights of action; (2) Plaintiff has brought claims against the modeling industry, in general, but the modeling industry, in general, is not a defendant in this lawsuit; and (3) Plaintiff has failed to plead her claims with the requisite degree of particularity and specificity. Specifically, all of Plaintiff's claims brought under Article 11 of the New York State General Business Law ("GBL") should be dismissed because Article 11 of the GBL does not provide for a private right of action. Plaintiff cannot fix this infirmity by seeking a declaratory judgment with respect to her GBL Article 11 claims since a declaratory judgment cannot be predicated upon a statute that does not provide for a private right of action. In addition, Plaintiff's claims alleging record-keeping violations under the Fair Labor Standards Act ("FLSA") should be dismissed because there is no private right of action for such claims.

Furthermore, Plaintiff's claims against the modeling industry, in general, should be dismissed because the modeling industry, in general, is not a defendant in this lawsuit. In addition, Plaintiff has not pleaded any wage and hour violations with respect to a putative class or collective with sufficient specificity.

## II.    ARGUMENT

### A.    Plaintiff's Article 11 Claims Should Be Dismissed With Prejudice Because There Is No Private Right of Action for Article 11 Claims

All of Plaintiff's claims under Article 11 of the GBL should be dismissed, with prejudice, in their entirety because there is no private right of action under this section of the law. Fed. R. Civ. P. 12(b)(1) and (6); *Rhodes v. Herz*, 27 Misc. 3d 722, 736 (Sup. Ct. N.Y. Cty 2010), *aff'd,* 84 A.D.3d 1 (1st Dep't 2011) (dismissing plaintiff's complaint because "no general private right of action for civil remedies exists for violations of [article 11].");[1] *Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.*, No. 1:05-cv-07314-LBS, 2008 U.S. Dist. LEXIS 74377 (S.D.N.Y. Sept. 23, 2008) (dismissing defendants' counterclaim under GBL Article 11 because there is no private right of action under Article 11); *Webb v. Robert Lewis Rosen Assocs.*, No. 03 Civ. 4275, 2003 U.S. Dist. LEXIS 23160 (S.D.N.Y. Dec. 23, 2003) (GBL Article 11 does not provide for a private right of action; it can only be enforced by the New York government), *aff'd*, 128 F.

---

[1] In affirming, the First Department explained: "Preliminarily, we affirm because we have previously determined that article 11 provides no private right of action. . . . Contrary to plaintiff's assertions, the holding of the motion court and the holding in *Shelton v Elite Model Mgt., Inc.* (11 Misc 3d 345 [2005]), we again conclude that article 11 does not promulgate an express right of action. . . .  [I]t is only the Commissioner who can institute an action upon the bond and against the licensed employment agency and not the individual sustaining injury or damages. The fact that the Commissioner's power to initiate an action upon the bond is not compulsory under this section is not, as some might argue, an indication of an express limited private right of action. Instead, the discretion afforded to the Commissioner under General Business Law § 178 is merely a recognition that the initiation of a claim or suit on an employee's behalf will not always be required because General Business Law § 189 (2) vests the Commissioner with broad investigatory powers such that a suit might be obviated." 84 A.D.3d at 6-8 (citations omitted).

App'x 793 (2005).

The fact that Plaintiff dresses up her GBL Article 11 claims as claims upon which she is seeking a declaratory action does not rectify the deficiency in her pleading. A plaintiff cannot seek a declaratory judgment when the underlying statute upon which the declaratory judgment is predicated does not provide for a private right of action. *Sigall v. Zipcar, Inc.*, No. 13 Civ. 4552, 2014 U.S. Dist. LEXIS 22976, at *1, 10 (S.D.N.Y. Feb. 24, 2014) (the statutory section at issue "provides the Attorney General with 'broad enforcement powers,' and it would be unfair to infer a private cause of action 'where the Legislature has provided a potent official enforcement mechanism'. . . . Accordingly, Plaintiffs' claims for declaratory and injunctive relief based upon alleged violations of [this statute] must be dismissed."), *aff'd*, 582 F. App'x 18 (2d Cir. 2014);[2] *Duit Constr. Co. v. Bennett*, No. 4:13-cv-00458-KBG, 2014 U.S. Dist. LEXIS 86362, at *28 (E.D. Ark. June 25, 2014) ("because Duit seeks a declaration that Arkansas has violated and continues to violate a statute that does not provide a judicially remediable right, the Declaratory Judgment Act does not provide Duit a cause of action."); *Creech v. Reinke*, No. 1:12-cv-00173-EJL, 2012 U.S. Dist. LEXIS 77915, at *67 (D. Id. June 4, 2012) ("Leavitt has not persuaded the Court that, in the absence of a private cause of action in the CSA and FDCA, he can bring a cause of action for declaratory relief based on these statutes."); *Chestnut v. Wells Fargo, N.A.*, No. 11-cv-5369, 2012 U.S. Dist. LEXIS 27473, at *8-9 (E.D.N.Y. Feb. 22, 2012) (Declaratory Judgment Act does not confer subject matter jurisdiction on a complaint); *Durr v. Strickland*, 602 F.3d 788 (6th Cir. 2010) (declaratory relief not available where private right of action does not exist on underlying statute); *Jones v. Hobbs*, 745 F. Supp. 2d 886, 893 (E.D. Ark. 2010)

---

[2] Plaintiff cited this case in opposition to Defendants' motion to dismiss her complaint, but rather than support Plaintiff's case, it supports Defendants' argument that Plaintiff cannot seek a declaratory judgment when such declaratory judgment is predicated on GBL Article 11 claim because there is no private right of action for GBL Article 11 claims.

("Declaratory Judgment Act does not authorize actions to decide whether federal statutes have been or will be violated when no private right of action to enforce the statutes has been created by Congress."); *Irick v. Ray*, No. 3:10-1004, 2010 U.S. Dist. LEXIS 123274, at *12-13 (M.D. Tenn. Nov. 19, 2010) ("the Court concludes that no private right of action exists under either the CSA or the FDCA, and therefore, any injury allegedly suffered by the Plaintiff cannot be redressed through a declaratory judgment action.") (citations omitted), *aff'd*, 628 F.3d 787 (6th Cir. 2010); *West v. Ray,* No. 3:10-0778, 2010 U.S. Dist. LEXIS 101834, at *11 (M.D. Tenn. Sept. 24, 2010) ("because no private right of action exists under either the CSA or the FDCA, any injury can not be redressed through a declaratory action."), *aff'd*, 401 F. App'x 72 (6th Cir. 2010); *Qwest Commc'ns Corp. v. Maryland Nat'l Capital Park & Planning Comm'n*, No. RWT 07cv2199, 2010 U.S. Dist. LEXIS 47009, at *31-32 (D. Md. May 13, 2010) ("The Declaratory Judgment Act cannot be used to circumvent Congress' intent not to provide telecommunications providers with a private cause of action under § 253. Because Qwest has failed to identify an independent jurisdictional basis for its declaratory judgment action, its compensatory damages claim under § 2202 does not save the First and Second Claims for Relief from the bar of mootness."); *Gaalla v. Citizens Med. Ctr.*, No. V-10-14, 2010 U.S. Dist. LEXIS 65147 (S.D. Tex. June 30, 2010) (declaratory judgment may not issue without a private right of action); *Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263, 1271-72 (S.D. Fla. 2005) (dismissing plaintiffs' complaint seeking a declaratory judgment under Trading with Enemy Act because this statute did not provide a private right of action), *aff'd*, 450 F.3d 1251 (11th Cir. 2006); *Johnson v. Parker Hughes Clinics,* No. Civ. 04-4130 PAM/RLE, 2005 U.S. Dist. LEXIS 741, at *4 (D. Minn. Jan. 13, 2005) ("The Declaratory Judgment Act is not a jurisdictional statute. Thus, an independent basis for federal question jurisdiction must exist. Both parties concede that HIPAA

does not provide for a private cause of action. Indeed, Johnson's claim does not seek relief under HIPAA, but rather seeks an order interpreting the statute. The Court finds that this is insufficient to confer subject matter jurisdiction.") (citations omitted); *Mylan Pharms, Inc. v. Thompson*, 268 F.3d 1323, 1332 (Fed. Cir. 2001) (court cannot issue a declaratory judgment if the statute upon which the declaratory judgment is predicated does not provide for a private right of action).

Accordingly, all of Plaintiff's Article 11 claims (which are listed below)[3] must be dismissed because the interpretation of the statute Plaintiff asks this court to abide is truly the province of the legislature:

1)      In addition to misclassifying their models as independent contractors, many, if not all, NYC modeling agencies, including MSA, go one step further to increase their profits at the expense of both NYC models and apparel industry clients. While these modeling agencies hold themselves out to the public as organizations that will obtain employment and/or engagement for models, and while the primary purpose and activities of these organizations *is* to obtain employment and/or engagements for models, these agencies have nonetheless "re-classified" themselves as "not employment agencies." (Am. Cplt. ¶ 17).

2)      As chronicled in *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (SDNY), in which a model alleged violations of the Sherman Antitrust Act, there is substantial evidence that many, if not all, NYC modeling agencies jointly sought to "re-classify" themselves by simultaneously maintaining that they were no longer "employment agencies" within the meaning of [GBL] § 171(2). (Am. Cplt. ¶ 18).[4]

3)      The alleged purpose of this coordinated effort for, many, if not all, NYC modeling agencies, was to collectively evade application of a 10% cap on the fees these modeling agencies may charge their models for obtaining employment and/or engagements. GBL §§ 171(8-a) and 185(1)(b), (4), (8) (class C employees). General Business Law section 185(8) limits the fee employment agencies may charge models for their services to 10% of the employee's income from the position, but these NYC modeling agencies, including MSA, contend that this cap does not apply to the commissions they charge against models' wages. (Am. Cplt. ¶ 19).

---

[3] For the Court's convenience and so that the Court does not have to cross-reference the Amended Complaint, Defendants list all of the paragraphs that should be dismissed from Plaintiff's Amended Complaint.

[4] *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2003 U.S. Dist. LEXIS 698 (S.D.N.Y. Jan. 16, 2003) does not support Plaintiff's Amended Complaint or her contention that she can bring a claim for a declaratory judgment based on a GBL Article 11 claim. In *Masters*, the court dismissed the plaintiffs' Article 11 claims, and the judge explained: "sections 189 and 190 set forth a comprehensive scheme by which Article 11 is to be enforced, and I decline to depart from that legislative scheme and engraft another enforcement mechanism." *Id.* at *30-31 (citation omitted).

4)      These NYC modeling agencies, including MSA, also contend that they may levy these fees against models' pay even where the agency did not obtain the associated employment for the model.   However, General Business Law section 185(1)(b) prohibits employment agencies from charging a fee unless the agency referred the model to the paying employer or actually represented the model in negotiating the applicable employment contract. (Am. Cplt. ¶ 20).

5)      Thus, by "re-classifying" themselves as "not employment agencies," these NYC modeling agencies, including MSA, circumvent both the statutory 10% cap on the fees or commissions they may charge against models' wages (GBL § 185(8)), and the statutory requirement that the agency must actually assist the model to obtain employment and/or an engagement before it may charge the model a commission or fee on wages derived therefrom (GBL § 185(1)(b)). (Am. Cplt. ¶ 21).

6)      In addition, GBL § 185 caps the fee an employment agency may charge the apparel industry client at 10%. These NYC modeling agencies likewise seek to avoid this limit by a "reclassification" as "not employment agencies." GBL § 185(1)(b). (Am. Cplt. ¶ 22).

7)      Many, if not all, NYC modeling agencies, including MSA, attempt to contract around GBL § 185, by including non-negotiable language in their employment agreements unilaterally labeling themselves as "not employment agencies." (Am. Cplt. ¶ 23).

8)      Under that cover, NYC modeling agencies, including MSA, typically impose a 20% contractual "commission" on the wages earned by their models. Indeed, many, if not all, NYC modeling agencies, including MSA, include provision for payment of this 20% commission in their employment contracts, even when a model finds work without the assistance or involvement of their modeling agency. Both of these practices explicitly violate the plain language of GBL § 185. GBL § 185(1)(b), (4), (8) (class C employees). (Am. Cplt. ¶ 24).

9)      Many, if not all, NYC fit modeling agencies, including MSA, charge *an additional* 20% 'service fee' to the apparel industry client when they book the fit model with the client in violation of GBL § 185(1)(b). (Am. Cplt. ¶ 25).

10)      In the case of MSA Models, if the apparel industry client refuses to pay the "service fee," Defendants simply deduct this "service fee" from their models' wages. As a result, Defendants' deductions to models wages in "commissions" can be as high as 40%. (Am. Cplt. ¶ 26).

11)       This action also seeks a declaratory judgment that Defendants' employment contract is prospectively unenforceable, because of Defendants' illegal operation as an unlicensed employment agency in violation of GBL § 172, and charging of illegal fees in violation of GBL § 185, with respect to Defendants' prospective contractual right to payment of commissions from Plaintiff and similarly situated MSA fit models' wages, above the 10% amount permitted by GBL § 185, and/or for commissions against wages earned from work Plaintiff and similarly situated MSA fit models obtained without MSA's assistance. (Am. Cplt. ¶ 28).

12)      In misrepresenting herself as "not an employment agency" within the meaning of GBL § 171(2), Levine has illegally sought to avoid application of a 10% cap on fees chargeable on the wages of MSA fit models, as mandated by GBL § 185. Levine has similarly and illegally sought to avoid application of the requirement that an agency actually assist the model in

obtaining employment and/or an engagement in order to charge the model a commission on wages derived therefrom. (Am. Cplt. ¶ 43).

13)    Although Levine attempts to contract around the requirements of GBL § 172 (licensing requirement for employment agencies) and GBL § 185 (fee cap), and additional aspects of Article 11, she is nonetheless an "employment agency" within the meaning of GBL § 171(2). (Am. Cplt. ¶ 44).

14)    MSA explicitly operated as an employment agency subject to the licensing requirement of GBL § 172 and the 10% fee cap of GBL § 185 from approximately March 2001 until November 1, 2010, when it surrendered its employment agency license. In the letter from Levine surrendering the license Levine stated: "Please find enclosed our Employment Agency License. We will no longer be operating as an employment agency." (Am. Cplt. ¶ 45).

15)    Levine's initial March 2001 application for MSA to operate as an employment agency identified Levine as "the individual who will actually direct and operate the placement activities of the proposed agency." (Am. Cplt. ¶ 46).

16)    Levine signed MSA's March 2002, March 2004, March 2006, and March 2008 employment agency license renewals. (Am. Cplt. ¶ 47).

17)    Upon information and belief, Levine has been an "agency manager" within the meaning of GBL § 171, for all, or the majority, of MSA's explicit operation as an employment agency. An "agency manager" is "the person designated by the applicant for a license who is responsible for the direction and operation of the placement activities of the agency at the premises covered by the license." GBL § 171(4). (Am. Cplt. ¶ 48).

18)    In misrepresenting itself as "not an employment agency" within the meaning of GBL § 171, MSA Models has illegally sought to avoid application of the 10% cap on the fees chargeable to MSA fit models imposed by GBL § 185. (Am. Cplt. ¶ 72).

19)    MSA has similarly illegally sought to avoid application of the GBL § 185 requirement that an agency actually assist the model obtain employment and/or an engagement in order to charge the model a commission on wages derived therefrom. (Am. Cplt. ¶ 73).

20)    MSA Models changed its corporate name from "Model Service Agency, LLC" to "Model Service LLC" during approximately December 2000. (Am. Cplt. ¶ 83).

21)    Upon information and belief, MSA Models did not make any changes to its operations and/or business practices when it changed its name from "Model Service Agency, LLC" to "Model Service LLC" during approximately December 2000. (Am. Cplt. ¶ 84).

22)    Although MSA Models attempts to contract around the requirements of GBL §§ 172 (licensing requirement) and 185 (fee cap), at all times relevant, it has nonetheless been an "employment agency" within the meaning of GBL § 171(2), despite its surrender of its employment agency license in November 2010. (Am. Cplt. ¶ 85).

23)    Since at least November 2010, if not earlier, MSA Models has required all MSA fit models, by way of MSA Model's employment contract, to "agree" with the legal conclusion that MSA Models is not an "employment agency" and/or a "theatrical employment agency. (Am. Cplt. ¶ 86).

24)    At all relevant times, the primary purpose of the work of MSA Models has been

to, for a fee, obtain, or attempt to obtain, employment and/or engagements for Plaintiff and/or similarly situated fit models. In the alternative, the primary business of MSA has been to render vocational guidance or counseling services and to directly or indirectly: (1) procure or attempt to procure or represent that it can procure employment or engagements for persons seeking employment or engagements; (2) represent that it has access, or has the capacity to gain access, to jobs not otherwise available to those not purchasing its services; and/or (3) provide information and/or service purporting to promote, lead to, or result in, employment for fit models with other employers. (Am. Cplt. ¶ 87).

25)     MSA Models employs numerous bookers whose primary, or sole duty, is to obtain go-sees and bookings for MSA fit models with apparel industry clients. (Am. Cplt. ¶ 88).

26)     Despite being an "employment agency" within the meaning of GBL § 171(2), upon information and belief, since November 2010, MSA Models has applied a deduction of (at least) 20% on all wages earned by its models, which exceeds the 10% fee permitted by GBL § 185. GBL § 185(1)(b), (4), (8). (Am. Cplt. ¶ 89).

27)     The business of MSA does not only incidentally involve the seeking of employment for fit models and/or models generally. (Am. Cplt. ¶ 90).

28)     Despite being an "employment agency" within the meaning of GBL § 171(2), upon information and belief, since November 2010, MSA Models has applied commissions to wages earned by its models even when MSA did not assist the model in obtaining the employment the commission was charged against, in violation of GBL § 185(1). (Am. Cplt. ¶ 91).

29)     Since at least November 2010, MSA Models has operated as an unlicensed employment agency in violation of GBL § 172, as well as, upon information and belief, charged illegal commissions beyond the 10% commission permitted by GBL § 185 for models (as Class C employees). As a result, its employment contracts are illegal and prospectively unenforceable, by Defendants, against Plaintiff and similarly situated MSA fit models, with respect to Defendants' contractual right to deduct a commission from wages, as to commissions beyond the 10% fee permitted by GBL § 185. (Am. Cplt. ¶ 92).

30)     In addition, MSA Models' deductions of 20% (or higher) commissions, and/or withholding of additional monies, from Plaintiff and similarly situated MSA fit models' wages, are illegal deductions prohibited by NYLL § 193. (Am. Cplt. ¶ 93).

31)     The employment contract Defendants required Plaintiff to sign to work for MSA Models purports to require agreement with the legal conclusion that MSA is "not an employment agency" and/or "not a theatrical employment agency." (Am. Cplt. ¶ 126).

32)     On June 30, 2014, Defendants sent Plaintiff correspondence demanding payment of "commissions" of 20% on all of Plaintiff's wages associated with fit modeling with Cache, or any other apparel industry client, through March 2016. The letter referenced MSA's position that it was exercising its "exclusive rights" under the MSA employment contract. Defendants' demand for payment of these commissions was in violation of GBL § 185 because it exceeded the 10% cap and the requirement that any commission be the result of Defendants assisting Plaintiff in obtaining the related employment with Cache and/or additional apparel industry clients imposed by GBL § 185. (Am. Cplt. ¶ 145).

33)     At all times relevant, Defendants have restricted MSA fit models from acting like independent business people by, *inter alia*, prohibiting them from: (1) working for more than one modeling agency as fit models; (2) performing fit modeling services for an apparel industry client without MSA's permission; and/or (3) obtaining employment without a 20%-40% "commission" to MSA from their wages from fit modeling work, in violation of GBL § 185. (Am. Cplt. ¶ 172).

34)     Article 11 was passed to protect vulnerable workers from unscrupulous employment agencies, in support of health and public welfare. (Am. Cplt. ¶ 215).

35)     MSA is an "employment agency" within the meaning of GBL Article 11, § 171(2). (Am. Cplt. ¶ 216).

36)     MSA holds itself out to the public, and to potential MSA fit models, as an organization that, for a fee, will obtain or attempt to obtain employment and/or engagement for models, and whose primary purpose and activities are to obtain employment and/or engagements for models. (Am. Cplt. ¶ 217).

37)     Defendants' primary business activity is to, for a fee, obtain and/or attempt to obtain, employment and/or engagements for models. (Am. Cplt. ¶ 218).

38) In addition, or in the alternative, Defendants' primary business activity is to, for a fee, render vocational guidance or counseling services (as explicitly acknowledged in the MSA contract) and directly or indirectly: (1) procure or attempt to procure or represent that they can procure employment or engagements for persons seeking modeling employment or engagements; (2) represent that they have access, or have the capacity to gain access, to modeling jobs not otherwise available to those not purchasing their services; and/or (3) provide information or services purporting to promote, lead to or result in modeling employment for the applicant with any employer other than himself. (Am. Cplt. ¶ 219).

39)     Plaintiff and similarly situated MSA fit models are "artists" within the meaning of GBL § 171(8-a) because they are models. (Am. Cplt. ¶ 222).

40)     MSA is not presently licensed, and has not been licensed as an employment agency by the NYC Department of Consumer Affairs since November 2010, as required by GBL § 172. MSA has therefore been operating in violation of GBL § 172 as an unlicensed employment agency for more than four years. (Am. Cplt. ¶ 223).

41)     The operation of an unlicensed employment agency is a misdemeanor punishable by imprisonment not to exceed one year pursuant to GBL § 190. (Am. Cplt. ¶ 224).

42)     Defendants have also, as a matter of course, violated GBL § 185, by charging its models a commission of at least 20% of their wages from modeling employment, regardless of whether Defendants assisted in obtaining the relevant employment. GBL § 185 imposes a 10% fee cap on the amount of wages that employment agencies, such as Defendants, may charge for obtaining employment. (Am. Cplt. ¶ 225).

43)     Upon information and belief, MSA Models has failed to comply with any of the requirements for employment agencies stated in Article 11 of the GBL. (Am. Cplt. ¶ 226).

44)     Defendants previously operated as an employment agency from 2001 to November 2010, when MSA surrendered its employment agency license in November 2010. (Am. Cplt. ¶ 227).

45)      Because the MSA employment contract violates the licensing requirement of GBL § 172, as compounded by Defendants additional violation of GBL § 185 by charging a 20% commission against models' wages, Defendants may not prospectively enforce their contractual right to commissions above the 10% amount permitted by GBL § 185. (Amended Cplt. ¶ 228).

46)      Such non-enforcement is not out of proportion to the requirements of public policy or appropriate individual punishment, and the public interest in the enforcement of MSA's illegal contract for commissions is clearly outweighed by the public policy behind GBL § 185. This is particularly so given MSA's previous acknowledgment that its operations required an employment agency license until November 2010. (Am. Cplt. ¶ 229).

47)      Defendants have a policy and/or practice of deducting wages and/or charging MSA fit models commissions higher than the 10% fee described in GBL § 185 (for class C employees). (Am. Cplt. ¶ 230).

48)      Defendants have a policy and/or practice of charging its apparel industry clients commissions above the 10% fee permitted by GBL § 185. (Am. Cplt. ¶ 231).

49)      In the alternative, to the extent GBL § 185 authorizes deductions of commissions from Plaintiff and similarly situated MSA fit models' wages, Defendants have deducted more than the 10% fee authorized by GBL § 185(8), and/or deducted such fees from wages related to employment Defendants did not assist the fit model in obtaining, and all deductions of commissions above the 10% amount permitted by GBL § 185 have been violations of NYLL § 193. (Am. Cplt. ¶ 234).

50)      In the alternative, to the extent GBL § 185 has authorized deductions from the wages of Plaintiff and the members of the Fit Model Class, that authorization was limited to deductions totaling a maximum fee of 10% of models' wages, and deductions above this amount were not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency. (Am. Cplt. ¶ 304).

51)      Defendants have operated as an unlicensed employment agency since November 2010 in violation of GBL § 172. (Am. Cplt. ¶ 320).

52)      Defendants' employment contracts with Plaintiff and the members of the Fit Model Class contain a contractual provision entitling Defendants to charge Plaintiff and the members of the Fit Model Class commissions of (at least) 20% of their wages from fit modeling work, whether or not Defendants assist in obtaining such fit modeling work. This contractual provision explicitly violates GBL § 185. (Am. Cplt. ¶ 321).

53)      Since November 2010, during its operation as an unlicensed employment agency, Defendants have charged illegal commissions exceeding the 10% fee permitted by GBL § 185, against the wags [sic] of Plaintiff and the members of the Fit Model Class. (Am. Cplt. ¶ 322).

54)      Upon information and belief, Defendants intend to continue to enforce their illegal contractual commission provision of (at least) 20%, against Plaintiff and the members of the Fit Model Class, with respect to their wages from fit modeling work, with respect to fit modeling work that occurred during Defendants' unlicensed operation as an employment agency since November 1, 2010, exceeding the 10% fee authorized by GBL § 185. (Am. Cplt. ¶ 323).

55)      There is a substantial and continuing controversy between Defendants on the one hand, and Plaintiff and the members of the Fit Model Class on the other, and a declaration of

rights is both necessary and appropriate to establish whether, and/or to what extent, Defendants may prospectively enforce the illegal contractual commission provision of their employment contracts, against Plaintiff and the members of the Fit Model Class, with respect to fit modeling work that occurred during Defendants' unlicensed operation as an employment agency since November 1, 2010, exceeding the 10% fee authorized by GBL § 185. (Am. Cplt. ¶ 324).

**B.   Plaintiff's Claims About The Modeling Industry Generally Must Be Dismissed Because The Modeling Industry, In General, Is Not A Defendant In This Case**

Plaintiff has alleged a number of claims about the New York City modeling industry, in general, that are not aimed directly (or in some circumstances, at all) at MSA or Susan Levine, the only defendants in this case. Alleged wrongdoing on the part of the amorphous New York City modeling industry, in general, cannot be imputed to MSA. Likewise, such conjectural, non-MSA specific conduct cannot be used to bolster Plaintiff's claims against MSA at the pleading stage. Accordingly, all of Plaintiff's claims alleging wrongdoing on the part of the modeling industry, in general, should be dismissed. Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 515 (S.D.N.Y. 2009) (granting motion to dismiss against certain defendants because "the Court cannot accept the CAC's reference to a history of fraud in the municipal derivatives market as a factual averment that supports the CAC's present claims, at least as to some of the Joint Defendants whose alleged unlawful conduct is not otherwise plausibly verified. . . . [T]hese allegations do not make the claims against any of such Defendants more plausible."). The claims that must be dismissed for these reasons include:

56)    Many if not all, New York City ("NYC") modeling agencies, including MSA Models, operate without regard for the various applicable labor laws covering models' work. These NYC modeling agencies' wage and hour violations arise from the near industry-wide misclassification of NYC models as independent contractors. (Am. Cplt. ¶ 4).

57)    Through this misclassification, many, if not all, NYC modeling agencies seek to avoid application of the minimum wage, overtime, non-deduction, and timely payment requirements of federal and state wage and hour laws applicable to the models they employ. (Am. Cplt. ¶ 5).

58)     The result is a NYC modeling industry in which models with low bargaining power are frequently not paid all of their earned wages, are paid wages late, are paid wages only after complaining about non-payment, and/or are simply not paid at all. (Am. Cplt. ¶ 6).

59)     Although many, if not all, NYC modeling agencies maintain that their models are independent contractors, this nearly industry-wide imposed label is often legally incorrect. (Am. Cplt. ¶ 7).

60)     As a result of NYC modeling agencies' near industry-wide misclassification of models as independent contractors, many, if not all NYC modeling agencies, are liable to their past and current models for unpaid minimum wages, unpaid overtime wages, unpaid earned wages, late payment of wages, and illegal deductions, as well as associated liquidated damages and interest. (Am. Cplt. ¶ 8).

61)     Accordingly, these NYC modeling agencies' collective evasion of wage and hour protections has resulted in millions of dollars in lost wages to these agencies models and, in turn, millions of dollars in illegal profits for these NYC modeling agencies. (Am. Cplt. ¶ 9).

62)     As a result, although modeling is often seen as a glamorous career in New York City, it is often quite the opposite. (Am. Cplt. ¶ 10).

63)     Most models receive modest wages for their work: the U.S. Bureau of Labor Statistics' *Occupational Outlook Handbook* lists the median pay for U.S. models in 2012 as $18,750 per year and $9.02 per hour. (Am. Cplt. ¶ 11).

64)     Accordingly, models that have provided a service that has enriched NYC modeling agencies and the apparel industry clients that require fit models' services to design clothing, are only marginally compensated, or not compensated at all, all within an apparel manufacturing industry grossing millions of dollars. (Am. Cplt. ¶ 12).

65)     MSA, and many, if not all, NYC modeling agencies' misclassification of their models as independent contractors has similarly resulted in MSA and NYC modeling agencies' failure to pay unemployment benefits, obtain workers' compensation insurance, or pay applicable social security taxes with respect to their models. (Am. Cplt. ¶ 16).

66)     In addition to misclassifying their models as independent contractors, many, if not all, NYC modeling agencies, including MSA, go one step further to increase their profits at the expense of both NYC models and apparel industry clients. While these modeling agencies hold themselves out to the public as organizations that will obtain employment and/or engagement for models, and while the primary purpose and activities of these organizations *is* to obtain employment and/or engagements for models, these agencies have nonetheless "re-classified" themselves as "not employment agencies." (Am. Cplt. ¶ 17).

67)     As chronicled in *Masters v. Wilmhelmina Modeling Agency, Inc.*, No. 02 Civ. 4911 (SDNY), in which a model alleged violations of the Sherman Antitrust Act, there is substantial evidence that many, if not all, NYC modeling agencies jointly sought to "re-classify" themselves by simultaneously maintaining that they were no longer "employment agencies" within the meaning of GBL § 171(2). (Am. Cplt. ¶ 18).

68)     The alleged purpose of this coordinated effort for, many, if not all, NYC modeling agencies, was to collectively evade application of a 10% cap on the fees these modeling agencies may charge their models for obtaining employment and/or engagements. GBL §§ 171(8-a) and

185(1)(b), (4), (8) (class C employees). General Business Law section 185(8) limits the fee employment agencies may charge models for their services to 10% of the employee's income from the position, but these NYC modeling agencies, including MSA, contend that this cap does not apply to the commissions they charge against models' wages. (Am. Cplt. ¶ 19)

69)    These NYC modeling agencies, including MSA, also contend that they may levy these fees against models' pay even where the agency did not obtain the associated employment for the model. However, General Business Law section 185(1)(b) prohibits employment agencies from charging a fee unless the agency referred the model to the paying employer or actually represented the model in negotiating the applicable employment contract. (Am. Cplt. ¶ 20).

70)    Thus, by "re-classifying" themselves as "not employment agencies," these NYC modeling agencies, including MSA, circumvent both the statutory 10% cap on the fees or commissions they may charge against models' wages (GBL § 185(8)), and the statutory requirement that the agency must actually assist the model to obtain employment and/or an engagement before it may charge the model a commission or fee on wages derived therefrom (GBL § 185(1)(b)). (Am. Cplt. ¶ 21).

71)    In addition, GBL § 185 caps the fee an employment agency may charge the apparel industry client at 10%. These NYC modeling agencies likewise seek to avoid this limit by a "re-classification" as "not employment agencies." GBL § 185(1)(b). (Am. Cplt. ¶ 22).

72)    Many, if not all, NYC modeling agencies, including MSA, attempt to contract around GBL § 185, by including non-negotiable language in their employment agreements unilaterally labeling themselves as "not employment agencies." (Am. Cplt. ¶ 23).

73)    Under that cover, NYC modeling agencies, including MSA, typically impose a 20% contractual "commission" on the wages earned by their models. Indeed, many, if not all, NYC modeling agencies, including MSA, include provision for payment of this 20% commission in their employment contracts, even when a model finds work without the assistance or involvement of their modeling agency. Both of these practices explicitly violate the plain language of GBL § 185. GBL § 185(1)(b), (4), (8) (class C employees). (Am. Cplt. ¶ 24).

74)    Many, if not all, NYC fit modeling agencies, including MSA, charge an additional 20% "service fee" to the apparel industry client when they book the fit model with the client, in violation of GBL § 185(1)(b). (Am. Cplt. ¶ 25).

75) In the case of MSA Models, if the apparel industry client refuses to pay the "service fee," Defendants simply deduct this "service fee" fee from their models' wages. As a result, Defendants' deductions to models' wages in commissions can be as high as 40%. (Am. Cplt. ¶ 26).

**C.      Plaintiff's Claim Alleging Violations of FLSA Recordkeeping Provisions Should Be Dismissed Because There Is No Private Right Of Action for FLSA Record-Keeping Claims**

Plaintiff alleges: "Upon information and belief, Defendants failed to make, keep, and preserve complete and/or accurate records with respect to Plaintiff and the members of the Fit Model Collective, [sic] as to workweeks, hours spent during required in-person meetings with Levine, and/or hours spent at go-sees, resulting in incomplete records of all hours worked each workday and all hours worked each workweek, as required by the FLSA at 29 U.S.C. § 211(c), and supporting federal regulations. In the alternative, Defendants have maintain [sic] such records." (Am. Cplt. ¶ 243). There is no private right of action for record-keeping violations under the FLSA, however. Thus, Plaintiff's claims seeking recovery for such violations should be dismissed with prejudice. Fed. R. Civ. P. 12(b)(1); Fed. R. Civ. P. 12(b)(6); *Chen v. Major League Baseball*, 6 F. Supp. 3d 449, 460 n.11 (S.D.N.Y. 2014) (granting defendant's motion to dismiss and stating "the general consensus is that the FLSA provides no private right of action for recordkeeping violations.") (citations omitted); *Mariano v. Town of Orchard Park,* No. 09-cv-916S, 2011 U.S. Dist. LEXIS 135915, at *8-9 (W.D.N.Y. Nov. 18, 2011) (dismissing claims of improper record-keeping under the FLSA, with prejudice, because there is no stand-alone cause of action for such violations); *Cunningham v. Elec. Data Sys. Corp.*, 579 F. Supp. 2d 538, 542-543 (S.D.N.Y. 2008) ("While Plaintiffs allege in the Amended Complaint that Defendant has failed to keep adequate records in violation of the FLSA, including 29 U.S.C. §§ 211(c) and 215(a), it is not entirely clear that Plaintiff seeks any recovery based on this [sic] allegations. In any case, Defendant is correct that there is no private right of action to enforce these provisions. . . . Therefore, to the extent Plaintiffs' complaint purports to assert a claim under the FLSA's record-keeping provisions, Defendant's motion to dismiss this claim is granted.") (citation omitted).

15

**D.    Plaintiff's Class And Collective Allegations Should Be Dismissed Because They Do Nothing More Than Parrot The Elements Of The Implicated Statute[5]**

A complaint can only survive a motion to dismiss if the complaint contains sufficient factual matter that, if accepted as true, states a claim to relief that is plausible, not merely possible, on its face. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557; *Nakahata v. New York Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192 (2d Cir. 2013); *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013); *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 918 (2014); *see also Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638 (9th Cir. 2014); *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236 (3d Cir. 2014); *Pruell v. Caritas Christi*, 678 F.3d 10, 14 (1st Cir. 2012). Complaints that contain only threadbare recitals of the elements of a cause of action supported by mere conclusory statements should be dismissed. *Id*. Pleadings that are "'no more than conclusions . . . are not entitled to the assumption of truth.'" *Lundy*, 711 F.3d at 113 (citation omitted); *DeJesus*, 726 F.3d at 87-88. In order to survive a motion to dismiss, a claim must do more than parrot the elements of the statute at issue. *DeJesus*, 726 F.3d at 89 (dismissing FLSA complaint because "[w]hatever the precise level of specificity that was required of the complaint, [plaintiff] was at least required to do more than repeat the language of the statute.") (footnote omitted); *Iqbal*, 556 U.S. 662; *Twombly*, 550 U.S. 544. Doing more than merely echoing the statute in question is what moves a complaint from merely plausible to probable.

In the context of FLSA minimum wage and overtime claims, a plaintiff must do more than simply allege she worked more than 40 hours in a week and was not paid for all hours or

---

[5] Plaintiff's Amended Complaint has fixed some of these issues with respect to Plaintiff's allegations on behalf of herself, but the Amended Complaint still falls short of the *Twombly* and *Iqbal* standard for pleading with specificity on behalf of the class and collective action allegations.

that her pay dipped below minimum wage. Rather, a plaintiff must allege approximately when she performed the work for which she claims she is owed money. A plaintiff should also allege approximately how much work she performed for which she is seeking compensation. A plaintiff does not need to have exact figures for a complaint, but a plaintiff must allege more than simply the violation she is complaining about happened. *See, e.g., Johnson v. Equinox Holdings, Inc.*, No. 13 Civ. 6313, 2014 U.S. Dist. LEXIS 91786 (S.D.N.Y. July 2, 2014). Though an approximation of how much money a plaintiff is seeking is not required, it can help draw a plaintiff's claim closer to plausibility. *Lundy*, 711 F.3d at 114, n.7. While the Amended Complaint contains such approximations with respect to Plaintiff, no such approximations are alleged for anyone else in the putative class or collective. "[W]here a plaintiff brings an FLSA claim 'for and in behalf of himself . . . and other employees similarly situated,' the complaint should indicate who those other employees are, and allege facts that would entitle them to relief." *See Zhong v. August August Corp.*, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007) (citation omitted). Plaintiff has failed to do that here. Rather, all she has done is parrot the governing statutes and allege:

76) Upon information and belief, MSA Models has implemented a policy and/or practice of failing to pay fit models minimum wages, failing to pay fit models overtime wages, failing to pay fit models all of their earned wages, failing to pay wages promptly, failing to pay fit models unless and until they specifically request payment of their wages, and/or making illegal deductions to models' wages. (Am. Cplt. ¶ 15).

77) This action seeks to recover for Plaintiff, and similarly situated MSA fit models, minimum wages, wages currently due, late wages, unlawful deductions, and associated liquidated damages, including but not limited to, minimum wages for time spent during go-sees (initial meetings with potential apparel industry clients) and required in-person meetings with MSA Models owner Susan Levine, payment of all unpaid earned wages, liquidated damages for all wage payments that were eventually made but were not made promptly within the meaning of the FLSA, as well as Defendants' unlawful deductions of commissions from MSA fit models' wages, all pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and/or the New York Labor Law ("NYLL"), Article 6 §§ 190 *et seq.* and Article 19, §§ 650 *et seq.* (Am. Cplt. ¶ 27).

78)     Plaintiff and the Fit Model Collective further allege that Defendants have had and/or have a policy or practice of failing to pay Plaintiff and the Fit Model Collective their minimum wages and/or not paying minimum wages promptly as required by the FLSA, inclusive of a policy or practice of not paying wages and/or minimum wages for more than a month after the wages were earned by the performance of fit modeling services. (Am. Cplt. ¶ 98).

79)     The Fit Model Collective consists of many similarly situated individuals to whom Defendants have not paid the federal minimum wage, or to whom they have not paid minimum wages promptly, within the meaning of the FLSA, and who would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit. (Am. Cplt. ¶ 99).

80)     The Representative Plaintiff's claims are typical of the claims of the Class. Plaintiff and the Fit Model Class were subject to the same or very similar compensation policies and practices and have sustained the same or similar types of damages as a result of Defendants' violations of the NYLL. (Am. Cplt. ¶ 108).

81)     Under the FLSA and the NYLL more than one employer may be responsible for the failure to pay wages. (Am. Cplt. ¶ 194).

82)     At all times relevant, Defendants have been joint employers of MSA fit models within the meaning of the FLSA and NYLL: they (1) had the power to fire and hire Plaintiff and the members of the Fit Model Class and the Fit Model Collective; (2) supervised and controlled the schedules and conditions of employment of Plaintiff and the members of the Fit Model Class and the Fit Model Collective; (3) determined the rate and method of payment of Plaintiff and the members of the Fit Model Class and the Fit Model Collective; and (4) maintained employment records of Plaintiff and the members of the Fit Model Class and the Fit Model Collective, with respect to, *inter alia*, their rates of pay, hours worked, and deductions from wages. (Am. Cplt. ¶ 195).

83)     Upon information and belief, MSA has a policy or practice of not paying MSA fit models promptly, within the meaning of the FLSA, inclusive of paying such models more than a month after they performed fit modeling work, which has resulted in Plaintiff and similarly situated MSA fit models receiving less than the federal minimum wage. (Am. Cplt. ¶ 204).

84)     Upon information and belief, MSA has a policy or practice of failing to pay MSA fit models for all wages earned. (Am. Cplt. ¶ 205).

85)     Upon information and belief, Defendants have still not paid members of the Fit Model Class and Fit Model Collective hundreds of thousands, if not millions, of dollars in earned wages. (Am. Cplt. ¶ 206).

86)     Upon information and belief, Defendants have a policy and/or practice of paying overdue wages only when MSA fit models complain about underpayments. (Am. Cplt. ¶ 207).

87)     Upon information and belief, the delays in payment of wages to Plaintiff, and similarly situated fit models, were intentional and increased Defendants' profits through additional accrued interest to Defendants (*i.e.* "the float"), and/or because these delays in payment otherwise financially benefited Defendants. (Am. Cplt. ¶ 208).

88)     Upon information and belief, Defendants' non-payment of earned wages to MSA's fit models was intentional, and financially benefited Defendants, by permitting Defendants to obtain payment for the full value of its models' services from apparel industry clients at no cost to

MSA. (Am. Cplt. ¶ 209).

89)     There is no reasonable business justification for Defendants' substantial delays in paying wages and/or non-payment of wages to Plaintiff and similarly situated MSA fit models. (Am. Cplt. ¶ 210).

90)     Defendants use several mechanisms to enforce compliance with their above-described rules, policies, practices, procedures, and/or requirements, and/or to sanction those MSA fit models that do not comply, including but not limited to threatening, and in some instances, they would in fact: (1) stop attempting to book a model on go-sees: (2) prohibit a model from working for a specific apparel industry client; and/or (3) remove the model from MSA's website (*i.e.* the board). (Am. Cplt. ¶ 211).

91)     Defendants also use several contractual mechanisms to enforce compliance with Defendants' above-described policies, including but not limited to, the following employment contract provisions, which Defendants use to deter MSA models from leaving MSA or pursuing any dispute with MSA, and to threaten and pursue MSA models when they leave or pursue a dispute with MSA. (Am. Cplt. ¶ 212).

92)     MSA's employment contract states: "in the event Model breaches this Agreement or otherwise refuses to fulfill Model's obligations hereunder . . . MSA may at its sole election, (i) retain as liquidated damages *all funds then held and/or subsequently received by MSA on Model's behalf*, or (ii) seek all legal and/or equitable remedies then available to MSA, in which event MSA shall, pending the resolution of MSA's claims, be entitled to hold the funds referred to in the preceding clause (i) as security for any judgment MSA may obtain against Model in connection with such claims." (Emphasis added.) MSA utilizes this clause to threaten and/or punish MSA fit models that do not comply with its requirements, and/or by actually withholding their wages, leaving these models without any immediate recourse to gain access to their income until they comply with MSA's wishes. (Am. Cplt. ¶ 213).

93)     MSA's employment contract states: "Model shall be responsible for paying all reasonable outside attorney's fees' and other collection costs (including, without limitation, any percentage-based and/or other third party fees) incurred by MSA in the enforcement of this agreement and/or its rights and remedies hereunder, whether or not an arbitration or other legal action is initiated or filed." MSA utilizes this clause to threaten models that do not comply with its requirements, and/or pursue disputes with MSA, with financial ruin. (Am. Cplt. ¶ 214).

94)     Defendants have also, as a matter of course, violated GBL § 185, by charging its models a commission of at least 20% of their wages from modeling employment, regardless of whether Defendants assisted in obtaining the relevant employment. GBL § 185 imposes a 10% fee cap on the amount of wages that employment agencies, such as Defendants, may charge for obtaining employment. (Am. Cplt. ¶ 225).

95)     Because the MSA employment contract violates the licensing requirement of GBL § 172, as compounded by Defendants additional violation of GBL § 185 by charging a 20% commission against models' wages, Defendants may not prospectively enforce their contractual right to commissions above the 10% amount permitted by GBL § 185. (Am. Cplt. ¶ 228).

96)     Defendants have a policy and/or practice of deducting wages and/or charging MSA fit models commissions higher than the 10% fee described in GBL § 185 (for class C employees). (Am. Cplt. ¶ 230).

97)    Defendants have a policy and/or practice of making illegal deductions of "commissions," contractual liquidated damages, and/or a contractual "security" from MSA fit models' wages in violation of NYLL § 193. These illegal policies and practices are explicitly stated in Plaintiff's, and upon information and belief, similarly situated MSA fit models', MSA employment contracts. (Am. Cplt. ¶ 232).

98)    Defendants' deductions from Plaintiff's and similarly situated MSA fit models' wages were not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency. (Am. Cplt. ¶ 233).

99)    Defendants' deductions of commissions from MSA fit models' wages were not for the benefit of Plaintiff or similarly situated MSA fit models. (Am. Cplt. ¶ 235).

100)    Defendants' deductions of contractual "liquidated damages" and/or contractual "security" were not for the benefit of Plaintiff or similarly situated MSA fit models. (Am. Cplt. ¶ 236).

101)    Defendants' deductions of its commissions were, *inter alia*, for the purpose of paying Defendants' administrative costs, which is explicitly prohibited by NYLL § 193 and supporting New York State Department of Labor Regulations. (Am. Cplt. ¶ 237).

102)    The provision in Defendants' employment contract for the authorization of deductions from MSA fit models' wages was not entered into voluntarily, within the meaning of NYLL § 193(1)(b) and related regulations, by Plaintiff and similarly situated fit models. (Am. Cplt. ¶ 238).

103)    Defendants' deductions for any and all "expenses," as described in the MSA employment contract, is not authorized by NYLL § 193 and supporting New York State Department of Labor Regulations. (Am. Cplt. ¶ 239).

104)    Defendants' use of a non-interest-bearing "reserve account," as described above, is an unlawful deduction from wages prohibited by NYLL § 193, and supporting New York State Department of Labor Regulations. (Am. Cplt. ¶ 240).

105)    The MSA employment contract Plaintiff signed and, upon information and belief, those signed by the Fit Model Class, explicitly describe and/or refer to the above-referenced wage deductions related to the "reserve account" as "deductions." (Am. Cplt. ¶ 241).

106)    Defendants have also deducted wages in violation of NYLL § 193 by taking Plaintiff, and similarly situated MSA fit models' wages, based on the MSA employment contracts' liquidated damages and "security" provisions. The withholding of Plaintiff and the Fit Model Class' earned wages based on these contractual provisions are illegal deductions that are not authorized by NYLL § 193. (Am. Cplt. ¶ 242).

107)    Defendants have had and have a widespread pattern, policy, and/or practice of failing to provide Plaintiff and the Fit Model Class the notice required by NYLL § 195(1) and/or the Guidelines Regarding Notice and Acknowledgement of Wage Rate/Temporary Help Firms. (Am. Cplt. ¶ 245).

108)    Defendants did not inform Plaintiff, or the members of the Fit Model Class, in writing, at the time of the initial interview and/or hire, of: (1) the range of hourly wages he or she would likely earn based upon his/her qualifications and assignment suitability, based on a good faith, non-overbroad estimate of the typical wage earned by similarly qualified employees

20

working at assignments similar to those for which the applicant-employee was eligible and likely to be assigned; (2) the designated pay day and/or notice that the pay day may vary depending upon the usual practice at the assignment; and/or (3) the employee's rights, in general, to overtime compensation. (Am. Cplt. ¶ 247).

109)    Defendants did not provide Plaintiff, or the members of the Fit Model Class, with the Department of Labor "Notice and Acknowledgement of Wage Rate(s)/Temporary Help Firms" form (LS 51) and/or other notice required by NYLL § 195(1). (Am. Cplt. ¶ 248).

110)    Defendants did not obtain the signature of Plaintiff, or, upon information and belief, of the members of the Fit Model Class, on form LS 51 and/or other notice required by NYLL § 195(1). (Am. Cplt. ¶ 249).

111)    Defendants did not provide Plaintiff, or the members of the Fit Model Class, a copy of the signed Notice and Acknowledgement of Wage Rate(s)/Temporary Help Firms (LS 51) and/or other notice required by NYLL § 195(1), or keep the original signed form in Defendants' files. (Am. Cplt. ¶ 250).

112)    Defendants failed to notify Plaintiff and the members of the Fit Model Class, orally or in writing, at the time they were booked with an apparel industry client, of: (1) the specific designated pay day for the particular assignment; and/or (2) the overtime rate of pay he or she would receive; or, if applicable, inform Plaintiff and the members of the Fit Model Class that the position is exempt from additional overtime compensation and the basis for the overtime exemption. (Am. Cplt. ¶ 251).

113)    Defendants did not establish, maintain and preserve, for not less than six years, the original signed copy of the form Notice and Acknowledgement of Wage Rate(s)/Temporary Help Firms (LS 51) and/or other notice required by NYLL § 195(1) and/or the Guidelines Regarding Notice and Acknowledgement of Wage Rate/Temporary Help Firms. (Am. Cplt. ¶ 252).

114)    Defendants have also had a widespread pattern, policy, and/or practice of failing to comply with the payment notice requirements of NYLL § 195(3) and/or the Guidelines Regarding Notice and Acknowledgement of Wage Rate/Temporary Help Firms, by failing to provide Plaintiff and the members of the Fit Model Class with a statement, along with each paycheck, listing the number of hours worked reflected in the wages contained in the paycheck, and/or the regular and overtime wage rate paid for the hours worked for each go-see, booking, and/or fit modeling assignment. (Am. Cplt. ¶ 253).

115)    At all times relevant, Plaintiff and the members of the Fit Model Collective were employed and/or jointly employed by Defendants within the meaning of the FLSA. (Am. Cplt. ¶ 256).

116)    At all times relevant, Defendants have had a widespread pattern, policy, and/or practice of violating the FLSA, as detailed in this Class and Collective Action Complaint, including misclassifying Plaintiff and the members of the Fit Model Collective as independent contractors, and failing to pay them the minimum wage for all hours Defendants suffered or permitted them to work, inclusive of a policy or practice of not paying for time spent performing fit modeling services on go-sees and/or attending in-person meetings with Levine, which failures resulted in minimum wage violations for time spent on go-see and meetings with Levine, during workweeks when such fit models did not have a booking with an apparel industry client, and/or did not otherwise receive payment from Defendants for any other work.

(Am. Cplt. ¶ 257).

117)    At all times relevant, Defendants failed or refused to pay Plaintiff and the members of the Fit Model Collective at a rate equal to or greater than the federal minimum wage for all weeks worked, which violated the FLSA. 29 U.S.C. § 206. (Am. Cplt. ¶ 259).

118)    Defendants have failed to pay Plaintiff and the members of the Fit Model Collective the minimum wages to which they were entitled under the FLSA. (Am. Cplt. ¶ 263).

119)    Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiff and the members of the Fit Model Collective and/or their non-compliance has been willful. (Am. Cplt. ¶ 264).

120)    As a result of the unlawful acts of Defendants, Plaintiff and the members of the Fit Model Collective have been deprived of minimum wage compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b). (Am. Cplt. ¶ 265).

121)    As a result of Defendants' willful violations of the FLSA, Plaintiff and the members of the Fit Model Collective have suffered damages by being denied minimum wages in accordance with 29 U.S.C. §§ 201 *et seq*. (Am. Cplt. ¶ 266).

122)    At all times relevant, Plaintiff and the members of the Fit Model Collective were employed and/or jointly employed by Defendants within the meaning of the FLSA. (Am. Cplt. ¶ 269).

123)    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating the FLSA, as detailed in this Class and Collective Action Complaint, including misclassifying Plaintiff and the members of the Fit Model Collective as independent contractors and failing to pay them the minimum wage for all hours Defendants suffered or permitted them to work. (Am. Cplt. ¶ 270).

124)    Defendants failed to pay Plaintiff and the members of the Fit Model Collective promptly after their wages were earned, including failing to pay them any wages within a month of their wages being earned through providing fit modeling services, during numerous workweeks, in violation of the FLSA. As a result, Plaintiff and the members of the Fit Model Collective were paid less than the minimum wage during these workweeks. (Am. Cplt. ¶ 274).

125)    Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiff and the members of the Fit Model Collective and/or their noncompliance has been willful. (Am. Cplt. ¶ 275).

126)    As a result of the failure to pay wages promptly, Plaintiff and the members of the Fit Model Collective have suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts and/or liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b). (Am. Cplt. ¶ 276).

127)    Defendants failed to pay Plaintiff and the members of the Fit Model Class all of the minimum wages to which they are entitled under the NYLL. (Am. Cplt. ¶ 279).

128)    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating the NYLL, as detailed in this Class and Collective Action Complaint,

including misclassifying Plaintiff and the members of the Fit Model Class as independent contractors, and failing to pay them the minimum wage for all hours Defendants suffered and permitted them to work, inclusive of a policy or practice of not paying for time spent performing fit modeling services on go-sees and/or attending required in-person meetings with Levine, which failures resulted in minimum wage violations for time spent on go-sees and meetings with Levine, during workweeks when such fit models did not have a booking with an apparel industry client, and/or did not otherwise receive payment from Defendants for any other work. (Am. Cplt. ¶ 280).

129) Within the relevant time period, Defendants failed to pay Plaintiff and members of the Fit Model Class minimum wages for all hours worked to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations. (Am. Cplt. ¶ 284).

130) By Defendants' knowing and/or intentional failure to pay Plaintiff and the members of the Fit Model Class minimum wages for all of the hours they worked, Defendants have willfully violated NYLL § 650 *et. seq.* and the supporting New York State Department of Labor regulations. (Am. Cplt. ¶ 285).

131) Due to Defendants' violations of the NYLL, Plaintiff and the members of the Fit Model Class are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest. (Am. Cplt. ¶ 286).

132) At all times relevant, Defendants have been employers and/or joint employers within the meaning of the NYLL. (Am. Cplt. ¶ 288).

133) At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating NYLL § 191, as detailed in this Class and Collective Action Complaint, inclusive of a widespread pattern, policy, and/or practice of failing to pay wages within the time periods required by NYLL § 191. (Am. Cplt. ¶ 292).

134) At all times relevant, Defendants willfully failed to pay Plaintiff and the members of the Fit Model Class all of their wages on a weekly or bi-weekly basis. (Am. Cplt. ¶ 293).

135) By Defendants' knowing and/or intentional failure to pay Plaintiff and the members of the Fit Model Class, Defendants have willfully violated the NYLL and the supporting New York State Department of Labor regulations. (Am. Cplt. ¶ 294).

136) These unpaid earned wages are still due to Plaintiff and the members of the Fit Model Class. (Am. Cplt. ¶ 295).

137) Due to Defendants' violations of the NYLL, Plaintiff and the members of the Fit Model Class are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest. (Am. Cplt. ¶ 296).

138) At all times relevant, Defendants have been employers and/or joint employers within the meaning of the NYLL. (Am. Cplt. ¶ 298).

139) Defendants have willfully and/or intentionally reduced the wages of Plaintiff and the members of the Fit Model Class by making unlawful deductions from their wages. (Am. Cplt. ¶ 301).

140)    At all times relevant, Defendants have engaged in a widespread pattern, policy, and/or practice of violating NYLL 193, as detailed in this Class and Collective Action Complaint, inclusive of a widespread pattern, policy, and/or practice of applying illegal deductions to Plaintiff and the members of the Fit Model's Class' wages from fit modeling employment. Defendants have had a widespread pattern, policy, and/or practice of making deductions to the wages of Plaintiff, and the members of the Fit Model Class, with respect to Defendants' 20% "commission," 20% "service charge," withholding of wages as "liquidated damages" and/or a "security," and/or other expenses asserted by MSA. (Am. Cplt. ¶ 302).

It is impossible to determine from Plaintiff's pleading how much and when members of the putative class and collective worked without being paid minimum wage – and who among those members other than Plaintiff, specifically, worked without being paid the minimum wage, or worked without being paid on time. In *Lundy*, 711 F.3d at 114, the Second Circuit upheld the dismissal of plaintiffs' FLSA claims because the plaintiffs had not alleged "a single workweek" in which they worked uncompensated time in excess of 40 hours. Rather, they just alleged they "typically" worked a given number of hours or "occasionally" worked extra time. Plaintiff's claims here do not even go that far, as she does not allege that anyone else typically or occasionally worked uncompensated time. Rather, she simply parrots the statutes at issue and says the minimum wage was not paid for all hours worked. This is not enough to survive a motion to dismiss. *See Gisomme v. Healthtex Corp.*, No. CV 13-2541, 2014 U.S. Dist. LEXIS 67588, at *6 (E.D.N.Y. May 15, 2014) (dismissing plaintiffs' claims because "the Second Circuit requires that plaintiffs provide 'sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week.'") (citation omitted); *Ramos v. City of New York Fire Dep't*, No. 13 Civ. 9225, 2014 U.S. Dist. LEXIS 66449, at *19-20 (S.D.N.Y. May 9, 2014) (dismissing FLSA complaint because, even though there were over 270 named plaintiffs in the action, the complaint failed to plead the dates of any single plaintiff's employment, or number of hours the plaintiff actually or regularly worked during any single week during the period of employment, that would constitute a single

24

plaintiff working more than 40 hours/week); *Nakahata*, 723 F.3d at 199-200 (affirming dismissal of FLSA and NYLL claims because they lacked adequate factual allegations, such as "(i) when unpaid wages were earned and the number of hours worked without compensation;" and (ii) " specific facts of employment including dates of employment, pay, and positions").

### III.     CONCLUSION

As described above, all of Plaintiff's claims under Article 11 of the GBL should be dismissed in their entirety because there is no private right of action under this section of the law, and Plaintiff's predicating declaratory relief upon such claims does not save them. Additionally, Plaintiff's claims of recordkeeping violations under the FLSA should be dismissed because there is no private right of action for such claims. Furthermore, any claims Plaintiff has brought against the modeling industry, in general, should be dismissed because the modeling industry, in general, is not a defendant in this lawsuit. In addition, Plaintiff's claims brought on behalf of the class and collective should be dismissed for failure to plead with the requisite specificity. Accordingly, for the foregoing reasons, Defendants' motion to dismiss should be granted.

Dated: New York, New York
           January 20, 2015

                                                                EPSTEIN BECKER & GREEN, P.C.

                                                                By:            /s Margaret Thering
                                                                        Ronald M. Green
                                                                        Evan J. Spelfogel
                                                                        Margaret C. Thering
                                                                250 Park Avenue
                                                                New York, New York  10177-1211
                                                                (212) 351-4500
                                                                *Attorneys for Defendants*