# DLF | THE DUGGER LAW FIRM PLLC

*Cyrus E. Dugger, Esq.*
*154 Grand St., New York, NY 10013*
*Tel: (646) 560-3208*
*www.theduggerlawfirm.com*

August 6, 2015

**Via ECF**

The Honorable James C. Francis
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, New York 10007

Re:   *Agerbrink v. Model Service LLC d/b/a MSA Models et al.*, No. 14 Civ. 7841 (PO) (JCF)

Dear Judge Francis:

I represent Plaintiff Eva Agerbrink, the putative class, and the putative collective in the above-referenced litigation. I write to request a corrective notice and additional relief as a result of a class communication regarding this litigation made by Bill Ivers ("CCO Ivers"), the Chief Operating Officer for Defendant Model Service, LLC d/b/a MSA Models' ("MSA" or "MSA Models"), and sent on or about May 7, 2015 (the "May 7 Email").

Specifically, Plaintiff respectfully requests that the Court issue an order:

(1) requiring COO Ivers to send a corrective notice, via email, to all recipients of the May 7 Email. A proposed version of such notice is attached hereto as Exhibit A; [1]
(2) enjoining COO Ivers from discussing the instant litigation or its purported tax implications with putative class members;
(3) requiring Defendants to immediately produce all additional correspondence, including metadata, between COO Ivers and any MSA fit model relating to the instant litigation, any purported waiver of rights potentially relating to this litigation, or any purported tax implications of this litigation;
(4) requiring that any future communications concerning the lawsuit, and/or its purported tax implications, by any other MSA personnel, shall include the statement "MSA will not retaliate against you for participating in the *Agerbrink v. MSA Models* lawsuit, or retaliate against you for speaking with Ms. Agerbrink's attorney"; and
(5) requiring Defendants to provide a list of the names of the recipients of the May 7 Email.

---

[1]   *See Tedesco v. Mishkin*, 629 F. Supp. 1474, 1483 n.12 (S.D.N.Y. 1986) (ordering similarly-worded corrective notice).

## I.    The May 7 Email

During the Court's initial pretrial conference on July 29, 2015, Plaintiff's counsel objected to the May 7 Email, which, upon information and belief, was sent by COO Ivers to many or all putative class members.[2]  Plaintiff's counsel noted that it appeared the May 7 Email contained misrepresentations regarding this litigation and requested that the Court direct Defendants to produce a copy of the communication.  At the Court's request, Defendants' counsel agreed.  The text of the May 7 Email was provided to Plaintiff's counsel later the same day.  Defendants' counsel, however, failed to produce the subject line of the email, which upon information and belief reads "MSA Models - Solicitation on Linkedin by an attorney representing Eva Agerbrink."

Therefore, upon information and belief, the May 7 Email reads as follows:

***

Subject:  MSA Models - Solicitation on Linkedin by an attorney representing Eva Agerbrink

MSA is currently defending a law suit [sic] brought by Eva Agerbrink. She claims that she and our other Fit Models have been wrongfully classified as independent contractors and should have been classified as employees of MSA.

As an independent contractor you retain control over when, where, for whom and how you wish to work, and at what rates.  MSA helps you get into the business, provides the support you request and helps you manage your careers.

On the other hand, employees work fixed hours, work where and when management tells them, work for hourly rates, and work under close management control.

Ms. Agerbrink's attorney Cyrus Dugger has been reaching out and contacting some of you "to discuss your work with MSA."[3]  What he really wants is for you to become his client and join in this law suit [sic] against MSA so he can earn more legal fees.  Of course, you have a legal right to talk to him, but there are several important things you should know before you decide to do this:

---

[2]    During the initial pretrial conference Defendants' counsel represented to the Court that the putative class consists of only sixty members.  Following a re-review of MSA's website, Plaintiff notes that there is likely a significant disagreement between the parties concerning the actual size of the class.

[3]    In fact, as noted more fully below, the referenced LinkedIn communication actually stated "discuss your *experience* with MSA Models" or "your *experience* as an MSA fit model," in an effort to avoid any dispute with Defendants regarding the characterization of fit models' status as employees in the communication.

1.   Tax Considerations:

Currently, as self-employed independent contractors, you receive IRS form 1099's and file your taxes as independent business persons.  You are allowed under the tax laws to deduct from your reported taxable income substantial legitimate business expenses, such as any fees you pay to MSA or clients and customers and any other costs of doing business such as schooling, photo shoots, management fees and the creation of your portfolios, etc.  There is no income withholding for taxes and similar items.

Employees get IRS form W-2's, have federal, state and City taxes and social security withheld from their pay, and are limited in what employment business expenses they can deduct on their tax returns.

We strongly recommend that before deciding whether to talk to attorney Dugger, you first talk to your personal tax advisor concerning your own individual circumstances and the effect, if any, that the outcome of this case may have on your tax status and to see just what impact there might be on your personal tax situation.

2.   Discovery Considerations:

Persons who talk to attorney Dugger and/or who join the Agerbrink lawsuit may be asked to provide documents or information relating to their work at MSA, and for evidence to support any claim they might make.  They may be required to participate in written and/or oral discovery proceedings including depositions under oath, and they may have to testify under oath in a trial of this matter.

If you have any questions about these matters, I would be pleased to talk with you about them, or to put you in touch with MSA's attorney who, I am sure, could answer any of your concerns.

Sincerely,

Bill[4]

\*\*\*

---

[4]      Significantly, the May 7 Email provided no assurance that MSA would not retaliate against putative class members for participating in the litigation or speaking with Plaintiff's counsel, nor did it notify putative class members of their protections against retaliation under the FLSA and NYLL.

## II.     The Court Has the Authority and Responsibility to Correct Misleading, Coercive, and Otherwise Harmful Communications with Putative Class Members and Opt-Ins

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981); *see also Scott v. Chipotle Mexican Grill, Inc.*, No. 12 Civ. 08333, 2014 U.S. Dist. LEXIS 140060, at *20 (S.D.N.Y. Sept. 29, 2014) ("A district court's authority to control lawyers' conduct is particularly broad in the context of class actions and FLSA collective actions.").

This duty and authority extends to: (1) communications by plaintiffs, defendants, or both; (2) communications both before and after class certification; and (3) both Rule 23 class actions and FLSA collective actions. *See Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 567 (D. Conn. 2011); *Ralph Oldsmobile, Inc. v. GMC*, No. 99 Civ. 4567, 2001 U.S. Dist. LEXIS 13893, at *5 (S.D.N.Y. Sept. 7, 2001); *Brown v. Mustang Sally's Spirits & Grill, Inc.*, No. 12 Civ. 529S, 2012 U.S. Dist. LEXIS 144722, at *5 (W.D.N.Y. Oct. 5, 2012); Fed. R. Civ. P. 23(d)(1)(B) (a court may make appropriate orders "to protect class members and fairly conduct the action -- giving appropriate notice to some or all class members"). The "primary purpose in supervising communications is . . . to ensure that potential members receive accurate and impartial information regarding the status, purposes and effects of the class action." *Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at *6 (quoting *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011)); *see also Erhardt v. Prudential Grp. Inc.*, 629 F.2d 843, 846 (2d Cir. 1980) ("It is the responsibility of the court . . . to safeguard [class members] from unauthorized, misleading communications from the parties or their counsel.").

As this Court has observed, while "in general, communications that are litigation-neutral -- that do not alter the legal relationship between the defendants and members of a putative class -- are not subject to restriction . . . . , courts have a responsibility to restrict communications that are potentially coercive or misleading." *Zamboni v. Pepe W. 48th St. LLC*, No. 12 Civ. 3157, 2013 U.S. Dist. LEXIS 34201, at *8-9 (S.D.N.Y. Mar. 12, 2013) (Francis, J.); *see also In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) ("Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally.").

Indeed, "[i]n some circumstances where there is an ongoing and unequal business or employment relationship between the parties, communications may be deemed *inherently* coercive." *Zamboni*, 2013 U.S. Dist. LEXIS 34201, at *9 (emphasis added); *In re Currency Conversion Fee Antitrust Litig. ("Currency II")*, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005) (quoting *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202 (11th Cir. 1985)) ("A unilateral communications scheme . . . is rife with potential for coercion. If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive."); *Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at *9-10 (quoting *Austen*, 831 F. Supp. 2d at 568) ("when a defendant is in an ongoing, current business relationship with members of a putative class, for example an

4

employment relationship, it may be prudent to preempt the defendant's ability to use the relationship and pressure class members"); *EEOC. v. Morgan Stanley & Co.*, 206 F. Supp. 2d 559, 562 (S.D.N.Y. 2002). In such business contexts, even a record supporting only *potential* coercion may be sufficient to warrant court intervention, particularly where, as here, the putative class members are dependent on the defendant, or the defendant's goodwill, for their financial well-being. *See Ralph Oldsmobile, Inc.*, 2001 U.S. Dist. LEXIS 13893, at *11-12 ("finding of potential coercion . . . warranted" where "the potential class members depend upon the defendant" and "[t]heir continued success . . . may depend upon [the defendants'] good will"); *see also Motisola Malikha Abdallah v. Coca-Cola Co.*,186 F.R.D. 672, 679 (N.D. Ga. 1999) ("simple reality suggests that the danger of coercion is real and justifies the imposition of limitations on [the employer's] communications with potential class members").

Not only should a court protect against "communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class," *Currency Conversion Fee Antitrust Litig.* ("*Currency I*"), 224 F.R.D. 555, 569 (S.D.N.Y. 2004) (quoting *In re Sch. Asbestos Litig.*, 842 F.2d at 683), it must also "ensure that potential class members receive . . . objective, neutral information about the nature of the claims pending before this Court [and] the potential remedies available." *Wachovia Bank N.A.*, 790 F. Supp. 2d at 135 (quoting *Kleiner*, 751 F.2d at 1203) (internal quotation marks omitted)). Courts therefore intervene to address communications that, either intentionally or unintentionally cause confusion, chill participation in the litigation or communication with class counsel, provide non-objective or neutral information, or fail to acknowledge an employer's adverse interests. *See Zamboni*, 2013 U.S. Dist. LEXIS 34201, at *10 (citing *Goody v. Jefferson Cnty*, No. 09 Civ. 437, 2010 U.S. Dist. LEXIS 101212, at *3 (D. Idaho Sept. 23, 2010)); *In re School Asbestos Litig.*, 842 F.2d at 680-82; *Wachovia Bank N.A.*, 790 F. Supp. 2d at 135; *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 633 (N.D. Tex. 1994); *see also Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 602 (2d Cir. 1986).

In short, since "[t]he damage from misstatements could well be irreparable," *Kleiner*, 751 F.2d at 1203, courts may restrict communications with putative class members based on a record supporting either actual or potential harm. *See In re: Sch. Asbestos Litig.*, 842 F.2d at 671; *Veliz v. Cintas Corp.*, No. 3 Civ. 1180, 2004 U.S. Dist. LEXIS 24871, at *14 (N.D. Cal. Nov. 12, 2004) ("A showing of actual harm, however, is not necessary"); *Hampton Hardware*, 156 F.R.D. at 633 ("actual harm need not be proven to justify an order limiting class contacts. Rather, an order limiting contacts is justified upon a finding of 'a likelihood of serious abuses'").

## III.   Counsel For Both Parties Have the Right Communicate Appropriately With Members of the Putative Class

Against this backdrop, "[p]laintiffs [nonetheless] have a right to seek information from putative class members." *Gordon v. Kaleida Health*, 737 F. Supp. 2d 91, 101-02 (W.D.N.Y. 2010); *Mendez v. Enecon Ne. Applied Polymer Sys.*, No. 14 Civ. 6736, 2015 U.S. Dist. LEXIS 90794, at *5 (E.D.N.Y. July 13, 2015); *Dziennik v. Sealift, Inc.*, No. 05 Civ. 4659, 2006 U.S. Dist. LEXIS 33011, at *10 (E.D.N.Y. May 23, 2006) ("As a preliminary matter, plaintiffs generally have a right to contact members of the putative class."). In fact, there is no dispute that *both* parties have the right to engage in *non-coercive, misleading, chilling, and/or threatening*

communications with putative class and collective members, because "*[b]oth* parties need to be able to communicate with putative class members - if only to engage in discovery regarding issues relevant to class certification - from the earliest stages of class litigation." *Austen*, 831 F. Supp. 2d at 563-569 (emphasis added); *Enecon Ne. Applied Polymer Sys.*, 2015 U.S. Dist. LEXIS 90794, at *6-7 (quoting ABA Formal Op. 07-445 (2007)) ("Both plaintiffs' counsel and defense counsel have legitimate need to reach out to potential class members regarding the facts that are the subject of the potential class action, including information that may be relevant to whether or not a class should be certified."); *see also Zamboni*, 2013 U.S. Dist. LEXIS 34201, at *10-11.

## IV.     The Court Should Intervene to Protect the Rights of Putative Class Members

Defendants are entitled to defend against Plaintiff's collective and class action Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") claims. However, their defense should rest on the merits, not misleading statements, coercion or intimidation of economically dependent and vulnerable putative class members, the disparagement of counsel, or confusion.

In sending the May 7 Email, COO Ivers substantially violated Defendants' legal obligations with respect to the instant litigation. As discussed below, the May 7 Email was: (1) misleading; (2) coercive: (3) intended to chill participation in the lawsuit and/or communication with Plaintiff's counsel; (4) intended to undermine confidence in Plaintiff's counsel; (5) likely to cause confusion and the dissemination of non-objective and/or neutral information about this lawsuit to the class; and (6) had no purpose other than to interfere with putative class members' ability to make informed objective decisions and the overall fairness of the litigation process.

### A.     The May 7 Email Was Misleading to Class Members

The May 7 Email mislead putative class members in a variety of ways. Specifically, it:

- misrepresented that the purpose of Plaintiff's counsel's communication to putative class members was not to investigate their claims, but instead was to "[have them] join in this law suit [sic] against MSA so he can earn more legal fees." May 7 Email;
- misstated and oversimplified the applicable legal tests used to determine employee status pursuant to the FLSA and NYLL;
- "strongly" suggested that the resolution of this lawsuit will definitively and/or automatically determine putative class members' tax status;
- "strongly" suggested this lawsuit's success will harm the economic interests of putative class members, notwithstanding that putative class members are potentially entitled to significant damages and additional relief if this litigation succeeds;
- suggested that merely speaking to Plaintiff's counsel about the case will, standing alone, potentially cause them to be forced to "testify under oath in a trial of this matter." May 7 Email.

1.    **The May 7 Email Misrepresented the Purpose of Plaintiff's Counsel's Attempt to Communicate with the Putative Class**

As an initial matter, Plaintiff's counsel's attempted investigative outreach to putative class members through LinkedIn was *not* a solicitation.[5]  Rather, the message, *inter alia*, described the primary claim of the lawsuit, asked to speak with MSA models regarding "their experience with MSA," and noted that putative class members had no obligation to respond to the communication.  As such, it was an investigatory outreach into the work and "experience" of MSA models, the purpose of which was to evaluate the appropriateness, or appropriate scope of, a collective and/or class action.  *See supra* § III; *infra* note 5.  Significantly, this investigation led to the conclusion that Plaintiff's motion for conditional certification would benefit from the receipt of initial discovery from Defendants.

Nonetheless, the May 7 Email describes these communications, without caveat, as a "Solicitation on Linkedin by an attorney representing Eva Agerbrink."  May 7 Email ("What he really wants is for you to become his client and join in this law suit [sic] against MSA so he can

---

[5]    After Plaintiff's counsel raised the May 7 Email at the initial pretrial conference, Defendants' counsel requested the opportunity to submit a competing motion to the Court regarding Plaintiff counsel's communications with putative class members through LinkedIn. Plaintiff's counsel's message read (or was substantially similar to):

*"My law firm is investigating the potential legal claims of models who worked for MSA Models. I identified you as a current or former MSA model based on your LinkedIn profile, and am contacting you as part of my investigation into these potential claims. Specifically, I am investigating claims with respect to Agerbrink v. Model Service LLC d/b/a MSA Models et al., No. 14 Civ. 7841, which alleges that MSA Models and Susan Levine misclassified MSA fit models as independent contractors. If you would be willing to discuss your experience with MSA Models please contact me at cd@theduggerlawfirm.com or (646) 560-3208. Of course, you are under no obligation to respond to this message."*

*[\*an alternative version states "If you would be willing to discuss your experience as an MSA Fit Model . . . ."].*

This was an appropriate investigatory communication, *see Enecon Ne. Applied Polymer Sys.*, 2015 U.S. Dist. LEXIS 90794, at \*5-7 (holding communication "restrictions do not apply to contacting potential class members as witnesses" and finding class communication appropriate where it "(1) informs [employer's] employees about the existence of Plaintiff's lawsuit, (2) briefly describes the claims alleged, (3) states that Plaintiff's counsel is 'currently investigating' Plaintiff's claims 'by speaking with other . . . employees to determine if they have any information that support[s Plaintiff's] claims,' and (4) states that recipients may 'feel free' to contact Plaintiff's counsel '[i]f [they] have any information regarding any of the violations that [Plaintiff] alleges [the employer] committed as mentioned in this letter.'"); *Austen*, 831 F. Supp. 2d at 563-569; *supra* § III, and Plaintiff's counsel vigorously disputes any contrary contention.

earn more legal fees."). COO Ivers has no personal knowledge of "what [Plaintiff's counsel] really want[ed]," and no basis to make such representations to the putative class as if they were fact. More importantly, the representation was misleading because it was false. Plaintiff's counsel merely sought *some* opportunity to discuss the work of MSA models -- the primary subject matter of this lawsuit -- with MSA models, as compared to Defendants' and their counsel's almost unlimited access to MSA models.

### 2.    The May 7 Email Misrepresented the Applicable Legal Standards

Second, COO Ivers, who upon information and belief, is not an attorney, communicated an inaccurate statement of law, presented as fact, concerning the relevant test for employee status concerning this lawsuit. Indeed, the May 7 Email declined to mention *most* of the factors actually applicable to employee status under the FLSA: (1) the degree of control exercise by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) (finding nurses were employees of healthcare employment agency). Further still, the FLSA economic reality test is not as mechanical as suggested by the May 7 Email. *See id.* ("Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided."); U.S. Department of Labor Administrator's Interpretation, No. 2015-1 ("Ultimately, the goal is not simply to tally which factors are met, but to determine whether the worker is economically dependent on the employer . . . or is really in business for him or herself . . . .").[6]

### 3.    The May 7 Email Misrepresented That Tax Status is at Issue in This Litigation and "Strongly" Suggested that this Litigation will Harm Putative Class Members' Economic Interests

Third, the May 7 Email implied that potential class and collective members' tax status is directly at issue in this lawsuit. That representation was clearly false. This Court is not a tax court nor is this lawsuit a tax court proceeding. The tax status of MSA fit models will be determined, in the first instance, by the Internal Revenue Service, which applies its own unique test incorporating twenty factors to make a determination regarding employee status for tax purposes. *See* IRS Publication 15-A (2015) at 7-8;[7] IRS Revenue Ruling 87-41.[8]  Given its distinct test, the IRS could very well reach a contrary determination as to employee status for *tax purposes*, regardless of the Court's determination of employee status with respect to the FLSA and NYLL.

COO Ivers' suggestion that tax status is directly at issue in this litigation was therefore highly misleading. *See Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at

---

6    *Available at* http://www.dol.gov/whd/workers/Misclassification/AI-2015_1.htm.
7    *Available at* http://www.irs.gov/pub/irs-pdf/p15a.pdf.
8    *Available at* http://www.legalbitstream.com/scripts/isyswebext.dll?op=
get&uri=/isysquery/irldb3f/1/doc.

*15 ("The manner in which potential plaintiffs are informed of the . . . potential tax issues . . . must be free from coercion."). Furthermore, COO Ivers' "strong" "recommendation" to consult a tax advisor regarding "potential" tax consequences associated with this case, implied that there would be a *likely* overall negative impact on putative class members, despite their potential entitlement to *substantial* monetary awards (in Plaintiff's case, and likely many others instances, exceeding $50,000 in back pay, reimbursements, and and liquidated damages). *Id.*; *see also Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) ("letter . . .misleading [where it] mischaracterized the damages available to the putative class by ignoring statutory liquidated damages").[9]

### 4. The May 7 Email Misrepresented that Speaking with Plaintiff's Counsel Would Likely Propel Them Into the Litigation

Fourth, the May 7 Email mislead by suggesting that merely speaking with Plaintiff's counsel regarding this litigation would potentially require MSA models to "testify under oath in a trial of this matter" or "participate in written and/or oral discovery proceedings." May 7 Email. Yet, the mere fact that a fit model *spoke* with Plaintiff's counsel would not somehow propel them into the trial of this action -- unless Defendants illegally retaliated against such persons by compelling them as witnesses *because of* their participation in Plaintiff's counsel's investigation of claims.

### 5. The May 7 Email Failed to Disclose Defendants' Interests in Putative Class Members' Non-Engagement with the Litigation

Finally, the May 7 Email failed to acknowledge MSA's interests in the outcome of the litigation while simultaneously urging putative class members to disengage from the litigation or communication with Plaintiff's counsel. *See Lujan v. Cabana Mgmt.*, No. 10 Civ. 755, 2011 U.S. Dist. LEXIS 82204, at *9 (E.D.N.Y. July 27, 2011) (notice "should make clear that defendants' interests are potentially adverse to those of their current employees"); *Mevorah v. Wells Fargo Home Mortg., Inc.*, No. 05 Civ. 1175, 2005 U.S. Dist. LEXIS 28615, at *15 (N.D. Cal. Nov. 17, 2005) ("It does not appear from the record currently before this court that defendant properly explained . . . that 'the organization's interests are or may become adverse to those of the constituent(s)'").

---

[9]      The May 7 Email also tellingly failed to disclose the existence of Plaintiff's then operative Declaratory Judgment Act ("DJA") class action claim. That claim sought a class-wide declaratory judgment that MSA's contractual commission of 20% of fit models' wages was illegal and unenforceable above the 10% permitted by the New York General Business Law, because of MSA's operation as an unlicensed employment agency and charging of excessive fees. *See* GBL §§ 172, 185. COO Ivers' omission of any reference to the DJA claim, which represented a significant potential benefit to MSA fit models, only further underscores the misleading intent and effect of the May 7 Email.

## B.    The May 7 Email Was Inherently Coercive

As noted above, "[i]n some circumstances where there is an ongoing and unequal business or employment relationship between the parties, communications may be deemed inherently coercive." *Zamboni*, 2013 U.S. Dist. LEXIS 34201, at \*9; *supra* at 4-5. These are such circumstances.

Here, MSA fit models are *entirely* economically dependent on MSA. MSA and/or its contract purport to, over the course of multi-year automatically renewing agreements, *inter alia* (1) prohibit fit models from working with any other agency; (2) prohibit fit models from working as models at all -- without the involvement of MSA and/or payment of commissions to MSA during (and in many cases after) the multi-year contract term; (3) require fit models to refer to MSA all inquiries from potential clients regarding their services; (4) prohibit fit models from discussing their rate of pay with apparel industry clients; (5) require that fit models stop working with an apparel industry client if the fit model stops working with MSA; and (6) otherwise prohibit fit models from working with apparel industry clients without Defendants' permission and/or involvement. *See generally* Am. Class and Collective Action Complaint ("Am. Compl."), ECF No. 16, ¶¶ 149-175, Ex. A ("MSA Agreement"). Were these restrictions not sufficiently coercive, MSA and/or the MSA contract contend that actual (or perceived) violations of these provisions permit MSA to immediately retain all of the fit model's funds in its possession as "liquidated damages," and/or as a "security" as to a future judgment against the model in litigation. *See* Am. Class and Collective Action Complaint, ECF No. 16, Ex. A ("MSA Agreement") ¶ 11.

The one-sidedness of this contract, and the resulting economic dependence of fit models on MSA, makes this an "ongoing and unequal business or employment relationship" that is inherently coercive. *Zamboni*, 2013 U.S. Dist. LEXIS 34201, at \*9; *In re Currency Conversion Fee Antitrust Litig. ("Currency II")*, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005) (quoting *Kleiner*, 751 F.2d at 1202); *Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at \*9-10 (quoting *Austen*, 831 F. Supp. 2d at 568); *see also Morgan Stanley & Co.*, 206 F. Supp. 2d at 562. Indeed, the coercive nature of this relationship *exceeds* that of many of the business and/or employer relationships that have previously supported court intervention. Here, MSA controls the ability of its fit models to: (1) work as models, at all, during multi-year contracts; (2) receive payment for their work in a timely manner -- or at all; and (3) receive notice of apparel industry clients' interest in working with them (potential clients are typically not permitted to contact models directly -- and vice-versa). In fact, if a model falls out of favor with MSA, MSA may effectively end (or irreparably harm) their career on a whim -- constructively discharging them by declining to book them, simultaneously contractually prohibiting them and/or interfering with their ability to work as a model for another agency -- or at all, and, in some cases, demanding payment for a release from their contract. *See Ralph Oldsmobile, Inc.*, 2001 U.S. Dist. LEXIS 13893, at \*11-12 ("the potential class members depend upon the defendant for information, supplies, and credit. . . . Their continued success and, indeed, existence may depend upon GM's good will. The record, therefore, presents the clear potential for abuse."); *Hampton Hardware*, 156 F.R.D. at 633 (coercion where class members "necessarily rel[ied] upon the defendant for dissemination of factual information" and were therefore "particularly susceptible to believing the defendant's comments that the lawsuit will cost them money"); *Kleiner*, 751 F.2d at 1202;

*Currency Conversion Fee Antitrust Litig.* (*"Currency II"*), 361 F. Supp. 2d at 253.

Furthermore, courts have found communications to employees from senior executives, like Chief Operating Officer Ivers, to be particularly likely to be coercive because of these individuals' positions of authority within the company. *See Cintas Corp.*, 2004 U.S. Dist. LEXIS 24871, at *15 ("statement, coming from the CEO . . . sent to current . . . employees, improperly serves to discourage the joining of the instant suit"); *Motisola Malikha Abdallah*, 186 F.R.D. at 679 ("inherent danger that [emails from CEO of employer] . . . could deter potential class members from participating in the suit out of concern for the effect it could have on their jobs"); *see also Wright v. Adventures Rolling Cross Country, Inc.*, No. 12 Civ. 0982, 2012 U.S. Dist. LEXIS 83505, at *5-18 (N.D. Cal. June 15, 2012); *Haffer v. Temple Univ. of Com. Sys. of Higher Educ.*, 115 F.R.D. 506, 508 (E.D. Pa. 1987).

Not only were the circumstances of the May 7 Email coercive, the content was, as well. The email mischaracterized the lawsuit as a ploy by Plaintiff's counsel to obtain fees, suggested that it is likely to harm putative class members financially, and discouraged class members from communicating with Plaintiff's counsel. *See Ralph Oldsmobile, Inc.*, 2001 U.S. Dist. LEXIS 13893, at *8 ("The letters denigrated the suit, claimed it would cost the wholesaler (and therefore its members-owners) substantial sums, and asked potential class members not to participate."); *Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at *15-16 ("The manner in which potential plaintiffs are informed of the counterclaims and potential tax issues, however, must be free from coercion"); *Mevorah.*, 2005 U.S. Dist. LEXIS 28615, at *11-12; *see also Tedesco v. Mishkin*, 629 F. Supp. 1474, 1484 (S.D.N.Y. 1986) ("any communications by [defendant] to the class members regarding either the propriety of this suit or plaintiffs' counsels' representation are likely to be deceptive and coercive.").[10]

**C.      The Intent or Effect of the May 7 Email Was to Chill Participation in the Lawsuit**

At a most basic level, the May 7 Email had "no purpose but to discourage absent class members from joining the suit," and chill their participation. *Belt*, 299 F. Supp. 2d at 668-69; *see also Hampton Hardware*, 156 F.R.D. at 632-33 ("Regardless of the stated purpose of the letters - a routine dissemination of information to members - any common sense reading of them reveals that they are an attempt to prevent member participation in the class action.").

First, the correspondence attempted to chill participation by "misrepresent[ing] damages available," through suggesting that fit models would be less well off if the litigation succeeded. *Belt*, 299 F. Supp. 2d at 668-69. Despite the substantial damages and additional relief (*see supra* at 9, n. 9) potentially available to MSA fit models if the litigation is successful, the May 7 Email emphasized *only* potential negative tax (and discovery) implications -- an effective boogey-man that "preyed upon the absent class members' fears and concerns." *Mustang Sally's Spirits &*

---

[10]      Although COO Ivers offered that the choice of speaking with Plaintiff's counsel was their own, his additional statements in the email "diminished" the likelihood that fit models would believe he wished them to do so. *Cintas Corp.*, 2004 U.S. Dist. LEXIS 24871, at *15; *Haffer*, 115 F.R.D. at 511.

*Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at *15 ("The manner in which potential plaintiffs are informed of . . . potential tax issues . . . must be free from coercion."); *Belt*, 299 F. Supp. 2d at 669 (employer "could have no purpose but to discourage absent class members from joining the suit when it . . . preyed upon the absent class members' fears and concerns"); *Cf. Wright*, 2012 U.S. Dist. LEXIS 83505, at *5; *see also Hampton Hardware*, 156 F.R.D. at 632-33 (where "class members are warned of the potential cost to them [and/or are] told that by participating in the lawsuit they are suing themselves . . . the clear message is that if they participate in this 'improper' lawsuit that they will pay" -- the intent and/or effect is "to reduce the class members participation in the lawsuit based on threats to their pocketbooks.").

Second, COO Ivers likely sought to chill participation by suggesting, without caveat, that *even speaking* to Plaintiff's counsel (including if the model never received an investigative communication through LinkedIn), would likely result in a requirement that they testify under oath at trial. *See* May 7 Email (emphasis added) ("Persons who *talk to* attorney Dugger and/or who join the Agerbrink lawsuit . . . may be required to participate in written and/or oral discovery proceedings *including depositions under oath*, and they may have to *testify under oath in a trial of this matter*."). This statement was nothing but intimidation -- a thinly-veiled threat to retaliate for participation in and/or the investigation of the lawsuit, in violation of the FLSA and NYLL. It certainly was not sent primarily out of a concern for the financial interests of fit models. *See Hampton Hardware*, 156 F.R.D. at 634 ("[i]t is difficult to conceive of any advice from [defendant] regarding the lawsuit that is not rife with the potential for confusion and abuse given [defendant]'s interest in the suit"); *see also Prudential Grp., Inc.*, 629 F.2d at 845. In fact, fit models who merely speak to Plaintiff's counsel will become witnesses only if MSA intentionally targets (*i.e.*, retaliates against) those individuals in discovery.

### D.   The May 7 Email Misled by Omission and Was Neither Neutral nor Objective

The May 7 Email was not only misleading, "with regard to the accuracy of its statements but with regard to its purported objectivity and neutrality," a shortcoming that also merits court intervention. *In re Sch. Asbestos Litig.*, 842 F.2d at 681 (quoting *Erhardt*, 629 F.2d at 846) ("'unapproved notice[s] to class members [that] are factually or legally incomplete lack objectivity and neutrality . . . [and] will surely result in confusion and adversely affect the administration of justice'"); *see also Kleiner*, 751 F.2d at 1203 ("Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the fact, without opportunity for rebuttal.").

COO Ivers, Defendant MSA, and Defendant MSA President Susan Levine (who upon information and belief was carbon copied on the May 7 Email) have obvious incentives to reduce interest in the lawsuit. They are *highly* adverse to MSA fit models with respect to the lawsuit, yet the email did not disclose or even suggest the possibility of these adverse interests. *See Hampton Hardware*, 156 F.R.D. at 633 ("[defendant], an interested party in the litigation faces a conflict of interest in advising members on the merits of participation in the lawsuit due to its direct pecuniary interest in the outcome."). The May 7 Email likely sought to "reduce the defendants' liability in the class action" by discouraging class members from participating. *In re School Asbestos Litig.*, 842 F.2d at 681. "Such communications are not, in fact, litigation-

neutral; as . . . they seek to protect defendants' pecuniary interests by influencing decisions that will determine defendants' ultimate potential liability in the litigation." *Id.* at 682; *Hampton Hardware*, 156 F.R.D. at 633.

### E.      The May 7 Email Attempted to Undermine Putative Class Members' Confidence in or Cooperation with Class Counsel

By mischaracterizing this lawsuit and Plaintiff's counsel's communication as something akin to wage and hour "ambulance chasing," Defendants knowingly and intentionally sought to dissuade putative class members from cooperating with Plaintiff's counsel's investigation -- or even communicating with Plaintiff's counsel at all. Such prejudicial conduct readily supports court intervention. *See In re Sch. Asbestos Litig.*, 842 F.2d at 682 (collecting cases supporting court intervention where defendants "sought either to affect class members' decisions to participate in the litigation or to undermine class plaintiffs' cooperation with or confidence in class counsel"); *Haffer*, 115 F.R.D. at 511 (intervening where "the clear import of the memo [sent to the class was] that [defendant] prefer[ed] that its student athletes not meet with class counsel"); *Wright*, 2012 U.S. Dist. LEXIS 83505, at *13 ("[a]lso problematic . . . are the comments about Plaintiffs' counsel . . . . [They are] no doubt intended to encourage Plaintiffs and/or potential class members not to participate in the lawsuit.").

The intent and effect of these negative characterizations of Plaintiff's counsel were further exacerbated by the May 7 Email's simultaneous referral of all questions regarding the litigation to Defendants' own counsel. *See Haffer*, 115 F.R.D. at 511 ("[M]essage [that defendant did not want plaintiff to communicate with plaintiff's counsel] is further reinforced by urging class members to communicate with [employer's attorney], rather than their own attorneys. This invites continued violations of the prohibitions against communications with an opposing party. I find that this memo was intended to discourage class members from meeting with class counsel.").

### F.      The May 7 Email Likely Caused the Confusion of Putative Class Members

The May 7 Email also likely caused confusion among members of the putative class for many of the same reasons that it is affirmatively misleading, which weighs further in favor of court intervention. *See Hinds Cnty., Miss.*, 790 F. Supp. 2d at 134 (quoting *In re Currency Conversion Fee Antitrust Litig. ("Currency I")*, 224 F.R.D. at 569) ("The court's 'duty and authority . . . to protect the integrity of the potential class' extends to "'communications that . . . otherwise threaten to create confusion . . . .'"); *Gordon v. Kaleida Health*, 737 F. Supp. 2d 91, 99 (W.D.N.Y. 2010) ("the court's interest in preventing undue confusion among putative members of class or FLSA collective actions under its supervision during the certification and notification phases of the case is a substantial one"); *see also Goody*, 2010 U.S. Dist. LEXIS 101212, at *9 ("silence on [an] issue likely confused the other putative plaintiffs").

The need to avoid confusion is particularly critical here because of the ongoing dependent employment relationship between fit models and MSA. *See Forauer*, 2013 U.S. Dist. LEXIS 164167, at *12 (quoting *Lujan*, 2011 U.S. Dist. LEXIS 82204, at *2) (holding "[employer's] correspondence with an employee or former employee may also be . . . confusing

to potential class members concerning the validity of the collective action" and that "[t]he
implication regarding the merits of the action is particularly acute here given "the risk of explicit
or implicit coercion in the employment context"); *see also Hampton Hardware, Inc*, 156 F.R.D.
at 634 ("It is difficult to conceive of any advice from [defendant] regarding the lawsuit that is not
rife with the potential for confusion and abuse given [defendant]'s interest in the suit.").

## IV.   A Corrective Notice and Additional Relief is Warranted

For all the reasons discussed above, the Court should intervene "to protect the integrity of
the potential class." *In re Currency Conversion Fee Antitrust Litig. ("Currency I")*, 224 F.R.D.
at 569. In fashioning an appropriate remedy, the Court should carefully tailor the remedy to
address the harm, or potential harm, demonstrated by the record before it. *See Hampton
Hardware*, 156 F.R.D. at 632 (court intervention should result in "a carefully drawn order that
limits speech as little as possible consistent with the rights of the parties under the
circumstances" and must give "explicit consideration to the narrowest possible relief which
would protect the respective parties"). At the same time, the Court's order must also be effective
in attempting to remedy potentially "irreparable" harm. *Kleiner*, 751 F.2d at 1203.

Plaintiff therefore respectfully requests that the Court issue an order:

(1) requiring COO Ivers to send a corrective notice, via email, to all recipients of the May 7
Email, within seven (7) days of this Court's Order. A proposed version of such notice is
attached hereto as Exhibit A;[11]
(2) enjoining COO Ivers from discussing the instant litigation or its purported tax
implications with putative class members;[12]
(3) requiring Defendants to immediately produce all additional correspondence, including
metadata, between COO Ivers and any MSA fit model relating to: (i) the instant
litigation; (ii) any purported waiver of rights potentially relating to this litigation; and/or;
(iii) any purported tax implications of this litigation;[13]
(4) requiring that any future communications concerning the lawsuit or its purported tax
implications, by any other MSA personnel, shall include the statement "MSA will not
retaliate against you for participating in the *Agerbrink v. MSA Models* lawsuit, or retaliate
against you for speaking with Ms. Agerbrink's attorney";[14] and
(5) requiring Defendants to provide Plaintiff's counsel with a list of the names of the
recipients of the May 7 Email.[15]

Furthermore, because additional relief may be warranted if COO Ivers engaged in other
inappropriate communications with fit models regarding the lawsuit, or if counsel assisted COO

---

[11]   *See Tedesco v. Mishkin*, 629 F. Supp. 1474, 1483 n.12 (S.D.N.Y. 1986) (ordering
similarly-worded corrective notice); *Haffer*, 115 F.R.D. at 512; *Cintas Corp.*, 2004 U.S. Dist.
LEXIS 24871, at *16.
[12]   *See Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at *16.
[13]   *Cf. Wright.*, 2012 U.S. Dist. LEXIS 83505, at *15.
[14]   *See Morgan Stanley & Co.*, 206 F. Supp. 2d at 563.
[15]   *See Wright*, 2012 U.S. Dist. LEXIS 83505, at *15.

Ivers in doing so, Plaintiff requests that the Court order COO Ivers to submit an affidavit to the Court stating: (i) the nature, scope, and content of any additional written or oral discussions regarding the lawsuit with any MSA models; and (ii) whether, and to what extent, counsel assisted him in any manner, with respect to the May 7 Email or other communications to class members.

Plaintiff respectfully reserves her right to seek additional relief if COO Ivers engaged in additional similar class communications regarding the lawsuit, or if counsel assisted him with respect to the May 7 Email or other similar communications to putative class members.

## V.    Conclusion

For all of the above-stated reasons, Plaintiff respectfully requests that the Court Order the requested corrective notice and additional relief.

Respectfully submitted,

Cyrus E. Dugger

cc:    (via ECF)

Ronald M. Green
Evan J. Spelfogel
Jamie F. Friedman

15

# Exhibit A

.

**Subject:** *Agerbrink v. Model Service LLC d/b/a MSA Models et al.*, No. 17 Civ. 7841

I write pursuant to an Order entered by Magistrate Judge Francis, in the lawsuit *Agerbrink v. Model Service LLC d/b/a* MSA Models ("*Agerbrink v. MSA Models*"), a potential class and collective action, filed in the Southern District of New York by Eva Agerbrink on September 26, 2014.

Previously, I sent an email, dated May 7, 2015, to […] MSA fit models regarding *Agerbrink v. MSA Models*.

The Court has determined that my email was misleading, coercive, and/or otherwise harmful, and has imposed sanctions against me for my wrongful conduct.

In compliance with Judge Francis' instructions, I have attached a copy of the Court's Order dated […], regarding my May 7, 2015 email concerning *Agerbrink v. MSA Models*. I have also included the complete text of the Court's Order at the end of this email.

Please read the Order carefully to correct any misimpressions about this litigation, or about Plaintiff's counsel, that may have been caused by my May 7, 2015 email.

Please be further advised that this litigation may be highly beneficial to your own economic interests. For example, if successful on all of her claims, in all respects, Ms. Agerbrink would likely receive more than $50,000 in back pay, reimbursements, and/or liquidated damages, payable by MSA Models and/or Susan Levine.

If you have any further questions regarding this email, or the attached Order, please contact Ms. Agerbrink's attorney, Cyrus E. Dugger, Esq. at (646) 560-3208 or cd@theduggerlawfirm.com.