# DLF | THE DUGGER LAW FIRM PLLC

*Cyrus E. Dugger, Esq.*
*154 Grand St., New York, NY 10013*
*Tel: (646) 560-3208*
*www.theduggerlawfirm.com*

August 19, 2015

**Via ECF**

The Honorable James C. Francis
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *Agerbrink v. Model Service LLC d/b/a MSA Models et al.*, No. 14 Civ. 7841 (PO) (JCF)

Dear Judge Francis:

I represent Plaintiff Eva Agerbrink, the putative class, and the putative collective in the above-referenced litigation, and write in further support of Plaintiff's August 6, 2015 Letter Motion ("Aug. 6 Motion") requesting corrective notice and additional relief concerning the May 7 Email.

## I.   Defendants Offer Little in Opposition to the Need for Court Intervention

Simply put, Defendants' August 14, 2015 opposition fails to substantively challenge Plaintiff's arguments or authorities.

### A.   Defendants' Opposition Offers Little to Contest Plaintiff's Argument that the May 7 Email was Misleading

#### 1.   Defendants' Arguments Fail to Oppose a Finding That The May 7 Email Misrepresented the Purpose of Plaintiff's Counsel's Attempt to Communicate with the Putative Class

As an initial matter, Defendants fail to offer a single legal authority in support of their contention that Plaintiff's investigatory outreach was a solicitation. Defendants similarly fail to explain how COO Ivers had personal knowledge of "what [Plaintiff's counsel] really wante[d]," May 7 Email, such that he could make definitive representations to the putative class about Plaintiff's counsel's internal mental processes. Accordingly, COO Ivers' statement was misleading because: (1) it was inaccurate, *see* August 6, 2015 Letter ("Aug. 6 Motion") at 5-8, 7

n.5; (2) was not based on personal knowledge; and (3) was presented as fact as opposed to merely an opinion. Aug. 6 Motion at 5-6, 7 n. 5, 13; *see also Wright v. Adventures Rolling Cross Country, Inc.*, No. 12 Civ. 0982, 2012 U.S. Dist. LEXIS 83505, at *16-18 (N.D. Cal. June 15, 2012) (requiring corrective notice stating "[defendant's] emails contained statements that were critical of Plaintiffs' attorneys. Any such statements are solely the opinions of [defendant]").[1]

2.   **Defendants' Arguments Fail to Oppose a Finding That The May 7 Email Misrepresented the Applicable Legal Standards**

Unable to squarely defend COO Ivers' unsolicited provision of inaccurate legal advice about the litigation to the putative class, Defendants retreat to the invention of a purported lay person exception to the prohibition on misleading class communications. *See* August 14 Letter from Evan J. Spelfogel ("Defs.' Opp.") at 7 ("Mr. Ivers was not under any obligation to set forth the complex legal standards applicable to wage and hour claims or classification rules," and may mischaracterize legal standards so long as he does so "using lay terms"). Yet, unsurprisingly, Defendants fail to offer any legal authority for such a proposition -- because such a lay person exception does not exist. Instead, courts, including the Supreme Court, have been quite clear that the prohibition on misleading communications applies to counsel and parties alike. *See* Aug. 6 Motion at 4, 11; *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) (emphasis added) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel *and parties*."); *Veliz v. Cintas Corp.*, No 03 Civ. 1180, 2004 U.S. Dist. LEXIS 24871, at *15 (N.D. Cal. Nov. 12, 2004) (applying restrictions because of class communication by CEO); *Motisola Malikha Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 679 (N.D. Ga. 1999) (same).

Certainly, outside the context of communications with the putative class regarding the litigation, COO Ivers was under no obligation to personally familiarize himself with the "complex legal standards," Defs.' Op at 7, applicable to the FLSA and NYLL. However, COO Ivers was likewise under no obligation *to send* the May 7 Email discussing these "complex legal standards," *id.*, that he knew, or should have known, he did not fully understand. He nevertheless chose to do so. Once he did -- he inserted himself into the litigation -- and was prohibited from, *inter alia*, making misleading or confusing statements, and otherwise required to comply with Defendants' legal obligations concerning class communications. *See* Aug. 6 Motion at 11; *Cintas Corp.*, 2004 U.S. Dist. LEXIS 24871, at *15; *Motisola Malikha Abdallah*, 186 F.R.D. at 679.[2]

---

[1]   Defendants attempt to shift attention from their conduct by recklessly accusing Plaintiff's counsel of ethics violations. These meritless allegations are addressed in detail below. *See* infra note 10.

[2]   Even if Defendants' lay person exception did exist (which it does not), COO Ivers' email was nonetheless misleading because it: (1) presented his legal advice, without caveat, as if it were established fact; (2) suggested that he was qualified to provide a legal opinion; (3) failed to disclose that he was not an attorney; (4) failed to note that his representations regarding "complex legal standards" were incomplete; and (5) failed to make even passing mention of the actually relevant legal FLSA and/or NYLL factors for employee status or the "the economic

In addition, the May 7 Email was misleading and confusing because it was offered, without caveat, as a statement of indisputable fact. It was not offered merely as Defendants' legal position or one of several reasonable interpretations, nor did it otherwise leave room for doubt that the statements of law were accurate and complete. *See, e.g., Wright*, 2012 U.S. Dist. LEXIS 83505, at *16 (requiring corrective notice stating "emails contained statements that were critical of Plaintiffs' attorneys. Any such statements are solely the opinions of [defendant]").

Further, to the extent that non-attorney COO Ivers offered legal advice to the putative class regarding the lawsuit (at least without the assistance of counsel) he may have engaged in the unauthorized practice of law. *See* Judiciary Law §§ 476-a(1), 488; Penal Law § 270; *Servidone Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 911 F. Supp. 560, 565-566 (N.D.N.Y 1995) ("It is well-settled in New York that 'the practice of law forbidden in this State by section 270 of the Penal Law . . . includes legal advice and counsel as well as appearing in the courts and holding oneself out as a lawyer.'"); *Application of N.Y. Cnty. Lawyers Ass'n*, 4 Misc. 2d 728, 729 (N.Y. Sup. Ct. 1956) ("Practicing 'law' must perforce be reasonably interpreted to include the giving of advice"). It is for the very reason that it is likely to mislead and confuse -- as specifically prohibited here in the context of class communications -- that the provision of legal advice by non-lawyers is generally prohibited in New York. *See Gover v. Savyon*, 26 Misc. 3d 1224(A), 1224A (N.Y. Sup. Ct. 2009) ("Its purpose is to protect the public in this State from 'the dangers of legal . . . advice given by persons not trained, examined and licensed for such work . . . ."). As a result, to the extent COO Ivers engaged in the unauthorized practice of law, his statements about legal standards were misleading and confusing.

In sum, COO Ivers cannot have it both ways -- on the one hand inserting himself into the litigation by giving legal advice (potentially in violation of the judiciary law) -- only to then object that he is just a "lay person" when the accuracy of his advice, and its harmful effects, are scrutinized by this Court.

Defendants' response is that, despite their misleading and incomplete nature, some of COO Ivers' statements of the legal standards are "accurate." Defs.' Opp at 8. But that is not so. It is not the case, as COO Ivers stated to the putative class without limitation, that in *every* instance, a person is *always* an independent contractor where they "retain control over when, where, for whom, and how [they] wish to work, and at what rates." Def. Op. at 8; *see, e.g., generally O'Connor v. Uber Techs.*, No. 13 Civ. 3826, 2015 U.S. Dist. LEXIS 30684 (N.D. Cal. 2015). The nature of the inquiry required by the economic reality test (and the need to examine the actual *scope* of any "control") makes any such universal characterizations inaccurate when provided without significant caveats. *See* Aug. 6 Motion at 8; *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The factors that have been identified by various courts in applying the economic reality test are not exclusive"); U.S. Department of Labor Administrator's

---

reality test." Further still, any such exception would certainly not apply to a sophisticated senior executive such as MSA Models' Chief Operating Officer Ivers. *See Cintas Corp.*, 2004 U.S. Dist. LEXIS 24871, at *15 (applying restrictions because of class communication by CEO); *Motisola Malikha Abdallah*, 186 F.R.D. at 679.

3

Interpretation, No. 2015-1 ("Ultimately, the goal is not simply to tally which factors are met, but to determine whether the worker is economically dependent on the employer . . . or is really in business for him or herself . . . .").[3]

### 3. Defendants' Arguments Fail to Oppose a Finding That The May 7 Email Misrepresented That Tax Status is at Issue in This Litigation and that this Litigation will Harm Putative Class Members' Economic Interests

Defendants decline to directly challenge the principle that "[t]he manner in which potential plaintiffs are informed of the . . . potential tax issues . . . must be free from coercion," *Mustang Sally's Spirits & Grill, Inc.*, No. 12 Civ. 529, 2012 U.S. Dist. LEXIS 144722, at *15 (W.D.N.Y. Oct. 5, 2012). Instead, in an attempt to support their position that the May 7 Email was not misleading or coercive with respect to "potential tax implications," *id.*, they offer a court-authorized opt-in notice from a different litigation that references taxes. Defendants inadvertently support Plaintiff's position.

The referenced class communication in *Saleem v. Corporate Transportation Group Ltd.* was not only a formal court-approved opt-in notice -- as opposed to an email directly from Defendants' senior management -- it also explicitly specified that "[t]he Plaintiffs in this case *are not seeking any determination of drivers' tax status*." (emphasis added). Def. Op. at 10 n.7. One of Plaintiff's primary points is that this precise caveat is *entirely absent from* the May 7 Email, and *its omission* renders the communications highly misleading. In its absence, the most likely conclusion of readers of the May 7 Email was the exact *opposite* understanding -- *i.e.* that Plaintiff *is* seeking a determination of drivers' tax status -- which both misled and confused members of the putative class.[4]

---

[3]  *Gerlach*, an out-of-Circuit decision cited by Defendants, is far afield. In *Gerlach*, the court's decision not to order a corrective notice was based on the fact that "Defendants['] [communication did] not mischaracterize the litigation," did "not give legal advice," explicitly stated that "if [putative class members] decide[d] to speak to Plaintiffs' attorneys, they w[ould] not be retaliated against," and further "reiterates that their jobs will not be affected by participating in the lawsuit or by speaking to Plaintiffs' counsel." *Gerlach v. Wells Fargo & Co.*, No. 05 Civ. 0585, 2006 U.S. Dist. LEXIS 24823, at *22-23 (N.D. Cal. Mar. 28, 2006). None of these facts are present here.

[4]  That Defendants' counsel, Epstein Becker & Green, P.C. (retained in the fall of 2014) is the same counsel who represented the defendants in *Saleem*, and assumedly presided over the omission from the May 7 Email of the very caveats required by the court in *Saleem*, renders such omissions all the more problematic. *See Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 669 (E.D. Tex. 2003) ("The fact that defense counsel admittedly assisted in the letter's drafting convinces the Court that these misrepresentations were not accidental."). To wit, the May 7 Email appears to quote aspects of the *Saleem* notice *other than* the above-referenced caveats.

4

Defendants next offer that the May 7 Email was appropriate because Defendants had previously provided fit models advice regarding tax issues. That argument again inadvertently assists Plaintiff. Specifically, it begs the question: if Defendants' welcome letter, *see* Defs.' Op, Ex. A at 26, ECF 36-1, had already provided tax advice, what was the purpose of the May 7 Email's provision of duplicative tax advice other than to suggest tax status was at issue in the litigation? The only realistic answer is that there was no proper purpose. *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 632-33 (N.D. Tex. 1994) ("Regardless of the stated purpose of the letters - a routine dissemination of information to members - any common sense reading of them reveals that they are an attempt to prevent member participation in the class action.").

Finally, through their silence, Defendants concede Plaintiff's argument that the May 7 Email otherwise misled by suggesting a likely overall negative impact of the lawsuit despite the likely significant net financial (and at that time Declaratory Judgment Act) benefits to members of the putative class -- *even if* fit models are (at some unknown point in the future following an independent action by the IRS) reclassified as independent contractors for tax purposes. *See* Aug. 6 Motion at 9; *Romano v. SLS Residential, Inc.*, 253 F.R.D. 292, 298 (S.D.N.Y. 2008) ("What was said during the phone calls was also an integral part of the strategy. . . . Defendants spoke only of supposed negative consequences that could flow from participation in this lawsuit. They were not to mention that this lawsuit may actually be a good thing for people with grievances against the Defendants.").

### 4. Defendants Concede That The May 7 Email Misrepresented that Speaking with Plaintiff's Counsel Would Likely Propel Them Into the Litigation

Defendants, through their silence on this point, concede Plaintiff's argument that Defendants misrepresented that merely speaking with Plaintiff's counsel would likely require them to testify at trial under oath. *See* Aug. 6 Motion at 9.

### 5. Defendants' Arguments Fail to Oppose a Finding That May 7 Email Failed to Disclose Defendants' Interests in Putative Class Members' Non-Engagement with the Litigation

Defendants' opposition offers nothing substantive in opposition to the conclusion that the May 7 Email misled by failing to disclose Defendants' adverse interests in the litigation.

First, Defendants assert that they were not "obligated to acknowledge MSA's interests in the outcome of the litigation." Defs' Opp. at 10. Courts, however, disagree with Defendants. *See* Aug. 6 Motion at 9; *Lujan v. Cabana Mgmt.*, No. 10 Civ. 755, 2011 U.S. Dist. LEXIS 82204, at *9 (E.D.N.Y. July 27, 2011); *Mevorah v. Wells Fargo Home Mortg., Inc.*, No. 05 Civ. 1175, 2005 U.S. Dist. LEXIS 28615, at *15 (N.D. Cal. Nov. 17, 2005). Next, Defendants argue in the alternative that they did in fact disclose their adverse interests in the outcome of the lawsuit by simply acknowledging that it existed. *See* Defs.' Op at 10-11. This argument also falls woefully short. Statements failing to disclose adverse interests are frequently misleading, not because putative class members are unaware that a lawsuit was filed, but because of Defendants' failure to disclose the nature and scope of their *interests* in the *outcome* of the

5

lawsuit. *See* Aug. 6 Motion at 5, 9, 12-13; *Lujan*, 2011 U.S. Dist. LEXIS 82204, at *3 (noting disclosure of the existence of the lawsuit); *Mevorah*, 2005 U.S. Dist. LEXIS 28615, at *12 (same); *In re Sch. Asbestos Litig.*, 842 F.2d 671, 681 (3d Cir. 1988); *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1203 (11th Cir. 1985)); *Hampton Hardware*, 156 F.R.D. at 633.

Not only did the May 7 Email do just about everything it could to imply that Defendants' and fit models' interests were one and the same -- it fails to mention *anything* about how the lawsuit would or might affect *Defendants* -- to say nothing of Defendants' potential significant liability and potential payments to putative class members if the litigation succeeds. *See Romano v. SLS Residential, Inc.*, 253 F.R.D. 292, 298 (S.D.N.Y. 2008) ("While Defendants fabricated and expounded on the negative effects of class membership, they chose not to mention any positive consequences that might result from membership in the class, such as the airing of grievances and the righting of wrongs.").[5]

### B. Defendants' Arguments Fail to Oppose a Finding That The May 7 Email Was Inherently Coercive

At the outset, Defendants' opposition appears to misapprehend the legal standards applicable to inherently coercive class communications. Defendants argue that "[u]nlike the facts and circumstances involved in the cases cited by Plaintiff, MSA, did not tell or even ask models not to participate in the lawsuit." Defs' Op. at 12. Defendants also appear to misread Plaintiff's argument as suggesting that "the mere fact that the models are affiliated with MSA and involved in a business relationship with MSA." Defs.' Op at 11. But both of these points address the wrong question. The correct question is whether *the nature* of the *specific* relationship between Defendants and their fit models renders all communications *inherently* coercive (regardless of the specifics of a particular communication). *See* Aug. 6 Motion at 4, 10-11; *Zamboni v. Pepe W. 48th St. LLC*, No. 12 Civ. 3157, 2013 U.S. Dist. LEXIS 34201, at *9 (S.D.N.Y. Mar. 12, 2013) (Francis, J.) (emphasis added) (""[i]n some circumstances where there is an ongoing and unequal business or employment relationship between the parties, communications may be deemed *inherently* coercive."). Because it does, and moreover, because Defendants' opposition addresses the wrong questions, their arguments fail to oppose this

---

[5] Defendants' attempts to distinguish *Lujan* fail. Contrary to Defendants' characterization, in determining the appropriate scope of relief, *Lujan* did not rely on a "long history of problematic communications," Def. Op. at 11, and, in fact, explicitly disavowed any such reliance in reaching its decision. *See Lujan*, 2011 U.S. Dist. LEXIS 82204, at *8 ("[T]he Court cannot determine whether the previous interviews with putative class members were, in fact, misleading or coercive"). Additionally, Defendants' argument that *Lujan* is inapposite because it was decided "after the class had been certified," Defs.' Op. at 11, is misleading -- at best. In *Lujan*, the Court had conditionally certified a FLSA collective but had not certified a class action, and its holding was pertinent to all member of the putative class. *Lujan*, 2011 U.S. Dist. LEXIS 82204, at *2 (emphasis added) (defendants' counsel sought an order to contact *putative* class members "for the purpose of opposing plaintiffs' *pending motion* to certify a Rule 23 class").

6

argument.[6]

Nor do Defendants convincingly argue that, structural relationship aside, this *particular* communication was not coercive. They offer nothing in response to Plaintiff's argument that communications from senior managers, such as COO Ivers, are inherently, or at least frequently, coercive, *see* Aug. 6 Motion at 11, nor do they explain how the characterization of Plaintiff's counsel and the lawsuit's suggested negative effects were not coercive communications. *See id.*

Instead, Defendants offer, at the beginning of their opposition, a self-serving description of their business-employment relationship with their fit models, ostensibly provided with an eye towards framing the merits of Plaintiff's FLSA and NYLL misclassification claims. *See* Defs.' Op at 2-4.[7] Tellingly, however, nowhere in this narrative do Defendants directly contradict Plaintiff's primary characterizations of Defendants' (and/or their contracts') asserted relationship with MSA fit models. *See* Aug. 6 Motion at 10-11 (explaining how relationship between MSA and fit models is inherently coercive); Defs' Op. at 2-4 (declining to directly contest above-reference characterizations). By failing to do so, Defendants concede Plaintiff's argument that their relationship with fit models is inherently coercive. *See* Aug. 6 Motion at 10-11.

### C. Defendants' Arguments Fail to Oppose a Finding That The Intent or Effect of the May 7 Email Was to Chill Participation in the Lawsuit

On this point, Defendants' opposition: (1) declines to explain how the effect of the communication did not chill participation in the lawsuit; (2) declines to offer any authorities in opposition; and (3) rests entirely on (an unsuccessful) attempt to distinguish Plaintiff's cited authorities.[8] Accordingly, because Defendants have failed to: (1) articulate a purpose of the May

---

[6] In *Papa John's*, Defendants' lone cited authority concerning coercion, the court declined a motion for a corrective notice that was based *solely* the fact that the putative class members were employees of the restaurant. *See Jackson v. Papa John's USA, Inc.*, No. 08 Civ. 2791, 2009 U.S. Dist. LEXIS 23325, at *7 (N.D. Ohio Mar. 10, 2009) (emphasis added) ("This Court will not presume that Defendants' communication was coercive based *solely* on the fact that the [employees] worked for the Defendants."). But that run of the mill at-will employment relationship between pizza restaurant employees and their employer bears little resemblance to the highly dependent and coercive multi-year contractual relationships at issue here. *See* Aug. 6 Motion at 10-11.

[7] In the course of this description, however, Defendants provide substantial support to Plaintiff's First Defense to Counterclaims in her Answer to Counterclaims ¶ 380, ECF No. 30. The exhibit to Defendants' opposition all but requires the conclusion that Defendants *are* operating as an unlicensed employment agency in violation of GBL § 172, because it is incompatible with the conclusion with Defendants' position that they are not "procur[ing] or attempt[ing] to procure employment or engagements for" fit models, or that their "business only incidentally involves the seeking of employment" for fit models. GBL § 171(8), (2); *see* Defs.' Op., Ex. A at 24, ECF No. 36-1 ("We get you the casting"); GBL §§ 171-72, 185.

[8] Defendants' attempts to distinguish *Hampton Hardware* and *Belt* fail. *Hampton*

7

7 Email other than to "discourage absent class members from joining the suit"; (2) dispute that the May 7 Email "misrepresent[ed] damages available"; or (3) dispute that the May 7 Email likely chilled participation by suggesting that speaking to Plaintiff's counsel would likely result in required testimony at trial under oath. Consequently, they have failed to effectively counter Plaintiff's arguments. *See* Aug. 6 Motion at 11-12.

### D. Defendants Concede That The May 7 Email Misled by Omission and Was Neither Neutral nor Objective

Through their silence, Defendants concede Plaintiff's argument that the May 7 Email was neither neutral nor objective. *See* Aug. 6 Motion at 12-13. This infraction, standing alone, warrants court intervention.

### E. Defendants Concede That The May 7 Email Attempted to Undermine Putative Class Members' Confidence in or Cooperation with Class Counsel

Again, through their silence, Defendants concede Plaintiff's argument that the May 7 Email sought to undermine putative class members' confidence in and/or cooperation with Plaintiff's counsel by mischaracterizing this lawsuit, and Plaintiff's counsel's communication, as something akin to wage and hour "ambulance chasing." *See* Aug. 6 Motion at 13; *Wright*, 2012 U.S. Dist. LEXIS 83505, at *16 (ordering corrective notice where defendants communicated to the class that plaintiff's counsel was "interested solely in a payoff"); *see also Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) (communication misleading where it "represented that attorney's fees would be deducted from any recovery when attorney's fees are available as a separate element of damage"). This infraction, standing alone, warrants court intervention.[9]

---

*Hardware* found that each of the relevant letters were "misleading communications justifying court intervention," including that where "class members are warned of the potential cost to them" the intent and/or effect is "to reduce the class members participation in the lawsuit based on threats to their pocketbooks," as in the May 7 Email. *Hampton Hardware*, 156 F.R.D. at 632-33. Nor did *Belt*, as Defendants contend, turn on the previous disputes regarding class communications. Its holding is clear that communications that misrepresent the nature or scope of damages and the relief available to the class chill interest in the litigation and warrant court intervention. *See Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 669 (E.D. Tex. 2003) ("[defendant] could have no purpose but to discourage absent class members from joining the suit when it misrepresented damages available and preyed upon the absent class members' fears and concerns.").

[9] Defendants argue that, in *Tedesco*, the court did not find a statement regarding plaintiff's counsel's fees objectionable. *See* Defs. Op at 14-15. But COO Ivers' representations to the class that: "Ms. Agerbrink's attorney Cyrus Dugger has been reaching out and contacting some of you "to discuss your work with MSA." *What he really wants* is for you to become his client and join in this law suit [sic] against MSA *so he can earn more legal fees*," (emphasis added) is clearly distinguishable from the statement regarding fees in *Tedesco*. In *Tedesco*, the communication stated, *inter alia*, that: "In *my opinion*, this law firm is *not only seeking a monetary recovery for* investments made by *its clients*, *as well* as substantial legal fees for itself. . . ." *Tedesco v.*

8

### F.  Defendants Concede That The May 7 Email Likely Caused Confusion Among Putative Class Members

Finally, through their silence, Defendants concede Plaintiff's argument that the May 7 Email likely caused confusion among members of the putative class for many of the same reasons that it is affirmatively misleading. *See* Aug. 6 Motion at 13-14. This infraction, standing alone, warrants court intervention.

## II.  Plaintiff's Proposed Relief is Appropriate and Narrowly Tailored

### A.  Court Intervention is Appropriate

Defendants' contention that no corrective actions is warranted, *see* Defs.' Op at 13-14, is meritless for several reasons.

First, Defendants overlook, or attempt to ignore, that the Court may act to avoid even potential harm, particularly where, as here, the relationship at issue is inherently coercive. *See* Aug. 6 Motion at 4-5; *see also* Dfs.' Op. at 13 (suggesting "adverse impact" required for court "to restrict party communications"). Next, Defendants undercut themselves by suggesting that the Court should be particularly hesitant to limit Defendants' communications with the putative class regarding the lawsuit because MSA fit models "entrust" their careers to Defendants. *See* Dfs.' Op. at 13 ("This is particularly so in our case where clients models' professional careers are entrusted to MSA"). In fact, Defendants have described the very type of dependency -- where putative class members must rely on Defendants' goodwill, resources, or information for their well-being -- that strongly supports corrective action because the relationship is inherently coercive. *See* Aug. 6 Motion at 10; *Romano v. SLS Residential, Inc.*, 253 F.R.D. 292, 300 (S.D.N.Y. 2008) ("To the extent that the Defendants were in a position of power and trust over the potential plaintiffs, the Defendants in bad faith took full advantage of that position to manipulate the potential plaintiffs . . . .").

Finally, Defendants' continue to argue that Plaintiff's investigatory communication was somehow an impermissible solicitation, and that, as a result, no court intervention is appropriate with respect to the May 7 Email. Yet again, tellingly, Defendants, within sixteen double-spaced pages in opposition, fail to offer any legal authority in support of the proposition that Plaintiff's counsel's communication was anything but an appropriate investigatory communication.[10] This

---

*Mishkin*, 629 F. Supp. 1474, 1478 (S.D.N.Y. 1986) (emphasis added). Importantly, the statement in *Tedesco*, unlike here, both notes that the statement is merely the opinion of the author and that plaintiff's counsel is seeking significant monetary relief *for the class*. *Id.* ("[L]aw firm is . . . seeking a monetary recovery for investments made by its clients . . . ."). The statement in *Tedesco* is therefore (while imperfect) far less problematic than the statements regarding fees in the May 7 Email.

[10]  Unable to offer anything to contest the appropriate investigatory nature of Plaintiff's outreach, Defendants, in an effort to deflect attention away from their conduct at issue here,

9

resort to recklessly accusing Plaintiff's counsel of violations of the New York Code of Professional Conduct and Fed. R. Civ. P. 11. These allegations are completely meritless.

First, Defendants accuse Plaintiff's counsel, based solely on the fact of the post-filing investigation of class claims, of violating of Fed. R. Civ. P. 11. This argument is highly unmeritorious. The standards applicable to Plaintiff's counsel's compliance with Fed. R. Civ. P. 11 are distinct from the standards this Court will apply to a motion for conditional and class certification. *See* Fed. R. Civ. P. 11 ("[A]n attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"). Plaintiff's counsel met these obligations.

However, Plaintiff's counsel had every reason to further investigate the appropriateness, and appropriate scope of, class and collective claims, given that the Court will apply different standards than Fed. R. Civ. P. 11 to Plaintiff's forthcoming motions for conditional and class certification. Relatedly, it is well-established that Plaintiff's counsel may, and likely should, do just that. *See Mendez v. Enecon Ne. Applied Polymer Sys.*, No. 14 Civ. 6736, 2015 U.S. Dist. LEXIS 90794, at *5-7 (E.D.N.Y. July 13, 2015) (quoting ABA Formal Op. 07-445 (2007)) ("Both plaintiffs' counsel and defense counsel have legitimate need to reach out to potential class members regarding the facts that are the subject of the potential class action, including information that may be relevant to whether or not a class should be certified."); *Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 563-69 (D. Conn. 2011) (emphasis added) ("*[b]oth parties* need to be able to communicate with putative class members - if only to engage in discovery regarding issues relevant to class certification - from the earliest stages of class litigation."); Aug. 6 Motion at 5-6.

Second, Defendants accuse Plaintiff's counsel of violating New York Rule of Professional Conduct 7.3(c), because Plaintiff's counsel's investigatory communication did not contain an attorney advertising label. For starters, Defendants misquote Rule 7.3(c) which does not actually contain the language Defendants quote, *see* Defs.' Op at 4 n.3, apparently inadvertently quoting the Model Rules of Professional Conduct, which differ textually from Rule 7.3(c) of the New York Rules of Professional Conduct.

In any event, investigatory communications are not "advertisements" under the New York Rules of Professional Conduct. *See* New York Rule of Professional Conduct 1(a) (emphasis added) ("'Advertisement' means any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary *purpose of which* is for the retention of the lawyer or law firm"); *see also* NYCLA Commentary on New York Rule of Professional Conduct 7.1 ¶ 6 (emphasis added) ("*Not all communications* made by lawyers about the lawyer or the law firm's services *are advertising*. Advertising by lawyers consists of communications made in any form *about* the lawyer or the law firm's services, the primary *purpose of which* is retention of the lawyer or law firm for *pecuniary gain* as a result of the communication."). The "purpose" of an investigatory communication is not "the retention of the lawyer or law firm," but the investigation of claims. Here, because Plaintiff's counsel's investigatory communication was not an "advertisement," New York Rule of Professional Conduct 7.1 did not apply, and there was therefore no requirement to include an attorney

argument fails for the simple reason that Plaintiff's investigatory communication was permissible. *See* Aug 6. Motion at 5-7, 7 n. 5.

### B.  Plaintiff's Requested Relief is Narrowly Tailored

Each aspect of Plaintiff's requested relief is as narrowly tailored as possible without being ineffective.

#### 1.  The Requested Corrective Notice is Narrowly Tailored

There are no means by which to adequately address the misimpressions caused by the May 7 Email that do not include attempting to undo them with a corrective notice. Here, as in *Tedesco*, because the Court "cannot be certain, without hearing testimony from each class member, as to the precise effect the [May 7 Email] had on the members of the class . . . , [i]n order to correct any misimpressions the letter might have conveyed, a copy of [the Court's Order], together with" a corrective explanatory email to "all class members" is an aspect of the proper relief. *Tedesco v. Mishkin*, 629 F. Supp. 1474, 1484-1485 (S.D.N.Y. 1986).

Courts have not hesitated to order corrective notices, particularly, where, as here, the exact scope of the harm (or potential harm) from misinformation, chilling, and intimidation is hard to measure precisley. *See Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 115 F.R.D. 506, 512 (E.D. Pa. 1987) (ordering corrective notice where communication

---

advertising label in the communication. *See* New York Rule of Professional Conduct 7.1(f) (emphasis added) ("Every *advertisement* . . . shall be labeled 'Attorney Advertising' on the first page."). Indeed the counter-intuitive inclusion of an "attorney advertising" label in an investigatory communication would likely be incredibly confusing to the recipient of the correspondence. Similarly, because it was not an advertisement, Plaintiff's counsel's investigatory communication was by definition not a "solicitation." *See* New York Rule of Professional Conduct 7.3(b) (emphasis added) ("'solicitation' means any *advertisement* initiated by or on behalf of a lawyer or law firm . . . the primary *purpose of* which is the retention of the lawyer or law firm, and a significant motive for which is *pecuniary gain*").

Notably, although Defendants have been in possession of Plaintiff's counsel's investigatory communication for over three and a half months (since at least May 7, 2015) they took no immediate action, and raised no concern to the Court regarding this investigatory communication, until Plaintiff's counsel submitted the instant motion objecting COO Ivers' May 7 Email. Assumedly, if Defendants really believed their own arguments, they would have immediately raised this issue with the Court on or before May 7, 2015. That they did not do so until now speaks volumes.

Finally, Defendants make reference to a March 12, 2015 conversation that they contend contradicts the investigatory nature of Plaintiff's counsel's communications. While Plaintiff's counsel is at a loss as to the statement their letter references (which appears to be -- yet another -- attempt to inappropriately disparage Plaintiff's counsel), it has not yet been raised here. Plaintiff's counsel stands ready to forcefully address this allegation, if and when, it is ever articulated.

"discouraged class members from meeting with class counsel"); *Veliz v. Cintas Corp.*, No. 03 Civ. 1180, 2004 U.S. Dist. LEXIS 24871, at *15 (N.D. Cal. Nov. 12, 2004) (ordering corrective notice where communication "improperly serve[d] to discourage the joining of the instant suit"); *Wright v. Adventures Rolling Cross Country, Inc.*, 2012 U.S. Dist. LEXIS 83505, at *16 (ordering corrective notice where defendants communicated to the class that plaintiff's counsel was "interested solely in a payoff [which was] . . . intended to encourage Plaintiffs and/or potential class members not to participate in the lawsuit."); *Romano v. SLS Residential, Inc.*, 253 F.R.D. 292, 299 (S.D.N.Y. 2008) ("the corrective notice will . . . also include a letter from the Defendants acknowledging that they improperly communicated with putative class members regarding the confidentiality of their records."). Here, Plaintiff's proposed corrective notice is narrowly tailored to correct actual and potential misimpressions from the May 7 Email -- no more -- no less.

### 2. The Communication Prohibition is Narrowly Tailored

Second, rather than requesting a company-wide prohibition on communications with putative class members regarding the litigation, Plaintiff narrowly tailors her request to apply only to the May 7 Email's author, COO Ivers (and any co-authors). Plaintiff requests this narrowly tailored prohibition notwithstanding that courts typically make such restrictions company-wide. *See, e.g.*, *Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722, at *16; *Wright*, 2012 U.S. Dist. LEXIS 83505, at *15 (same).

### 3. The Request for Copies of Communications is Necessary

Third, Plaintiff's request for copies of similar communications by Defendants regarding the litigation to the putative class seeks to address any additional as-yet-unknown harm (or potential harm) as early on in the litigation as possible. *Cf. Wright*, 2012 U.S. Dist. LEXIS 83505, at *15 (copies of communications required "[b]ecause Defendants communications ha[d] plausibly had a chilling effect on participation in the class action"). Although, Plaintiff will eventually be entitled to most or all of the requested communications during discovery, the longer any harmful statements go unaddressed, the harder they will be to correct -- and the more substantial the resulting harm. For example, the harm would be further compounded if any such inappropriate communications are not corrected well before the FLSA opt-in period, as such misinformation might affect potential opt-ins' decisions to join the collective.

Consequently, the Court should therefore address any other similar communications together, at the outset of the litigation, particularly given that the scope of their harm (or potential harm) may be cumulative and/or potentially irreparable.

### 4. The Non-Retaliation Disclosure is Appropriate and Narrowly Tailored

Plaintiff's purely preventative requested remedy of a mandatory statement of non-retaliation prior to any communications by Defendants' personnel about the lawsuit is the most narrowly-tailored alternative to a complete ban on communications by all of Defendants' personnel. *See EEOC v. Morgan Stanley & Co.*, 206 F. Supp. 2d 559, 563 (S.D.N.Y. 2002).

Plaintiff's requested concise pre-communication disclaimer is far more modest than the several imposed on defendants' counsel in *Lujan*. *See Lujan*, 2011 U.S. Dist. LEXIS 82204, at *9-12.

### 5. The Request for the May 7 Email Recipient List is Narrowly Tailored

The request for the names, but not the contact information, of all recipients of the May 7 Email is necessary so that Plaintiff's counsel is aware of which of the putative class members have been potentially affected by this communication. This request is narrower than the relief imposed in *Wright*, where the court also ordered production of contact information. *See Wright*, 2012 U.S. Dist. LEXIS 83505, at *15 (emphasis added) ("The Court shall also require Defendants to identify every potential class member to whom to whom a prior 'mass communication' was disseminated *(including contact information)*.").

In summary, the relief Plaintiff requests is narrowly tailored, and in many instances, more modest than that imposed by other courts in similar circumstances.

### C. The Request for an Affidavit from COO Ivers is Both Necessary and Unopposed

Defendants offer nothing in opposition to the request for the submission of an affidavit from COO Ivers regarding: (1) additional communications with the putative class about the lawsuit or its purported tax implications; and/or (2) counsel's involvement as to the May 7 Email or similar class communications. Its submission is necessary to identify any additional actual or potential harm from purely oral communications to putative class members, as well as to determine the extent, if any, of Defendants' counsel's involvement as to the May 7 Email or related communications. Either scenario would merit additional relief beyond that currently requested. *See Belt*, 299 F. Supp. 2d at 669 ("The fact that defense counsel admittedly assisted in the letter's drafting convinces the Court that these misrepresentations were not accidental.").

## III. Conclusion

For all of the above-stated reasons, Plaintiff respectfully requests that the Court order the requested corrective notice and additional relief requested in Plaintiff's Aug. 6. Motion.

Respectfully submitted,

Cyrus E. Dugger

cc: (via ECF)

Ronald M. Green
Evan J. Spelfogel
Jamie F. Friedman

13