UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
EVA AGERBRINK, individually and    :   14 Civ. 7841 (JPO) (JCF)
on behalf of all others similarly  :
situated,                          :        MEMORANDUM
                                   :        AND  ORDER
            Plaintiff,             :
                                   :
     - against -                   :
                                   :
MODEL SERVICE LLC d/b/a MSA MODELS :
and SUSAN LEVINE,                  :
                                   :
            Defendants.            :
- - - - - - - - - - - - - - - - - - -:
MODEL SERVICE LLC d/b/a MSA MODELS :
and SUSAN LEVINE,                  :
                                   :
            Counter Claimants,     :
                                   :
     - against -                   :
                                   :
EVA AGERBRINK,                     :
                                   :
            Counter Defendant.     :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     This is a collective action brought under the Fair Labor

Standards Act (the "FLSA"), 29 U.S.C. § 201, et seq.[1]  The

plaintiff alleges that the defendants engaged in improper

communication with putative collective action members.   The

plaintiff has submitted a letter motion seeking an order (1)

requiring the defendants to provide curative notice, (2) enjoining

future communication from defendant Model Service LLC ("MSA")'s

Chief Operating Officer to putative collective action members

concerning this litigation, (3) requiring the defendants to produce

information about the prior communication and to disclose any

_____

        [1] The plaintiff also asserts claims under New York Labor Law.

1

additional communication, and (4) requiring the defendants to include an anti-retaliation statement with any future communications about the lawsuit.  For the reasons that follow, the plaintiff's motion is granted in part and denied in part.

<u>Background</u>

The plaintiff filed this action on September 26, 2014, alleging that the defendants violated her FLSA rights and those of other MSA "fit models" because they misclassified fit models as independent contractors.  After the plaintiff filed an amended complaint, the defendants moved to dismiss.  The Honorable Paul Oetken, U.S.D.J., denied the defendants' motion as to the plaintiff's wage and hour claims.  The plaintiff has not yet moved for conditional certification.  However, at a pretrial conference held on July 29, 2015, the plaintiff raised concerns about an e-mail sent by defendant MSA's Chief Operating Officer Bill Ivers to putative collective action members on May 7, 2015 (the "Ivers E-mail").  The Ivers E-mail, which is the subject of the instant dispute, is reproduced below:

> Subject:  MSA Models > Solicitation on Linkedin by an attorney representing Eva Agerbrink
>
> MSA is currently defending a law suit [sic] brought by Eva Agerbrink.  She claims that she and our other Fit Models have been wrongly classified as independent contractors and should have been classified as employees of MSA.
>
> As an independent contractor you retain control over when, where, for whom and how you wish to work, and at what rates.  MSA helps you get into the business, provides the support you request and helps you manage your careers.
>
> On the other hand, employees work fixed hours, work where

and when management tells them, work for hourly rates, and work under close management control.

Ms. Agerbrink's attorney Cyrus Dugger has been reaching out and contacting some of you "to discuss your work with MSA." What he really wants is for you to become his client and join in this law suit [sic] against MSA so he can earn more legal fees. Of course, you have a legal right to talk to him, but there are several important things you should know before you decide to do this:

1. <u>Tax Considerations</u>
Currently, as self-employed independent contractors, you receive IRS form 1099's [sic] and file your taxes as independent business persons. You are allowed under the tax laws to deduct from your reported taxable income substantial legitimate business expenses, such as any fees you pay to MSA or clients and customers and any other costs of doing business such as schooling, photo shoots, management fees and the creation of your portfolios, etc. There is no income withholding for taxes and similar items.

Employees get IRS form W-2's [sic], have federal, state and city taxes and social security withheld from their pay, and are limited in what employment business expenses they can deduct on their tax returns.

We strongly recommend that before deciding whether to talk to Ms. Agerbrink's attorney, you first talk to your personal tax advisor concerning your own individual circumstances and the effect, if any, that the outcome of this case may have on your tax status and to see just what impact there might be on your personal tax situation.

2. <u>Discovery Considerations</u>
Persons who talk to attorney Dugger and/or who join the Agerbrink lawsuit may be asked to provide documents or information relating to their work at MSA, and for evidence to support any claim they might make. They may be required to participate in written and/or oral discovery proceedings including depositions under oath, and they may have to testify under oath in a trial of this matter.

If you have any questions about these matters, I would be pleased to talk with you about them, or to put you in touch with MSA's attorney who, I am sure, could answer any of your concerns.

(Ivers E-mail, attached as Exhibit 2 to Letter of Evan J. Spelfogel

3

dated August 14, 2015 ("Spelfogel 8/14/15 Letter")).

The plaintiff contends that the Ivers E-mail contained statements that were misleading, coercive, and likely to chill participation and confuse potential opt-in plaintiffs. (Letter of Cyrus E. Dugger dated August 6, 2015 ("Dugger 8/6/15 Letter") at 6). Among other relief, the plaintiff requests the Court order the defendants to disseminate a corrective notice. (Dugger 8/6/15 Letter at 14). In response, the defendants assert that the e-mail was "truthful, accurate and proper." (Spelfogel 8/14/15 Letter at 6).[2]

Discussion

A.   Legal Standard

District courts have "both the duty and the broad authority" to govern the conduct of counsel and parties in class actions brought under Rule 23 of the Federal Rules of Civil Procedure and collective actions brought under the FLSA. Gulf Oil, 452 U.S. at 99-100 (recognizing district courts' authority to govern communications between parties and class members because of "opportunities for abuse" that exist in class actions); see also

---

[2] Because the parties do not dispute the content of Mr. Ivers' e-mail and have produced the communication, an evidentiary hearing is not required. Cf. Zamboni v. Pepe West 48th St. LLC, No. 12 Civ. 3157, 2013 WL 978935, at *1 (S.D.N.Y. March 12, 2013) (conducting an evidentiary hearing because "parties presented contradictory versions of the facts"); Babbitt v. Albertson's Inc., No. C-92-1883, 1993 WL 128089, at *5 (N.D. Cal. Jan. 28, 1993) ("[W]hile Gulf Oil [Co. v. Bernard, 452 U.S. 89 (1981)] requires specific findings of actual or potential abuse, it does not require an evidentiary hearing to determine whether restrictions on communications are proper.").

Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170-71 (1989)
(noting "same justifications" identified in Gulf Oil for "governing
the conduct of counsel and the parties" apply in collective
actions); Brown v. Mustang Sally's Spirits & Grill, Inc., No. 12 CV
529S, 2012 WL 4764585, at *2 (W.D.N.Y. Oct. 5, 2012) ("Courts have
the authority in both Rule 23 class actions and FLSA collective
actions (29 U.S.C. § 216(b)) to enter appropriate orders governing
the conduct of counsel and parties."); Fengler v. Crouse Health
System, Inc., 634 F. Supp. 2d 257, 261-62 (N.D.N.Y. 2009) (applying
Gulf Oil in FLSA collective action and explaining how "[o]rders
limiting the communications of the parties and counsel fall within
the purview of a district court").  Pursuant to this authority, a
district court may limit communications by plaintiffs, defendants,
or both.  Zamboni, 2013 WL 978935, at *2 (collecting cases).

    Although there is nothing inherently improper about a party's
communication with potential class members prior to certification,
judicial intervention is warranted when communications pose "a
serious threat to the fairness of the litigation process, the
adequacy of representation and the administration of justice
generally." Mustang Sally's, 2012 WL 4764585, at *3 (quoting In re
School Asbestos Litigation, 842 F.2d 671, 680 (3d Cir. 1988)).  A
district court may prevent confusion and unfairness by prohibiting
and correcting communication that is inaccurate, unbalanced,
misleading, or coercive, or which improperly attempts to encourage
class members not to join the suit.  See Wright v. Adventures
Rolling Cross Country, Inc., No. C-12-982, 2012 WL 2239797, at *5

(N.D. Cal. June 15, 2012) (imposing restrictions after concluding defendants' communications "have plausibly had a chilling effect on participation in the class action"); Urtubia v. B.A. Victory Corp., 857 F. Supp. 2d 476, 485 (S.D.N.Y. 2012) (limiting defendants' contact with potential class members where employment relationship placed defendant in a position to exercise "strong coercion"); Jones v. Casey's General Stores, 517 F. Supp. 2d 1080, 1088 (S.D. Iowa 2007) (noting a district court's "relatively broad discretion in limiting communications with putative collective members when such communications cross the boundaries of propriety, including when the communications are unbalanced, misleading, or factually inaccurate"); Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc., 214 F.R.D. 696, 698 (S.D. Ala. 2003) ("Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." (footnotes omitted)); Belt v. Emcare, Inc., 299 F. Supp. 2d 664, 669-70 (S.D. Tex. 2003) (ordering corrective notice, enjoining defendants from further unauthorized communications with putative plaintiffs, and extending opt-in period after finding defendants' communications were misleading, coercive, and intended to discourage participation).

This supervisory authority exists even before a class is certified. In re Initial Public Offering Securities Litigation,

6

499 F. Supp. 2d 415, 418 n. 13 (S.D.N.Y. 2007); Piper v. RGIS
Inventory Specialists, Inc., No. C-07-32, 2007 WL 1690887, at *7
(N.D. Cal. June 11, 2007) (noting courts may limit pre-notice
communications where party has engaged in misleading or improper
communications or where they are inconsistent with court-authorized
notice); Ralph Oldsmobile Inc. v. General Motors Corp., No. 99 Civ.
4567, 2001 WL 1035132, at *2 (S.D.N.Y. Sept. 7, 2001) ("[A] court's
power to restrict communications between parties and potential
class members [] appl[ies] even before a class is certified.").
Indeed, the need for a district court to ensure that all parties
act fairly is especially great during the early stages of FLSA
litigation. Because formal notice to potential plaintiffs is sent
only after conditional certification, "pre-certification, ex parte
communication with putative FLSA collective members about the case
has an inherent risk of prejudice and opportunities for
impropriety." Billingsley v. Citi Trends, Inc., 560 F. App'x 914,
921 (11th Cir. 2014). Moreover, "[b]ecause FLSA plaintiffs must
opt-in, unsupervised, unilateral communications with those
potential plaintiffs can sabotage the goal of the FLSA's informed
consent requirement by planting the slightest seed of doubt or
worry through the one-sided, unrebutted presentation of 'facts.'"
Id. at 924; see also Belt, 299 F. Supp. 2d at 669 ("Defendants'
conduct is more egregious in this collective action than it would
be in a class action because potential class members must opt into
the collective action rather than opt out as in a class action.").

Notwithstanding its "broad authority," a district court's

7

discretion to circumscribe communication "is not unlimited." Gulf
Oil, 452 U.S. at 100-01.  A district court "must not interfere
with any party's ability to communicate freely with putative class
members, unless there is a specific reason to believe that such
interference is necessary." Mustang Sally's, 2012 WL 4764585, at
*2 (emphasis omitted)).  Furthermore, a court order restricting
communication with putative class members must be grounded in "a
clear record and specific findings that reflect a weighing of the
need for a limitation and the potential interference with the
rights of the parties." Gulf Oil, 452 U.S. at 101.  A showing of
actual harm is not always necessary.  Hampton Hardware, Inc. v.
Cotter & Co., 156 F.R.D. 630, 633 (N.D. Tex. 1994).  Yet some
evidence beyond "the mere possibility of abuses" is required to
justify judicial intervention. Gulf Oil, 452 U.S. at 104; Wiginton
v. Ellis, No. 02 C 6832, 2003 WL 22232907, at *3 (N.D. Ill. Sept.
16, 2003) ("Even if we do not need to make a finding that a
particular abuse has occurred, i.e., that [defendant] intended to
mislead putative class members or prevent participation in the
suit, we must still have a clear record of threatened abuses."
(emphasis omitted)); Burrell v. Crown Central Petroleum, Inc., 176
F.R.D. 239, 244 (E.D. Tex. 1997) ("Absent a clear record and
specific findings of realized or threatened abuses, an order cannot
be justified under the relevant standard.").

　　　To support an order limiting communications between a
defendant and putative class members, a plaintiff must show, first,
that a communication has been or is about to be conveyed and,

second, that this communication is improper.  <u>Jones v. Jeld-Wen,
Inc.</u>, 250 F.R.D. 554, 561 (S.D. Fla. 2008); <u>Longcrier v. HL-A Co.</u>,
595 F. Supp. 2d 1218, 1226-27 (S.D. Ala. 2008).  Here, there is no
doubt that Mr. Ivers e-mailed potential opt-in plaintiffs, but the
parties dispute whether or not it is the type of precertification
communication justifying court intervention.

    B.  <u>The Ivers E-mail</u>

The plaintiff points to several aspects of the e-mail that she
claims are misleading, coercive, or likely to chill participation
in the litigation.  She claims the e-mail contains
misrepresentations about plaintiff's counsel, the legal test for
determining employee status under the FLSA, the lawsuit's potential
impact on putative plaintiffs' tax status and economic interests,
and the consequences of speaking with plaintiff's counsel. (Dugger
8/6/15 Letter at 6).  She argues that all communications between
MSA and the models are inherently coercive due to the models'
economic dependence on the defendants, and that the Ivers E-mail
was particularly coercive because (1) it was from a senior officer
and (2) it implied the lawsuit would have negative consequences.
(Dugger 8/6/15 Letter at 10; Letter of Cyrus E. Dugger dated Aug.
18, 2015 ("Dugger 8/19/15 Letter") at 6-7).  In response, the
defendants contend that the Ivers E-mail was not misleading or
inappropriate and that the models' "business relationship with MSA
does not make the communication from MSA to the models inherently
coercive." (Spelfogel 8/14/15 Letter at 11).  According to the
defendants, the Ivers E-mail was meant to provide "information and

9

guidance" to models, some of whom had "reached out to MSA for assistance, information and clarification from MSA" after being contacted by plaintiff's counsel.  (Spelfogel 8/14/15 Letter at 4-5).  Below, I will address the plaintiff's specific allegations of impropriety in turn.

1.  <u>MSA's Relationship with Fit Models</u>

The plaintiff contends that the Ivers E-mail is inherently coercive because of the relationship between MSA and the models. A risk of explicit or implicit coercion exists where the parties are involved in an employment or ongoing business relationship. <u>Kleiner v. First National Bank of Atlanta</u>, 751 F.2d 1193, 1202 (11th Cir. 1985); <u>Zamboni</u>, 2013 WL 978935, at *3;  <u>Lujan v. Cabana Management, Inc.</u>, No. 10 CV 755, 2011 WL 3235628, at *2 (E.D.N.Y. July 27, 2011).  Such relationships can transform suggestions, requests, or observations into directives or threats.  <u>See, e.g.</u> <u>Camp v. Alexander</u>, 300 F.R.D. 617, 624 (N.D. Cal. 2014) (finding defendants' letter coercive as result of its "multiple predictions that the lawsuit, if successful, will cause the practice to close, with the obvious consequence that employees would lose their jobs.").  Yet the mere existence of such a relationship is not enough to justify restricting the defendants' communications.  <u>See</u> <u>Longcrier</u>, 595 F. Supp. at 1227 ("[I]t bears emphasis that mere inherent coerciveness in the employment relationship is insufficient, in and of itself, to warrant imposition of limitations on employers' ability to speak with potential class members prior to certification."); <u>Jackson v. Papa John's USA,</u>

Inc., No. 1:08-cv-2791, 2009 WL 650181, at *1-2 (N.D. Ohio March 10, 2009) (declining to limit defendant's communications on basis of employment relationship in absence of evidence of "coercive, misleading or improper communications" by defendant); Basco v. Wal-Mart Stores, Inc., Civ. A. No. 00-3184, 2002 WL 272384, at *3-4 (E.D. La. Feb. 25, 2002) ("[W]hile it is evident that there is an ongoing business relationship between employee and employer, it is not enough that a potentially coercive situation exists.").

The Ivers E-mail does not approach the degree of coercion present in many cases.  The e-mail does not contain threats, veiled or otherwise.   Contrary to the plaintiff's assertions (Dugger 8/6/15 Letter at 12), the e-mail does not imply that the defendants will retaliate against models who speak with plaintiff's counsel or choose to join the lawsuit.  Nor is there reason to believe that the models will feel pressured to avoid the litigation to protect their relationship with the defendants.   Indeed, the plaintiff agrees that the e-mail downplays the defendants' interest in the litigation.  (Dugger 8/19/15 Letter at 9).

On the other hand, potential opt-in plaintiffs may be inclined to defer to the defendants because of the nature of their relationship.  The models not only are economically dependent on the defendants (Dugger 8/6/15 Letter at 10), but, as the defendants themselves admit, also look to the defendants for "guidance." (Spelfogel 8/14/15 Letter at 2, 10).  The fact that the fit models rely on MSA for "professional advice" makes it less likely they will question information they receive from an MSA senior executive

and, therefore, more likely they will be misled by misrepresentations or omissions in the e-mail. <u>See</u> <u>Hampton Hardware</u>, 156 F.R.D. at 633 (noting that because of their ongoing business relationship, potential class members relied upon defendant for information and were "particularly susceptible to believing defendant's comments that the lawsuit [would] cost them money."). Against this background, I will consider the particular aspects of the e-mail that the plaintiff challenges.

### 2. <u>Characterization of Plaintiff's Attorney</u>

First, the plaintiff objects to the e-mail's characterization of plaintiff's counsel's outreach to putative class members as a "solicitation".[3] (Dugger 8/6/15 Letter at 7-8). In particular, the plaintiff objects to the assertion that what plaintiff's counsel "really wants is for you to become his client and join in this law suit [sic] against MSA so he can earn more legal fees." (Dugger 8/6/15 Letter at 7-8). It is unlikely that recipients of the e-mail interpreted this statement as anything other than the defendants' opinion, even absent such a caveat. Nonetheless, the accusation that plaintiff's counsel is motivated by greed could

---

[3] The defendants contend that plaintiff's counsel's communication was "an unsolicited attorney advertisement." (Spelfogel 8/14/15 Letter at 4). In their filings, both parties level accusations that need not be resolved to determine whether the Ivers e-mail had the potential to mislead or coerce. The defendants allege violations of the Rules of Professional Conduct and Rule 11 of the Federal Rules of Civil Procedure in connection with plaintiff's counsel's message. (Spelfogel 8/14/15 Letter at 4-6). The plaintiff suggests Mr. Ivers "may have engaged in the unauthorized practice of law." (Dugger 8/19/15 Letter at 3). However, these allegations are either outside the scope of the instant dispute, beyond the authority of this Court to adjudicate, or both.

have a chilling effect on participation.  As the court noted in
<u>Wright</u>, the assertion that plaintiffs' counsel "are interested
solely in a payoff," although not unusual and fairly clearly an
opinion, is still problematic.  It is no doubt intended to
encourage Plaintiffs and/or potential class members not to
participate in the lawsuit."  2012 WL 2239797, at *5; <u>see also</u>
<u>Camp</u>, 300 F.R.D. at 624 (finding defendants' statement that "we
believe that this lawsuit is motivated by greed and other improper
factors" likely to chill participation).

     3.  <u>Description of Independent Contractors and Employees</u>

The plaintiff next challenges the e-mail's description of
independent contractors and employees as inaccurately stating the
legal test for employee status.  The e-mail states, in relevant
part:

> MSA is currently defending a law suit [sic] brought by
> Eva Agerbrink.  She claims that she and our other Fit
> Models have been wrongly classified as independent
> contractors and should have been classified as employees
> of MSA.
>
> As an independent contractor you retain control over
> when, where, for whom, and how you wish to work, and at
> what rates.  MSA helps you get into the business,
> provides the support you request and helps you manage
> your careers.
>
> On the other hand, employees work fixed hours, work where
> and when management tells them, work for hourly rates,
> and work under close management control.

(Dugger 8/6/15 Letter at 2; Spelfogel 8/14/15 Letter at 8; Ivers
Email).  These descriptions raise practical considerations but do
not come across as a "statement of law," nor do they suggest a
legal test used by courts in deciding employee status.

Furthermore, while the plaintiff notes that "universal characterizations" cannot be accurate, (Dugger 8/19/15 Letter at 3), and the e-mail should have stated, for example, that "employees generally work fixed hours," the absence of such a qualifier does not significantly alter the text's impact.

The e-mail's depiction of independent contractors and employees is certainly one-sided. By juxtaposing select characteristics in such a way, the e-mail casts independent contractors in a more positive light, presumably so that fit models will question why they would want to be classified as employees rather than independent contractors. The crucial question, however, is not whether the e-mail slanted or omitted facts, but whether it did so to such an extent that it crossed the line into misrepresentation. Compare Keystone Tobacco Co. v. U.S. Tobacco Co., 238 F. Supp. 2d 151, 157 (D.D.C. 2002) (concluding that while communications "contain some self-serving advocacy for defendants' position, [the court] cannot find that the statements therein are inaccurate or misleading"), with Camp, 300 F.R.D. at 624 (finding potential for defendant's letter to chill participation where letter was "entirely one-sided, omitting relevant information regarding Plaintiffs' claims and failing to provide contact information for Plaintiffs' counsel").

As the defendants note, they have a right to "communicate about issues relevant to the lawsuit with models [they] represent[]." (Spelfogel 8/14/15 Letter at 1). There is nothing inherently improper about a defendant in an FLSA action

14

communicating with prospective opt-in plaintiffs, including to express its opinions about the litigation. <u>Urtubia</u>, 857 F. Supp. 2d at 485 (noting "[d]efendants' right to communicate directly with current and former employees who are potential class members regarding this litigation and its subject matter," but finding potential for abuse warranted limited restrictions); <u>Longcrier</u>, 595 F. Supp. 2d at 1226 ("As a general matter, employers are free to communicate with unrepresented prospective class members concerning the lawsuit and even to solicit affidavits from them concerning the subject matter of the suit."); <u>In re M.L. Stern Overtime Litigation</u>, 250 F.R.D. 492, 499-500 (S.D. Cal. 2008) (concluding letter sent to putative plaintiffs in misclassification lawsuit was not coercive or factually inaccurate because defendant's "opinion . . . that Account Executives function most effectively on behalf of their clients as 'exempt' employees, under a system that does not require timekeeping, required meal and rest breaks, and authorization to work overtime hours in order to receive premium pay, is permissible advocacy"). Yet while a communication is not required to be neutral, it may not be so one-sided as to "sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal." <u>Kleiner v. First National Bank of Atlanta</u>, 751 F.2d 1193, 1203 (11th Cir. 1985); <u>cf.</u> <u>Georgine v. Amchem Products, Inc.</u>, 160 F.R.D. 478, 496 (E.D. Pa. 1995) ("To compound the problem, but not the sole factor that makes these communications misleading, is the fact that almost all . . . contain one-sided attacks . . .").

The description of independent contractors and employees, albeit selective, is not so misleading as to require correction.

      4.  <u>Tax Status</u>

According to the plaintiff, the Ivers E-mail misleadingly suggests that "tax status is directly at issue in this litigation." (Dugger 8/6/15 Letter at 8). The e-mail contains a section titled "Tax Considerations," which states:

> Currently, as self-employed independent contractors, you receive IRS form 1099 [sic] and file your taxes as independent business persons. You are allowed under the tax laws to deduct from your reported taxable income substantial legitimate business expenses, such as any fees you pay to MSA or clients and customers and any other costs of doing business such as schooling, photo shoots, management fees and the creation of your portfolios, etc. There is no income withholding for taxes and similar items.
>
> Employees get IRS form W-2's [sic], have federal, state and city taxes and social security withheld from their pay, and are limited in what employment business expenses they can deduct on their tax returns.
>
> We strongly recommend that before deciding whether to talk to attorney Dugger, you first talk to your personal tax advisor concerning your own individual circumstances and the effect, if any, that the outcome of this case may have on your tax status and to see just what impact there might be on your personal tax situation.

(Ivers E-mail).

The plaintiff is correct that "this lawsuit is not a tax court proceeding" and that the Internal Revenue Service ("IRS") applies a different test to determine employee status for tax purposes than the one used by courts for FLSA determinations. (Dugger 8/6/15 Letter at 8). "The concept of 'employment' under the FLSA is extremely broad –– broader than the common law definition of employment and even broader than several other federal

16

employment-related statutes, such as the Internal Revenue Code." Herman v. Mid-Atlantic Installation Services, Inc., 164 F. Supp. 2d 667, 671 (D. Md. 2000), aff'd sub nom. Chao v. Mid-Atlantic Installation Services, Inc., 16 F. App'x 104 (4th Cir. 2001); see also Werner v. Bell Family Medical Center, Inc., No. 3:09 C 701, 2012 WL 1514872, at *2 (M.D. Tenn. May 1, 2012) ("The IRS' analysis does not mirror the economic realities test, though the evidence demonstrates at least some overlap."); Heath v. Perdue Farms, Inc., 87 F. Supp. 2d 452, 461 (D. Md. 2000) (noting that IRS's "common law definition of 'employee,' [is] a definition much narrower than that of the FLSA"). As a result, "it is conceivable for a worker to be correctly classified differently under the different standards that apply for different statutory purposes. However, that is not typical, and in most cases, applying the various laws does result in the same worker classification." Statement of Seth D. Harris, Deputy Secretary, U.S. Department of Labor, Before the Senate Committee on Health, Education, Labor, and Pensions (June 17, 2010), available at http://www.dol.gov/_sec/media/congress/ 20100617_Harris.htm (last visited Oct. 26, 2015). Notwithstanding the lack of any independent IRS determination, an employer will likely issue W-2s to individuals who have been found to be employees under the FLSA. Therefore, while the plaintiff is correct that tax status is not directly at issue in this litigation, the defendants are also correct that, for practical purposes, the lawsuit has "foreseeable outcomes that could well impact the tax status and resulting tax obligations of the models."

(Spelfogel 8/14/15 Letter at 10).

More problematic than the suggestion that the models' tax status may be impacted by the litigation, however, is the implication that any change will be negative. The e-mail's discussion of tax status is misleading in its one-sided presentation of the tax benefits and responsibilities of independent contractors and employees. The e-mail suggests that independent contractors pay less taxes because they may deduct "substantial legitimate business expenses" and have "no income withholding for taxes," whereas employees "are limited in what employment business expenses they can deduct" and "have federal, state and city taxes and social security withheld from their pay." (Ivers E-mail; Dugger 8/6/15 Letter at 3). The e-mail does not mention that independent contractors are still liable for income tax, but pay taxes directly rather than having them withheld from earnings. See I.R.S. Publication 1779 (Rev. 3-2012), available at https://www.irs.gov/pub/irs-pdf/p1779.pdf (last visited Oct. 26, 2015) ("When you are an employee . . . . your employer is responsible for paying social security, Medicare, and unemployment (FUTA) taxes on your wages . . . . When you are an independent contractor . . . [y]ou are responsible for paying your own income tax and self-employment tax . . . . The business does not withhold taxes from your pay. You may need to make estimated tax payments during the year to cover your tax liabilities."). Yet, especially because the e-mail catalogs specific differences between the tax liabilities of employees and independent contractors, the putative

18

plaintiffs would have no reason to question its accuracy.

As previously noted, the potential for this omission to mislead is compounded because the fit models look to MSA for "professional advice." (Spelfogel 8/14/15 Letter at 6, 9). Although the e-mail suggests the models talk to their personal tax advisors "to see just what impact there might be on your personal tax situation[s]" (Ivers E-mail), it does so after clearly suggesting that the case will have a negative impact. Given the parties' relationship, this suggestion is both coercive and misleading. Maddy v. General Electric Co., Civ. A. No. 14-490, 2015 WL 1344626, at *3 (D.N.J. March 23, 2015) ("Although the coercive nature of the employment relationship is insufficient on its own to warrant a limitation on an employer's ability to communicate directly with putative class members, courts should intervene when those communications address the particular employment issues implicated in the pending lawsuit in a misleading manner that would discourage a reasonable employee from opting into the litigation."). The e-mail does not merely inform the models of a difference between the tax status of employees and independent contractors, but it also presents the difference in a way that highlights only the favorable elements of filing as an independent contractor. By suggesting that the models will be economically disadvantaged if they are required to file as employees rather than independent contractors, the e-mail creates a situation in which potential opt-in plaintiffs may "believe[] that there [i]s no point to joining the lawsuit because it [i]s 'a lose-lose situation.'"

<u>Stransky v. HealthONE of Denver, Inc.</u>, 929 F. Supp. 2d 1100, 1108-09 (D. Colo. 2013) (finding defendants' misleading statements about potential monetary consequences of outcome "likely to confuse, if not coerce"). Taken together, the timing and slant of the e-mail "demonstrate[] an aim to scare putative class members and reduce participation in the suit." <u>Maddy</u>, 2015 WL 1344626, at *4 (concluding that timing of defendant's e-mail emphasizing timekeeping policies and consequences for not following them indicated e-mail was motivated by litigation).

 5.  <u>Lawsuit's Impact</u>

 The plaintiff argues that the e-mail further misleads by implying the lawsuit will have only a negative impact on putative class members. (Dugger 8/6/15 Letter at 8-9; Dugger 8/19/15 Letter at 5). She argues that the e-mail should have indicated the possibility for "substantial" recovery through the litigation. (Dugger 8/6/15 Letter at 9; Dugger 8/19/15 Letter at 5). The defendants, however, are not required to explain in detail the potential benefits of participating in the lawsuit.[4] <u>Bobryk v. Durand Glass Manufacturing Co.</u>, No. 12-CV-5360, 2013 WL 5574504, at *5-6 (D.N.J. Oct. 9, 2013) (rejecting argument that communication was misleading or coercive because it lacked "neutral advisement of

---

[4] The plaintiff also contends that Mr. Ivers should have mentioned the possibility of a beneficial resolution of the Declaratory Judgment Act claim, which was pending at the time of the e-mail. (Dugger 8/6/15 Letter at 9 n. 9; Dugger 8/19/15 Letter at 5). The fact that the claim was subsequently dismissed, however, illustrates that its benefit to putative plaintiffs was not, as the plaintiff states, "likely."

Plaintiff's theory of the case," when communication contained other disclosures); Georgine, 160 F.R.D. at 496 n. 29 ("[I]f one-sidedness were the only issue here, the communications at issue would not be actionable."); Babbitt v. Albertson's Inc., No. C-92-1883, 1993 WL 150300, *3 (N.D. Cal. 1993) ("Defendant has not cited to, nor has this court found, any cases pertaining to pre-certification communications with potential class members in which a court has held that the communications must be objective and/or neutral." (footnote omitted)).

> 6.  Consequences of Speaking with Plaintiff's Counsel

The plaintiff also argues that the e-mail misleadingly suggests that speaking to plaintiff's counsel would create legal obligations for fit models. (Dugger 8/6/15 Letter at 9). The defendants do not respond to this claim. (Dugger 8/19/15 Letter at 5). Under the heading "Discovery Considerations," the Ivers E-mail states:

> Persons who talk to attorney Dugger and/or who join the Agerbrink lawsuit may be asked to provide documents or information relating to their work at MSA, and for evidence to support any claim they might make. They may be required to participate in written and/or oral discovery proceedings including depositions under oath, and they may have to testify under oath in a trial of this matter.

(Ivers E-mail). While opt-in plaintiffs may face certain discovery requirements, by lumping together "[p]ersons who talk to attorney Dugger and/or who join the Agerbrink lawsuit" (Ivers E-mail), the e-mail suggests that simply speaking with plaintiff's counsel could create an obligation to participate in discovery or to testify. This is certainly misleading. Cf. Georgine, 160 F.R.D. at 493-94

21

(concluding statement that class members would have obligations under settlement was misleading and "an attempt by counsel opposed to this settlement to scare individuals into believing that considerably more will have to be done to obtain compensation under the terms of the settlement than in the tort system"). A fit model who does not opt-in to the lawsuit is unlikely to be deposed or called to testify.

       7.  <u>The Defendants' Interest in the Litigation</u>

Lastly, the plaintiff contends the e-mail is misleading because it does not disclose the defendants' interests in litigation. (Dugger 8/6/15 Letter at 9). The defendants argue that MSA was not obligated to disclose its interests in putative class members' non-engagement with the lawsuit. (Spelfogel 8/14/15 Letter at 10). They further claim that the e-mail's acknowledgment that MSA was defending against the plaintiff's lawsuit "clearly meant that MSA was being sued and that its interests were adverse to Plaintiff and putative class members." (Spelfogel 8/14/15 Letter at 10-11). I disagree; the e-mail's failure to explicitly acknowledge the defendants' specific adverse interests has the potential to mislead by omission. In light of their ongoing business relationship, the fit models may presume that their interests are aligned with MSA's, and therefore may not question the e-mail's "advice." <u>See</u> <u>Georgine</u>, 160 F.R.D. at 496 ("[B]ecause none of the communications at issue revealed to the recipient that the drafter had a financial motive to obtain additional opt-outs, the recipient was not on notice to closely scrutinize the substance

of the communications.").

C.   Corrective Measures

Whether a communication is misleading or coercive -- and
therefore warrants judicial intervention -- often depends not on
one particular assertion, but rather the overall message or
impression left by the communication. See Bobryk, 2013 WL 5574504,
at *6 (noting "the absence of a bright-line rule controlling
pre-certification communications" requires courts to "assess[]
whether the factual circumstances surrounding ex parte
communications warrant the imposition of restrictions on speech");
A.R. ex rel. Root v. Dudek, No. 12-60460-CIV, 2013 WL 5278668, at
*9 (S.D. Fla. Sept. 19, 2013) ("Overall, the communications, when
taken as a whole and in context, do not threaten the proper
functioning of the litigation."); Georgine, 160 F.R.D. at 496 ("The
one-sided attacks[] and the failure to discuss . . . the drafters'
interests, . . . . when considered in conjunction with the
misleading statements and omissions . . . lead to the inescapable
conclusion that class members who were exposed to these
communications could not make an informed choice of whether to
remain in the class or to opt out."); cf. Davine, 2014 WL 5427006,
at *5 (declining to issue corrective notice where manager made one-
off potentially misleading statements, but defendant "took steps to
prevent the communication from discouraging participation").   A
court therefore "must examine 'the context in which the
communications were made and the effect of the communications' in
determining whether, and how much, communication should be

23

restricted." Stransky, 929 F. Supp. 2d at 1109 (quoting Bass v. PJCOMN Acquisition Corp., No. 09-CV-1614, 2011 WL 902022, at *4 (D. Colo. March 14, 2011)).

The alleged misrepresentations in the Ivers E-mail are nowhere near as egregious as in many of the cited cases. Nonetheless, the e-mail has the potential to mislead for the reasons discussed above, including the characterization of plaintiff's counsel as fee-driven, the one-sided discussion of tax benefits and obligations of independent contractors, and the suggestion that simply speaking with plaintiff's counsel may subject individuals to discovery or cause them to be required to testify at trial. Moreover, the relationship between the defendants and their fit models increases the potential harm from such misinformation. Taken as a whole, therefore, the Ivers E-mail has the potential to chill participation.

Accordingly, I must now identify "the narrowest possible relief" which would protect the respective parties. Gulf Oil, 452 U.S. at 102 (quoting Coles v. Marsh, 560 F.2d 186, 189 (3d Cir. 1977)). While there is a basis for imposing limited restrictions on the defendants' ability to communicate with putative class members, the plaintiff's proposed relief is overly broad and overreaching. Corrective notice and a limited restriction on future communications will adequately address any harm caused by the e-mail and protect against future harm, without interfering with the defendants' ability to conduct business or defend against this litigation.

In order to correct the misleading statements made in the e-mail, the Court has prepared a Corrective Notice, attached hereto at Appendix A, which clarifies the most prominent points of potential confusion.  To serve its purpose, the Corrective Notice must be delivered to the putative opt-in plaintiffs that were subjected to the misstatements.  Within 7 days of this Order, the Corrective Notice shall be sent through the defendants' e-mail to all the recipients of Mr. Ivers' May 7, 2015 e-mail.  The defendants are not required to produce the names of the recipients.

The defendants shall produce to the plaintiff all correspondence between Mr. Ivers and the fit models relating to this litigation.  The need for remedial measures created by the Ivers E-mail, however nuanced, is nevertheless evidence of the potential for misleading and coercive communications.  It is not necessary, however, to order the defendants to produce metadata related such communications.

I will not enjoin Mr. Ivers or the defendants from discussing the litigation with the putative class, though all future communication related to the litigation must be in writing.  The parties and their counsel are cautioned that I will take seriously any further claims of coercive, inflammatory, or one-sided communications in this case.  This restriction does not affect the defendants' ability to communicate with the fit models for normal business purposes.

Finally, the plaintiff's request that Bill Ivers submit an affidavit "stating (i) the nature, scope, and content of any

25

additional written or oral discussions regarding the lawsuit with any MSA models; and (ii) whether, and to what extent, counsel assisted him in any manner, with respect to the May 7 Email or other communications to putative class members," (Dugger 8/6/15 Letter at 15), is denied, as I have already ordered the defendants to produce all correspondence between Mr. Ivers and the fit models relating to the litigation.

Conclusion

For the reasons set forth above:

1. The defendants shall send the Corrective Notice attached at Appendix A by e-mail to all recipients of the Ivers E-mail within 7 days of the date of this Order;

2. The defendants shall produce to the plaintiff within 30 days of the date of this Order any and all correspondence between Mr. Ivers and fit models relating to this litigation;

3. All future communications by the defendants to potential opt-in plaintiffs about the litigation shall be in writing.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       October 27, 2015

Copies transmitted this date:

Cyrus E. Dugger, Esq.
The Dugger Law Firm, PLLC
154 Grand St.
New York, NY 10013

26

Evan J. Spelfogel, Esq.
Janie F. Friedman, Esq.
Ronald M. Green, Esq.
Epstein, Becker & Green, P.C.
250 Park Ave.
New York, NY 10177

Appendix A

**COURT NOTICE**

You previously received an e-mail from me about the lawsuit referenced above.  The Court has authorized this notice to correct any possible misunderstandings created by that e-mail.


**Background on Lawsuit**

The plaintiff in this case, Eva Agerbrink, claims that she and other fit models have been wrongly classified under the Fair Labor Standards Act as independent contractors rather than employees.  This lawsuit is not seeking a determination of fit models' tax status.


MSA disputes that fit models have been misclassified.  The Court has not made any findings in this matter.


**Filing Taxes as an Independent Contractor or as an Employee**

There are both benefits and disadvantages to filing taxes as an independent contractor or an employee.  For example, while independent contracts may deduct certain business expenses and do not have taxes withheld from their paychecks, they are responsible for paying income, Social Security, Medicaid, and other taxes directly to the government.


As I suggested in my previous e-mail, you should consult an independent financial advisor if you have questions about your

tax status.

**Criticisms of Plaintiff's Attorneys**

My e-mail contained a statement that was critical of the
plaintiff's attorney.  This statement was solely my opinion.

**Consequences of your Participation in the Lawsuit or Cooperation
with Plaintiff's Counsel**

Talking to the plaintiff's attorney will not obligate you to join
this lawsuit.  While you may be required to participate in
discovery if you ultimately join the lawsuit, simply speaking
with the plaintiff's attorney is unlikely to create any
obligations to testify at deposition or otherwise provide
discovery.

**Communications from Attorneys**

Attorneys representing the plaintiff and/or MSA may contact you
about this lawsuit.  It is up to you whether to communicate with
them.  You will not suffer any negative consequences for speaking
with the plaintiff's attorney.  If you communicate with MSA's
lawyers, those communications may not be confidential and could
be used in this case.