EPSTEIN BECKER & GREEN, P.C.
250 PARK AVENUE
NEW YORK, NEW YORK 10177
(212) 351-4500
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EVA AGERBRINK, individually                    :
and on behalf of all others similarly situated, :
                                               :
                          Plaintiff,           :        **ECF Case**
                                               :
            vs.                                :        14 CV 7841 (JPO) (JCF)
                                               :
MODEL SERVICE LLC d/b/a MSA MODELS, et al.     :
                                               :
                                               :
                          Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ....................................................................... 1

II.    ARGUMENT ................................................................................................. 3

    A.    A VALID AND ENFORCEABLE AGREEMENT  GOVERNS THE SUBJECT MATTER OF THIS DISPUTE,  AND, THEREFORE, PLAINTIFF MAY NOT BRING A  QUASI CONTRACT CLAIM OF UNJUST ENRICHMENT ........... 3

    B.    THE LIQUIDATED DAMAGES CLAUSE IS ENFORCEABLE........................ 8

    C.    EVEN IF PLAINTIFF WAS PERMITTED TO BRING AN  UNJUST ENRICHMENT CLAIM, SHE COULD NOT  PREVAIL AS MSA HAS NOT BEEN UNJUSTLY ENRICHED........................................................ 20

III.    CONCLUSION............................................................................................. 22

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bates Advert. USA, Inc. v. 498 Seventh, LLC*,
    7 N.Y.3d 115, 850 N.E.2d 1137, 818 N.Y.S.2d 161 (N.Y. 2006) ............................................9

*Bell v. Ebadat*,
    No. 08 Civ. 8965, 2009 U.S. Dist. LEXIS 129708 (S.D.N.Y. June 16, 2009) ......................14

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey Inc.*,
    448 F.3d 573 (2d Cir. 2006).................................................................................3, 4, 5, 20

*Bloomfield v. Bloomfield*,
    97 N.Y.2d 188 (2001) ...........................................................................................................5

*CIT Grp./Equip. Fin., Inc. v. Shapiro*,
    No. 09 Civ. 409, 2013 U.S. Dist. LEXIS 45870 (S.D.N.Y. Mar. 29, 2013) ............................7

*Dalston Constr. Corp. v. Wallace*,
    26 Misc. 2d 698 (N.Y. Sup. Ct. Nassau Cty. 1960)................................................................18

*Donnell v. Stogel*,
    161 A.D.2d 93 (2d Dep't 1990) ...........................................................................................6

*Ferro v. Bologna*,
    31 N.Y.2d 30 (1972) ...........................................................................................................6

*Hackenheimer v Kurtzmann*,
    235 N.Y. 57 (1923) ...........................................................................................................16

*HLT Existing Franchise Holding LLC v. Worcester Hospitality Group, LLC*,
    609 F. App'x 669 (2d Cir. 2015) .........................................................................................9

*Jarro Bldg. Indus. Corp. v. Schwartz*,
    54 Misc. 2d 13 (App. Term 2d Dep't 1967) ......................................................................17

*JMD Holding Corp. v. Cong. Fin. Corp.*,
    4 N.Y.3d 373 (2005) ...........................................................................................................14

*L & L WINGS, INC. v. Marco-Destin Inc.*,
    756 F. Supp. 2d 359 (S.D.N.Y. 2010)....................................................................................9

*Leasing Serv. Corp. v. Justice*,
    673 F.2d 70 (2d Cir. 1982)..................................................................................................14

*Morgan Servs, Inc. v. Lavan Corp.*,
    59 N.Y.2d 796 (1983) ...................................................................................................10

*Ray v. Ray*,
    61 A.D.3d 442 (1st Dep't 2009) ....................................................................................9

*Spirit Locker, Inc. v. EVO Direct, LLC*,
    696 F. Supp. 2d 296 (E.D.N.Y. 2010) ......................................................................7, 8

*Tobin v. Gluck*,
    Nos. 07-cv-1605, 11-cv-3985, 2015 U.S. Dist. LEXIS 133812 (E.D.N.Y. Sept.
    30, 2015) .................................................................................................................3, 4, 6

*Triggs v. Triggs*,
    46 N.Y.2d 305 (1978) .....................................................................................................5

*Trilegiant Corp. v. Sitel Corp.*,
    No. 09 Civ. 6492, 2013 U.S. Dist. LEXIS 72828 (S.D.N.Y. May 20, 2013) ...........3

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
    369 F.3d 34 (2d Cir. 2004) ......................................................................................14, 17

*Vacold LLC v. Cerami*,
    545 F.3d 114 (2d Cir. 2008) ..........................................................................................19

*Wechsler v. Hunt Health Sys., Ltd.*,
    330 F. Supp. 2d 383 (S.D.N.Y. 2004) ............................................................................9

*Weiss v. Weiss*,
    206 A.D.2d 741 (3d Dep't 1994) ..................................................................................14

*Willner v. Willner*,
    145 A.D.2d 236 (2d Dep't 1989) ..................................................................................10

*Zahralban v. Vicbar Constr. Corp.*,
    16 Misc. 2d 550 (N.Y. Sup. Ct. Kings Co. 1958) ........................................................19

**Other Authorities**

Restatement (Second) of Contracts § 184(1) (1981) .....................................................6

## I.      PRELIMINARY STATEMENT

Defendants Model Service LLC d/b/a MSA Models ("MSA"), Susan Levine and William Ivers ("Defendants") respectfully submit this memorandum of law in opposition to Plaintiff's Motion for Partial Summary Judgment.

While purporting to bring a class and collective action and while discovery is ongoing, Plaintiff brings this motion for partial summary judgment on behalf of the named Plaintiff only, and only for one claim in this action, specifically seeking a judgment of liability against Defendant MSA for unjust enrichment based on the language of paragraph 11 of the parties Agreement.  The disputed language states as follows:

> Model hereby agrees that in the event Model breaches this Agreement or otherwise refuses to fulfill Model's obligations hereunder, all obligations and liability, of any type, nature, or description, of MSA to model shall cease and terminate (unless an authorized representative of MSA agrees otherwise in writing), and in such event, MSA may, at its sole election, (i) retain as liquidated damages all funds then held and/or subsequently received by MSA on Model's behalf, or (ii) seek all legal  and/or equitable remedies then available to MSA, in which event MSA shall, pending the resolution of MSA's claims, be entitled to hold the funds referred to in the preceding  clause (i) as security for any judgment MSA may obtain against Model in connection  with such claims. Model shall be responsible for paying all reasonable outside attorneys' fees and other collection costs (including, without limitation, any percentage-based and/or other third-party fees) incurred by MSA in the enforcement of this Agreement and/or its rights and remedies hereunder, whether or not an arbitration or other legal action is initiated or filed.

Plaintiff's argument is premised on the erroneous assumption that the Agreement between the parties is not valid or enforceable because she mistakenly believes that if one provision in a contract is unenforceable, the entire contract becomes null and void.

First and foremost, the Agreement at issue here is a valid agreement that the parties intended to enter into, intended to govern their relationship and any dispute arising therefrom, and intended to be enforced. Plaintiff argues that the remedies provision in the contract is

invalid. While Defendants' dispute this point, even assuming *arguendo* that this portion of the Agreement was unenforceable, the rest of the Agreement would be saved and remain in force by virtue of its severability clause. The existence of the severability clause allows the contract to survive despite any alleged or actual overreaching in any clause by either party. This is black letter law that wholly applies to and resolves the instant dispute in Defendants' favor. The parties Agreement is valid and enforceable with respect to the subject matter of the dispute, and precludes Plaintiff's claims herein.

Contrary to Plaintiff's contentions, not only is the Agreement valid and enforceable and governs the parties' dispute, but the remedies provision at issue is not an unenforceable penalty provision.

Furthermore, if the Court were to delve into the merits of Plaintiff's claim, it would be clear that, even if she could bring an unjust enrichment claim, MSA was not unjustly enriched. Indeed, if any party benefited from the breach, it was Plaintiff.

Analysis of the Agreement language here in issue requires a finding that the Agreement is valid and enforceable.  Therefore, summary judgment on Plaintiff's claims should be denied.

## II.     ARGUMENT

**A.     A VALID AND ENFORCEABLE AGREEMENT GOVERNS THE SUBJECT MATTER OF THIS DISPUTE[1], AND, THEREFORE, PLAINTIFF MAY NOT BRING A QUASI CONTRACT CLAIM OF UNJUST ENRICHMENT**

Plaintiff's motion for partial summary judgment raises an issue of black letter contract law: New York Law provides that the courts should enforce contracts consistent with the clear intent of the parties. *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey Inc.*, 448 F.3d 573, 580 (2d Cir. 2006); *Tobin v. Gluck*, Nos. 07-cv-1605, 11-cv-3985, 2015 U.S. Dist. LEXIS 133812, at *31 (E.D.N.Y. Sept. 30, 2015) (Under New York law, when interpreting a contract, "'the intention of the parties should control, and the best evidence of intent is the contract itself'.") (citations omitted); *Trilegiant Corp. v. Sitel Corp.*, No. 09 Civ. 6492, 2013 U.S. Dist. LEXIS 72828, at *16 (S.D.N.Y. May 20, 2013) ("It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms. The parties' intent is derived 'from the plain meaning of the language employed in the agreements.'") (citation omitted).

Regardless of the validity of the Agreement's remedies provision in Section 11 of the Agreement (annexed to the Ivers Affidavit as Exhibit 1), the Agreement remains valid and enforceable. There can be no unjust enrichment claim where there is an enforceable contract between the parties that covers the subject matter of the dispute.  An unjust enrichment claim can only lie where there is no valid and enforceable agreement between the parties. It is a quasi-

---

[1] The current dispute – the issue of whether Plaintiff Agerbrink's Agreement contains an unenforceable penalty provision thereby invalidating the Agreement – has been raised prematurely. Plaintiff purports to bring class claims on behalf of models who signed Agreements with MSA, as a representative of two different classes for two separate types of claims (wage and hour claims and quasi-contract claims). The claim currently being litigated holds Plaintiff out as a representative of ALL models who were represented by MSA during the statutory period. By litigating her own claim, just one of seven in the Second Amended Complaint, on only her own behalf, she is defeating the purpose of class litigation's intent of judicial economy and putting her own claims first. If Plaintiff intends to litigate each claim separately, and is setting a precedent for individual plaintiffs who opt-in or do not opt out to litigate their own claims in such a piecemeal fashion, then perhaps she is not an adequate class or collective representative.

3

contract claim that the law creates in the absence of any agreement. *Beth Israel Med. Ctr.*, 448 F.3d at 586.

At the outset, the Court must determine whether the language of any part of the Agreement is ambiguous. *Tobin*, 2015 U.S. Dist. LEXIS 133812, at *31-32. "A contract is unambiguous if its 'language has a definite and precise meaning … concerning which there is no reasonable basis for a difference of opinion." *Id.*, at *32 (citations omitted).

The Plaintiff has not asserted that any portion of the contract is ambiguous, and MSA similarly does not make any such assertion. Indeed, the language is quite clear. Simply stated, MSA represents the Model, uses its best efforts to further her career, and sends invoices to clients for whom the Model has performed services (Ivers Aff., Exhibit 1, §§ 2, 4, and generally); the Model agrees to pay MSA an agreed upon percentage for MSA's services rendered to the Model. *Id.*, § 7, and generally. In the event that the Model believes MSA has breached its obligations under the Agreement, the Model may put MSA on notice, give MSA an opportunity to cure, and pursue her rights and remedies in the Courts of New York. *Id.*, §§16, 20, and generally. If MSA believes the Model has breached her obligations under the Agreement, MSA may elect one of two remedies, but not both: (i) it may retain as liquidated damages monies it possesses and/or subsequently receives from clients for whom the model performed services OR (ii) it may seek legal and/or equitable remedies *then available to it*; and if it opts to seek legal or equitable remedies, it may hold monies it possesses and/or subsequently receives as security against a future judgment in connection with such claims. *Id.*, § 11 (emphasis added). Finally, if at the time the parties signed the agreement, any provision of the Agreement "be void or unenforceable, such provision shall be deemed severed and this Agreement with such

provision severed shall remain in full force and effect to the extent permitted by law….” *Id.*, §
15.

These unambiguous clauses are the material terms of the contract for the purposes of the
instant dispute.  Clearly, “there is a written agreement, the existence of which is undisputed, and
the scope of which clearly covers the dispute between the parties.”  *Beth Israel Med. Ctr.*, 448
F.3d at 587 (citation omitted). Thus, as a matter of well settled contract law, the contract should
be enforced and the Plaintiff’s claims lying in quasi contract should be denied.

Even *assuming, arguendo,* that the Plaintiff’s assertion that Section 11 of the Agreement
is unenforceable because it contains a penalty provision (which Defendants do not concede and
which we address herein), that finding would not invalidate the Agreement on account of the
severability clause in Section 15.  Therefore, Plaintiff still could pursue a claim in quasi contract.
There was no intent by any party to violate the law.  Absent evidence of intent to violate the law,
a contract which may be performed both lawfully and unlawfully should be construed in favor of
its legality. See *Bloomfield v. Bloomfield*, 97 N.Y.2d 188 (2001). The existence of the
severability clause (Section 15 of the Agreement) permits the Court to sever an unenforceable
provision and uphold the rest of the Agreement.  As such, even if the Plaintiff prevailed on the
argument that the Agreement contains an unenforceable remedy provision, the severability
clause would be triggered striking the unenforceable remedy provision, and the rest of the
Agreement would remain intact and enforceable. *Beth Israel Med. Ctr.*, 448 F.3d at 581 (citing
*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999)) (enforcing portions of a restrictive covenant
where another portion of the covenant was overbroad and unenforceable as contrary to public
policy); “Where part of a contract is contrary to public policy, and therefore unenforceable, a
court may nevertheless enforce the remainder of the contract. *See Triggs v. Triggs*, 46 N.Y.2d

305 (1978) (enforcing legal provisions of a corporate shareholder agreement containing illegal provisions); *Ferro v. Bologna*, 31 N.Y.2d 30 (1972) (holding that a provision of a separation agreement that was of questionable legality did not vitiate the entire agreement and the other provisions of the agreement may be valid and enforceable); *see* Restatement (Second) of Contracts § 184(1) (1981) ("If less than all of an agreement is unenforceable [on grounds of public policy], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange."); *see Donnell v. Stogel*, 161 A.D.2d 93, 97 (2d Dep't 1990) ("As this court recently indicated: "where an agreement consists in part of an unlawful objective and in part of lawful objectives, the court may sever the illegal aspects and enforce the legal ones, so long as the illegal aspects are incidental to the legal aspects and are not the main objective of the agreement.") (citations omitted).

Plaintiff argues that the remedies language in Section 11 of the Agreement is unenforceable because it gives MSA both liquidated damages and additional legal and equitable remedies.  However, the language of this clause on its face indicates that MSA may seek only liquidated damages OR legal and equitable remedies for the same specific breach (i.e. "seek all legal and/or equitable remedies *then available* to MSA."), and would be permitted to withhold monies for Agerbrink within its possession as security for an eventual judgment it might secure in such litigation against Agerbrink. In short, in the event that the Court were to strike/sever the liquidated damages clause, the Agreement would still be enforceable with respect to MSA's retaining its alternate legal and equitable remedies and withholding monies as an offset against a future judgment. *See Tobin*, 2015 U.S. Dist. LEXIS 133812, at *88-90 ("In the absence of express language providing for liquidated damages, deposits are construed as securities, and a

6

landlord may only resort to the security in the event of breach to the extent of his actual losses.")
(citation omitted).

Indeed, this  Court recently found (albeit applying Arizona law) that where a remedy
provision was unconscionable because a liquidated damages provision duplicated the imposition
of other, actual damages, the severability clause permitted the court to sever the unconscionable
damage provisions and enforce the remainder of the contract. *CIT Grp./Equip. Fin., Inc. v.
Shapiro*, No. 09 Civ. 409, 2013 U.S. Dist. LEXIS 45870, at *24-25 and n.5 (S.D.N.Y. Mar. 29,
2013).  *CTI Group* illustrates the functionality of the severability provision to save an otherwise
enforceable contract. If this Court severs the liquidated damages portion of the remedies
provision in Section 11 of the MSA Agerbrink Agreement, the remainder of the Agreement
including the legal and equitable damages provision in that Section would remain valid and
enforceable. Thus, plaintiff's claim for unjust enrichment would fail.

Plaintiff's argument is heavily reliant on the *Spirit Locker* decision from the Eastern
District. However, Plaintiff has failed to address a critical distinction which sets *Spirit Locker*
apart from this dispute, and which renders it inapplicable.  Spirit Locker, a retailer, and EVO, a
credit card processing company, entered into an agreement for services. As part of that
agreement, EVO would assess and automatically debit $395 from Spirit Locker as liquidated
damages if Spirit Locker terminated the agreement early. The Agreement between Spirit Locker
and EVO did not contain any provision addressing Spirit Locker's right to recover the $395 fee
from EVO. Thus, whether Spirit Locker could recover that money was not a subject addressed
by their contract, and, therefore, was not an issue covered by a valid, enforceable contract.  As a
result, the Court found that because the subject matter of the dispute – Spirit Locker's
entitlement to recover the $395 early termination fee – was not otherwise covered by an

agreement between the parties, Spirit Locker could assert a claim of unjust enrichment, a claim of quasi-contract that cannot be made when the subject matter at issue is contained within a valid contract.  *See Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 297-298, 304-306 (E.D.N.Y. 2010).

In the Agreement between MSA and Plaintiff, the issue of Plaintiff's compensation and withholding of same – the issue she alleges forms the subject of her unjust enrichment claim – is the primary subject matter of the Agreement. It cannot be disputed that Plaintiff's compensation and obligations arising therefrom are addressed in the Agreement (§§ 2, 3, 7, and generally).

Furthermore, to the extent Plaintiff frames the issue as being about MSA's breach of the Agreement in withholding Plaintiff's funds, the subject matter of MSA's breach is also expressly addressed in the Agreement, (§16), as is the subject matter of withholding the funds pending a future judgment (§11), which portion of the clause is not alleged to be unlawful. Clearly, by virtue of MSA seeking legal remedies for a breach, Plaintiff would have an opportunity to participate and argue against the breach. Therefore, under any analysis, the issue of Plaintiff's compensation, the issue of MSA's breach, and the issue of MSA withholding monies, is addressed in, and governed by, the Agreement.

Thus, unlike *Spirit Locker*, where the subject matter of the claim by Spirit Locker against EVO – the right of Spirit Locker to recover a certain fee - was not addressed by the agreement, the subject matter of Plaintiff's claim pervades the Agreement.  In short, Plaintiff has a claim governed by a valid contract.  Therefore, under New York contract law, in the presence of a valid contract, there can be no claim of unjust enrichment.

B.    **THE LIQUIDATED DAMAGES CLAUSE IS ENFORCEABLE**

i.   **The Liquidated Damages Clause Is Not A Penalty**

Plaintiff's argument that the Liquidated Damages clause is an unenforceable penalty is without merit. The law in New York is clear: "[t]he burden rests with the party seeking to avoid the payment of damages." *HLT Existing Franchise Holding LLC v. Worcester Hospitality Group, LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (citing *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005)). That burden is "'to show that the stated liquidated damages are, in fact, a penalty,' and to 'demonstrate either that damages flowing from [the breach] were readily ascertainable at the time [the parties] entered into their . . . agreement, or that the [liquidated damages] fee is conspicuously disproportionate to these foreseeable losses'" *Ray v. Ray*, 61 A.D.3d 442, 444 (1st Dep't 2009) (quoting *JMD Holding Corp.*, 4 NY3d at 380). Here, the liquidated damages provision is not a penalty, and Agerbrink cannot meet her burden.

The determination of "[w]hether a contractual provision 'represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances.'" *Bates Advert. USA, Inc. v. 498 Seventh, LLC*, 7 N.Y.3d 115, 120, 850 N.E.2d 1137, 818 N.Y.S.2d 161 (N.Y. 2006) (citation omitted). "A liquidated damages clause . . . will be upheld by a court, unless the liquidated amount is a penalty because it is plainly or grossly disproportionate to the probable loss anticipated when the contract was executed." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 413 (S.D.N.Y. 2004) (quoting *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989)).

### ii. Actual Damages Are Impossible to Determine And The Liquidated Damages Provision is Reasonably Calculated Given the Probable Loss Occurring From Breach

"The reasonableness of the liquidated damages and the certainty of actual damages must be measured as of the time the parties enter the contract, not as of the time of the breach." *L & L WINGS, INC. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 363 (S.D.N.Y. 2010) (citing *Vernitron Corp. v. CF 48 Assocs.,* 104 A.D.2d 409, 409 (2d Dep't 1984)).

The liquidated damages clause is valid because the damages were difficult to measure at the time of the Agreement's formation. "Liquidated damages clauses are suited to factual situations where there is uncertainty concerning the measure of damages." *Willner v. Willner*, 145 A.D.2d 236 (2d Dep't 1989) (citation omitted); *see also Morgan Servs, Inc. v. Lavan Corp.*, 59 N.Y.2d 796, 797 (1983) (holding the rental of uniforms liquidated damages clause was valid because there was uncertainty concerning the re-rental or sale value of the uniforms).  In our present Agerbrink case, at the time the parties entered the Agreement, it was impossible to know how much money, if any, would be derived from the business relationship.

First, it takes time for a fit model to meet with success in the industry. The time during which a model is being developed, marketed and promoted after her initial engagement with MSA depends on the model's individual effort and the amount of time she wishes to dedicate to fit modeling. Ivers Aff., ¶ 11.  It can take up to 18 months to develop the fit model to a point where modeling is her full time career; for some, a fit model finds success sooner than 18 months, and for others, a fit model never reaches the level of success required to rely on fit modeling as a full time career.  During the development period, it is up to the fit model to select a body size for which she wants to be marketed, achieve that size and subsequently maintain those body measurements.  This involves exercise and diet and other variables specific to a fit model's particular body. Ivers Aff., ¶ 12.

In Agerbrink's case, she selected to fit at a standard size 8, and at the time she completed the open call form in March 2013, she was slimmer than a standard size 8, so she had to gain weight/mass to prepare for marketing.  It took her about 30 days to achieve her goal. In the case of other fit models, this could take 6 months or more, or never happen at all. Ivers Aff., ¶ 13.

It is up to a model to create the marketing materials (composite card, a.k.a. comp card, and specifications sheet with model image, a.k.a. spec sheet) that clients require when they consider fit models to hire to perform services. Ivers Aff., ¶ 14. Most importantly, models have to select a photographer, then make an appointment to have their photographs taken. This is referred to as test photography, or simply a Test. They also must have the funds to pay the photographer for the session. At the model's own choosing, they also must either hire a stylist to select clothes for the Test, go shopping for clothes, or select garments and accessories from their own closet. After the Test, the model has to obtain, review, select and have retouched the photographs to use in marketing materials.  In Agerbrink's case, this took approximately another 60 days.  For some models, this process takes less time; for others, it takes more time. Ivers Aff., ¶ 15.

Clients make the decision on which model to hire. Thus, the earlier the fit model becomes her selected size and produces marketing materials, the earlier it is possible for her to get the attention of prospective clients, and the earlier clients will have an opportunity to select her to work. It is never MSA's decision regarding for whom, where and when a fit model performs fit modeling work.  Models can, and often do, decline opportunities to meet prospective clients, and decline offers of paid work. Ivers Aff., ¶ 16.

Once a fit model states that she is ready to work, MSA markets and promotes her to clients whose needs match her specifications. Ivers Aff., ¶ 17. If, based on the marketing materials, a fit model meets a client's requirements, the fit model and the client may meet in person (known as a casting or a go-see). If, after the casting, the client wishes to engage the fit model, the client will inform MSA of the particulars of the job, including the hours needed and

the rates, if this information was not already shared with MSA and/or the fit model prior to, or at, the casting. Ivers Aff., ¶ 18.

 If the client wishes to work with the fit model, the fit model must then agree to work with the client. Ivers Aff., ¶ 19. Depending on the fit model, she may accept the job offered by the client on the terms provided by the client. In that situation, MSA will inform the client that the fit model has accepted, and will begin coordinating the fit model's schedule to perform work for the client. Ivers Aff., ¶ 20.  Sometimes a fit model will ask MSA to negotiate a higher rate for her, or to see if the client can offer more or fewer hours, or meet any other particular requirement of the fit model. In that case, MSA will conduct whatever negotiation the fit model directs, and either the client will agree or will not agree. In Agerbrink's case, she requested that MSA negotiate a higher rate and minimum work hours. During that process, MSA ended up reducing its commission. Ivers Aff., ¶ 21. If the client and the fit model can reach mutually agreeable terms, then MSA will begin coordinating the fit model's schedule to perform work for the client. If agreeable terms cannot be reached, MSA will typically inform the client that the fit model does not wish to accept the job with the client, and will continue promoting that fit model to other clients for whom she may be a better fit, and if so requested by the client, continue to search for another fit model to meet the original client's needs. Ivers Aff., ¶ 22.

Thus, when a model engages MSA, it is virtually impossible to know at the time the parties sign their agreement: 1) if the fit model will be successful; 2) when the fit model will be successful; 3) whether the fit model will pursue fit modeling on a full time basis, or; 4) whether the fit model will choose to limit her fit modeling work because she has other career goals that are her priority. Ivers Aff., ¶ 23.

Second, separate and apart from whether a fit model can become successful in the industry, each fit model is the sole decider with respect to how much she actually works. After MSA helps to develop the fit model and prepare her to work in the field, MSA will market and promote the fit model to  clients so that the fit model can fulfill a client's requirements and become that client's "go to" fit model for its fit modeling needs. MSA provided these services to Plaintiff Eva Agerbrink. Ivers Aff., ¶¶ 5-6. In addition, as a result of the general marketing we conduct, prospective clients reach out to MSA to engage a group of models or a specific model. Ivers Aff., ¶ 7.

To that end, however, MSA is subject to a particular fit model's instructions. These include, for example, a fit model who does not wish to work on Fridays; does not wish to take jobs that pay less than a specific rate; only wants to explore jobs that will result in a standing appointment (meaning, a job with predictable, recurring weekly appointments, rather than one-off jobs here and there); or will be pursuing other interests, such as Broadway acting or voiceover work. Ivers Aff., ¶ 8. Fit models, when starting their modeling careers, often have other jobs that prevent them from furthering their career in fit modeling.  Some are actors and travel with touring productions. Some go to work on cruise ships in the middle of their contract period.  Some move to Los Angeles to be available for pilot season or pursue their career aspirations in the music industry in the middle of their contract period, but then return before the contract period has ended.  Many fit models only work part time as a fit model and treat it as a career that is secondary to their primary career. For example, in Agerbrink's case, she was a real estate agent for ReMax realtors in Jersey City, N.J. in addition to fit modeling. Ivers Aff., ¶ 9.

Thus, if a fit model has other work that she intends to prioritize over fit modeling, then MSA must and does accommodate that fit model's instructions when marketing and promoting

the fit model to clients. Some fit models who have signed exclusive MSA fit modeling contracts work very few hours a week or a month, or none at all, while others work substantially more, depending on their instructions and options. Ivers Aff., ¶ 10.

These realities of the business make it too difficult to determine the amount of possible damages at contract formation as there were too many variables that precluded predicting Agerbrink's rate of modeling success. *See Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 74 (2d Cir. 1982) ("The value of the lessor's interest in the equipment at the termination of the lease would depend upon the physical condition of the equipment and the market conditions at that time," and "may in fact fluctuate radically over time."); *see cf. Weiss v. Weiss*, 206 A.D.2d 741 (3d Dep't 1994) (holding that where the set sum loaned was $7,500, calculating the lost interest due under the note "is easily ascertainable").

Moreover, because it would have been limited to money then on hand and/or owed by clients, the amount that would have been held by MSA as liquidated damages, in the event MSA invoked the clause, would not have been disproportionate to any loss to MSA caused by Agerbrink's breach. *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70 (2d Cir. 2004). It is the plaintiff's burden to prove the damages are not proportionate, and she has failed to do so here. *See JMD Holding Corp.*, 4 N.Y.3d at 380; *see cf. Bell v. Ebadat*, No. 08 Civ. 8965, 2009 U.S. Dist. LEXIS 129708, at *10 (S.D.N.Y. June 16, 2009) (holding where the breach was valued at $316, the liquidated damages of over $88,000 was grossly disproportionate).

To sum up this point, the Court need not delve into the actual conduct of the parties or the actual damages resulting from the Plaintiff's breach once the Court finds that the Agreement is valid and enforceable. Further, even if the court were to do so, it would be clear that the amount of funds withheld was not disproportionate to the loss caused by the breach. Here, MSA is

withholding $13,768.  $13,768 is significantly less than MSA would be entitled to if Plaintiff had not breached her Agreement or if MSA recovered actual damages for Agerbrink's breach. Ivers Aff., ¶ 35.  If she had approached MSA with Cache's offer of employment, as her Agreement bound her to do, MSA could have attempted to work out a headhunter's fee, which it has done in the past with other models, of up to 20% of one year's salary. That would mean MSA could have received up to $27,000.00 from Cache. If it had negotiated a headhunter's fee, MSA would have foregone its right to commission from Agerbrink (as MSA has done in the past for other fit models) and she would have paid nothing. Ivers Aff., ¶ 36.

If she had breached her Agreement and paid MSA actual damages, she would owe MSA $47,250.00, which is 20% of her Cache salary for the 21 months remaining on her Agreement. Ivers Aff., ¶ 37.

Finally, if she had fulfilled the terms of her Agreement and continued to be represented by MSA, she would have continued to pay MSA 20% commission on fit modeling jobs. This amount would far exceed $13,768.00: even including Plaintiff's ramp up and development time, in 15 months of representing Agerbrink she earned $48,750 (gross model rate, subject to commission), or approximately $3,250 per month, and paid to MSA commissions totaling $9,096.94. Thus, with 21 months left on the initial Term of her Agreement, and a further 24 months Tail provision for accounts introduced to her by MSA, it is reasonable to assume Agerbrink would have earned at least $68,250 and paid to MSA at least $13,650 in commissions during the initial Term, and for the remainder of the initial Term plus the Tail, her earnings could be $140,000 and MSA would have earned in excess of $29,000 in commission. Ivers Aff., ¶ 38. Thus, the amount withheld is not disproportionate to the amount of loss caused by the breach, and in fact, is far less than the actual loss from the breach.

Plaintiff contends that MSA is entitled to invoke the liquidated damages provision even for a single breach of a minor term in the contract and thus is disproportionate. *See* Pl Mem., 16. This, however, ignores the well-settled doctrine in New York whereby courts will apply liquidated damages only to material breaches of the contract. *Hackenheimer v Kurtzmann*, 235 N.Y. 57, 66-67 (1923) ("If, as we think, what the parties intended was that the $50,000 should be liquidated damages for a material interference with the good will of the business, it may be treated as what the parties themselves said it was, liquidated damages.").  Thus, the court need not credit the parade of horribles' hypotheticals proffered by Agerbrink and instead may focus on the breach here.  Clearly, it is valued at over $27,000 at a minimum, which is well within reason as liquidated damages.

Furthermore, the value of the liquidated damages, i.e. the monies on hand at the time of Agerbrink's breach (including monies subsequently received) will always be limited to a generally small period of time between the model's performance of modeling work and MSA's disbursement of the funds. For Agerbrink, MSA always paid within two weeks of receiving payment from her clients. *See* Ivers Aff., at ¶ 27. While some of her clients took longer to pay, it is not likely that MSA would, at any given time, have received or retained a disproportionate amount of money to hold as liquidated damages. The nature of the payment process does not permit such a windfall, as money gets disbursed on a regular rotating basis as it comes in. As a result, the amount of money on hand that might have been  held as liquidated damages in the event of a material breach would not have been disproportionate to the amount a model would generally be obligated to pay MSA over the course of what was remaining on her Agreement. Moreover, if a model believed that there was  a disproportionate withholding, she could  notify

MSA of what she perceived to be a breach, and pursue her remedies from there. *See* Ivers Aff., Exhibi 1, § 16.

Additionally, the clause should be upheld because it is an amount that can be considered a specific, certain amount. There is no requirement that liquidated damages must be in a specific dollar amount, only "an amount certain." *Jarro Bldg. Indus. Corp. v. Schwartz*, 54 Misc. 2d 13, 19 (App. Term 2d Dep't 1967) (striking a liquidated damages clause that allows for a percentage of the contract recovery *and* the right to sue for actual damages). Courts uphold liquidated damages provisions where the sum is fixed. *U.S. Fid. & Guar. Co.*, 369 F.3d at 70.  Here, it is fixed by definitional language rather than in dollars and cents, as of  a specific time, and will only be as much as MSA has on hand at the time of breach, plus any monies that come in subsequently for work that was already performed but not yet paid.  This amount operates similarly to a percentage and is based on the actual work the model performs under the Agreement.  If the Plaintiff chooses not to work multiple days a week, as is her right as an independent contractor, MSA will have less money on hand.  If she works five days a week with multiple clients, MSA might have more money on hand.

Contrary to Plaintiff's assertions, the amount in question could be and was limited as of the time of her breach, to monies then on hand and money paid to MSA for Agerbrink for her services up to the date of her breach.   The Agreement states in part that "[m]onies owed to Model from clients…. will be paid to Model after payment is received by MSA," and that MSA "shall remit to Model the net due to Model after deductions of MSA's entitlements." Ivers Aff., Exhibit 1, §3. MSA is not "arbitrarily" or "unilaterally" determining "by waiting to assert its claim of breach" because to do so would result in MSA's own breach of its contractual obligations, resulting in a potential breach of contract claim by a model.

Nothing in the law demands that the fixed amount not be fixed based on a point in time. *See Dalston Constr. Corp. v. Wallace*, 26 Misc. 2d 698, 699-700 (N.Y. Sup. Ct. Nassau Cty. 1960) (holding where the liquidated damages were merely a floor from which the aggrieved party could still sue and demand more damages, the clause was unenforceable) ("The underlying purpose is to permit parties to look to the future, anticipate that there may be a breach and make a settlement in advance. This implies . . . that the amount specified be a fixed amount.").  Here, that is precisely what the parties did.  They agreed ahead of time on an amount based on a normal course of business and used a snapshot in time as a way to determine the liquidated damages amount.

### iii.  The liquidated damages provision is a facially exclusive remedy

The Agreement contains the restriction that the liquidated damages provision must be used as an exclusive remedy. MSA may not seek both liquidated damages and legal and equitable relief. The relevant part of the text reads that in the event of breach, MSA may:

> "(i) retain as liquidated damages all funds then held and/or subsequently received by MSA on Model's behalf; or (ii) seek all legal and/or equitable remedies **then available to MSA**, in which event MSA shall, pending the resolution of MSA's claims, be entitled to hold the funds referred to in the preceding clause (i) as security for any judgment MSA may obtain against Model in connection with such claims." Agreement §11. (emphasis added).

Under the Agreement MSA can either (i) invoke liquidated damages or (ii) "seek all legal and/or equitable remedies **then available to MSA**."  (emphasis added).  If MSA were to seek liquidated damages, the "available" remedies would not include actual damages for the same money in connection with the same breach.  In other words, the Agreement allows for MSA to invoke the liquidated damages provision, which forecloses the possibility of seeking actual damages for the same breach because such a legal remedy is no longer "then available."  The "then available" language is not 'throw away' language; it is operative in making the liquidated

damages provision an exclusive remedy for breach of the Agreement.  Plaintiff is mistaken when

she states: "[b]ecause the Contractual Provision provides for liquidated damages as a non-

exclusive remedy, this provision is, on its face, an illegal penalty as a matter of law." Pl. Mem.,

at 10.  Courts routinely hold that a party can retain other remedies while having an enforceable

liquidated damages provision in a contract.  *See Vacold LLC v. Cerami* , 545 F.3d 114, 130 (2d

Cir. 2008):

> Although a liquidated damages provision precludes a party from recovering lost
> profits and other measures of damages, see *U.S. Fid. Guar. Co. v. Braspetro Oil
> Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004); *Sure-Trip, Inc. v. Westinghouse Eng'g*,
> 47 F.3d 526, 534-35 (2d Cir. 1995); *J.R. Stevenson Corp. v. County of
> Westchester*, 113 A.D.2d 918, 921, 493 N.Y.S.2d 819, 823 (1985); Restatement
> (Second) of Contracts § 347 cmt. a, it does not prevent a party from seeking
> specific performance, absent an express provision to this effect."); *See Rubinstein
> v. Rubinstein*, 23 N.Y.2d 293, 298, 244 N.E.2d 49, 52, 296 N.Y.S.2d 354, 358
> (1968) ("For there to be a complete bar to equitable relief there must be
> something more, such as explicit language in the contract that the liquidated
> damages provision was to be the sole remedy."); *Papa Gino's*, 135 A.D.2d at 76,
> ("[A] liquidated damages clause does not bar the equitable relief of specific
> performance unless there is explicit language that it is to be the sole remedy for a
> breach.") (citations omitted).

Plaintiff's erroneous characterization of the law on liquidated damages suggests that an

aggrieved party would have no relief for a tort or be able to seek an injunction where a contract

contains a liquidated damages provision.  This is not the law of New York.  There is no

exclusivity requirement for a liquidated damages provision, only that a party cannot seek both

liquidated damages and actual damages. *See Zahralban v. Vicbar Constr. Corp.*, 16 Misc. 2d 550

(N.Y. Sup. Ct. Kings Co. 1958).  The Agreement's language does not permit MSA to seek

liquidated damages as a penalty on top of actual damages.  *Fed. Realty Ltd. P'ship v. Choices

Women's Med. Ctr.*, Inc., 289 A.D.2d 439, 735 N.Y.S.2d 159, 161 (2d Dep't 2001).  Thus, the

language is valid and the Agreement is enforceable.

**C.    EVEN IF PLAINTIFF WAS PERMITTED TO BRING AN
       UNJUST ENRICHMENT CLAIM, SHE COULD NOT
       PREVAIL AS MSA HAS NOT BEEN UNJUSTLY ENRICHED**

Assuming, *arguendo,* that the Court found that (i) the liquidated damages clause was unenforceable; and (ii) the severability clause did not save the rest of the Agreement or the rest of Section 11 by striking only the liquidated damages portion; and (iii) the subject matter of Plaintiff's compensation and MSA's alleged breach were not covered by another portion of the contract; and (iv) Plaintiff could bring a claim for unjust enrichment, even then, the Court could not find in Plaintiff's favor because MSA has not been unjustly enriched.

As stated above, an unjust enrichment claim can be brought only if the Court first determines that no contractual relationship exists between the parties. *Beth Israel Med. Ctr.*, 448 F.3d at 586-587 ("The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.") (citations omitted). "'To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Id.* at 586 (citation omitted).

Here, MSA did not benefit from withholding monies as liquidated damages, or as a security against a future judgment. MSA would have been due *at least* twice what it withheld from Plaintiff if she had not breached her obligations under the Agreement. Ivers Aff., ¶¶ 35-38. By performing fit modeling work for Cache without notice to and compliance with various Agreement terms, Agerbrink deprived MSA of its' contractually agreed to commission payments.  MSA clearly would have been better situated if Plaintiff had not breached her contract and had continued her fit modeling work with MSA as her manager. She also could have honored her MSA Agreement by bringing Cache's offer of employment to MSA's attention, in which case MSA could have attempted to  negotiate a "head hunter's fee," in which

case Agerbrink would not have paid anything to MSA. Ivers Aff., ¶ 36. For the same reasons that the liquidated damages provision cannot be considered a penalty, MSA did not unjustly benefit from withholding the funds after Plaintiff breached.

At this time, the Court has not rendered a ruling on Plaintiff's independent contractor misclassification claim.  Thus, it has not yet reached the issue of whether the entire Agreement might be unenforceable because Plaintiff has been improperly classified. Unless and until the Court were to so rule,  as of the time of Agerbrink's instant motion and at present, a valid and enforceable Agreement between the parties existed.

 Plaintiff breached her obligations under the Agreement; Plaintiff's breach deprived MSA of future commission payments for the almost two remaining years on the Agreement; and MSA is holding less than the amount it would have made had Plaintiff not breached or if it had recovered actual damages. Thus, MSA has not benefited at Plaintiff's expense, and there is no equitable reason why MSA should be required to pay restitution to Plaintiff.

### III.    CONCLUSION

For the reasons set forth above, the Agreement should be held up as valid and enforceable, and Plaintiff's claim for unjust enrichment should be dismissed with prejudice.

Dated: New York, New York
       February 22, 2016

                              EPSTEIN BECKER & GREEN, P.C.


                              By:        /s Evan J. Spelfogel
                                 _____
                                    Ronald M. Green
                                    Evan J. Spelfogel
                                    Jamie F. Friedman
                              250 Park Avenue
                              New York, New York  10177-1211
                              (212) 351-4500
                              *Attorneys for Defendants*