EPSTEIN BECKER & GREEN, P.C.
250 PARK AVENUE
NEW YORK, NEW YORK 10177
(212) 351-4500
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EVA AGERBRINK, individually
and on behalf of all others similarly situated,

                    Plaintiff,

                vs.

MODEL SERVICE LLC d/b/a MSA MODELS, et al.

                  Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

**ECF Case**

14 CV 7841 (JPO) (JCF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
OMNIBUS MOTION**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 5

POINT I  DISCOVERY DEMANDS MUST BE RELEVANT
TO THE CLAIMS AND DEFENSES AND PROPORTIONAL
TO THE NEEDS OF THE CASE .................................................... 5

POINT II  MSA HAS PRODUCED RELEVANT INFORMATION .............................. 7

POINT III  REPRESENTATIVE MODEL SAMPLING ................................................ 14

POINT IV  DEFENDANTS' RESPONSES TO PLAINTIFFS ENUMERATED LIST . 15

CONCLUSION ................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Immigration & Customs Enf't Div.*,
   255 F.R.D. 350 (S.D.N.Y. 2008) ..........................................................................17

*Armstrong v. Bauer's Intelligent Transp., Inc.*, No. 13-cv-02691-MMC (MEJ),
   2014 U.S. Dist. LEXIS 79850 (N.D. Cal. June 10, 2014) .................................14, 15

*Chen-Oster v. Goldman Sachs & Co.*,
   285 F.R.D. 294 (S.D.N.Y. 2012) ..........................................................................15

*Ferring B.V. v. Fera Pharms., LLC*,
   No. CV 13-4640, 2016 U.S. Dist. LEXIS 132522 (E.D.N.Y. Sept. 27, 2016)........19

*Goes Int'l, AB v. Dodur Ltd.*,
   No. 14-cv-05666-LB, 2016 U.S. Dist. LEXIS 13748 (N.D. Cal. Feb. 4, 2016)........6

*Gropper v. David Ellis Real Estate, L.P.*, No. 10-cv-01401-JLS (WVG),
   2014 U.S. Dist. LEXIS 16849 (S.D.N.Y. Feb. 10, 2014)................................17, 18

*Halvorsen v. Credit Adjustments Inc.*,
   No. 15-CV-6228, 2016 U.S. Dist. LEXIS 48394 (N.D. Ill. Apr. 11, 2016) ...........14

*Prescient Partners, L.P. v. Fieldcrest Cannon*,
   No. 96 Civ. 7590, 1998 U.S. Dist. LEXIS 1826 (S.D.N.Y. Feb. 18, 1998) ...........19

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   No. 14-CV-04394, 2016 U.S. Dist. LEXIS 120131 (S.D.N.Y. Aug. 31, 2016)......16

*Siriano v. Goodman Mfg. Co.*, Civ. A. 2:14-cv-1131,
   2015 .U.S. Dist. LEXIS 165040 (S.D. Ohio Dec. 9, 2015) ...................................22

*Sky Med. Supply Inc. v. SCS Support Claim Sevs.*,
   No. CV 12-6383, 2016 U.S. Dist. LEXIS 121215 (E.D.N.Y. Sept. 7, 2016).........10

*State Farm Mut. Auto. Ins. Co. v. Fadya*,
   No. 14 Civ. 9792, 2015 U.S. Dist. LEXIS 162164 (Dec. 3, 2015),
   *aff'd*, 2016 U.S. Dist. LEXIS 119487 (S.D.N.Y. Mar. 24, 2016)..........................6

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016).........................................................................................15

FIRM:41687152v1

*United States ex rel. Carter v. Bridgepoint Educ. Inc.*,
    305 F.R.D. 225 (S.D. Cal. 2015) ............................................................................................17

*Vaigasi v. Solow Mgmt. Corp.*,
    No. 2011 CV 05088, 2016 U.S. Dist. LEXIS 18460 (S.D.N.Y. Feb. 16, 2016) .....................21

*William A. Gross Constr. Assocs., Inc. v. Am. Mfr.'s Mut. Ins. Co.*,
    256 F.R.D. 134 (S.D.N.Y. 2009) ............................................................................................19

**Rules**

Fed. R. Civ. P. 26 ................................................................................................................ *passim*

Fed. R. Civ. P. 34 ............................................................................................................................2

FIRM:41687152v1

**INTRODUCTION**

Defendant Model Service LLC ("MSA" or "Company") has complied with its discovery obligations by producing all available documents relevant to the parties' claims and defenses. *See* Fed. R. Civ. P. (26)(b)(1).  MSA has produced (i) its written policies and procedures generally applicable to fit models; (ii) each form of its exclusive fit model contract that describes MSA's obligations to act as the model's agent and its compensation for these services; and (iii) information concerning the named Plaintiff Eva Agerbrink. *See* Spelfogel Declaration ("ES Decl."), at 3.  For a representative sampling of fifteen exclusive fit models, MSA produced all documents located for each model including: (i) spec sheets; (ii) signed contracts; (iii) emails between MSA and the model; (iv) internal emails that mention the model; (v) emails between MSA and third parties that mention the model; and (vi) information contained in MSA's electronic systems (*i.e.*, Quickbooks, cDS/Agencypad, Blotter).  MSA's systems are primarily used to record models' services for apparel manufacturers and pay over to the models monies received by MSA on their behalf from clients and customers who retained the models' services. *See* ES Decl. at 2-3; Ivers Affidavit ("Ivers Aff.") at 9.  MSA has also made available for Plaintiffs' inspection many boxes of vouchers, which are sheets of paper with details from the modelling job (*e.g.*, date, hours) that are then input into Quickbooks for invoicing, containing 135,000 hard copy vouchers, and notebooks of handwritten schedules for all models, containing 16,800 pages of schedules, as maintained in the ordinary course of its business.[1] *See* ES Decl., Ex. E.  All information relevant to the determination of whether exclusive fit models were independent contractors or employees has been provided.

---

[1] These voluminous hard copy boxes of vouchers and notebooks are generally maintained by date, and not according to exclusive fit model.  Therefore, Defendant offered Plaintiffs the opportunity to examine the entire universe of documents.

MSA has worked in good faith pursuant to Fed. R. Civ. P. 26 to resolve disputes and provide relevant proportionate discovery.  MSA's efforts have been rebuked and met with rigid, doctrinaire, conclusory and tactical efforts by Plaintiffs, unfairly driving up discovery costs on this small business.  After MSA received Plaintiffs' discovery demands, it diligently undertook an investigation of its record-keeping and electronic systems in order to prepare responses.  In the midst of this process, MSA proposed revisions to the ESI protocol originally proposed by Plaintiffs.  Plaintiffs rejected these and declined to further cooperate in the development of a mutually agreeable ESI protocol.  MSA's provision of relevant documents for a representative sampling of fit models, and offer to Plaintiffs to identify additional models to include in the sample, was met with this motion to compel.  Plaintiffs declined to inspect the proffered voluminous hard copy vouchers and handwritten schedules, taking the unjustified position that (i) MSA should at its own cost and expense provide photocopies of over 150,000 pages, even though the vast majority is irrelevant or duplicative, and (ii) MSA should pay for costs in contravention of Fed. R. Civ. P. 34. *See* ES Decl., at 11; Fed. R. Civ. P. 34(b)(2)(E) (permitting inspection of documents as maintained in regular course of business).  Indeed, it is only now in the instant motion that Plaintiffs withdrew their demand that MSA copy at its own time and expense the voluminous vouchers/schedules, and substituted a reduced demand that MSA provide "merely" 10% of the material copied, while simultaneously seeking sanctions.

Plaintiffs continue, moreover, to insist that their patently improper requests for "all documents," "all information," and "all data," in nearly 80 expansive and interlocking requests be complied with as written even though (i) MSA has provided relevant documents; (ii) Plaintiffs have not pointed out any specific deficiencies in the sample production; and (iii) Plaintiffs have not accepted MSA's offers to add additional representative models or inspect hard copy

documents. Plaintiffs' repeated improper demands for "all documents," "all information" and "all data" encompasses virtually every document in MSA's possession.

Plaintiffs' discovery efforts are not grounded in appropriate standards of relevance and proportionality, and impose a disproportionate and costly burden on MSA – a small company with no IT staff.  Plaintiffs' initial proposed search terms yielded a "hit report" including nearly 74% of all of the approximately 1,100,000 documents gathered for the custodians.  Defendants' ESI vendor ran the search terms and calculated the percentages. *See* ES Decl. at 8-9.  For the first time in this motion to compel (without previously meeting and conferring on these terms) Plaintiffs have now proposed a second different set of even broader email search terms.  Indeed, these terms would return nearly 76% of the emails gathered for all custodians, whether relevant to this litigation or not. *See* ES Decl. at 9.  Similarly, Plaintiffs have now proposed an additional set of custodians for these expansive email searches without ever conferring with MSA, while simultaneously and improperly seeking to compel and impose costs.  In any event, no email searches should be ordered because all emails to, from and about the representative models have already been produced reflecting fully on interactions with MSA.[2]

Plaintiffs' motion represents a novel strategy of moving to compel production of documents (*e.g.*, policies, operational documents and contracts) that have already been produced and seeking sanctions and additional costs further driving up the costs of this litigation.  Without seeking reimbursement from Plaintiffs for copying costs, MSA have already provided copies of 5,500 pages of hard copy discovery, over 15 GB of reasonably usable and searchable electronic data, including over 43,000 emails, and have made available for inspection over 150,000 hard

---

[2] This information was gleaned from the following custodians: Alyssa Maurino, Amanda Beischer, Anothy Higgins, Bill Ivers, Elizabeth Pinto, Kelsey Campbell, Leah Dowdy, Lynette Howe, Margeaux Elkrief, Marcy Spanier, Makai Marcaspac, Maria Guzman, Ruby Morales, Susan Levine. *See* ES Decl. at 4.

copy documents.  Notwithstanding, Plaintiffs have moved to compel the production of virtually every business document maintained by the Company, and at MSA's cost.

Obtaining the electronic information for the balance of the over 300 exclusive fit models would alone take around 500 hours.  This is an unreasonable burden effectively rendering the information either inaccessible or the discovery effort disproportionate to the claims and defenses here.  Searching through the hard copy schedules and vouchers to identify exclusive fit model information would require a page by page review of over 150,000 pages, taking many weeks.  Plaintiffs' motion is not really about obtaining relevant discovery and data, because all the relevant information has been provided, but rather represents the continuation of a tactical effort ongoing for well over a year to use discovery as a sword to burden MSA with discovery expenses making it too costly to continue with its meritorious defenses.  Plaintiffs are able to do this with impunity because they have virtually no documents, and no ESI.

MSA is a small, family run business founded by Susan Levine, who continues to serve as Chief Executive Officer primarily responsible for business development.  Her son-in-law Bill Ivers serves as Chief Operating Officer responsible for day to day operations.  The Company employs fewer than 35 full time employees, mostly responsible for sales, marketing and scheduling.  The Company has no Chief Technology Officer or a human resources employee or officer.  Levine and Ivers handle those functions in addition to their given titles and responsibilities.  Given MSA's limited staff, and Ivers' hands on role in managing the day to day business, keeping up with the demands of this litigation has been an exceptionally burdensome and costly task for MSA.  For example, to obtain requested information for the representative sample of fifteen fit models, MSA devoted 3 of its staff, who worked over a 3 week time period to search for, locate and photocopy the material.  Similarly, Bill Ivers has spent well over one

hundred hours over the last year on producing discoverable materials.  To locate, export and produce the data for each of the 15 sample models required 1.5 hours of Ivers' time. *See* Ivers Aff., 21.  Yet, Plaintiffs insist on litigating this case as if it were against a large, multinational corporation with its own internal legal, compliance and human resources divisions.

The issue in this case is narrow, specific, and straightforward; *i.e.*, whether the exclusive fit models were independent contractors who hired MSA as their agent to secure bookings and market and support their efforts for a fee, or whether they were MSA's employees.  MSA has produced all documents containing relevant data points and has provided all information relevant to this issue and proportionate to the claims and defenses.  Much of Plaintiffs' motion, in contrast, contains superfluous conclusions and long string cites to dozens of irrelevant cases. The only issue now centers on whether the comprehensive information already produced for the 15 sample models and Agerbrink should be extended to some additional number of the remaining 300 plus exclusive fit models.  This matter should proceed on the current records or with limited further sampling of additional models to be identified by Plaintiffs.  Plaintiffs' motion should be denied.

## **ARGUMENT**

### **POINT I**

### **DISCOVERY DEMANDS MUST BE RELEVANT TO THE CLAIMS AND DEFENSES AND PROPORTIONAL TO THE NEEDS OF THE CASE**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R.

Civ. P. 26(b)(1); *see also State Farm Mut. Auto. Ins. Co. v. Fadya*, No. 14 Civ. 9792, 2015 U.S.

Dist. LEXIS 162164 (Dec. 3, 2015) (Francis, J.) (applying the 2015 amendments), *aff'd*, 2016

U.S. Dist. LEXIS 119487 (S.D.N.Y. Mar. 24, 2016)   The Advisory Committee Notes explain

that "[r]estoring the proportionality calculation to Rule 26(b)(1) . . . does not place on the party

seeking discovery the burden of addressing all proportionality considerations. Nor is the change

intended to permit the opposing party to refuse discovery simply by making a boilerplate

objection that it is not proportional." Fed. R. Civ. P. 26 Advisory Committee Notes (2015

Amendments) ("2015 Amendments"). Rather, the "[t]he parties and the court have a collective

responsibility to consider the proportionality of all discovery and consider it in resolving

discovery disputes." *Id.*; *see also State Farm*, 2015 U.S. Dist. LEXIS, at *7 ("the amended rule is

intended to 'encourage judges to be more aggressive in identifying and discouraging discovery

overuse' by emphasizing the need to analyze proportionality before ordering production of

information.") (citation omitted); *Goes Int'l, AB v. Dodur Ltd.*, No. 14-cv-05666-LB, 2016 U.S.

Dist. LEXIS 13748, at *12 (N.D. Cal. Feb. 4, 2016) (citing advisory committee notes: parties

share a "collective responsibility" to consider proportionality and "tailor their efforts to the needs

of th[e] case").   The 1983 Committee Note cautioned that "[t]he court must apply the standards

in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a

device to coerce a party, whether financially weak or affluent."   Fed. R. Civ. P. 26 Advisory

Committee Notes (1983 Amendments).   MSA is already burdened significantly by the scope of

discovery. *See* Ivers Aff. at 7, 21-26.   MSA has repeatedly informed Plaintiffs of the undue

burden of the cumulative effect of the nearly 80 interlocking and overlapping document demands

served, and have provided a viable and proportionate solution to provide Plaintiffs with relevant

information.   Plaintiffs have ignored their obligation to tailor discovery to the needs of the case

and continue to insist on production of "all documents," even though it is irrelevant and disproportionate.

## POINT II

## MSA HAS PRODUCED RELEVANT INFORMATION

MSA is a small company.  As with most small companies, its' record keeping is a combination of hard copies (files, notebooks, vouchers), and electronic systems (Outook, Quickbooks, Blotter, Cds, Agencypad).  Different manual and electronic record-keeping, systems and software were in effect at different times since 2008 (the statute of limitations period).  Depending on the time period, models' records may differ. *See* Ivers Aff. at 10.  As a result, the fact that records in a particular format may not appear for some models does not mean, as Plaintiffs incorrectly argue, that information is being withheld.  Indeed, all the determinative information (*e.g.*, terms of agreement, scheduling, payment) is included in MSA's production irrespective of the particular recordkeeping system used at any given time. On occasions when a small number of documents were not originally discovered despite MSA's good faith effort, MSA has produced them.

Plaintiffs have erroneously suggested that Defendants have concealed the existence of its systems, notwithstanding that MSA affirmatively disclosed its record-keeping and systems, including through (i) its initial disclosures dated August 12, 2015, when MSA stated that it would rely on the hard copy schedules, vouchers and agreements, as well as reports exported from cDs and Quickbooks. *See* ES Decl., Ex. A; and (ii) the production of documents related to Agerbrink on October 29, 2015. Further, in its amended disclosures dated October 29, 2015, Defendants supplemented to disclose Blotter. *See* ES Decl., Ex. B.  Indeed, Plaintiffs have reversed course in the instant motion to unfairly cast MSA in a bad light, despite their earlier acknowledgment that Defendants have been forthcoming – *see* ES Decl. Ex. C, Plaintiffs'

December 24, 2015 letter, at 2 (docket entry # 75) – "Nonetheless, *Defendants' discovery disclosures, produced documents and minimal exchange of information* **have revealed** the existence of several databases and/or information systems likely to contain relevant information." (emphasis added).  Defendant has produced all available relevant data points for Eva Agerbrink and 15 models selected to provide a representative sample of each record keeping system. *See* Ivers Aff., at 11.  Should Plaintiffs, however, continue to reject representative sampling, their demands for "all documents" and "all data" as written are impermissible and should not be enforced.

Plaintiffs' motion is replete with conclusory statements, ignoring any discussion concerning the particular information that has already been provided, and which represents all information relevant to determine whether Plaintiffs were independent contractors.  Defendants have provided for Agerbrink and the 15 selected models all relevant information from the time the model enters the door to the time she gets paid or leaves MSA's management.[3]

1.      **Formation of the Relationship**: application/open call/enrollment form. *See* ES Decl., Ex. D1.  These forms reflect information underpinning the decision by the exclusive fit model and MSA to enter into a management agreement regarding fit modeling.  The model is provided with these forms so that MSA may capture physical information about the model.  The information captured on these forms includes the model's name and contact information, as well as detailed physical measurements and hair color.  If the Model and MSA decide to enter into a relationship, they work together.[4] *See* ES Decl., Ex. D2.  As a result of MSA's marketing, the

---

[3] For ease of reference, the information below can be found in ES Decl., Ex. D, and sub-indexed.  We have included certain screen shots for illustration purposes.

[4] The "application/open call form" contains the model's name, date of application, work status (citizen, green card, visa), address, phone, email, SS number, date of birth, height, size, bust, shoe, waist, hair color, hip measurements,

model's networking, or the apparel company decision, the apparel company, at its sole discretion, hires the model to model its clothing and provide input feedback on style and fit.

2.     **Terms and Conditions**: individual signed agreements, form agreements, the terms and conditions from MSA's website and MSA Model Guide. *See* ES Decl., Ex. D3, D4, D5.  MSA has produced each version of its exclusive fit model agreement back to 2008, and individual signed agreements for the 15 representative models, plus Agerbrink,[5] the terms and conditions from its website and the MSA Model Guide.[6]

3.     **Model's scheduling/services**: scheduling notebooks of handwritten calendars, spec sheets, vouchers, emails. *See* ES Decl., Ex. D6, D7.  MSA markets the model to apparel clients using the spec sheet, which is a one page listing of the model's detailed measurements and a picture.  *See* ES Decl. 12.  Until approximately 2015, the scheduling of exclusive fit models was reflected on handwritten paper sheets maintained in notebooks.  These sheets would generally show if a model were booked at a client and for how long, and whether the model was scheduled for a casting (go-see).  *See* Ivers Aff. at 12.  The vouchers (containing date of service and time spent) were filled out by the exclusive fit model and the end user/hiring apparel company, and were submitted by the model to MSA for processing of the invoice to the apparel company and for ultimate payment to the model. *See* Ivers Aff. at 9.  In addition, Quickbooks invoices reflect scheduling showing the date of service and the hours for which the client was billed.  All

---

and eye color  (Ex. D1 (MAS30)).  The spec sheet contains sizing for bust, chest, waist, high hip, low hip, thigh, total rise, inseam, neck, shoulder, sleeve, muscle, bra and height, and sometimes photographs (Ex. D2 (MSA31-35)).

[5] The Management Agreement contains a description of MSA's services and the payment terms.  (Ex. D3 (MSA22-29)).

[6] The MSA Model Guide contains, *inter alia*, sections concerning: business terms, MSA history, the model's responsibilities, development, booking and runway information, and accounting information and procedures.  (Exh. D5 (MSA1-21)).

9

vouchers and handwritten schedules for all exclusive fit models were made available to Plaintiffs for inspection and MSA offered to provide at its expense a reasonable number of copies.[7] *See* ES Decl., Ex. E, Friedman Letter to Dugger, Jan 22, 2016.  Plaintiffs' refusal and filing of this motion to compel and seek sanctions is inconsistent with the Fed. R. Civ. P.  "Typically, '[t]he most obvious means of complying with the requirement of Rule 34(b) to produce documents as they are kept in the usual course of business is to permit the requesting party to inspect the documents where they are maintained, and in the manner in which they are organized by the producing party.'" *Sky Med. Supply Inc. v. SCS Support Claim Sevs.*, No. CV 12-6383, 2016 U.S. Dist. LEXIS 121215, at *16 (E.D.N.Y. Sept. 7, 2016) (citation omitted).  Further, much of the information in the physical paper documents is cumulative of other discovery.  Email production sufficiently shows when a model was scheduled, and emails for sample models have already been produced.  Available information regarding how many hours a model worked for an apparel client originating from the voucher is reflected in database reports, *i.e.*, Quickbooks, Blotter or Agencypad.  Voucher information is input into Quickbooks to generate an invoice for the apparel client and is duplicative of information already produced. *See* Ivers Aff. at 18.

Handwritten Schedules (maintained in notebooks):  The following image of a sample schedule shows the manual scheduling of the models' appearances, which may also be reflected in the emails.

---

[7] This information goes to damages, in that time spent at castings (typically not paid by apparel manufacturers) only becomes an issue after a decision on the merits of the misclassification issue.  Thus, discovery on that information is premature.  Similarly with vouchers, they are not organized by division or model, and their review and production would be extremely burdensome. *See* Ivers Aff. at 16-18.



<u>Hard Copy Voucher (maintained in boxes)</u>: Shows the dates, start/finish time, hours and rate.

<u>Quickbooks Invoice:</u>[8] The electronic invoice includes the service date, hours and payment.

---

[8] Because Plaintiffs never agreed to the representative sampling, MSA did not engage in the time consuming process of producing these Quickbooks invoices for sample models other than Agirbrink. *See* Ivers Aff. at 9.

4.      **Model's payment**: Quickbooks. *See* ES Decl., Ex. D8.   Once a Quickbooks invoice has been sent to the client, MSA awaits payment.  After the client pays, MSA remits the balance to the model, less its percentage fee.  This information is kept in Quickbooks.

5.      **Database Reports.**  The following information has been provided in electronic form:

a.  Blotter Model Statement[9]: Shows, *inter alia*, paid activity finalized and sent to Quickbooks, including the job date and payment and Quickbooks invoice number. *See* ES Decl., Ex. D9.



b.  Agency Pad Statement: Shows transactions related to the model (including invoices, expenses, checks).  All of this information was provided in usable Excel format. (AgencyPad is an upgrade to cDs and was used beginning in 2015 onwards).  Fields in these reports, although not always used, include: Date, Invoice/Cheque, Voucher number, Type, Client/Product/Expense, Reference, Gross, Total, Opening Balance, Total Balance, Uncleared Fees, Uncleared Usage, Balance Due. *See* ES Decl., Ex. D10.

_____

[9] MSA used Blotter generally during the 2012 to 2014 time period.  The primary use of Blotter by MSA was to convert the voucher information into Quickbooks so that an invoice could be generated and payment received.  Ivers Aff. at 19.

c.   cDs history: shows calendar items but because the Fit Division did not use this cDs functionality until approximately 2015, there are limited reports on it. *See* ES Decl., Ex. D11. This overlaps with "Agencypad history" because Agencypad is a cDs program.

d.   Blotter jobs: shows jobs model booked and where MSA invoiced. (2012-2014). *See* ES Decl., Ex. D12.

e.   Blotter expenses: shows all expenses charged to model accounts, such as website or photography. *See* ES Decl., Ex. D13.

f.   Quickbooks Enterprise Vendor report: shows the model's jobs, payments, and whether the model was paid by MSA. (through end of 2014). Specific fields include, though not always used: Date Entered, Date of Service, Name of Model, Address, Email, Memo (where client name and date appear), Due Date, Account, Split (noting where MSA took the ordinary 20% or some special arrangement), Paid, Credit, Amount, Tax Line. *See* ES Decl., Ex. D14.

g.   Quickbooks online vendor report: shows same information as Quickbooks Enterprise. (2015 forward).

13

## POINT III

## REPRESENTATIVE MODEL SAMPLING

Following the January 2016 court conference, Defendants proposed to Plaintiffs that the case proceed via sampling. *See* ES Decl., Ex. E.  Plaintiff's counsel rejected this proposal and continued to demand "all data and information from Defendants' database and systems." *See* ES Decl., Ex. F. at 3, Joint letter to Court, ECF 87.  Defendants carefully selected sample models, such that the sample production covered all of the relevant databases and information systems that existed during the entire period covered by the applicable statutes of limitations (*i.e.*, back to 2008). *See* Ivers Aff. at 11.   Additionally, Defendants (i) offered Plaintiff's counsel the opportunity to request that additional models be added to the production, and (ii) offered to produce documents for every opt-in plaintiff in the FLSA collective, subject to the Court's ruling on the propriety of sampling. *See* ES Decl., Ex. E, at 2-3.  Plaintiffs' conclusory allegations that the sample is not representative of the relationship between MSA and the models is unsubstantiated. *See* Pl. Br. at 1.  Plaintiffs cite to no fact or testimony to support that claim and, indeed, it is inconsistent with their class allegations.

District Courts have endorsed sampling as a way forward in discovery.  For example, the Northern District of Illinois suggested sampling as a means to reduce an undue and disproportionate burden and resolved the discovery dispute by ordering sampling, stating "production of a sample of the requested documents would appear to be an appropriate and sensible way to address these discovery requests." *Halvorsen v. Credit Adjustments Inc.*, No. 15-CV-6228, 2016 U.S. Dist. LEXIS 48394, at *13 (N.D. Ill. Apr. 11, 2016).  In *Armstrong v. Bauer's Intelligent Transp., Inc.*, a putative class of chauffeurs claimed they were not properly compensated for all time worked in violation of the FSLA.  No. 13-cv-02691-MMC (MEJ), 2014 U.S. Dist. LEXIS 79850, at *14 (N.D. Cal. June 10, 2014).  Plaintiff sought production of all

chauffeur route sheets for all corporate shuttle work over a multi-year period.   Id. at *2. Defendants produced route sheets for all routes driven by the named plaintiff, as well as a sample of route sheets driven by other putative class members.   *Id*.   The Court acknowledged that the route sheets were relevant to the plaintiff's claims, but also recognized the burden associated with producing all route sheets.   *Id*. at *14.   The Court ordered defendants to produce a representative sample of the requested route sheets.   *Id*.   Courts in the Second Circuit have also endorsed sampling to reduce undue burden.   *See Chen-Oster v. Goldman Sachs & Co.*, 285 F.R.D. 294, 304 (S.D.N.Y. 2012) (Francis, J.).   Especially in light of the Supreme Court's ruling in *Tyson* where sampling was endorsed during damages assessment (a far more controversial step given due process implications), the Court should order it here at the certification stage. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) ("A representative or statistical sample, like all evidence, is a means to establish or defend against liability.").

## POINT IV

### DEFENDANTS' RESPONSES TO PLAINTIFFS ENUMERATED LIST

A.      The Order Concerning Makeup of Putative Class:   Plaintiffs' request is duplicative and has already been addressed.   Defendants have furnished information regarding class size of fit models on numerous occasions to Plaintiff's counsel including on January 25, 2016 (ES Decl., Ex. G), and in a letter on January 15, 2016: "MSA has counted 333 exclusive Fit Models who have contracts covering the period September 2008 through August 2015.   216 of these Fit Models have arbitration clauses in their Agreements." (ES Decl., Ex. H, Friedman Letter to Dugger Jan. 15, 2016).   Defendants object to request No. 4 as that request is overly broad and outside the scope of this litigation.   The Court pre-certified a class relating to "MSA models who signed exclusive contracts with respect to fit modeling." ES Decl., Ex, I, ECF 90, page 19, Order Conditionally certifying class.   The Second Amended Complaint speaks to class claims

involving Fit models only (with the exception of those who are owed money on an unjust enrichment claim). *See* ES Decl., Ex., J, ECF 77, para 127.  Plaintiff's counsel's understanding of how many runway, fashion and lifestyle models work with MSA is irrelevant to Plaintiffs' claims with respect to exclusive fit models, and is also irrelevant to amounts models who breached their contracts with MSA might be owed on the unjust enrichment claim.  Defendants timely objected to this request. *See* ES Decl. Ex. K.[10]  This is the type of fishing expedition frowned upon by courts in this district. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394, 2016 U.S. Dist. LEXIS 120131, at *37-38 n.9 (S.D.N.Y. Aug. 31, 2016).

B.      Corrective Notice Order:  Defendants have or will produce to Plaintiff's counsel all known correspondence between them and fit models regarding the corrective notice.

C.      Plaintiffs' Interrogatories and Requests for All Documents and All Information Should Be Denied:  Plaintiff's Interrogatories seeking the identification of "**all**" electronic documents custodians, "source of ESI," "sources of electronic documents and/or records" including the identification of every email account, office computer, hard drive, facebook accounts, videorecorders and databases are well outside the scope of relevant discovery, as are the source of every electronic document, the present availability of every electronic document, the erasure of every electronic document, the time period involved, the current physical location and the categories of metadata available for each source of ESI.  These are overly broad, irrelevant and disproportionate.  Fed. R. Civ. P. 26(b) (as amended) (deleting the former provision of the rule providing for relevant discovery "including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons

---

[10] Defendant's timely objected to all of Plaintiff's discovery requests and have preserved them throughout the litigation. *See* ES Decl., Ex. K.

who know of any discoverable matter"). *See* 2015 Amendments. The committee notes clarify that such discovery "should still be permitted under the revised rule **when relevant and proportional to the needs of the case**." *Id.* (emphasis added). At the outset, these interrogatories exceed the scope of inquiry permitted under Local Rule 33.3, do not seek relevant information and are not narrowly tailored. *See, e.g., Aguilar v. Immigration & Customs Enf't Div.*, 255 F.R.D. 350, 355 (S.D.N.Y. 2008) ("[m]etadata thus is discoverable if it is relevant to the claim or defense of any party and is not privileged"); *see also United States ex rel. Carter v. Bridgepoint Educ. Inc.*, 305 F.R.D. 225, 236 (S.D. Cal. 2015) ("for accessible or inaccessible ESI to be discoverable, the relevance test set in Rule 26(b) must be satisfied."). Defendants properly raised all of these objections in its Responses and Objections, and offered in its revisions to Plaintiff's proposed ESI protocol to identify "relevant" custodians, databases, email accounts and other ESI. Plaintiffs rejected this solely because their proposal was not accepted in total and because it did not comport with their sense of timeliness. *See* ES Decl., at 6.[11] As shown above, Defendants have subsequently produced documents and ESI that identify all relevant custodians, databases, data fields, hard copy information and email accounts relevant to exclusive fit models. Thus to the extent the interrogatory was properly limited to seeking disclosure of relevant data, the issue is now mute as the information has been provided.

D.     Document Requests:

1.     Defendants' Systems (No. 90): Plaintiff's request is overbroad because it seeks "all data" and encompass "all MSA fit models." *See Gropper v. David Ellis Real Estate, L.P.*, No. 10-cv-

---

[11] The emails were produced in a load file, along with Bates numbered TIFF for each document, with the following fields: FIRSTBATES, LASTBATES, ATTACHRANGE, BEGATTACH, ENDATTACH, Author, Recipients, Production IDs, Subject, Date Sent, Date Created, Date Modified, Custodian, Folder, File Name or Email Subject, MD5, File Extension, Statuses, Any redactions.

01401-JLS (WVG), 2014 U.S. Dist. LEXIS 16849, at*11 (S.D.N.Y. Feb. 10, 2014) (Francis, J.) ("By the same token, many of the plaintiff's discovery demands are objectionable on their face… the request for 'any and all' documents concerning that subject is inherently overbroad.") (citation omitted).  Defendants have already informed Plaintiff's counsel that the information he is seeking cannot be easily segregated between those models with or without arbitration agreements. *See* Ivers Aff. at 9.  The request impermissibly seeks "all data" for over 300 potential class-members. *See* ES Decl., Ex. H.  This request is emblematic of the Plaintiffs' disregard of the appropriate scope of discovery.  MSA's sampling proposal properly limits discovery to relevant data (as outlined above)  to a representative number of potential class members.

2.    Emails (Nos. 2, 4, 74 and passim):  Plaintiffs proposed search terms, and Defendants advised Plaintiffs that all emails between the representative models or about them were being provided. *See* ES Decl., Ex E, but that Plaintiffs' search terms, even if applied, were inappropriate, overbroad and MSA provided the hit report, demonstrating that fact. *See* Spelfogel Decl., Ex. L.  The parties met and conferred on this issue but Plaintiffs refused to (i) pursue the representative sampling approach which would have provided all communications to and from or about a particular model; (ii) modify the search terms.  *See* ES Decl., Ex. M, Dugger email to Friedman; ES Decl., Ex. L.  The initial search terms from March yielded enormous results, 537,897 hits, approximately 72% of all of the documents searched across the custodians.  The terms are addressed in their breadth and lack of particularization (e.g. "check," "hair," "handle," "unavailable," "clean.").  Plaintiffs' complain that the "extensive nature" of MSA's records have not been revealed (Pl. Br. at 6), but the facts show otherwise.

18

For the first time, in the instant motion, Plaintiffs have proposed new email search terms and new custodians while simultaneously moving to compel, never having met and conferred. This is inconsistent with normal process, and the certification requirement. *See Prescient Partners, L.P. v. Fieldcrest Cannon*, No. 96 Civ. 7590, 1998 U.S. Dist. LEXIS 1826, at *8 (S.D.N.Y. Feb. 18, 1998) (Francis, J.) ("Under ordinary circumstances however, the failure to meet and confer mandates denial of a motion to compel.") (citation omitted).   It is also inconsistent with Plaintiffs' proposed ESI protocol, which contemplated providing the hit reports and conferring over terms. ES Decl., Ex. N.   Plaintiffs have also plainly disregarded Magistrate Judge Peck's "wake-up call to the Bar in this District about the need for careful thought, quality control, testing and cooperation with opposing counsel in designing search terms or 'keywords' to produce emails or other electronically stored information ('ESI')."   *William A. Gross Constr. Assocs., Inc. v. Am. Mfr.'s Mut. Ins. Co.*, 256 F.R.D. 134, 134 (S.D.N.Y. 2009); *see also Ferring B.V. v. Fera Pharms., LLC*, No. CV 13-4640, 2016 U.S. Dist. LEXIS 132522, at *1, 9 (E.D.N.Y. Sept. 27, 2016) (finding that in relation to ESI protocol the norm in complex civil litigation cases "is that counsel for both sides review and agree in advance on the parameters of the search, on any search terms to be used, and on the specific custodians to be searched.") (citations omitted). It is also further evidence that Plaintiffs are making this motion for tactical purposes.   In any event, the search terms are too broad, as are the custodians.   Further, all the emails to and from and relevant to the particular models have been provided.   Indeed, these new terms, supposedly derived from a judicially endorsed list from a different case, are even broader than the initial ones discussed in March. *See* Pl. Br. at 13.   Plaintiffs' new searches for "Primary," "Assistant," and "Domain Parsing" would cover approximately 76% of all documents. *See* ES Decl., at 9. Additionally, Plaintiff's proposed terms would cost tens of thousands of dollars to review and

produce the 790,705 results. *See* ES Decl., at 10.  Yet, Plaintiff's counsel criticizes the sample model document production that included every email between the MSA custodians and the models, and every email sent from or received by the MSA custodians that mentioned the sample models. *See* Pl. Br. at 2.  This is a clear example of Plaintiffs not participating in good faith, while assailing MSA and requesting sanctions from the court.

3.      Policies (Nos. 16, 18, 19, 86):  On several occasions, including in an October 29, 2015 letter, Defense counsel represented that "[a]fter review of this issue with our client, we have provided all training/general model guides that are distributed to fit models." *See* ES Decl., Ex. O.  Yet, Plaintiffs' counsel continues to demand "all instructional, guidance, training materials, guides, and/or related materials provided to any or all Exclusive MSA Fit Models(s)." *See* Pl. Br. at 16.  He has not identified any other policies or procedures, nor has his client in deposition.

4.      Independent Contractor Classification (Nos. 3, 69):   MSA has already produced responsive materials, *i.e.* documents pertaining to a NYS unemployment insurance determination classifying MSA models as independent contractors. *See* ES Decl., Ex. P.

5.      Corporate Structure (Nos. 22, 23, 24, 25, 27):  MSA already produced the operating agreement for the LLC in March 2016 and performance and job duty documents for model managers in November 2015.  As the Ivers' affidavit, and previous affidavits from Susan Levine and William Ivers have stated, Levine and Ivers are, respectively, the CEO and COO of the company. *See* ES Decl., Exs., Q; Ivers Aff. at 1-2.  Depositions will reveal further reporting lines.  The Company does not maintain organization charts.

6.      Operational Documents (No. 31, 86):  Defense counsel has already informed Plaintiffs' counsel that there were no meeting minutes for the LLC.  Further, Plaintiff's counsel did not meet and confer on the request for a review of emails to and from Radensky or

Kevin@gilbertinternation.net, and it appears improperly requested for the first time in this motion to compel.

7.      Defendants Levine and Ivers' Individual Liability (Nos. 57, 88):   MSA has already produced the operating agreement which shows percentages earned by Susan Levine and William Ivers, and their positions within the Company.

8.      Agreements  (No. 5, 13, 18, 69, 76):   MSA has already produced all signed agreements with the sample models and Eva Agerbrink, as well as all other versions of agreements used for exclusive fit models, going back to 2008 (the earliest statute of limitations period). *See* ES Decl. Ex. R. Additionally, MSA has produced form releases showing the applicable terms when an exclusive fit model is released from the model agreement. *See* ES Decl. Ex. S.  There is little, if any, marginal utility to producing agreements for all other fit models. *See Vaigasi v. Solow Mgmt. Corp.*, No. 2011 CV 05088, 2016 U.S. Dist. LEXIS 18460, at *43 (S.D.N.Y. Feb. 16, 2016) ("Proportionality focuses on the marginal utility of the discovery sought.") (citations omitted).

9.      Exclusive Nature Of Fit Model Contract (Nos. 15, 60, 61, 69):   This request is inappropriate because it seeks "all responsive …. Documents … all data … all correspondence" concerning the agreements.   All variations of the fit model agreements have already been produced.   Similarly, all correspondence between Plaintiff and MSA and sample models and MSA has been produced.  The sample model production includes models who had disputes with MSA regarding their obligations under the agreements, including those who worked with other agencies. Ivers Aff. at 11.   As such, the sample production has provided all the relevant information.   As noted above, the request for "all documents" is patently overbroad and unenforceable,   Further, this request seeks to compel communications between a third party,

attorney David Schwartz and models.  Plaintiff's counsel has already issued a subpoena to David Schwartz and received the subpoenaed items.

10.   <u>Contractual Restrictions (Nos. 62, 63, 64, 69)</u>:  The models are free to negotiate the terms and conditions of their work with the user designer and apparel companies, including rates of pay. *See* Ivers Aff. at 3.  As such, there are no "Generally Applicable, operational, and policy documents" pertaining to MSA's restricting a model's ability to do so.

11.   <u>Alleged Fit Model Breaches Of MSA's Modeling Contract (No. 32, 69)</u>:  As mentioned previously, the sample model production included some who had disputes with MSA.

12.   <u>Fit Model Schedules And Hours Worked (Nos. 17, 40, 47, 69)</u>:  All of the scheduling documents have been copied and provided, or made available for inspection. Plaintiff's proposed search terms have no bearing on go-see sheets, which are casting calls not related to "job w/2 records or billing w/2 information."  MSA does not maintain start or stopping sheets for the Fit Division. *See* Ivers Aff. at 14.  The burden on MSA to locate the hard copy schedules of all of the over 300 exclusive fit models for the more than six years involved is disproportionate.[12]

13.   <u>Forms (No. 87)</u>:  Documents concerning the representative fit models have been produced, and Defendants will produce any other relevant documents if they have not already.

14.   <u>Fit Model Rates (No. 12)</u>:  Documents responsive to this request were produced as part of the sample model production.  Emails to and from model managers giving model rate quotes to apparel clients speak precisely to this issue.  Any discussion over rates between MSA personnel and the model would take place via email or over the phone.  Thus, the sample model emails represent the best evidence of such discussions.

---

[12] If production is necessary, MSA suggests phased discovery on these documents inasmuch as they go primarily to damages. *See, e.g., Siriano v. Goodman Mfg. Co.*, Civ. A. 2:14-cv-1131, 2015 .U.S. Dist. LEXIS 165040, at *18-19 (S.D. Ohio Dec. 9, 2015).

15.    <u>Vouchers (Nos. 7, 8)</u>:  All vouchers have been produced or made available for inspection. It is disproportionate to have MSA bear the cost of assembling and copying these many tens of thousands of documents.

16.    <u>P & L (Nos. 30, 33, 67, 86)</u>:  P&L information is not relevant.  Information concerning investments, payments, chargebacks, and expenses for representative models has been provided.

17.    <u>Booker Discretion (Nos. 53, 74, 80)</u>:  This request is covered in communications produced for the sample models, including communications to and from, and about the models.

18.    <u>The Integral Nature Of Fit Modeling To MSA (No. 43, 86)</u>:  The entirety of MSA's production comprehensively addresses this issue.

19.    <u>Advertising, Recruitment, And Promotion (No. 41, 66)</u>:  Plaintiffs' request for all advertisements and advertisement materials is irrelevant to any of the issues in the case.

20.    <u>Fit Model Applications (Nos. 26, 71)</u>:  To the extent these exist, they have been or will be produced for each sample model.  Not all models filled these out. *See* Ivers Aff. at 20.

21.    <u>Termination, Deactivation (Nos. 14, 26, 53, 54, 77, 69)</u>:  Defendants produced releases for other models and communications with some sample models who had disputes.

22.    <u>Skilled or Unskilled Nature of MSA Fit Modeling (Nos. 34, 35, 75)</u>:  Documents responsive to this request were produced in the sample model production.

23.    <u>Permanence Of Exclusive MSA Fit Models (No. 39)</u>:  Documents responsive to this request were produced in the sample model production.

24.    <u>Employment Records (Nos. 28, 29, 86)</u>: Because the models are independent contractors, MSA does not maintain employment or personnel files or records, such as "wage rate notices."

25.    <u>Investigations And Compliance (No. 68)</u>:  Defendants produced audit documents from the NYS Department of Labor, determining that the models are independent contractors.

26. <u>Complaints, And Evaluations (Nos. 20, 21, 73)</u>: Any complaints from apparel industry clients mentioning a model by name were produced as part of the sample model production. As Defendants have repeatedly informed Plaintiffs' counsel, because the models are independent contractors, MSA does not maintain performance evaluations.

27. <u>Payments (Nos. 9, 10, 11, 49, 55)</u>: Defendants have produced QuickBooks reports for each sample model that address these requests, and will produce other relevant documents.

28. <u>Deductions (Nos. 48, 50, 52, 84, 85)</u>: MSA has produced expense reports concerning any charges MSA made to sample models. MSA does not pay wages to the models.

29. <u>Documents Concerning Fit Model Substitutions (No. 70)</u>: Responsive documents to this request, to the extent any exist, were produced in the sample model production.

30. <u>Calendars (No. 65)</u>: Defendants offered to produce hard copy calendars with redactions, but Plaintiffs' counsel insisted on native format. The production should be in hard copy with redactions or with an AEO designation in order to maintain privacy and client information.

31. <u>Fit Model Weight, Fit, And Appearance (No. 72)</u>: Responsive documents to this request were produced in the sample model production.

32. <u>Additional Litigations (No. 58)</u>: Responsive documents to this request were produced in the sample model production. Defendants have or will produce any other responsive documents.

33. <u>Invoicing (No. 56)</u>: This information has already been produced in the form of the Quickbooks report for the sample. Invoices have to be manually generated from Quickbooks one at a time, and as such, this request is burdensome. *See* Ivers Aff. at 9.

34. <u>Interviews And Articles (No. 42)</u>: These records are not maintained. *See* Ivers Aff. at 11.

35. <u>Fringe Benefits (No. 46)</u>: Responsive documents to this request, if any, would have been included in the sample model production.

36.    <u>Defendants' Affirmative Defenses (No. 78)</u>:   Defendants have produced New York Department of unemployment insurance audit documents responsive to this request.

37.    <u>Plaintiff's Defenses To Counterclaims (Nos. 1, 36, 37, 38, 48, 68)</u>:   Accounting records relating to Plaintiffs' Defenses in the form of a Quickbook Report have been produced.

38.    <u>Complete Contact Information For The Potential Collective (No. 76)</u>:   Defendants already produced a list of contact information for all of those models who signed or renewed contracts since September 16, 2012.

<strong><u>CONCLUSION</u></strong>

For the reasons set forth above, this Court should reject Plaintiffs' motion to compel and for sanctions.  The Court should order sampling the appropriate way forward with discovery and the parties should be instructed to meet and confer over any additional information.

Dated: New York, New York
         December 7,  2016

                                                      EPSTEIN BECKER & GREEN, P.C.

                                                      By:        /s Evan J. Spelfogel
                                                                 Ronald M. Green
                                                                 Evan J. Spelfogel
                                                      250 Park Avenue
                                                      New York, New York  10177-1211
                                                      (212) 351-4500
                                                      *Attorneys for Defendants*