# Exhibit A

```
 1   IN THE UNITED STATES DISTRICT COURT

 2   FOR THE SOUTHERN DISTRICT OF NEW YORK
     -------------------------------------------X
 3   EVA AGERBRINK, individually and on
     behalf of all others similarly situated,
 4
                            Plaintiff,
 5
         -against-
 6
     MODEL SERVICE LLC D/B/A MSA MODELS
 7   and SUSAN LEVINE,

 8                           Defendants.

 9   CASE NO.: 7841 (JPO)(JCF)
     -------------------------------------------X
10

11                       250 Park Avenue
                         New York, New York
12
                         December 3, 2015
13                       9:44 a.m.

14

15        DEPOSITION of Plaintiff, EVA AGERBRINK,

16   before Melissa Gilmore, a Shorthand Reporter

17   and Notary Public of the State of New York.

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24             New York, New York  10022
                     212-750-6434
25                  REF:  111395
```

```
 1                        AGERBRINK
 2   conditions of the Caché offer?
 3              MR. DUGGER:  Same objection.
 4        A.    I understand.  The terms and
 5   condition was that it was an assistant -- it
 6   was an assistant -- office assistant position,
 7   namely, with a few hours of modeling.  There
 8   was no written how many hours of modeling it
 9   was.
10              So it was -- but I understood that
11   it was doing filing and organizing closets and
12   answering phones and ordering lunch for Rich,
13   which was the manager of the department,
14   organizing a lot of files and, whenever needed,
15   try on clothes.
16        Q.    What was it?
17        A.    Try on clothes, which was the role
18   of a fit model, try on cloths.
19        Q.    So did you work with Caché as a fit
20   model?
21        A.    Yes, I did.
22        Q.    Beginning when?
23        A.    I do believe it was June 30.
24        Q.    Of 2014?
25        A.    Correct.
```

1                           AGERBRINK

2        Q.     And are you still doing that work?

3        A.     No, sir.

4        Q.     When did it end?

5        A.     It ended in February.  We were laid

6    off, about 30 of us, in 2014.

7        Q.     February 2015?

8        A.     '15.  Sorry, '15.

9        Q.     And what have you been doing in

10   terms of work since you were laid off from

11   Caché?

12       A.     Well, the very first thing was I was

13   faced with a foreclosure, and so that I spent

14   my time doing first to try to avoid a

15   foreclosure and to find someone to buy the

16   apartment.

17              So that was the first thing that had

18   to be dealt with, and that meant, you know,

19   being -- showing the apartment, always having

20   the apartment available.  It took a lot of my

21   time.

22              Then I, of course, looked for work

23   for a long time.  I've been doing working -- as

24   far as working, I've done some background work,

25   acting work, and I moved out of my apartment

```
 1                    AGERBRINK
 2   for a month to save money on the rent.  That's
 3   it.
 4       Q.    What's the address of the apartment,
 5   please?
 6       A.    100 Christopher Columbus Drive,
 7   Apartment 1922, Jersey City, New Jersey 07302.
 8       Q.    Was that the only apartment or home
 9   that you had around that time?
10       A.    Around the time -- yes, I was living
11   in 174 Washington Street, Apartment 3A, Jersey
12   City, New Jersey 07302 that was my condo that I
13   owned that I later was able to -- well, I
14   didn't find the buyer, another realtor found
15   the buyer, and I was able to get out of the
16   foreclosure and been cleared by the bank.
17       Q.    So this condo you just told us
18   about, was that the apartment that you say you
19   had a foreclosure issue with?
20       A.    Correct.  And then I moved into the
21   studio that I'm in now, but previous to that I
22   had an address -- before I moved into the
23   apartment, I was staying with a friend of mine,
24   which was 225 Grand Street, Penthouse Apartment
25   9, same zip code and address, Jersey City, New
```

```
1                        AGERBRINK
2    condo apartment.
3         A.    Okay.  The more recent before that
4    was 201 Christopher Columbus Drive and that was
5    Apartment Number 3.
6         Q.    Also Jersey City?
7         A.    Also Jersey City, yes.  Do you need
8    me to explain why I --
9         Q.    No.  Now you mentioned that you
10   worked with MSA twice, two separate time
11   frames?
12        A.    That's correct.
13        Q.    When was the first time frame?
14        A.    The first time I started working
15   with them was -- it must have been around --
16   I'm not exactly sure on that date.
17        Q.    What year?
18        A.    2003, around there.  2003.
19        Q.    For how long?
20        A.    Until Ms. Liz Pinto got me an
21   in-house position with New York & Company.  I
22   started with New York & Company in 2005.
23        Q.    What do you mean by got you a
24   position with New York & Company?
25        A.    It was the greatest thing that ever
```

AGERBRINK

1

2    happened to me.  As Ms. Liz Pinto's job is to

3    find clients for models, and I was sent over

4    there on a Go-See, and they selected me based

5    on my measurements, and they liked me.

6            And after a few weeks, they wanted

7    me to work there full time, and Ms. Liz Pinto

8    negotiated my yearly salary.  Of course, they

9    got their commission on it.  And then I

10   basically left the agency because then I

11   started working for New York & Company.

12       Q.    Getting back to your preparation for

13   today, what documents did you review, if any?

14       A.    I read the old contract that I

15   signed when I joined MSA for the second time.

16   I read the letter that the attorney -- their

17   attorney sent me.  I don't recall the name of

18   the attorney.

19           And I read some of my own notes that

20   I wrote to myself regarding the last day I saw

21   Ms. Pinto where she threatened me if I were to

22   go work for Caché, that I would never work in

23   this town again.  Some of my other notes -- I

24   remember reading my own notes where I noticed

25   that there was a check that had been paid to me

```
 1                       AGERBRINK

 2        A.     Yes.

 3        Q.     Have you ever been a plaintiff or a

 4   defendant in another lawsuit before this one?

 5        A.     No.

 6        Q.     Have you ever filed for personal

 7   bankruptcy?

 8        A.     No.

 9        Q.     Have you ever made any claims of

10   discrimination or harassment or retaliation

11   against any individual or entity?

12        A.     No, sir.

13        Q.     Have you ever filed any wage and

14   hour claims against any company or entity?

15        A.     I'm sorry.  What was that question

16   about?

17        Q.     Have you ever filed any wage and

18   hour or overtime claims?

19        A.     No, sir.

20        Q.     Do you have any licenses of any

21   kind?

22        A.     Yes, sir.  I have a real estate

23   license.

24        Q.     When did you first obtain that?

25   What year approximately?
```

```
 1                        AGERBRINK
 2            MR. DUGGER:  I'm just going to
 3      instruct the witness not to guess.  If
 4      you're not sure you can give a range of
 5      dates, but please don't guess.
 6      A.    Between 2000 and 2005.
 7      Q.    That was when you first obtained
 8  your real estate license?
 9      A.    Yes, sir.
10      Q.    Is that limited to a particular
11  state or jurisdiction?
12      A.    Yes, sir.  The first license was New
13  York State.
14      Q.    And any other licenses?
15      A.    Yes, sir.  California state.
16      Q.    Any others?
17      A.    New Jersey state.
18      Q.    Any others?
19      A.    I took the license for New Jersey
20  twice and the license for New York twice.
21      Q.    Are you currently licensed?
22      A.    In New Jersey only.  The others I
23  let expire.
24      Q.    What do those licenses permit you to
25  do?
```

```
 1                        AGERBRINK
 2             MR. DUGGER:  Objection, vague.
 3      A.    The license of a real estate person?
 4      Q.    Yes.
 5      A.    It gives you the right to sell
 6  property for a broker.
 7      Q.    Did you sell property for a broker
 8  pursuant to any of these licenses?
 9      A.    No, sir.
10             MR. DUGGER:  Objection, vague.
11      Q.    From 2000 until the present time,
12  have you ever sold any real estate?
13      A.    No, sir.
14      Q.    In addition to real estate licenses,
15  do you have any other licenses?
16      A.    No, sir.
17      Q.    Driver's license?
18      A.    Yes, sir.
19             MR. DUGGER:  That was a trick
20      question, Evan.
21             MR. SPELFOGEL:  It was not.  It was
22      intended to help her out.
23      Q.    What is your educational background?
24      A.    I studied in Sweden in Sandaskolan,
25  S-A-N-D-A-S-K-O-L-A-N.  I studied economics,
```

                              AGERBRINK

1
2    and later I studied English writing at
3    Georgetown University.  I studied psychologist
4    at GW.  This is in Washington, DC.  I studied
5    psychotherapy in Regent's College in London.
6         Q.    Do you have any degrees with respect
7    to any of that?
8         A.    No, sir.
9         Q.    What is the highest degree that you
10   possess?
11        A.    The real estate license.  It's
12   equivalent to -- I think in the United States
13   you call it -- some college.
14        Q.    Bachelor's?
15        A.    I think it's a bachelor's degree.
16   It's equivalent of three years.
17        Q.    You have a high school education?
18        A.    Yes.
19        Q.    Did you complete a college
20   education?
21        A.    No, sir.
22        Q.    Have you worked as a real estate
23   broker?
24        A.    No, sir.
25        Q.    Have you done any work whatsoever

AGERBRINK

1

2    Q.    Did you report that income on your

3  tax returns?

4    A.    Yes, sir.

5    Q.    When you file your tax returns, did

6  you file as an independent contractor?

7    A.    Sir, I hand my paperwork to my

8  accountant and he files the taxes for me.

9    Q.    Did you file as an employee?

10          MR. DUGGER:   Objection, calls for a

11      legal conclusion.

12    A.    I hand everything to my accountant,

13  and he does the filing for me.

14    Q.    Did you get, with respect to either

15  the rentals or the commercial lease, a 1099

16  form?

17    A.    Yes, sir.

18    Q.    Did you get a W-2 form?

19    A.    I don't know that, sir.

20    Q.    Are you currently working for

21  anybody?

22    A.    I do -- no, I'm not working for

23  anybody.  I do background work.

24    Q.    What is background work?

25    A.    Background work is in a show --

```
 1                         AGERBRINK
 2   television show or a movie where they need
 3   people in the background.  Since I am part of a
 4   union, Screen Actors Guild, I'm hired sometimes
 5   to do background work.
 6              My dog was hired in the last TV show
 7   I was in, because he had a special skill,
 8   because he could walk in footsies.
 9              MR. SPELFOGEL:  Off the record.
10              (Discussion off the record.)
11       Q.    Since the last time you did any work
12   with MSA, what companies or individuals have
13   you performed any services for?
14       A.    Caché.
15       Q.    Is that the only one?
16       A.    Yes, sir.
17       Q.    And you've already told us that with
18   respect to Caché that you did filing?
19       A.    Yes, sir.
20       Q.    And office work?
21       A.    Yes, sir.
22       Q.    And a few hours of modeling?
23       A.    Yes, sir.
24       Q.    Who did you model for?
25       A.    Caché.
```

                              AGERBRINK

1

2        Q.      You've told us that you worked twice

3    with MSA.

4        A.      Correct.

5        Q.      The first time I think you said

6    was --

7        A.      Back in, I think it was 2003.

8        Q.      For how long?

9        A.      Until I -- until Ms. Liz Pinto got

10   me an in-house position with New York &

11   Company.

12       Q.      So that would have been in '05 then

13   approximately?

14       A.      Yes.

15       Q.      And when was the second time?

16       A.      The second time was in 2013, I want

17   to say March.

18       Q.      Until when?

19       A.      Until June of 2014.

20       Q.      A total of approximately 15 months?

21       A.      Uh-huh.

22       Q.      How did you get the position with

23   MSA the second time?

24       A.      I walked in -- actually, I walked

25   in, and I was asked to come back when they have

AGERBRINK

1
2   Go-Sees.  I came back on a Go-See.  I waited in
3   the room until I was seen by Ms. Levine, and
4   then I was measured by Ms. Pinto, and I was
5   hired, but I wasn't told I was hired that time.
6           I was told -- Ms. Levine said come
7   back in a week, and when I came back in a week
8   is when I was told that I was hired and to sign
9   the contract.
10      Q.    Did you read the contract before you
11  signed it?
12      A.    Sir, I skimmed the contract and I
13  signed it.  I know from being in the business
14  for 20 years, if you don't sign a contract
15  no -- the agency does not want to work with
16  you.
17      Q.    Was there anything in the contract
18  you did not agree with?
19          MR. DUGGER:  Objection, calls for a
20      legal conclusion.
21      A.    Sir, I skimmed the contract.  I
22  didn't read the contract.  I probably should
23  have, but I didn't.  I skimmed over it.
24      Q.    What do you mean by skimmed over it?
25      A.    It took me about ten seconds to go

```
                          AGERBRINK
```

A plus-size client needs a plus-size model.  A
missy client who needs a size six, you need to
be size six.  Missy client who needs a size
eight, needs a size eight.

            So it's just having the particular
measurements that the client wants, but there
is a range also as well.

     Q.    Did you fit model in any of these
particular categories, that is missy or large
size --

            MR. DUGGER:  Objection, compound.

     Q.    -- petite?

     A.    Yes, sir.  My range is a missy,
eight to ten.

     Q.    And what kind of garments did you
fit model for?

     A.    Every garment.

     Q.    Dresses?

     A.    Dresses.

     Q.    Suits?

     A.    Suits.

     Q.    Under garments?

     A.    No, sir.

     Q.    Anything else besides dresses and

```
 1                         AGERBRINK
 2        Q.    Did you ask them what they meant by
 3   fit model?
 4        A.    I had no idea what a fit model was.
 5        Q.    How did you find out what a fit
 6   model was?
 7        A.    They -- they explained to me that
 8   basically you were like a human mannequin.  You
 9   need posture and you need to maintain
10   measurements.
11        Q.    So getting back to this Gramercy
12   situation.
13              Gramercy you said arranged for you
14   certain Go-Sees?
15        A.    Yes, they -- their job is to contact
16   clients.
17        Q.    Client being what?
18        A.    Their clients.  They contact the
19   garment industry and they -- the garment
20   industry says we are looking for a new fit
21   model.  They contact the client.  They have a
22   list of models that they manage.  They manage
23   their schedule.  They manage everything about
24   them, the schedule -- everything, everything.
25   They communicate with their client that we have
```

```
 1                        AGERBRINK
 2    X amount of models.  The client says, okay, we
 3    will take a look at them, send them over.
 4              You go over, and they take a look at
 5    you.  You try on about three outfits.  You're
 6    not supposed to try on more than three outfits,
 7    and you perform the same job you do on a Go-See
 8    as you do when you actually work.
 9         Q.   So when you go on one of these
10    Go-Sees, typically you say you limit yourself
11    to trying on three outfits max?
12         A.   Yes.
13         Q.   About how long does this take?
14         A.   It differentiates.  It could be 30
15    minutes.  It could be an hour.
16         Q.   Fifteen minutes?
17              MR. DUGGER:  Objection, vague.
18         A.   Very seldom.  I have never been on a
19    Go-See that took 15 minutes.
20         Q.   30 to 60 minutes would be normal?
21         A.   More closer, yes.
22         Q.   When you say the agent manages the
23    model --
24         A.   Yes.
25         Q.   -- please tell us what you mean by
```

AGERBRINK

1  manages.

2         A.     The agent is in total control of the

3  model.  The agent -- first of all, how we

4  dress, our schedule.  We are not in charge of

5  our schedule.  They are in charge of our

6  schedule.  They tell us we have to report

7  everything we do to them.  We have to report --

8  we need to take time off for emergency, we have

9  to request everything through them.

10              They send us to a place where we get

11  our haircut done.  We are not ever to speak

12  with their client.  We have a voucher system

13  where we have to send in the voucher in order

14  to get paid.  We have to come in on biweekly

15  inspections, so that, in this case, Ms. Levine

16  can inspect her girls.  That's how we get paid.

17        Q.     By the way, I was asking you I think

18  about this Gramercy modeling agency I think

19  that we are talking about.

20        A.     Yes.

21        Q.     So what you're telling me is about

22  Gramercy?

23        A.     Gramercy Models.  It's exactly the

24  same way.

```
 1                        AGERBRINK

 2              MR. DUGGER:  Were you done with your

 3         answer?

 4              THE WITNESS:  Yes.

 5      Q.    When you first began doing fit

 6  modeling, was it steady work?

 7              MR. DUGGER:  Objection, vague.

 8      Q.    Do you understand what I mean?

 9      A.    Yes, I do.  I understand.

10              When I first began as a fit model,

11  you first go on numerous Go-Sees.

12      Q.    Right.

13      A.    And so you don't get paid for those

14  Go-Sees.  Although you were doing same work you

15  would as if you were hired, but you're not paid

16  to go on Go-Sees.

17      Q.    What is the difference between a

18  Go-See and an interview?

19      A.    In an interview, you are talking

20  about a specific skill that you have.  On a

21  Go-See you don't talk about any skill.  You

22  basically try on clothes.  They look at many

23  models in a range, and you're not supposed to

24  speak.  You're not supposed to talk.

25      Q.    Aside from the fact that in a Go-See
```

AGERBRINK

1 you don't talk whereas in an interview you do,

2 are both of those the same in terms of the

3 client or customer trying to decide which model

4 to use for a particular job?

5          MR. DUGGER:  Objection, vague,

6      compound.

7      A.    They are completely different.

8      Q.    Did you ever go on any job

9 interviews?

10     A.    Yes, sir.

11     Q.    With clients, with customers?

12     A.    I went on a job interview when I

13 went to Caché.

14     Q.    During the fit modeling, when you

15 did fit modeling, I think you've told us that

16 you need to use your body in different ways.

17     A.    No, sir, I never said that.  You try

18 on clothes.

19     Q.    Yes, but don't you then make

20 movements so that the designer can see how the

21 garment falls and how the garment fits and how

22 the garment moves?

23     A.    Yeah, but you do the same thing when

24 you try on clothes in the fit room.  You see if

1                          AGERBRINK

2     you can move.

3          Q.    When you do that fit modeling --

4          A.    I'm saying when you're buying

5     clothes.

6          Q.    When you fit model, is there ever

7     any conversation between the designer, the

8     client, and the fit model with respect to

9     changes in the garment?

10               MR. DUGGER:  Objection, vague.

11         A.    My first boss that I worked for,

12    Luigi, at New York & Company always used to

13    tell me models should be seen not heard.

14         Q.    I understand that.  Weren't there

15    occasions, however, when you did fit modeling

16    when you did respond to questions or did make

17    suggestions?

18               MR. DUGGER:  Objection, compound.

19         A.    No, because I don't have the skill

20    to make the suggestion of how a garment should

21    be corrected.  I don't have those skills.

22         Q.    Why would a client choose one fit

23    model over another if they are both the same

24    size and same measurements?

25         A.    Usually, there is more than one fit

```
 1                        AGERBRINK
 2    model for a client.  There are occasions when
 3    the fit model gets sick and they have to have
 4    another one coming in doing the job.  So there
 5    are usually more than one for a job for a
 6    client.
 7         Q.    Did you ever turn down a fit
 8    modeling assignment?
 9         A.    Never.
10         Q.    Did you ever ask to have a fit
11    modeling assignment rescheduled?
12         A.    Never.
13         Q.    Were there ever any occasions when
14    you were working with MSA as a fit model when
15    you were not available at the time and on the
16    date that you were told there was a fit
17    modeling opportunity?
18         A.    Never.
19         Q.    When you did fit modeling with MSA
20    clients or customers, what kind of movements
21    during the fit modeling did you do?
22         A.    This movement.
23               MR. SPELFOGEL:  Let the record show
24         the witness is moving her arms.
25         A.    This is the lift.
```

```
 1                         AGERBRINK
 2              MR. SPELFOGEL:   Lifting her elbows.
 3        A.    I would see if I could drive the
 4   car.
 5        Q.    Making a motion with your arms in
 6   front of you as if you were driving a car?
 7        A.    As if I were driving a car.   And
 8   sometimes I would be sitting down to show how
 9   the -- how low the pants in the back looks
10   like, but we had people -- for QVC, we would
11   have the people that were hired at QVC, and
12   they would come in.   They would do the same
13   thing because they were given all different
14   sizes.
15        Q.    Did you do any bending?
16        A.    No.
17        Q.    Reaching?
18        A.    No.   Well, I mean, you call this
19   reaching?   Maybe this is reaching.
20        Q.    The motion of driving a car?
21        A.    Yeah.
22        Q.    When you were working with MSA
23   clients and customers, did they ever ask you
24   for any suggestions or information about the
25   garment?
```

```
1                         AGERBRINK

2         A.    No.  The technical designers, they

3    have skills, and it's always better, even if

4    you're guessing, to not say anything because

5    you could be completely wrong.

6              You really don't have the skill.

7    These people are trained and skilled.  They

8    have gone to school.  They are really skilled

9    in their field.  So you're better off trying it

10   on and they make -- they make the judgment on

11   how it should be corrected.

12              MR. DUGGER:  Evan, how about a quick

13        five-minute break?

14              MR. SPELFOGEL:  Sure.

15              (Recess taken.)

16              MR. DUGGER:  Evan, to start off,

17        Ms. Agerbrink wants to address some of the

18        testimony she gave that I think there

19        might have been some space between what

20        you intended in your question and what she

21        answered to clarify.

22              MR. SPELFOGEL:  You can take care of

23        that on redirect if you wish.

24              MR. DUGGER:  I have an obligation to

25        correct testimony that I think may be
```

```
1                            AGERBRINK

2          perceived as inaccurate, and she has every

3          right to correct it.

4                  MR. SPELFOGEL:  This is after you

5          and she talked out in the hallway during

6          your break?

7                  MR. DUGGER:  Correct.

8    BY MR. SPELFOGEL:

9          Q.    What would you like to correct,

10   Ms. Agerbrink?

11         A.    The rescheduling.  I never asked to

12   have any of my jobs rescheduled.  However, the

13   agency rescheduled a few of my jobs because the

14   two clients kind of coincided with each other.

15                So there was a time that QVC needed

16   me on another day and then we would have to

17   reschedule with Carole Hochman, so that I could

18   work.  So I wanted just to clarify that.

19         Q.    QVC and Carole Hochman were both

20   what?

21         A.    They were both the clients of MSA

22   that I worked for, yeah.

23                And the other thing I wanted to

24   correct is when you asked me about -- I was

25   asked about the corrections.  I never gave a
```

AGERBRINK

1

2    corrections as how to fit a garment.

3              However, I would give my opinion on

4    whether I felt it was too tight or I had

5    restricted movements or if it was itchy, but

6    those are opinions.  Those are not -- those are

7    not -- I'm not telling someone how to correct

8    the garment.

9         Q.   Besides too tight, itchy or

10   restrictive, did you give any other opinions?

11        A.   Yeah, that like it was too short,

12   sleeve length too short.  Sometimes they ask do

13   you feel sexy in the dress.  Again, that's an

14   opinion.  I don't feel sexy in the dress.

15        Q.   So when a -- do you call this

16   company that you're doing the fit modeling for

17   a client, a customer?

18        A.   They are a client of the modeling

19   agency.  They are not my client.  If they were

20   my client, I would be a contractor of them.

21        Q.   And what did you respond when you

22   were asked if you feel sexy?

23        A.   Sometimes yes.  Sometimes no.

24        Q.   And with respect to the sleeve

25   length, did they ask you is the sleeve length

```
1                      AGERBRINK
2   the right length?
3        A.     No, never.
4        Q.     You volunteered your opinion?
5        A.     Yeah, because that's the job of the
6   technical designer to see that.
7        Q.     And when you --
8        A.     Most models don't know even the
9   sleeve length.
10       Q.     When you commented that something
11  was too short, the sleeve length was too short,
12  was that in response to a specific question?
13       A.     No.
14       Q.     You just gave your opinion?
15       A.     Yeah, my opinion.  In fashion,
16  sleeve lengths are all over.  So you really
17  don't know.  Some designers want the sleeve
18  length to be much longer and some of them want
19  them to be much shorter.
20              So it's not a professional answer to
21  answer.  It's really, what do you think, it's
22  too short?
23       Q.     What did you mean when you say you
24  gave your opinion that a garment was itchy?
25       A.     You can put on a sweater in a store
```

AGERBRINK

      MR. DUGGER:  Objection, vague.

    A.    It was all different.  Every week was different, but we limited the fittings to two days a week between about 9, 9:30, break for lunch, to about maybe 2:30 in the afternoon, but because of the changes that the company was going through, it was all different.  It was all changed.

    Q.    On the days that you were doing fit modeling with Caché, these two days a week you said, did you also do filing?

    A.    Yes, I did.

    Q.    Office work?

    A.    Yes.

    Q.    So how many hours on average did you do fit modeling work for Caché?

    A.    Per day?

    Q.    Per day on the days you did fit modeling.

    A.    On the days that we did, four hours, maybe five hours.  The fittings were in five minutes, ten minutes.  That's how they put them in.

    Q.    You mentioned a union that you were

```
 1                          AGERBRINK
 2   couldn't handle my expenses anymore, and I
 3   didn't know what to do.  I wanted more than
 4   anything else to stay working with the agency.
 5        Q.     The agency being MSA?
 6        A.     MSA.  I will always remember, for
 7   the rest of my life, when Ms. Pinto got me the
 8   job for New York & Company.  And I thought
 9   that -- you know, I really believed that this
10   could happen again, but when I was treated so
11   poorly and so unprofessional, and I was
12   constantly told that I was -- you know, they
13   wanted newer, they wanted younger models, and I
14   couldn't get any Go-Sees at the end, and I was
15   sent down to QVC in the midst of the winter
16   with the snow we had.
17              I was not sent my paychecks.  I
18   asked for my paychecks.  I had to pay for two
19   apartments because they had a client that I was
20   working for up in New York and the client down
21   in QVC, driving back and forth and not being
22   paid for three months.  I had no other way of
23   going but to look for employment on my own.
24              And on top of that, Ms. Levine, I
25   remember sitting in the office, and she said
```

```
 1                        AGERBRINK
 2    times are tough, times are really hard, times
 3    are really hard, you know, why don't you go out
 4    and look for work.
 5         Q.    And this is while you were under
 6    contract with MSA?
 7              MR. DUGGER:  Objection, calls for a
 8         legal conclusion.
 9         A.    Yes.
10         Q.    Was that during the term of your
11    contract with MSA?
12         A.    Yes.
13         Q.    What did you do with respect to
14    looking for other work on your own?
15         A.    I had been a model for 20 years, and
16    I have always worked for an agency.  The agency
17    is the one that gets you the job.  They manage
18    your schedule.  They collect the money from the
19    client, and they pay you.  It's very, very
20    difficult to be a model and try and do it as an
21    independent contractor because you have to make
22    sure that you're paid and this is the job of
23    the agency.
24              So, I'm sorry, I'm rambling.  What
25    was the question?
```

```
 1                         AGERBRINK
 2              MR. SPELFOGEL:  Read back the last
 3         question, please?
 4              MR. DUGGER:  Maybe you should just
 5         talk and then you can ask a couple of
 6         questions at the end.
 7              MR. SPELFOGEL:  Read back the last
 8         question.
 9              (Record read.)
10    A.     Right.  So I hadn't been paid for
11    over three months and my -- the girl I was
12    working with at QVC said to me, well, you know,
13    usually what they do if -- you know, they keep
14    your money and you're lucky that you're paid at
15    all.
16              And she wanted me to contact
17    Mr. Higgins that had been working with MSA.  I
18    think I left a message for him, but I actually
19    never spoke with him because I was so -- just
20    the whole thing was just so horrible.
21              And I basically -- I couldn't pay my
22    bills.  I couldn't pay my car insurance, and my
23    boyfriend at the time said to me, basically,
24    are you an idiot?  If the agency are not going
25    to get you any clients, you have to go out and
```

```
 1                         AGERBRINK
 2    find your own client.
 3                 And Terri, who's always on LinkedIn,
 4    she found the job on LinkedIn.  She said, here,
 5    they're looking for someone like you.  And she
 6    helped me put -- write my LinkedIn because I'm
 7    not very good, you know, with the marketing
 8    thing.  I have never had to market myself or
 9    advertise or anything.
10                 So she showed it to me, and I wrote
11    a letter to the girl that had -- the girl that
12    was looking for people at Caché, and she
13    responded to me.  So that's what happened.
14         Q.    Did you talk to anybody at MSA
15    around that time about ending your contract
16    with MSA?
17         A.    Yes, many times.
18         Q.    Who did you speak to?
19         A.    I spoke with Liz many times.  I
20    remember saying to Liz, Liz, I can't -- you
21    know, why did you sign me exclusively if you're
22    not going to find any work.  And she kept
23    reminding me, well, you're on an exclusive
24    contract.  You can't go to work for anyone
25    else.  You're signed exclusively for three
```

```
 1                        AGERBRINK
 2    years.
 3              And it was a nightmare.  A total
 4    nightmare.
 5        Q.    Who is Mr. Higgins?
 6        A.    Mr. Higgins was the director for MSA
 7    from I think 19 -- this is what's in his
 8    LinkedIn, from 1999 to, I think, 2010.
 9        Q.    And what did he have to do with
10    getting you work?
11        A.    No, I never met Mr. Higgins when I
12    was working.  I was always -- I was always
13    working for Liz Pinto, and I only had a chance
14    to meet Higgins in October of this year.
15        Q.    2015?
16        A.    Yes, sir.
17        Q.    Did you ever contact Mr. Higgins
18    back in 2014 when your jobs were drying up at
19    MSA?
20              MR. DUGGER:  Objection, vague.
21        A.    I left a message, but I never spoke
22    with Higgins.  It was Terri Murray who
23    suggested that I speak with him because she
24    knew a lot of -- she knew that Mr. Higgins had
25    gone through a lot with MSA.
```

```
1                      AGERBRINK
2     poured out of his heart everything that he had
3     gone through when he was working for MSA.
4          Q.    And that was when in 2015?
5          A.    October.  Mr. Higgins had nothing
6     but negative things to say about Model
7     Services, and he said to me that when Bill
8     Ivers came in, everything changed and how
9     models were not paid and how they used the
10    models pay to pay for other things.
11         Q.    Did I understand you to say before
12    that you were told that MSA couldn't pay you
13    because the client hadn't paid MSA?
14         A.    I was told that by Liz Pinto, yes.
15         Q.    So is it typical that the client
16    pays MSA for your services and MSA then pays
17    money over to you with respect to those
18    services?
19         A.    Yes.  MSA wouldn't pay us our salary
20    if we haven't turned in the voucher.
21         Q.    Tell me about the voucher.  What is
22    the voucher?
23         A.    A voucher system is something I --
24    after I go in and I try on the garment, the
25    outfit, whatever it is, I hand over a voucher
```

```
 1                        AGERBRINK
 2    which tells them who my employer is, which says
 3    MSA, what type of work I did, which was in this
 4    case fit modeling.
 5              I fill in the day.  I fill in the
 6    time, and I need I get a signature from their
 7    client that they sign.  Then I take that
 8    voucher and I have to turn it over to my
 9    employer, which is MSA in order to get paid.
10        Q.    Now, you say your employer, MSA.
11    Doesn't the voucher say on the face of the
12    voucher that the client, the customer is the
13    employer?
14        A.    I actually never read the fine print
15    on a voucher.  You have to turn in the voucher
16    to your employer, which is MSA.  They are the
17    ones who pay me.
18        Q.    They are the agent you told me.
19        A.    No, MSA is the employer.  I work for
20    MSA.  I don't work for their client.
21        Q.    That's not what you told us before.
22    You said MSA was your agent.
23              MR. DUGGER:  Asked and answered.
24        A.    MSA is the employment agency.  They
25    have -- I guess they call them agent -- bookers
```

1                          AGERBRINK

2     is another word for an agent, booker.  So Liz

3     Pinto works for MSA.  She's a booker.

4          Q.    She works with you; is that right?

5     And she helped get you jobs; is that right?

6          A.    Ms. Liz Pinto's job is to contact

7     clients and then to send me, that work for the

8     agency, to send me to the client, their client,

9     and hopefully their client will pick me as the

10    model.

11         Q.    And when they pick you as a model

12    and you perform fit modeling for them, you fill

13    out a voucher?

14         A.    Yes.

15         Q.    Is it a multipart voucher?

16               MR. DUGGER:  Objection, vague.

17         A.    I don't understand.

18         Q.    Is it a voucher that has additional

19    copies?

20         A.    Yes, sir.  Yeah.

21         Q.    And what do you do with the voucher

22    and the copies?

23         A.    Okay.

24               MR. DUGGER:  Asked and answered.

25         A.    When I was working for QVC, I would

```
 1                          AGERBRINK
 2   take a photograph of the voucher and then
 3   e-mail that the next minute to Liz.
 4        Q.    Do you give that voucher -- did you
 5   give that voucher to the customer?
 6             MR. DUGGER:  Objection, vague.
 7        A.    They take the voucher.  They sign
 8   it, and they keep one copy, yes.
 9        Q.    They keep one copy after they sign
10   it?
11        A.    Uh-huh.
12        Q.    And you have a copy?
13        A.    Yes, sir.
14        Q.    And you make a photograph of that
15   copy?
16        A.    Well, I don't make a photograph of a
17   copy for myself.  I make a -- if I am not able
18   to turn in that voucher, Ms. Pinto and I
19   realized that it would be faster for me to
20   photograph since I was working and e-mail it,
21   then to come in on Monday and turn in the
22   voucher.
23        Q.    And you keep a copy of it yourself?
24        A.    Yes.
25        Q.    And now, is it the customer who set
```

```
 1                         AGERBRINK
 2    sir, but maybe it's just showing that I was
 3    there for the hour that you sent me to your
 4    client.   I did go there and here is the proof
 5    that I was there.
 6          Q.    The voucher would have your name on
 7    it?
 8          A.    No, I fill in my name.
 9          Q.    Yes, that's what I mean.   When you
10    hand the voucher to the client, it has your
11    name?
12          A.    Yes.
13          Q.    The date of service?
14          A.    Yes.
15          Q.    The rate?
16          A.    I fill in the rate, yes.
17          Q.    The time?
18          A.    Yes.
19                MR. DUGGER:   Evan, just to clarify,
20          what do you mean by time?
21          Q.    The time of the performance of the
22    services.
23          A.    Yes.
24                MR. SPELFOGEL:   Let's mark this as
25          Agerbrink 1.
```

```
1                          AGERBRINK

2         Q.    Yes, we're talking about -- all my

3    questions are now going to relate to 2013 to

4    2014 when you worked for MSA.

5               Were there any days that you didn't

6    work for any MSA clients?

7         A.    Yes, there were.

8         Q.    Were there weeks when you did not

9    work for any MSA clients?

10              MR. DUGGER:  Objection, vague.

11        A.    Yes, there was -- no -- yes, I'm

12   sorry.  That's correct.

13        Q.    So starting from March of 2013 going

14   right up till you stopped working with MSA in

15   summer of 2014 --

16        A.    June.

17        Q.    -- June of 2014, approximately how

18   many weeks in that 15-month period did you do

19   no work at all for any MSA clients?

20              MR. DUGGER:  Objection, vague.

21        A.    There were weeks that I only had

22   Go-Sees that I did not get paid for any of

23   MSA's clients.

24        Q.    Didn't you work with QVC every week

25   during that period of time?
```

```
1                          AGERBRINK
2    between Christmas and New Year's -- I don't
3    recall, but --
4         Q.    There may have been a week between
5    Christmas and New Year's where you did not work
6    at QVC?
7               MR. DUGGER:  Mischaracterizes prior
8         testimony.
9         A.    Right.
10        Q.    But other than that, did you work
11   for QVC every week from October of 2013 to June
12   of 2014?
13              MR. DUGGER:  Mischaracterizes prior
14        testimony.
15        A.    I worked for MSA every week except
16   for I think the Christmas week from when --
17   from when they hired MSA till when I left.
18        Q.    When you say you worked for MSA --
19        A.    Right.
20        Q.    -- was that work work that you
21   performed at QVC?
22        A.    Correct.
23        Q.    Approximately how many hours did you
24   perform services at QVC during that period of
25   time each day on average?
```

AGERBRINK

1

2      A.      Some weeks it was 12 hours and some

3   weeks it was 22 hours.

4      Q.      Was it ever more than 22 hours?

5      A.      Never.

6      Q.      Was it ever less than 12 hours?

7      A.      I don't recall.  I think 12 was --

8   actually, I don't recall that, but I want to

9   recall that it was 12 hours.

10             MR. DUGGER:  He's not asking you to

11         guess, Ms. Agerbrink.  So give a range if

12         you're not sure, but please don't just

13         guess.

14     A.      There were days I would drive down

15   to their client and --

16     Q.      Drive down to QVC in Pennsylvania?

17     A.      Drive down to Westchester.

18     Q.      That's Westchester, Pennsylvania not

19   Westchester, New York?

20     A.      Westchester, Pennsylvania.  I would

21   drive down on Tuesday afternoon, and then I

22   wouldn't start fittings until sometimes

23   10 o'clock, and we were finished at 1 o'clock.

24     Q.      What did you do, if anything, before

25   you started fittings?

```
 1                         AGERBRINK
 2         Q.     Did you ever exchange e-mails with
 3    Athena?
 4         A.     Yes, I did.
 5         Q.     About what?
 6         A.     She would tell me sometimes what
 7    time the fittings -- actually, no.
 8                I don't know if there was by text
 9    message or e-mails about the time that we would
10    start fitting, but there was -- I exchanged
11    e-mails through MSA about the time that MSA had
12    fired me from working at QVC because they
13    couldn't reach me during the day.  There were
14    several e-mails that was going back and forth,
15    but everything was through MSA.
16         Q.     During the time from October of 2013
17    to June 2014, did you exchange e-mails with
18    Athena?
19         A.     Yes, through MSA regarding --
20         Q.     When you say through MSA, what do
21    you mean?
22         A.     Everything has to be -- everything
23    has to be -- go through MSA.  You can lose your
24    job if you -- if you try to negotiate or talk
25    about anything.  It's their client so you can
```

```
1                           AGERBRINK

2               MR. DUGGER:  Take your time to read

3          through all the documents.

4          A.    (Perusing.)

5          Q.    Ms. Agerbrink, have you had an

6   opportunity to look at the text messages in

7   Exhibit Number 3?

8          A.    Yes, sir.

9          Q.    And did you exchange these text

10  messages with Athena?

11         A.    Yes, sir.

12              MR. DUGGER:  I just want to point

13         out, just in case there is a

14         misunderstanding, that the first text on

15         this is indicated from Terri Murray not

16         Ms. Agerbrink.

17         Q.    Who is Terri Murray?

18         A.    Terri Murray was the model that I

19  worked with at QVC.

20         Q.    So in the message body in the middle

21  of the page, it says, "See you tomorrow."

22              Is Thierry Murray saying to you she

23  will see you tomorrow?

24         A.    I don't know who sent the message in

25  the message body.
```

```
 1                      AGERBRINK
 2        not the author.
 3  BY MR. SPELFOGEL:
 4        Q.    Did you receive a copy of this?
 5        A.    Right now I did.
 6        Q.    Did you have a communication with
 7  anybody at QVC around January 6 of 2014,
 8  concerning the substance of that page?
 9              MR. DUGGER:  If you recall.
10        A.    Yes, sir.  I had several text
11  messages from Athena regarding the start time.
12              As you can see most of these are
13  after the agency is closed.  It's 6:45, 6:46,
14  10:36 at night.  At that time my employer is
15  closed, and so, therefore, the way that Liz
16  Pinto suggested is to receive it per text, and
17  then I would text Liz Pinto and let her know
18  that I got the start time.
19        Q.    Now, for example, the third of these
20  pages in the group message body reads, "So we
21  can't start at 10 and go to 5 on Wednesdays?"
22              Do you see that?
23        A.    Yes, sir.
24        Q.    Did you say that to somebody at QVC?
25        A.    Yes, sir.  It's right there.
```

```
 1                        AGERBRINK

 2       Q.    And on the next one, the fourth

 3   page, in the message body, "If I have to cancel

 4   tomorrow, can you give me Monday or Tuesday as

 5   a fitting day?"

 6            MR. DUGGER:  Sorry.  Just so the

 7        record is clear, you're skipping the first

 8        sentence.

 9            MR. SPELFOGEL:  About a forecast for

10        more snow, yes, I'm skipping that.

11       Q.    I'm reading the next sentence that

12   reads, "If I have to cancel tomorrow, can you

13   give me Monday or Tuesday as a fitting day?"

14            Is that a message that you conveyed

15   to someone at QVC?

16       A.    No, sir, this is a message from

17   Athena saying if she has to cancel, I believe.

18            MR. DUGGER:  Just for the record,

19        the document states that this chat is from

20        Athena not from plaintiff.

21       A.    I never canceled a fitting because

22   of the weather.  I rented a car so that I could

23   get down there.

24       Q.    Did you ever ask for a fitting to be

25   rescheduled to a different day?
```

```
 1                      AGERBRINK
 2      A.     No, sir.
 3             MR. DUGGER:  Objection, vague.
 4      A.     I never did.  I think I recall
 5  asking to start later because of the snow and
 6  the time that it took to get down to
 7  Westchester.  If you are not on time for your
 8  agency's client, you can get fired for that.
 9      Q.     Is it the agency or is it the -- or
10  was it QVC that was setting the times for these
11  modeling?
12             MR. DUGGER:  Objection, vague.
13      A.     QVC communicates with the agency,
14  and the agency manages your schedule.  So the
15  agency can say no, she cannot work for you on
16  such and such day.  It's ultimately the --
17      Q.     Because you had a conflict with some
18  other assignment?
19      A.     Because I may have a conflict with
20  another one of their clients.
21             MR. DUGGER:  I need to put on the
22        record that this set of e-mails --
23             MR. SPELFOGEL:  Text messages.
24             MR. DUGGER:  -- text messages,
25        excuse me, the vast majority are authored
```

1                          AGERBRINK

2        A.     About the time we would start, yes,

3   because the time that they would start would

4   not be decided until after the -- MSA is

5   closed.  So MSA aren't able to call me during

6   the office hours because, as you can tell, the

7   decision on what time to start was a lot of

8   times after 10 o'clock at night.

9               So it was Liz Pinto's suggestion

10  that we do over text, and when I would receive

11  the text, I would then text Ms. Liz Pinto and

12  let her know we're starting at 9:30 tomorrow.

13  People go to bed at 10 o'clock at night, and it

14  was my responsibility to be there on time.

15       Q.     To be there on time because QVC

16  wanted you there at a certain time?

17       A.     Yeah, QVC wants -- QVC would have

18  either -- they would have called up MSA and

19  basically fired them if I don't show up there

20  on time.

21       Q.     Does MSA make or sell any clothing?

22       A.     I don't know, sir.

23       Q.     As far as you know, did they?

24       A.     I don't think so, sir.

25       Q.     Did QVC make or sell any clothing?

1                        AGERBRINK

2        A.     They sell clothing, but I don't

3   think it's their own clothing.   They sell

4   clothing through their network.

5        Q.     Whose clothing is it?

6        A.     Various designers.   Isaac Mizrahi.

7   You need me to --

8        Q.     If you can recall just a handful,

9   that's fine.   Give us an idea.

10        A.     Let me see.   Barely There, Dennis

11   Basso.   About 20 different designers.

12        Q.     And QVC, can you explain what kind

13   of company that was, if you know?

14        A.     I do know that QVC, they sell

15   merchandise on television.   They have their own

16   television -- I guess is it on cable or regular

17   television?   They sell merchandise.

18        Q.     And the merchandise is manufactured

19   by other companies; is that right?

20        A.     Yes.

21        Q.     And none of that merchandise is

22   manufactured by or sold by MSA; is that right?

23        A.     No.

24        Q.     It is correct that it is not

25   manufactured or sold by MSA?

```
 1                           AGERBRINK

 2        A.    MSA does not manufacture clothes

 3   that is sold by QVC, no.  Actually, I take that

 4   back because I don't know.  I can't say that

 5   for sure.  I don't know.

 6        Q.    As far as you know?

 7        A.    As far as I know.

 8        Q.    MSA doesn't make clothes?

 9        A.    No, I don't think so.

10        Q.    I don't believe you identified who

11   Jessica is.

12        A.    Jessica worked for QVC.  She works

13   together with Athena.

14              (Discussion off the record.)

15              MR. SPELFOGEL:  Mark this as

16         Agerbrink 4.

17              (Agerbrink Exhibit 4, E-Mail Chain,

18         Bates Stamped MSA000767 through 770,

19         marked for identification.)

20              MR. DUGGER:  Take your time to read

21         through the document.

22              THE WITNESS:  Uh-huh.

23        A.    (Perusing.)

24        Q.    Have you had a chance to read

25   through it?
```

```
 1                      AGERBRINK

 2   went down for the Go-See.

 3        Q.    And Athena is then telling Liz that

 4   it was a pleasure meeting you and Francine and

 5   couldn't say enough about their

 6   professionalism?

 7        A.    Yes.

 8        Q.    My question to you is, do you have

 9   any idea what is meant by professionalism in

10   that sense?

11        A.    I think we -- you know, we looked

12   like models when we showed up.  We had good

13   attitudes, and when asked our opinion, maybe we

14   gave good opinions.  And it's -- you know, it's

15   first impression, and I thought -- I believe

16   she was impressed with us.

17        Q.    And in the rest of that e-mail

18   message on September 24, Athena is telling Liz

19   that QVC needs a model to be there on Thursday,

20   October 3, 8:30 to 3:30 p.m. and another one on

21   Friday, October 4 for the same time frame; is

22   that right?

23        A.    Yes.

24             MR. DUGGER:   Which page are you on,

25        Evan?
```

```
 1                      AGERBRINK
 2            MR. SPELFOGEL:   The third page.
 3       A.    Yes.
 4       Q.    From that e-mail, who was doing the
 5  scheduling?
 6       A.    Model Services did the scheduling.
 7       Q.    Isn't that Athena telling Model
 8  Services, telling Liz the schedule and the days
 9  that QVC wants?
10       A.    She is telling them what time she
11  needs a model there, and it's up to Model
12  Services to clear our schedule to who is going
13  to be down there.  I happened to have a car.
14  Francine did not have a car, and I recall --
15  I've never turned down a job.
16            So I told Liz Pinto I can be there
17  either day.
18       Q.    So on the second page, the top
19  e-mail.
20            MR. DUGGER:   MSA 768.
21            MR. SPELFOGEL:   Yes.
22       A.    Uh-huh.
23       Q.    Liz writes to you, "Does one day
24  work better than the other, Thursday, October 3
25  or Friday, October 4?"
```

AGERBRINK

1

2    A.    Uh-huh.

3    Q.    And you then said either day, you

4  could switch your schedule?

5    A.    Uh-huh.  Yes.

6    Q.    When you were working with MSA from

7  March of 2013 to June of 2014, what, if any,

8  upkeeping or grooming practices did you

9  maintain?

10          MR. DUGGER:  Objection, vague.

11    Q.    Do you know what I mean?

12    A.    Yes, sir.  I do know what you mean.

13    Q.    Thank you.

14    A.    I didn't do anything different than

15  I would normally do.  I've always maintained my

16  diet, my measurements.  I've always spent time

17  in the gym.  I didn't do anything different

18  than I would do normally.

19    Q.    You also took care of your nails?

20    A.    I've always taken care of my nails,

21  sir.

22    Q.    Your hair?

23    A.    Always taken care of my hair, sir.

24    Q.    And did you pay for all of this?

25    A.    Yes, sir.

1                              AGERBRINK

2        Q.    Was maintaining these practices that

3    you've just described necessary in order to get

4    the assignments?

5                    MR. DUGGER:   Objection, vague.

6        A.    As a matter of fact, several -- on

7    many occasions, Liz told me not to work out and

8    eat more carbs.

9        Q.    Why was that, if you know?

10       A.    Because you want to have soft

11   curves.  So sometimes it's really -- you have

12   measurements.  You have to keep those

13   measurements.  So it's -- you do nothing

14   different than really -- but maybe I didn't

15   want to eat as many carbs as I did.

16       Q.    Did you have any professional

17   headshots taken, during this time we're talking

18   about?

19       A.    Not headshots, but I had

20   photographs, yes.

21       Q.    What kind of photographs?  How would

22   you describe those photographs?

23       A.    Taken by a professional

24   photographer.

25       Q.    Full body?

1                            AGERBRINK

2        A.      Full body shot -- well,

3   three-quarter shot.

4        Q.      Why did you do that?

5        A.      I wanted to.  First of all, I

6   thought it would help me -- help -- I mean, you

7   have to give photographs to your agency,

8   otherwise when they communicate with their

9   client, they can't just say I got this girl

10  that's great.  You know, their clients want to

11  see, well, can we see, you know, who are your

12  employees?

13       Q.      So you have a folio of photographs?

14       A.      No, fit models don't use portfolios,

15  no.  We don't even carry a comp card around.

16  It's the agency, the employment agency that

17  sends out comp cards to their clients.

18              And the clients get the comp card,

19  and they call up the agency, and they say I got

20  X A of cards here of yours girls.  I would like

21  to see this one, this one, this one, and you

22  show up and you don't bring anything.

23       Q.      And who paid for the photographs?

24       A.      I paid for the photographs, but I

25  have used those photographs for many different

AGERBRINK

1
2      things.  I'm using the photographs right now to
3      do -- help do fund raising for children that
4      get into drugs in schools.  I use the
5      photographs on Match dot com.
6          Q.    Don't all the models, to your
7      knowledge, carry comp cards with them when they
8      go to clients?
9          A.    Not fit models, no.
10         Q.    Did you have a comp card?
11         A.    I had a few.
12         Q.    Did you carry them with you?
13         A.    No, sir.  The comp cards are at the
14     agency, so that the agency can send out those
15     comp cards to their clients.
16         Q.    They are also online, aren't they?
17         A.    Yes.
18         Q.    Were you encouraged by MSA to test
19     often, so you have a more diversified
20     portfolio?
21              MR. DUGGER:  Objection, vague.
22         A.    No, sir.
23         Q.    Did you ever ask Liz at MSA which
24     photographers that she might recommend for you?
25         A.    Yes, sir.  I asked once, and she was

```
 1                         AGERBRINK
 2    honest.  She said here is a list.  You got to
 3    go meet them.
 4          Q.    Do you recall if she recommended
 5    Steven Menendez?
 6          A.    No, sir.
 7          Q.    What about Quro, Q-U-R-O?
 8          A.    No, sir.
 9          Q.    Jessica Larovie, L-A-R-O-V-I-E?
10          A.    No, sir.
11          Q.    Liz never recommended those people
12    to you for photography?
13          A.    No, sir.  I don't remember that.
14          Q.    Do you recall Liz furnishing to you
15    prices that different photographers charged?
16          A.    No, sir.  We didn't discuss price.
17    I might have asked her -- I don't recall it,
18    but I might have asked her, you know, how much
19    it is, but I don't recall it.
20          Q.    Do you know what a digital marketing
21    fee is?
22          A.    Yes, sir.
23          Q.    What is it?
24          A.    I know that it's $240.
25          Q.    And what is it for?
```

AGERBRINK

1

2    A.    It's for the modeling agency to, you

3    know -- they're the employment agency.   They

4    have models that they hire, and in order to

5    get -- for them to get clients, they have to

6    have a digital website where they show the

7    models that work for them.

8    Q.    So it's used for a website and

9    online marketing; is that right?

10   A.    Yes, sir.

11   Q.    Is it used for portfolio management?

12        MR. DUGGER:   Objection, vague.

13   A.    I don't know that.   I don't work

14   inside the agency, but a fit model -- a fit

15   model doesn't need a portfolio.

16   Q.    So is there any particular reason

17   why Liz would furnish you with that

18   information?

19   A.    You need a photograph.

20        MR. DUGGER:   What do you mean by

21        portfolio, Evan, just to clarify?

22   Q.    Do you know what portfolio means?

23   A.    Yes, sir.

24   Q.    What does it mean?

25   A.    Print models carry portfolios.

                          AGERBRINK
1
2       Q.    What's the difference between a
3  print model and a fit model?
4       A.    It's a huge difference.  Print model
5  work on occasions with print jobs.  The rate
6  for a print job is -- it's much, much higher.
7             Fit model is basically a living
8  mannequin that throws on clothes, and it's not
9  about how great your photographs look or if you
10 carry a portfolio.  I know print models carry
11 portfolios.
12            MR. SPELFOGEL:  We will mark as the
13       next Agerbrink Exhibit Number 5.
14            (Agerbrink Exhibit 5, E-Mail Chain,
15       Bates Stamped MSA000714 through 715,
16       marked for identification.)
17      A.    Can I add something to that?
18      Q.    Sure.
19      A.    I think I recall that I was the one
20 who asked Liz I want to get some new pictures
21 done, and so she handed me the list.
22      Q.    And does that relate to Agerbrink
23 Exhibit Number 5 that I've just shown you?
24      A.    No, it was related to the question
25 you asked me before.

```
 1                       AGERBRINK
 2        Q.    Now, what is this book and comp
 3   cards that you had done?
 4        A.    I wanted to buy the book, which
 5   is -- it says MSA on it.  I just wanted to buy
 6   the book, so I could keep my photographs in it.
 7              And the comp cards were the comp
 8   cards that MSA used to send out to their
 9   clients.  And I guess I'm saying that I bought
10   a book and I had comp cards done.  So I was
11   questioning why I was charged another $240.
12              But there's no requirement to buy
13   the book.  MSA doesn't make you buy the book.
14        Q.    And on the first page, the first
15   e-mail from -- the e-mail from Liz to you on
16   April 7 at 11:45 a.m. in the middle paragraph,
17   you see where it says -- Liz wrote, "As for
18   images, I encourage models to test often so
19   that there is a more diversified portfolio."
20        A.    Yes, sir.
21        Q.    "The more images a model has, the
22   more opportunity available."
23        A.    Yes, sir.
24        Q.    "You could use a great dress shot,
25   some updated images," and then do you see her
```

```
 1                        AGERBRINK
 2        Q.    But you only work as a fit model; is
 3   that right?
 4        A.    I only worked as a fit model.  The
 5   photographs that I ended up taking with Fadil,
 6   the ones that I liked, was not the ones that
 7   were used on -- on the website.
 8        Q.    Is there any particular --
 9        A.    So I didn't like the photographs, so
10   I guess I questioned it.
11        Q.    Is there any particular technical
12   language that a fit model would use in talking
13   with a designer?
14        A.    No, sir.
15        Q.    Between March of 2013 and June 2014,
16   did you ever do any runway work?
17        A.    No, sir.
18        Q.    Any fashion work?
19        A.    No, sir.
20        Q.    Showroom work?
21        A.    No, sir.
22        Q.    Any other types of modeling besides
23   fit modeling?
24        A.    No, sir.
25        Q.    Approximately how many different
```

AGERBRINK

1

2     A.    Yes, for the client of the agency.

3     Q.    Do you know in advance how many fit

4 models the client of the agency is going to

5 retain?

6     A.    Never.  The client usually calls

7 several employment agencies, several agencies.

8     Q.    So some of the models who are there,

9 the fit models who are there at the same time

10 you are, might be coming from a different

11 agency not from MSA?

12     A.    I don't know that because I don't

13 know all the fit models.

14     Q.    How do you find out that your fit

15 modeling was successful?

16     A.    By my agent.  Liz will call me up,

17 and she will a say they liked you and they want

18 you to come back again or sometimes they liked

19 you and they would like to start booking you.

20     Q.    So during the period from March of

21 2013 to June of 2014, when you were working

22 with MSA, approximately how many Go-Sees did

23 you go on?

24     A.    Twenty.  I don't have an exact

25 number, sir.

```
 1                       AGERBRINK
 2        Q.    What do you mean by that?
 3        A.    When I first started working for
 4   MSA, their job is, of course, to get me out to
 5   work, so I can make money for them and --
 6        Q.    So you had more Go-Sees then?
 7        A.    Right.  And then when I started --
 8   when they got me -- when they got QVC to hire
 9   them, then I was limited to the amount of days
10   that I was in New York.
11        Q.    So that was starting in October of
12   2013?
13        A.    Uh-huh.
14        Q.    You had no Go-Sees from then
15   until --
16        A.    No, that's not correct.
17        Q.    You had fewer Go-Sees?
18        A.    Yes, sir.
19        Q.    Approximately how many Go-Sees per
20   week did you have after you began working with
21   QVC?
22        A.    Many weeks I had no Go-Sees.  I
23   would usually not have more than one Go-See a
24   week while I was working for their client, QVC.
25        Q.    Were all the Go-Sees you went to
```

```
 1                      AGERBRINK
 2   after the first few weeks with MSA here in the
 3   New York City area?
 4        A.    Yes.
 5        Q.    You didn't have to go down to
 6   Pennsylvania?
 7        A.    No, all of them were in New York.
 8              MR. DUGGER:  When was the period you
 9        said?
10              MR. SPELFOGEL:  After the first few
11        weeks beginning with MSA.
12        A.    All the Go-Sees were in New York
13   City.
14        Q.    Were the ones, the first few weeks
15   with MSA, also within New York City?
16        A.    The first few weeks that I joined --
17   that I started working for Model Services, I
18   don't recall having any Go-Sees the first
19   couple of weeks.
20        Q.    Then you began having Go-Sees?
21        A.    Correct, and they were in the New
22   York City area.
23        Q.    All your Go-Sees were in the New
24   York City area?
25        A.    Yes.
```

```
 1                      AGERBRINK
 2      Q.      Were you ever told by Liz Pinto or
 3  anybody else at MSA that when you go on a
 4  Go-See you should try -- not try on more than
 5  three garments?
 6      A.      Yes.
 7      Q.      Were you also told you should try
 8  not to have the Go-See last for more than 15 or
 9  30 minutes?
10      A.      Well, it's in the best interest for
11  the agency to be able to get you to see as many
12  clients as they can, but you're not in charge
13  of your time and your schedule, but, yeah, they
14  tell you don't try on more than three outfits
15  because a lot of clients use Go-Sees for the
16  model and they don't pay for it.
17      Q.      So the client doesn't pay for a
18  Go-See.  Is that the standard procedure in the
19  industry?
20      A.      Yes, sir.  Or the other way around,
21  the agency doesn't charge the client for models
22  that do Go-Sees when they really should because
23  we do the same amount of work as we do when we
24  work and we get paid for it.
25      Q.      During the time that you were
```

AGERBRINK

1
2  working with MSA this second time around,
3  besides your income from MSA and the real
4  estate income you've told us you had, did you
5  have any other income?
6       A.   Yes, sir.  I worked for a week and a
7  half in a spa.
8       Q.   Approximately when, if you can
9  recall?
10      A.   It was -- well, it was --
11           MR. DUGGER:  I don't want you to
12      guess.
13      Q.   Was it the summer of 2013, your
14  first summer working with MSA?
15      A.   No, it wasn't the summer.  It was --
16  I can't guess, but it was before I started
17  working with Carole Hochman.  I recall it was
18  winter, December -- the talks about it was
19  December 2012.  So I don't recall.  It was a
20  week and a half.
21      Q.   Did you receive an IRS form W-2 with
22  respect to that income?
23      A.   Yes, I did --
24           MR. DUGGER:  Objection, vague.
25      A.   -- I don't know what I received, but

```
 1                          AGERBRINK

 2        A F T E R N O O N     S E S S I O N

 3                 (Time noted:  1:40 p.m.)

 4   E V A    A G E R B R I N K,     resumed and

 5         testified as follows:

 6   CONTINUED EXAMINATION

 7   BY MR. SPELFOGEL:

 8        Q.    You mentioned a company by the name

 9   of Carole Hochman.

10        A.    Yes.

11        Q.    What is that?

12        A.    Carole Hochman is a client of MSA

13   that I went and performed fittings for.

14        Q.    When?

15        A.    During -- during the time I was

16   hired by MSA.

17        Q.    The second time around?

18        A.    Second time around.  And also while

19   I was with QVC.

20        Q.    Did you do any work with Carole

21   Hochman when you were in-house with Caché?

22        A.    Yes.

23        Q.    When was that?

24        A.    But I wasn't in-house with Caché.

25        Q.    Clarify.
```

```
 1                        AGERBRINK
 2        believe that is something added by
 3        defendants' discovery team and not on the
 4        original document.
 5             MR. SPELFOGEL:   Thank you.
 6             (Agerbrink Exhibit 6, E-Mail Chain,
 7        Bates Stamped PLS00002179, marked for
 8        identification.)
 9             MR. DUGGER:   Take your time to read
10        through these.
11             THE WITNESS:   Okay.
12   A.        (Perusing.)
13   Q.        By the way, as you're looking
14   through this, just let me ask you, who was Eva
15   Sweden?
16   A.        That's my e-mail address on my
17   Verizon.
18   Q.        Okay.
19   A.        (Perusing.)
20   Q.        Are you finished?
21   A.        I haven't read them all.
22   (Perusing.)
23   Q.        Okay?
24   A.        Yes, sir.
25   Q.        Let's look at the first page.
```

```
 1                         AGERBRINK
 2    to "They fucked up," I believe in my heart that
 3    Model Services fucked up.  And then when I say,
 4    "Send me your ex and your number," my
 5    girlfriend Jin, my neighbor, was going through
 6    a divorce, and she wanted me to say something
 7    to her husband.  And so that was the name and
 8    the number I asked for.
 9         Q.    So if I understand what you've just
10    explained, you had some assignment scheduled at
11    QVC?
12         A.    It was the regular as always, and at
13    this time, remember I said earlier that Liz
14    said, because they would call so late, that the
15    agency had closed, that I would get a text
16    message from Jessica or from Athena, and then I
17    would give that text message right away to Liz,
18    so that she knows my schedule.  So she knows
19    where I am at all times.
20         Q.    I thought Liz knew your schedule.
21         A.    Liz is the one who manages my
22    schedule.
23         Q.    So didn't she know your schedule in
24    advance?
25         A.    No.
```

```
1                          AGERBRINK
2        Q.     Why was that?
3        A.     QVC determines the time that they
4   want -- Liz knows that I am working with their
5   client, QVC, on Thursday, Friday -- on
6   Wednesday, Thursday and Fridays, but Liz has no
7   way of knowing what time that they want to
8   start the fittings.
9              And there were a lot of times, as
10  you saw in the earlier text messages, that they
11  didn't decide the time until 10 o'clock in the
12  evening.
13       Q.     They being QVC?
14       A.     They being QVC, and they -- at that
15  time, the agency was closed.  So in order not
16  to lose it, the text and then I would text Liz.
17  At this particular occasion, text or e-mail.
18             This particular day I moved -- not
19  that day, but I had moved when Liz couldn't get
20  ahold of me, and so she said we couldn't get
21  ahold of you all day, so you're no longer
22  needed for QVC is what she said.
23       Q.     Now, you have no way of knowing
24  whether that was at the direction of QVC or
25  not, do you?
```

```
 1                          AGERBRINK
 2    and I immediately picked up the phone and
 3    called Athena herself.  And I said I can't
 4    believe this is happening, and she said I
 5    confirmed this morning on my Verizon from
 6    Michelle that the start time was such and such
 7    time.  I was moving today, and I had no way of
 8    having e-mail access.
 9         Q.    That's what you explained to the
10    person Athena?
11         A.    So Athena said, well, MSA is our
12    client, and you need to deal with your agency
13    on that.  That was it.
14               So I was upset.  I was upset.  I
15    wanted to break the contract.  I didn't think
16    of anything.  I just was really, really upset.
17         Q.    So did you then speak to Liz at MSA
18    to break the contract?
19         A.    No, I was asked to come in by
20    Lynette, the front girl, and she said Susan
21    wants to talk to you, and it was about a week
22    that went by.
23               That was another week I wasn't
24    working.  And I did not make any phone calls.
25    Susan asked me to come in and talk to her, and
```

```
 1                          AGERBRINK
 2    broken the contract.
 3         Q.    Turn over to the next page, the
 4    fourth page, the one with the time stamp of
 5    12/3/2013.
 6         A.    Yes.
 7         Q.    You were chatting with Athena at
 8    this point; is that right?
 9         A.    Yes, yes, but this is not me
10    writing.  This is -- this is Athena writing to
11    me, yes.  Yes.
12              So Alice is a technical designer.
13    It is written from Athena and Lucia is Athena's
14    boss.  So Lucia --
15         Q.    Who is it in the last two lines of
16    that communication who's saying, "I called them
17    back at 12 minutes later where I was told you
18    guys did not want to have anything to do with
19    me.  I am resigning from them tomorrow"?
20         A.    Yes, sir, I wrote that.
21         Q.    And who were you resigning from?
22         A.    Well, I was very, very angry, and I
23    guess I thought I could resign.
24         Q.    From who?
25         A.    From MSA, but I couldn't quit.
```

1                        AGERBRINK

2   I came into the office and I sat down, and she

3   looked out the window, as usual, and I sat

4   down, and she was distraught, and I said to

5   her, you guys really fucked up, is what I used

6   those words.

7             But that was my meeting because

8   Susan asked me to come in, and then she was

9   arguing with Liz and Liz was arguing with her,

10  and I sat there and I listened to them.  And I

11  said to them, you know, I didn't come in here

12  to argue.  It would be great if we can find a

13  solution to this.

14       Q.    Do you know who got fit modeling

15  assignments at QVC after that?

16             MR. DUGGER:  Objection, vague.

17       A.    Liz and I together -- well, she

18  wrote the letter.  She wrote the e-mail

19  explaining to QVC that it was a

20  miscommunication, and Liz got me the job back

21  with QVC.

22       Q.    Did there come a time where you did

23  break the contract with MSA?

24             MR. DUGGER:  Objection, calls for a

25       legal conclusion.

```
 1                     AGERBRINK

 2       A.     I felt that MSA had broken the

 3   contract way before that.  I know there is

 4   no -- there is nowhere in the contract where it

 5   says that they have to pay you on time, but

 6   after lying to me numerous times about not

 7   being paid by QVC, and I was desperate to get

 8   paid, and I asked if I could see if Model

 9   Services had been paid or not.

10            I never talked about my rate or my

11   pay.  I just wanted to see if -- and actually

12   it was on -- I think it was Liz who suggested,

13   ask them if you can -- you know, if they can

14   pay you.

15            So I said can you please pay -- you

16   know, can you please pay your client, MSA,

17   because I have to get paid.  And so they took

18   me into the room where the girl is that writes

19   all the checks, and I saw it on the computer

20   screen.  She showed me, here is invoice.  It

21   was invoiced to Model Services, and we have

22   paid you.

23            So I knew then and there that they

24   were lying, and I didn't know what timing, but

25   after three months, I felt they had already
```

```
1                        AGERBRINK
2        Q.    Turn over to the next page with the
3   time stamp of 12/1/2013, and you're having a
4   chat there with Thierry Murray and with you,
5   Eva Agerbrink, correct?
6        A.    Yes.   Terri Murray was very upset
7   about what was happening with me, and she
8   wanted to start her own agency.   So that's kind
9   of a cute little message.
10       Q.    So you discussed --
11       A.    No, she didn't start a modeling
12  agency.   She always wanted to.
13       Q.    What's this two-year contract with
14  QVC that's referenced there?
15       A.    That is -- we are kind of joking
16  around.   She is saying because she got her job
17  with QVC on her own, so she was an independent
18  contractor for them.   They paid her directly,
19  and she basically managed her own schedule.
20  She took vacation whenever she wanted to.   She
21  had a contract with them.
22             So since she got that job on her
23  own, it would have been great.   We said that I
24  could work for her and not for Model Services
25  because Model Services had just acted so
```

```
 1                      AGERBRINK
 2   came to Washington, DC, I had a model seminar
 3   that I would do.  I had worked for a woman
 4   where I would go out to the schools and talk to
 5   young students about modeling.
 6        Q.    Did you or did you not have a model
 7   agency of your own?
 8        A.    Yes.
 9        Q.    And did you have --
10        A.    But it wasn't called modeling
11   agency.
12        Q.    It was called what?
13        A.    It was called the Elan -- you can
14   call it an agency if you want.
15        Q.    What do you call it?
16        A.    It was a -- what did you call it
17   then?  It was a preparation -- preparation --
18   it's 30 years ago.  It was called the Elan
19   Agency, E-L-A-N.
20        Q.    You say in this text that you had
21   your own store.
22        A.    Yes, sir.
23        Q.    What was that store?
24        A.    I purchased a children's clothing
25   store, and I ran it for a year.
```

```
1                        AGERBRINK

2       Q.    Was that also 20 or 30 years ago?

3       A.    No, sir, that was --

4       Q.    When was that?

5       A.    After I left -- after my job with

6  New York & Company was terminated, after -- I

7  bought the store back in 2011.

8       Q.    Did you have income from that store?

9       A.    Yes, I bought the store -- I bought

10 the lease, and I bought the inventory in the

11 store, and I sold the inventory that I had

12 bought.

13      Q.    Did you have a monthly income?

14      A.    No, I did not have a monthly income.

15      Q.    Was that between the time -- the two

16 times you worked for MSA?

17      A.    Yes, sir.

18      Q.    Have you done any work as an actress

19 since you began working for MSA the second

20 time?

21      A.    I've done acting work in the past

22 three months.

23      Q.    What were the circumstances of your

24 leaving New York & Company?

25      A.    New York & Company had a change of
```

```
1                        AGERBRINK
2    direction.  Instead of having me as an
3    employee, they wanted to fit on more than one
4    body.  So instead of having me as an employee,
5    and I guess they were saving money as well,
6    they would start hiring models from Model
7    Services.
8            So they went from having an employee
9    to hiring -- Model Services was their client,
10   and so we would only see models from -- coming
11   from Model Services.
12       Q.   You say Model Services was their
13   client?
14       A.   New York -- yeah, New York & Company
15   is a client of Model Services.  So all the
16   models that we would have over at New York &
17   Company came from Model Services that came over
18   to do Go-Sees.
19           And then later on, they hired the
20   models from Model Services and eliminated my
21   position.
22       Q.   Did you discuss with anyone from New
23   York & Company at that time the possibility
24   that you might file a lawsuit against them?
25       A.   Yes, I did, but not because of
```

1                        AGERBRINK

2        prior testimony.

3        A.    If I need to take vacation, I need

4    to let my agency know first because they're the

5    ones -- they're the ones in charge of my

6    schedule.

7        Q.    The client has given the agency days

8    and hours they want a model there?

9               MR. DUGGER:  Objection, misstates

10       prior testimony.

11       Q.    Isn't that right?

12       A.    Right, but that's not always so

13   because with their client, Carole Hochman, I

14   didn't have a set schedule.  Sometimes I was

15   asked to come for an hour and a half.  The next

16   week, Liz would inform me you have no work this

17   week.

18       Q.    Because Carole Hochman didn't have

19   any work?

20       A.    Because they didn't have any

21   fittings, exactly.

22       Q.    The client determines when it wants

23   to have a model there in terms of the day and

24   the hours; is that right?

25               MR. DUGGER:  Objection, misstates

```
1                        AGERBRINK
2        prior testimony.
3               MR. SPELFOGEL:  I'm not asking
4        anything about prior testimony.  I didn't
5        characterize prior testimony.  I'm asking
6        a simple question.
7        Q.     Isn't it true that the client
8    determines the day and the time it wants to
9    have a model there?
10       A.     No, sir.  The client has specific
11   fittings and they have a Go-See.  They call up
12   the modeling agency --
13       Q.     We are all passed that.  We are
14   passed that.
15              So you have been selected,
16   designated as somebody that the client wishes
17   to have a fit model?
18       A.     They will call up the agency to ask
19   if the model is available on such and such
20   time.  There are times when I am already
21   working with a client.
22       Q.     With a different client?
23       A.     So Liz Pinto will say no, she can't
24   come on that day, but she can come on this day.
25       Q.     On another day that's suitable for
```

```
 1                        AGERBRINK

 2    your schedule; is that right?

 3         A.    Well, that's suitable for their

 4    clients because she doesn't want me to not go

 5    work for one of their clients and send me to

 6    their client.  So her job is to make sure that

 7    I'm sent and I do as much work as I possibly

 8    can.  We are all workhorses.

 9         Q.    Would you say then that one of the

10    parts of Liz Pinto's job is to take from the

11    client the days and the hours they need a fit

12    model and then offer those hours and days to

13    you as a fit model?

14              MR. DUGGER:  Objection, vague.

15         A.    No, Ms. Pinto's job is much bigger

16    than that.

17         Q.    Is that part of it?

18         A.    You're putting her down because she

19    really is the key coordinator here.  The client

20    will come to Liz, and they will say we need a

21    model, and then Liz will manage -- she will

22    look at my schedule, and she will say, okay,

23    she can do this, she can do this, she can do

24    this.

25              Then she will communicate.  They
```

```
 1                      AGERBRINK
 2    will negotiate a time that is best for them
 3    because she has my schedule in front of me.
 4    That's her job.  She manages my schedule.  She
 5    manages Monday through Friday.
 6              And once she sees that this is a
 7    good opening, then she will call me and she
 8    will say I'm going to send you there on that
 9    day, and I said great.  You never turn down a
10    booking.  You never turn down a Go-See.  It's
11    crazy to do.  And you go there.
12              So it's really the client gives her
13    a window, a window of when he or she wants to
14    she their models, but she's the one who
15    coordinates everything.  She coordinates my
16    schedule.  She makes sure that it's all fitted
17    in.
18              There were a time when -- when
19    Carole Hochman needed me on a day that I was
20    working in Pennsylvania.  So Liz said how can
21    we do this, and she said you're going to have
22    to come up to New York after you're finished
23    work.  I'm going to cut your hours short with
24    QVC.
25              And so she cut them shorter that
```

```
 1                          AGERBRINK
 2    way, so that I could finish earlier, so I can
 3    go up and work for Carole Hochman and then come
 4    back down.
 5              So it's really Liz that's the key
 6    component here.
 7         Q.    Now, when you worked for MSA, did
 8    you discuss with Liz Pinto or anybody else from
 9    MSA the number of hours a week you wanted to
10    work?
11         A.    Yes.  Yes, sir.
12         Q.    Did you discuss the number of days a
13    week you wanted to work?
14         A.    I asked, please give me as much work
15    as, you know -- I want to work as much as I
16    can.  I want to work a lot of money -- I would
17    like to make some money.
18              I discussed it with Susan, too, and
19    she said to me, well, you know, business is
20    tough, business is hard, business is tough.
21    They want -- you know, they want newer models.
22    They want, you know, fresh models.  They want
23    younger models.  They want smaller sizes.  She
24    kept telling me business is tough, but I kept
25    asking them to give me --
```

```
 1                       AGERBRINK

 2        Q.    As much business as possible?

 3        A.    Yeah, because that was what I agreed

 4  with Liz.  I said, Liz, the expenses of going

 5  down to Pennsylvania and having the little room

 6  that I had down there with some weeks you're

 7  only working 16 hours and you pay taxes on top

 8  of that.  There wasn't much left over, but I

 9  kept telling her that I will keep doing this

10  because I took -- I accepted their client, QVC,

11  I accepted the job, although I misunderstood

12  it, but I did accept it.  I never give up.  I'm

13  a hard worker.  I would never give up.

14             I always believed that the agency

15  was doing the right thing.  I always believed

16  that they really, truly were trying to find me

17  more work.  And I said I keep working here -- I

18  will keep working here, you know, just promise

19  me that you keep looking for clients up in New

20  York, so that I can -- so that I can justify

21  the little money I'm making here.

22             If you can get me a few more, you

23  know, jobs up in New York, then you know -- and

24  I really, truly believed up until the very,

25  very end that they were doing all they could.
```