EPSTEIN BECKER & GREEN, P.C.
250 PARK AVENUE
NEW YORK, NEW YORK 10177
(212) 351-4500
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EVA AGERBRINK, individually                                 :
and on behalf of all others similarly situated,             :
                                                            :          **ECF Case**
                              Plaintiff,                     :
                                                            :          14 CV 7841 (JPO) (JCF)
              vs.                                            :
                                                            :
MODEL SERVICE LLC d/b/a MSA MODELS, et al.                  :
                                                            :
                                                            :
                              Defendants.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

I     STATEMENT OF FACTS ................................................................................ 1

II    PRELIMINARY LEGAL STATEMENT ...................................................... 5

III   ARGUMENT: PLAINTIFF WAS NOT DEFENDANTS'
EMPLOYEE AS A MATTER OF LAW ...................................................... 7

    A.  STANDARD ............................................................................................. 7

    B.  PLAINTIFF IS A SELF-EMPLOYED FIT MODEL ................................... 8

    C.  PLAINTIFF WAS PAID BY APPAREL COMPANIES
AS AN INDEPENDENT CONTRACTOR ................................................ 22

    D.  PLAINTIFF CLASSIFIED HERSELF AS AN INDEPENDENT CONTRACTOR .. 23

    E.  PLAINTIFF WORKED WITH MSA FOR ONLY 15 MONTHS .............................. 24

    F.  AGERBRINK'S FIT MODELING CAREER WAS
NOT INTEGRAL TO MSA'S BUSINESS ................................................. 24

    G.  UNDER THE TOTALITY OF THE CIRCUMSTANCES PLAINTIFF WAS
PROPERLY CLASSIFIED AS AN INDEPENDENT CONTRACTOR ................... 25

    H.  MSA IS NOT PLAINTIFF'S EMPLOYER UNDER THE FLSA AND NYLL ......... 25

IV   MSA'S COUNTERCLAIMS AND PLAINTIFF'S AFFIRMATIVE DEFENSES ........ 26

    A.  AGERBRINK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE UNJUST ENRICHMENT CLAIM IS PREMATURE ................................ 26

    B.  DEFENDANT'S COUNTERCLAIM FOR
TORTIOUS INTERFERENCE SHOULD PROCEED ............................... 27

    C.  AGERBRINK'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON HER SETOFF AND/OR RECOUPMENT
AFFIRMATIVE DEFENSE IS PREMATURE ........................................... 28

    D.  AGERBRINK'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON HER UNCONSCIONABILITY DEFENSE
IS LEGALLY AND FACTUALLY INCORRECT ..................................... 28

    E.  AGERBRINK'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON HER AFFIRMATIVE DEFENSE OR
REPUDIATION IS LEGALLY AND FACTUALLY INCORRECT ......................... 31

F.  AGERBRINK'S CLAIM FOR PARTIAL SUMMARY
    JUDGMENT ON HER PRIOR MATERIAL BREACH
    DEFENSE IS LEGALLY AND FACTUALLY INCORRECT.................................. 31

G.  AGERBRINK'S CLAIM FOR PARTIAL SUMMARY JUDGMENT ON HER
    BREACH IS WITHOUT SUPPORT IN THE RECORD OR UNDER LAW............. 32

H.  AGERBRINK'S CLAIM FOR PARTIAL SUMMARY
    JUDGMENT ON HER UNLICENSED EMPLOYMENT
    AGENCY DEFENSE IS LEGALLY AND FACTUALLY INCORRECT................. 33

CONCLUSION.................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agerbrink v. Model Serv. LLC*,
   No. 1:14-cv-07841, 2015 U.S. Dist. LEXIS 77821 (S.D.N.Y. June 16, 2015) ......................33

*Am. List Corp. v. U.S. News & World Report, Inc.*,
   75 N.Y.2d 38 (N.Y. 1989) .....................................................................................................31

*Anyan v. N.Y. Life Ins. Co.*,
   192 F. Supp. 2d 228 (S.D.N.Y. 2002), *aff'd*, 68 F. App'x 260 (2d Cir. 2003).......................12

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008).................................................................................................8, 25

*Brock v. Superior Care, Inc.*,
   840 F.2d 1054 (2d Cir. 1988)..........................................................................................6, 8, 11

*Browning v. CEVA Freight, LLC*,
   885 F. Supp. 2d 590 (E.D.N.Y. 2012) ........................................................................... *passim*

*Bynog v. Cipriani Grp. Inc.*,
   1 N.Y.3d 193 (N.Y. 2003) ........................................................................................................6

*Cano v. DPNY, Inc.*,
   287 F.R.D. 251 (S.D.N.Y. 2013) ..............................................................................................6

*Carter v. Dutchess Cmty. Coll.*,
   735 F.2d 8 (2d Cir. 1984).........................................................................................................25

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (N.Y. 2004) .......................................................................................................28

*Chebotnikov v. LimoLink, Inc.*,
   No. 14-13475, 2017 US Dist. Lexis 104577 (D. Mass. July 6, 2017) ...............................19, 24

*Claim of Pavan*,
   173 A.D. 1036 (3d Dep't 1991) ...............................................................................................14

*Danneskjold v. Hausrath*,
   82 F.3d 37 (2d Cir. 1996)...........................................................................................................8

*Deboissiere v. Am. Modification Agency*,
   No. 09 Civ 2316, 2010 U.S. Dist. LEXIS 113776 (E.D.N.Y. Oct. 22, 2010) ................. 23-24

*Dole v. Amerilink Corp.*,
    729 F. Supp. 73 (E.D. Mo. 1990).....................................................................................18

*Donovan v. Brandel*,
    736 F.2d 1114 (6th Cir. 1984) ..................................................................................8, 11

*Doyle v. City of New York*,
    91 F. Supp. 3d 480 (S.D.N.Y 2015).........................................................................8, 11

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
    865 F.2d 513 (2d Cir. 1989).........................................................................................2

*Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*,
    494 F. App'x 940 (11th Cir. 2012) ...............................................................................8

*Freund v. Hi-Tech Satellite, Inc.*,
    185 F. App'x 782 (11th Cir. 2006) ..............................................................................18

*Gate Guard Servs., LP v. Solis*,
    No. V-10-91, 2013 U.S. Dist. LEXIS 20156 (S.D. Tex. Feb. 13, 2013) .................................12

*Glatt v. Fox Searchlight Pictures Inc.*,
    293 F.R.D. 516 (S.D.N.Y. 2013) ...............................................................................26

*Herman v. Express Sixty-Minutes Delivery Serv.*,
    161 F.3d 299 (5th Cir. 1998) ......................................................................................14

*Herman v. Mid-Atl. Installation Servs.*,
    164 F. Supp. 2d 667 (D. Md. 2000), *aff'd*, 16 F. App'x 104 (4th Cir. 2001) ................... 18-19

*Matter of Hertz Corp.v. Comm'r of Labor*,
    2 N.Y.3d 733 (N.Y. 2004) .........................................................................................17

*Indergit v. Rite Aid Corp.*,
    293 F.R.D. 632 (S.D.N.Y. 2013) .................................................................................6

*Intchev v. AAA Cab Serv.*,
    685 F. App'x 548 (9th Cir. 2017) ...........................................................................10, 19

*Jianjun Chen v. 2425 Broadway Chao Rest., LLC*,
    No. 1:16-cv-5735, 2017 U.S. Dist. LEXIS 92149 (S.D.N.Y. June 15, 2017) ........................26

*Jones v. Star Credit Corp.*,
    59 Misc. 2d 189 (Sup. Ct. Nassau Cty. 1969)...................................................................29

*Kaplan v. Madison Park Grp. Owners, LLC*,
    94 A.D.3d 616 (1st Dep't 2012) .................................................................................31

*Karabu v. Pension Benefit Guar. Corp.*,
  No. 96 Civ. 4960, 1997 U.S. Dist. LEXIS 19582 (S.D.N.Y. Dec. 10, 1997)........................32

*Kirsch v. Fleet St., Ltd.*,
  148 F.3d 149 (2d Cir. 1998)........................................................................................10

*Lawrence v Miller*,
  11 N.Y.3d 588 (N.Y. 2008) .......................................................................................29

*Ling Nan Zheng v. Liberty Apparel Co.*,
  355 F.3d 61 (2d Cir. 2003).....................................................................................25-26

*Meyer v. United States Tennis Ass'n*,
  607 F. App'x 121 (2d Cir. 2015) .......................................................................14, 20, 24

*Meyer v. United States Tennis Ass'n*, No. 1:11-cv-06268,
  2014 U.S. Dist. LEXIS 128209 (S.D.N.Y. Sept. 11, 2014),
    *aff'd*, 607 F. App'x 121 (2d Cir. 2015) ................................................................15

*Model Serv., LLC v. MC2 Models Mgmt., LLC*,
  No. 160519/13, 2015 Misc. LEXIS 4766 (N.Y. Sup. Ct. N.Y. Cty. Sept. 18, 2015) .............30

*Morgenweck v. Vision Capital Advisors, LLC*, No. 08-2969,
  2010 U.S. Dist. LEXIS 141637 (S.D.N.Y. June 3, 2010),
  *aff'd*, 410 F. App'x 400 (2d Cir. 2011)...................................................................23

*Perez v. Off Duty Police Serv., Inc.*,
  No. 3:13-cv-00935, 2015 U.S. Dist. LEXIS 86377 (W.D. Ky. July 2, 2015) .............14, 19, 22

*Plainview S. & S. Concrete Co. v. NVNG Dev. Corp.*,
  151 A.D.2d 654 (2d Dep't 1989) .............................................................................33

*Preacely v. AAA Typing & Resume Inc.*, No. 12 Civ. 1361,
  2014 U.S. Dist. Lexis 182946 (S.D.N.Y. Apr. 28, 2014) .............................................. *passim*

*Rowe v Great Atl. & Pacific Tea Co.*,
  46 N.Y.2d 62 (N.Y. 1978) .......................................................................................29

*Rutherford Food Corp. v McComb*,
  331 U.S. 722 (1947)................................................................................................16

*Saleem v. Corp. Trans. Grp.*,
  854 F.3d 131 (2d Cir. 2017)................................................................................ *passim*

*Saleem v. Corp. Transp. Grp., Ltd.*,
  52 F. Supp. 3d 526 (S.D.N.Y. 2014), *aff'd*, 854 F.3d 131 (2d Cir. 2017) ...................... *passim*

*Scantland v. Jeffry Knight, Inc.*,
  721 F.3d 1308 (11th Cir. 2013) ...................................................16

*Sethi v. Narod*,
  974 F. Supp. 2d 162 (E.D.N.Y. 2013) ........................................26

*Sinco, Inc. v. Metro-North Commuter R.R.*,
  133 F. Supp. 2d 308 (S.D.N.Y. 2001) .........................................32

*State v. Wolowitz*,
  96 A.D.2d 47 (2d Dep't 1983) .....................................................29

*U.S. v. Silk*,
  331 U.S. 704 (1947) .....................................................................18

*Usery v. Pilgrim Equip. Co.*,
  527 F.2d 1308 (5th Cir. 1976) ....................................................16

*Velu v. Velolcity Express, Inc.*,
  666 F. Supp. 2d 300 (E.D.N.Y. 2009) ...................................12, 24

*Wang v. Hearst Corp.*,
  293 F.R.D. 489 (S.D.N.Y. 2013) ...................................................6

*Werner v. Bell Family Med. Ctr., Inc.*,
  529 F. App'x 541 (6th Cir. 2013) ................................................16

*WPA/Partners LLC v. Port Imperial Ferry Corp.*,
  307 A.D.2d 234 (1st Dep't 2003) .................................................33

*Matter of Yoga Vida NYC, Inc.*,
  28 N.Y.3d 1013 (N.Y. 2016) ........................................................13

**RULES**

Fed R. Civ. P. 56.................................................................................7

# I        STATEMENT OF FACTS

Plaintiff Eva Agerbrink was a professional fit model who hired MSA at several different parts of her career to help manage and promote her to designers and apparel manufacturers (collectively "Apparel Companies"). 56.1 ¶ 371. MSA did not employ Agerbrink; rather she hired MSA. 56.1 ¶ 341, 371.  She first hired MSA in 2003 and worked with MSA until 2005. 56.1 ¶ 372.  In 2005, MSA helped Agerbrink obtain an in-house fit modeling job with New York & Co. 56.1 ¶ 373.  Agerbrink was terminated by New York & Co. in 2011. 56.1 ¶ 375.  146:7. Thereafter, she engaged in several other professional endeavors. *Id.*  In 2013, Agerbrink re-hired MSA to help her re-establish her career as a fit model. 56.1 ¶ 371.  At that time, MSA counseled her that she might have difficulty finding fit modeling work in the then current market on account of Apparel Company preferences including her size and her age. 56.1 ¶ 391.

A "fit model" models clothing for designers during the apparel production process. 56.1 ¶ 310. As part of this process, Apparel Companies hire fit models to assist them with perfecting sample garments before those garments are mass produced. 56.1 ¶ 311.  Apparel Companies select fit models based on their respective style and experience as well as their fit for a particular line of apparel. 56.1 ¶ 316. Apparel Companies hire fit models based on the Apparel Companies' subjective assessment of how well the fit model represents the Apparel Companies' target customers. 56.1 ¶ 318.  By observing the clothing on a fit model and getting that fit model's feedback about the fit and movement of the clothing, the Apparel Companies can assess changes needed to the clothing based on, among other things, look, comfort, ease of movement, and adherence to the Apparel Companies' brand standards. 56.1 ¶ 319.  Based on the fit model's modeling and feedback, the Apparel Companies then modify the garments accordingly and finalize the sample garments for mass production (sometimes after more consultations with the fit model). 56.1 ¶ 320.  Fit modeling requires specialized skills because of, among other things,

the need for the model effectively to communicate technical aspects of fit and drape to the Apparel Companies. 56.1 ¶ 321.

The fit model's business managers, such as MSA, play no role in the relationship between fit models and Apparel Companies at the modeling appointments or fittings. 56.1 ¶ 544. No MSA employee ever attends a fit model's appointments, either a fitting or a go-see at an Apparel Company. *Id.*  MSA's relationship with Agerbrink consists largely of providing administrative assistance such as facilitating fit models' appointments with Apparel Companies and the invoicing to and processing payments from the Apparel Companies for the fit models. 56.1 ¶ 341-342, 440. MSA does not employ any fit models. 56.1 ¶ 231.  Fit models hire MSA. 56.1 ¶ 232.

Founded in 1947, MSA is a long standing and experienced model management company that has worked for hundreds of fit models since its inception. 56.1 ¶ 38.  MSA does not hire fit models; the fit models hire MSA. 56.1 ¶ 343, 538542-543.   In addition to facilitating the fit models' appointment and payments,  MSA provides career advice to fit models; helps fit models build their image and specification portfolios; offers nutrition and exercise consulting; offers hygiene and physical appearance consultations; helps models market themselves; helps nurture professional relationships between models, photographers, and Apparel Companies; creates and executes marketing campaigns for fit models; promotes models via media outlets; secures agent representation for models in markets across the globe and works with models' agents within and outside of New York City; assists models with international travel and lodging; negotiates discounts for fit models from photographers, stylists, and gyms that models may take advantage of if they so choose; and maintains a web presence on behalf of models so that they can promote

their careers through a fashion-industry-focused website that is professionally designed and managed. MSA. 56.1 ¶ 344.

An essential part of MSA's role is to serve the fit model in facilitating her relationships with Apparel Companies by facilitating scheduling and bookings, handling record keeping and offering billing and payment processing for the services Agerbrink and other models provided to the Apparel Companies. 56.1 ¶ 341, 344, 346.  Models, including Agerbrink, who wished to use MSA's services either entered into a management agreement with MSA, or used MSA's services ad-hoc. 56.1 ¶ 392-94.

Upon rehiring MSA as her manager in the Spring of 2013, Agerbrink had limited success in finding fit modeling work with Apparel Companies. 56.1 ¶417.  MSA helped her attract the interest of Apparel Companies and schedule go-sees, which are job interviews with Apparel Companies. 56.1 ¶ 358.  However, with the exception of a single "standing booking" once a week for an hour with Carol Hochman, a fashion company, Agerbrink was not able to obtain steady fit modeling work with any Apparel  Company until the Fall of 2013. 56.1 ¶ 417. Then, after a go-see, she obtained a standing booking with QVC, an Apparel Company located in Westchester Pennsylvania. 56.1 ¶ 399, 463.  Under the arrangement, QVC booked Agerbrink to work as a fit model Wednesdays, Thursdays and Fridays for an "inclusive," hourly rate of $105.[1] 56.1 ¶ 159,173.

Through her own business efforts and MSA's support, she was free to engage in various relationships with Apparel Companies. 56.1 ¶ 472. Typically, fit models work with multiple Apparel Companies during any given week. 56.1 ¶ 354.  In fact, Agerbrink instructed MSA to

---

[1] An inclusive rate means that the management commission as well as a service fee are included in the quoted hourly rate. 56.1 ¶ 466, 470.  Ordinarily, the service fee is charged to the Apparel Company directly in addition to the quoted hourly rate. *Id*.  The commission or management fee is the agreed upon percentage MSA charges a fit model for its services pursuant to the management agreement. 56.1 ¶ 471.

help her find as much work with Apparel Companies as possible. 56.1 ¶ 418. She was not, however, able to secure any other jobs. 56.1 ¶ 417.

Agerbrink's arrangement with QVC lasted approximately eight months. 56.1 ¶ 463, 480. During that time, Agerbrink invested significant time, money and efforts towards her work with QVC, including renting hotel rooms and subletting a room in a local apartment to be closer to QVC; and leasing a second car so that she could drive through inclement weather to her appointments/bookings. 56.1 ¶559-561.  During her relationship with QVC, Agerbrink regularly communicated directly with QVC personnel. 56.1 ¶474-476.  She also attempted to renegotiate her rate directly with QVC. 56.1 ¶476.  She also emailed her record of hours worked, in the form of vouchers, to MSA for payment processing and requested that MSA mail her disbursement checks directly to her. 56.1 ¶513-514.

The vouchers that Agerbrink and MSA used at the time were triplicate forms on which Agerbrink entered and tracked the amount of time she worked at various Apparel Companies. 56.1 ¶365-366.  Agerbrink brought these forms with her to Apparel Companies, she filled out the vouchers to reflect her services to the Apparel Company and then both she and the Apparel Company signed in acknowledgment of their contents. 56.1 ¶365-366, 436.  Agerbrink kept a copy of the signed form for her records and gave copies to the Apparel Company and to MSA. 56.1 ¶429.

Once Agerbrink and an Apparel Company had filled out and signed a voucher, MSA did not change the information on the voucher. 56.1 ¶ 435, 437, 439, 442. The vouchers are an industry standard instrument through which business records are created for the convenience of the fit model and the Apparel Company. 56.1 ¶ 427.  Apparel Companies will generally not pay an invoice without a corresponding voucher reflecting the work performed. 56.1 ¶ 425.

MSA input the information from the voucher into its computer system, whereby an invoice was created which MSA sent to the Apparel Company. 56.1 ¶442-444.   Once the Apparel Company transmitted payment of the voucher to MSA, MSA disbursed payment to Agerbrink, less the management fee Agerbrink had agreed to pay MSA for its services. 56.1 ¶440.

Agerbrink ultimately decided to sever her relationship with QVC because it was not profitable enough as her expenses were too high, e.g. her two cars, room rentals vis-a-vis her earnings from QVC. 56.1 ¶495, 560-61.   When Agerbrink stopped working with QVC, MSA did as well, because it represented no other fit models working for QVC at the time. 56.1 ¶499.

In May 2014, while she was still working for QVC, Agerbrink authorized MSA to submit her specifications for consideration by another Apparel Company, Caché. Defendants' Response to 56.1 ¶232.   Separately, she applied for and accepted an offer to work as an in-house fit model and full time employee for Caché. *Id.*   When Agerbrink received the job offer from Caché, she did not inform MSA. 56.1 ¶503.   By failing to inform MSA and subsequently refusing to pay over to MSA at least a portion of the management fee MSA would have earned for helping her to obtain the job at Caché, Agerbrink breached her management agreement (the "Agreement") with MSA. 56.1 ¶509.

## II   PRELIMINARY LEGAL STATEMENT

Plaintiff was not an "employee" of MSA and was properly classified as an independent contractor in accord with the accepted economic reality analysis applicable to claims brought pursuant to the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").   *See, e.g., Saleem v. Corp. Trans. Grp.,* 854 F.3d 131 (2d Cir. 2017); *Browning v. CEVA Freight, LLC,* 885 F. Supp. 2d 590, 598-599 (E.D.N.Y. 2012).   At all times during the relevant period,

Agerbrink held herself out to be an independent professional and reaped significant benefits as a result. 56.1 ¶ 322.

In determining whether a worker is in business for herself and is properly classified as an independent contractor under the FLSA, the courts look to the following main, but not exclusive, factors: "(1) the degree of control exercised by the [putative employer]; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship;" and (5) whether the work is integral to the employer's business. *Saleem,* 854 F.3d 131 (citations omitted).  No one factor is dispositive; rather the courts look to the totality of the circumstances. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988).

The economic reality analysis under the NYLL is very similar to that of the FLSA, focusing primarily on the degree of control exercised by the putative employer. *Wang v. Hearst Corp.*, 293 F.R.D. 489, 493 n.3 (S.D.N.Y. 2013) (J. Baer) ("The courts in this circuit have held that the NYLL 'embodies the same standard for employment as the FLSA.") (quoting *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012)); *see also Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 637 n.3 (S.D.N.Y. 2013) (J. Oetken) (applying same rule to the exemptions under both statutes).  The NYLL economic reality analysis also includes the following: (6) whether the worker worked at her convenience; (7) whether the worker was free to engage in work for third-parties; (8) whether the worker received fringe benefits; (9) whether the worker was on the putative employer's payroll; and (10) whether the worker was on a fixed schedule. *See Bynog v. Cipriani Grp. Inc.*, 1 N.Y.3d 193,199 (N.Y. 2003).

Plaintiff is an independent professional fit model who enjoyed full independence and operated free of any control by MSA. 56.1 ¶ 510-48. She worked at her own convenience when,

where and for whom she wished, and at rates she established and negotiated. 56.1 ¶ 534. She worked with Apparel Companies of her own choosing. 56.1 ¶ 405, 532.

Agerbrink retained MSA to be her business manager so that MSA could assist her with scheduling, communicate with Apparel Companies on her behalf and process her payments from them. 56.1 ¶ 346, 364, 406.  MSA provided important administrative services to Agerbrink by facilitating her appointments and helping promote her career. 56.1 ¶ 342, 344.  Agerbrink did not provide any services to MSA, nor did MSA have any control over Agerbrink's working relationships with Apparel Companies. 56.1 ¶ 314, 343, 409, 422, 541-44.

Similar to the administrative support services provided for in *Saleem*, here, MSA provided model management and support services to Agerbrink.  Agerbrink (and other fit models): (1) provided services directly to third parties (the Apparel Companies); and MSA was not on-site supervising or even observing that work; and (2) Agerbrink (and other fit models) had absolute discretion over which jobs to take, for which Apparel Companies and at what rates and which hours to work, if any; (3) MSA merely provided administrative support in the form of payment processing and scheduling assistance. 56.1 ¶ 341-347, 364, 406.

### III     ARGUMENT: PLAINTIFF WAS NOT DEFENDANTS' EMPLOYEE AS A MATTER OF LAW

#### A.     STANDARD

Summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Browning*, 885 F. Supp. 2d at 596 (quoting Fed. R. Civ. P. 56(c)).  In analyzing whether a worker is an employee or an independent contractor, the Second Circuit employs the "economic realities" test, which is analyzed under a totality of the circumstances. *Saleem*, 854 F.3d at 139-

140.   The Second Circuit in *Saleem* noted that the correct legal test is the economic realities "actual exercise of control" as opposed to the joint employer test of "power to control" articulated in *Barfield*. 854 F.3d at 149 n.37 (citing *Barfield v. N.Y.C. Health & Hosps. Corp.,* 537 F.3d 132, 144 (2d Cir. 2008)).

"The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Superior Care, Inc.*, 840 F.2d at 1059; *see also Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) ("Employees are those who as a matter of economic reality are dependent upon the business to which they render service."). "The touchstone of the economic reality test is the alleged employee's economic dependence on the employer." *Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*, 494 F. App'x 940, 942 (11th Cir. 2012) (citations omitted).

"[T]he Second Circuit has found that, in certain contexts, application of a multi-factor test can cause a court to miss the forest for the trees and that, in those cases, the economic reality test must be applied at 'a higher level of generality,' with attention to whether the case involves the kind of employment relationship Congress had in mind when it enacted the FLSA." *Doyle v. City of New York*, 91 F. Supp. 3d 480, 486 (S.D.N.Y 2015) (quoting *Danneskjold v. Hausrath*, 82 F.3d 37, 42-43 (2d Cir. 1996)).

Agerbrink hired MSA to provide administrative services and help support her career. 56.1 ¶ 371. That takes this case out of the type of "employment relationship Congress had in mind when it enacted the FLSA." *Doyle*, 91 F. Supp. 3d at 486. In this case, the facts are not in dispute; the characterization of those facts is.

## B.    PLAINTIFF IS A SELF-EMPLOYED FIT MODEL

### 1.    Plaintiff Was Not Subject To Defendants' Control

Agerbrink was not subject to MSA's control because Agerbrink hired MSA. 56.1 ¶ 371, 389, 392, 543.  In fact, Agerbrink did not provide services to MSA. 56.1 ¶ 343. Agerbrink provided services to the Apparel Companies. 56.1 ¶ 346.  The undisputed evidence clearly establishes that Agerbrink hired MSA and that she, not MSA controlled her relationship with MSA and with the Apparel Companies for which she performed services. 56.1 ¶ 371, 389. Agerbrink worked at her own convenience and with a frequency of her sole choosing; she accepted and rejected fit modeling offers from Apparel Companies without MSA's input, much less penalty; she did not have to follow rules established by Defendants and she  chose how, when, where, for whom and at what rate to perform work. *See*, *e.g.*, *Saleem*, 854 F.3d at 149; 56.1 ¶ 396, 405-407, 418-419, 510-548.  Additionally, Plaintiff invested substantially in her own businesses, profited from and suffered losses (including almost filing for bankruptcy) as a direct result of her own business decisions and guided by her own attorneys and accountants, was paid by the Apparel Companies per appointment, negotiated her own rates and model management fees, and enjoyed tax benefits by filing returns as a self-employed independent contractor. *See*, *e.g.*, *Saleem*, 854 F.3d at 141, n.22; *Browning*, 885 F. Supp. 2d at 599-607; 56.1 ¶ 549-563, 565-567, 572-582.

In addition, Plaintiff did not use MSA exclusively, but rather contracted with various Apparel Companies and model management companies to represent her at various times in her career. 56.1 ¶ 531-532, 539, 546. At all times, Plaintiff was free to engage with whichever Apparel Company she chose in her sole discretion or none at all. 56.1 ¶ 539-540.

### a.    Plaintiff Worked At Her Own Convenience

Strong indicium of independent contractor status is the fact that a worker may set her own schedule with her desired frequency and at her own convenience. *Saleem,* 854 F.3d at 146 (plaintiffs set their own schedules, and defendants "provided no incentive structure for Plaintiffs

to drive at certain times, on particular days, or in specific locations"); *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998) (driver properly classified as independent contractor, in part, because he was "free to set his own schedule and take vacations when he wished"); *Intchev v. AAA Cab Serv.*, 685 F. App'x 548, 550 (9th Cir. 2017) (no mandate on a minimum number of work hours).   Here, the evidence indisputably shows that Plaintiff set her own schedule and worked different weeks, days and hours for a variety of reasons. 56.1 ¶ 396, 405, 407, 418-419, 493, 540. In some instances, Plaintiff chose to schedule recurring, standing appointments with Apparel Companies because of the consistency and reliability of the work. 56.1 ¶ 477-479. For example, Plaintiff decided on her own that she wanted to work for QVC on a recurring basis, and then later determined that she did not want to continue booking standing appointments with QVC because it was not convenient for her. 56.1 ¶ 477-479, 496.  MSA never directed Plaintiffs' work schedule, nor could it. 56.1 ¶ 418-419.  MSA merely kept track of and facilitated appointments between Apparel Companies and Plaintiff at times mutually convenient to them. 56.1 ¶ 418-422.

Additionally, Plaintiff could find substitutes for herself if she wished to take a vacation or just a day off for whatever reason and could not or did not choose to go to the Apparel Company to work. Defendants' Response to 56.1 ¶ 217; 56.1 ¶ 600.  MSA did not control substitutions; only the Apparel Company could decide to accept or reject a substitute. *See Intchev*, 685 F. App'x at 550 (drivers held to be independent contractors where they could find relief drivers as substitutes); Defendants' Response to 56.1 ¶ 217; 56.1 ¶ 600.

### b.  Plaintiff Hired MSA to Provide Services to Her; She Did Not Provide Services To MSA

Plaintiff never performed work for MSA, but rather for the Apparel Companies directly. 56.1 ¶ 311-312.   Similarly, MSA never paid Plaintiff for her fit modeling services; rather Apparel Companies paid her for her services. 56.1 ¶ 318. MSA merely facilitated the invoicing

and collection of payments from the Apparel Companies and remittance over to the fit model, less its management fee percentage. 56.1 ¶ 330, 342-346.

"The ultimate concern is whether, as a matter of economic reality, the workers depend upon [the putative employer's] business for the opportunity to render [a] service or are in business for themselves." *Superior Care, Inc.*, 840 F.2d at 1059; *see also Donovan*, 736 F.2d at 1116 ("Employees are those who as a matter of economic reality are dependent upon the business to which they render service.").   In typical contractual engagements, the putative employer pays the worker directly for services she provides to the putative employer.  That is not the case here where Plaintiff provided services to third party Apparel Companies. 56.1 ¶ 311-312. MSA served only as Plaintiff's business manager by promoting Plaintiff's fit modeling career, and facilitating bookings and payments from Apparel Companies to Plaintiff. 56.1 ¶ 341-346.   Agerbrink and MSA clearly did not maintain the "kind of employment relationship Congress had in mind when it enacted the FLSA." *Doyle*, 91 F. Supp. 3d at 486 (citations omitted).

Further, MSA did not maintain employment records. 56.1 ¶ 351. There was no personnel file for Agerbrink (or any other fit model). *Id*.   MSA did not conduct internal reviews of Agerbrink. 56.1 ¶ 353. Agerbrink did not have an MSA company email address. 56.1 ¶ 352. MSA maintained records regarding invoicing and payments as part of its services to Agerbrink, but those were business records, not "employment records." 56.1 ¶ 349. This is not simply the case where a putative employer is derelict in its record keeping duties, but rather reflects the fact that neither party relied on those types of records in their relationship. MSA did not conduct reviews of Agerbrink's performance as a fit model because it did not control her performance as

a fit model. 56.1 ¶ 353.  MSA was never once present when she was performing fit modeling services for the Apparel Companies. 56.1 ¶ 314.

### c.      Plaintiff Could Reject Jobs

Courts have consistently held that workers who have the ability to reject assignments without penalty are independent contractors under the economic realities test. *See Saleem,* 854 F.3d at 146 (plaintiffs set their own schedules, and defendants "provided no incentive structure for Plaintiffs to drive at certain times, on particular days, or in specific locations"); *Preacely v. AAA Typing & Resume Inc.*, No. 12 Civ. 1361, 2014 U.S. Dist. Lexis 182946, at *13-16 (S.D.N.Y. Apr. 28, 2014); *Gate Guard Servs., LP v. Solis*, No. V-10-91, 2013 U.S. Dist. LEXIS 20156, at *11-12 (S.D. Tex. Feb. 13, 2013) (ability to reject assignments without penalty is relevant to the "control" factor in FLSA economic realities test); *Browning*, 885 F. Supp. 2d at 610; *Anyan v. N.Y. Life Ins. Co.*, 192 F. Supp. 2d 228, 239 (S.D.N.Y. 2002), *aff'd*, 68 F. App'x 260 (2d Cir. 2003).  Here, as in these other cases in which workers were found to be independent contractors, Plaintiff could and did reject go-sees and jobs. 56.1 ¶ 405, 407, 411, 414.  In her sole discretion, Plaintiff rejected appointments, standing bookings and go-sees because of scheduling conflicts, vacation plans, or simply because Plaintiff did not want to work at any given time or with a particular Apparel Company. 56.1 ¶ 405, 407, 411, 414.

### d.      Plaintiff Performed Work without MSA's Involvement

Independent contractor status is commonly found where the worker in question "could go out the next day with the same [car], clothes, equipment . . . and other supplies, and immediately work for another . . . company." *Velu v. Velolcity Express, Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009).  Plaintiff could and did perform services for multiple Apparel Companies (in addition to a number of other endeavors). 56.1 ¶ 417. When performing professional fit modeling for Apparel Companies, Plaintiff regularly could and did perform work without MSA's

involvement (other than helping to keep Plaintiff's schedule and to process invoicing and collection of funds from Apparel Companies for Plaintiff's behalf). 56.1 ¶ 396, 411, 474-478. MSA was never present when Plaintiff performed her fit modelling work at the Apparel Companies. 56.1 ¶ 314.

Plaintiff routinely went to QVC in Westchester Pennsylvania for days at a time, without MSA ever being on the premises or, indeed, having involvement in Plaintiff's schedule. 56.1 ¶ 473-478, 495. Plaintiff was always free to accept whatever engagement she chose for whatever Apparel Company, at her sole discretion. 56.1 ¶ 405, 473-478. That MSA helped collect Agerbrink's fees from Apparel Companies is not an indicium of control. MSA was simply assisting Agerbrink as a facilitator. *Matter of Yoga Vida NYC, Inc.*, 28 N.Y. 3d 1013, 1016 (N.Y. 2016) (Yoga instructors found to be independent contractors working with a studio even where the studio processed payment). Indeed, Agerbrink hired and paid MSA precisely for those scheduling, collection and payment services. 56.1 ¶ 342-346.

Agerbrink's independence as a professional was clearly evidenced by the multiple sources of income she choose to pursue. 56.1 ¶ 376, 381-384. Plaintiff first utilized MSA as her manager in the early 2000s, when she had already been a fit model for a number of years and had been utilizing the management services of a competitor. 56.1 ¶ 372, 378. After using MSA's services for a number of years she was subsequently referred by MSA to an in-house job at the Apparel Company New York & Company where she worked for several years. 56.1 ¶ 373. During this time, Agerbrink did not perform any independent fit modeling work for any other Apparel Companies. 56.1 ¶ 373-375. While employed by New York & Company, Plaintiff did not utilize MSA as a business manager at all. *Id.* In 2013, after her employment from New York & Company ended, Plaintiff decided that she wanted to work as an independent fit model for a

variety of Apparel Companies and again solicited MSA to manage and further develop her fit modeling career. 56.1 ¶ 388-390. After utilizing MSA's management services for approximately 15 months from March 2013 to June 2014, Plaintiff decided that she wanted to work exclusively for the fashion brand Caché as its employee (similar to her previous employment with New York & Company). 56.1 ¶ 503. After making this decision, Plaintiff again ceased utilizing MSA's management services. 56.1 ¶ 504. In addition, at various times in her career, Plaintiff utilized the management services of at least three business managers other than MSA. 56.1 ¶ 378.

In addition to her fit modeling career, Plaintiff engaged in other vocations, including as a film and television actor, a licensed real estate broker, and spa manager. 56.1 ¶ 381-384. MSA did not manage Plaintiff's business pursuits other than her independent fit modeling career. *See Meyer v. United States Tennis Ass'n*, 607 F. App'x 121, 123 (2d Cir. 2015) (ability to "maintain other non-umpiring jobs throughout the year" supported a finding of independent contractor status); *see also Browning*, 885 F. Supp. 2d at 590; *Claim of Pavan*, 173 A.D.2d 1036, 1037 (3d Dep't 1991) (independent contractor status of limo drivers supported where they could work for other organizations when they were not performing an assignment for the putative employee); *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299, 305 (5th Cir. 1998) (drivers independent contractors in part because they could work for other courier delivery systems).

### e.    MSA Did Not Establish Or Enforce Work Rules Or Conditions

MSA did not maintain any rules, requirements, policies or guidelines with respect to the work Plaintiff performed for Apparel Companies. *See Perez v. Off Duty Police Serv., Inc.*, No. 3:13-cv-00935, 2015 U.S. Dist. LEXIS 86377, at *9 (W.D. Ky. July 2, 2015) (denying summary judgment to putative employee where work rules "were simply customer requirements that [putative employer] was passing along to its workers"); 56.1 ¶ 314, 317, 367.  Rather, Plaintiff was solely responsible for determining when, where, for whom, and how often she chose to

perform fit modeling services. 56.1 ¶ 396, 411, 474-478.  MSA never attended Agerbrink (and other fit models) fit modeling appointments, nor did MSA even know whether she (or they) actually showed up for those appointments until it received signed vouchers back. 56.1 ¶ 367, 544.  MSA was responsible only for assisting Plaintiff (and other fit models) as their business manager in promoting her (and other fit models) to Apparel Companies for bookings, and facilitating appointments with and payments from the Apparel Companies. 56.1 ¶ 544, 342-346.

### f.    MSA Did Not Determine Or Influence Plaintiff's Compensation

MSA did not dictate Plaintiff's compensation. 56.1 ¶ 405, 476, 534.  Rather, among other factors specific to Plaintiffs' requests, time commitments and preferences, Plaintiff alone determined her booking rates with Apparel Companies. *See cf. Saleem*, 854 F.3d at 138 (finding independent contractor status even where putative employer set rate); *Meyer v. United States Tennis Ass'n*, No. 1:11-cv-06268, 2014 U.S. Dist. LEXIS 128209, at *13 (S.D.N.Y. Sept. 11, 2014) (finding independent contractor status even where putative employer set rate), *aff'd*, 607 F. App'x 121 (2d Cir. 2015); 56.1 ¶ 413.  For example, when offered a standing appointment with QVC, Plaintiff alone decided to work for $105 per hour, even though that rate was less than that which Plaintiff typically earned from Apparel Companies. 56.1 ¶ 465.  In fact, because of QVC's relatively low rate offering, Plaintiff initiated negotiations with MSA to reduce its management fee so that Plaintiff could realize a greater profit on her QVC work. 56.1 ¶ 468.

### g.    MSA Did Not Train or Direct Plaintiff

Plaintiff is an experienced professional fit model. 56.1 ¶ 322, 376.  Before soliciting MSA to be her business manager for the second time in 2013, Plaintiff had approximately 20 years of experience in the fit modeling industry. 56.1 ¶ 376.  Absent from Plaintiff's moving papers is any allegation that MSA made any suggestions on how she perform her work, critiqued the quality of her work or made recommendations about her work. Instead, at all times, she had

complete discretion in all of these areas. *See Werner v. Bell Family Med. Ctr., Inc.,* 529 F. App'x 541, 544 (6th Cir. 2013) ("there is no question that [she] retained discretion to decide how best to do it.") (citations omitted); 56.1 ¶ 472, 474-476, 493-495, 532-534, 539-544, 574-575.   In this case, Agerbrink was employed in-house at Apparel Companies, and freelanced as an independent contractor with the assistance of business managers other than MSA. Defendants' Response to 56.1 ¶ 71; 56.1 ¶ 376.   MSA did not teach or train Plaintiff to be a fit model; quite the contrary, Plaintiff was an experienced fit model well known in the business. 56.1 ¶ 322, 371, 377. Plaintiff utilized MSA only to help promote her to Apparel Companies and to facilitate the administrative aspects of her fit modeling career, such as acting as the go-between to help her with scheduling and booking go-sees and appointments, and facilitating the processing of her payments from the Apparel Companies. 56.1 ¶ 345-347, 418-419, 521-523.

### h.   The Contract Between Agerbrink and MSA Did Not Reflect How The Parties Conducted Business

Plaintiff argues that certain language in her Agreement with MSA gave MSA control over her and dictated her status as an employee. *See* Pl. Br. at 13.   However, Plaintiff's reliance on the Agreement's language is both factually and legally incorrect.

The economic realities test does not consider "the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (quoting *Rutherford Food Corp. v McComb*, 331 U.S. 722, 729 (1947)).   Other courts agree, "[i]t is not significant how one `could have' acted under the contract terms. The controlling economic realities are reflected by the way one actually acts." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312 (5th Cir. 1976) (footnote omitted); *see also Saleem*, 854 F.3d at 144 (citing *Usery* with approval in an alternate context).   Here, any alleged control

was merely hypothetical and never born out in reality.  Plaintiff was never disciplined by MSA for failure to maintain her specifications, or failure to give her "best efforts" under the Agreement. New York Courts have held that: "'[t]he requirement that the work be done properly is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either." *Matter of Hertz Corp. v. Comm'r of Labor*, 2 N.Y.3d 733, 735 (N.Y. 2004) (citations omitted).

Nor was there any real contractual control.  When Plaintiff breached her Agreement and was put on notice of that material breach, she continued working as a fit model with Caché, and eventually engaged the services of another competing model management company. 56.1 ¶ 546. Despite the parties' correspondence, MSA was unable to prevent Agerbrink from doing exactly what she wanted. 56.1 ¶ 547.

The exclusivity provision within the contract was not a constraint on Agerbrink's business, but rather an elected clear benefit to her. 56.1 ¶ 397. If Agerbrink had hired another management company contemporaneously with MSA, there would have been inevitable scheduling and other logistical conflicts and cross-communication issues. 56.1 ¶ 398.  Thus, for continuity of services and logistical ease and simplicity, Agerbrink elected to sign an exclusive Agreement with MSA. 56.1 ¶ 392.  Furthermore, exclusivity is not required. 56.1 ¶ 394.  There are other fit models who are managed by MSA without an exclusivity term. *Id.*  Had Agerbrink not believed that the exclusivity provision were in her best interest, she could have signed the Agreement without it. 56.1 ¶ 390, 394.

Thus, while much of Plaintiff's brief is spent contemplating the hypothetical control MSA had over her, (Pl. Br. 13-15) not only is hypothetical control irrelevant to the legal issue

before the court, but, in reality, the contract language did not hinder Agerbrink at all from any business opportunities that she could have, and did pursue.

>    2.    **Plaintiff Invested In Her Business And**
>          <u>**Had An Opportunity For Significant Profit And Loss**</u>

Unlike employees, independent contractors tend to make substantial investments in their businesses. *U.S. v. Silk*, 331 U.S. 704, 719 (1947) ("where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors") (citations omitted).   Plaintiff spent substantial sums of money investing in her fit modeling career, including clothing, hair styling, make-up, nutrition, fitness, photographs, travel, lodging and professional services fees, such as accountants, financial advisors and attorneys. 56.1 ¶ 549-565, 567. Agerbrink, as did other fit models, invested at least $20,000 on their careers. *See Id.*

Further, Agerbrink's professional investments here are substantial where she rented a sport utility vehicle, in addition to her other car, in order to commute to QVC in Pennsylvania, and rented and sublet multiple rooms locally around the QVC offices. *See Browning*, 885 F. Supp. 2d at 608 ("Plaintiffs made substantial investments in their businesses. They utilized their own vehicles and . . . were responsible for the costs and expenses associated with the vehicle, including maintenance and repair. Thus, this factor weighs in favor of independent contractor status."); *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784 (11th Cir. 2006) (independent contractor status supported where cable installer "drove his own vehicle and provided his own tools and supplies"); *Dole v. Amerilink Corp.,* 729 F. Supp. 73, 76 (E.D. Mo. 1990) (cable installers spent significant amounts of money on their trucks and tools, demonstrating they had made substantial investment in their businesses); *Herman v. Mid-Atl. Installation Servs.*, 164 F. Supp. 2d 667, 675 (D. Md. 2000) ("The installers are responsible for providing their own truck

or van and specialty tools. . . . Because these costs are considerable, especially considering the expense of a truck or van, and are of a type not normally borne by employees, this factor indicates that the Installers are contractors."), *aff'd*, 16 F. App'x 104 (4th Cir. 2001)) (footnote omitted); 56.1 ¶ 559-561.

Plaintiff also had a significant opportunity for profit or loss. Plaintiff's income from fit modeling was not regular or reliable, such as a salary or an hourly wage for a guaranteed or fixed number of hours of work. 56.1 ¶ 538.  Rather, Plaintiff was compensated by Apparel Companies based on the frequency and duration of her fit modeling services and at rates mutually agreed to by them. 56.1 ¶ 534.   Plaintiff's income was based largely on her industriousness and availability, neither of which were dictated by MSA. *See Intchev*, 685 F. App'x at 550 (passing out business cards to develop own clientele supports independent contractor status); *Off Duty Police Servs., Inc.*, 2015 U.S. Dist. LEXIS 86377, at *12 ("[A] worker's ability to request, accept, or decline additional assignments and control his schedule as indicative of an ability to maximize profit.") (citations omitted); *Chebotnikov v. LimoLink, Inc.*, No. 14-13475, 2017 US Dist. Lexis 104577, at *36 (D. Mass. July 6, 2017) (absence of any guarantee of a certain amount of work indicated independent contractor status); 56.1 ¶ 571.  There were numerous occasions where Plaintiff directed MSA to communicate with Apparel Companies that she was turning down fit modeling assignments because she decided instead to take a vacation or merely not work. Defendants' Responses to 56.1 ¶ 66, 78; 56.1 ¶ 493.

In the fit modeling industry, even in the case of a standing appointment, Apparel Companies regularly replace fit models for various reasons, such as skill, changes in physical specifications, dependability and accessibility. 56.1 ¶ 598, 600-601.  Agerbrink could not rely on standing appointments or seemingly loyal Apparel Companies for a steady source of income.

Additionally, part of any fit model's ability to profit from her services and maintain consistent and longstanding relationships with Apparel Companies is known as her "sell-through." 56.1 ¶ 595.  This is the industry concept of how well a fit-model represents her target customer and how well the garments for which she has provided fit modeling services sell as a result. 56.1 ¶ 596.  A fit model with a high sell-through will likely be asked to continue to provide services for an Apparel Company. 56.1 ¶ 596.  If a product results in a low sell-through, however, the Apparel Company will likely want to work with a different fit model. 56.1 ¶ 597-598.

Plaintiff decided for which Apparel Companies to work and when, depending on her potential for profit.  For example, Plaintiff was offered a standing fit modeling assignment by QVC, which is located in Westchester, Pennsylvania. 56.1 ¶ 478.  As discussed above, while working for QVC, Plaintiff decided to rent housing in or near West Chester, Pennsylvania, as well as to lease or finance a vehicle in order to accommodate her commute to and from work. 56.1 ¶ 560-561, 577. After working for QVC for approximately nine months, Plaintiff consulted with her accountant and attorney and considered bankruptcy because apparently her liabilities exceeded her profits based on her expenses vis-à-vis earnings. 56.1 ¶ 495-497.   Plaintiff ultimately decided to cease working for QVC because she did not realize enough of a profit from that venture. 56.1 ¶ 496.

Plaintiff also self-classified as an independent contractor on her tax returns and benefitted financially through her deductions. *See Meyer*, 607 F. App'x at 123 (tax status is a relevant factor in the employment relationship analysis under the NYLL); *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 540 (S.D.N.Y. 2014) ("[W]hile not dispositive of the inquiry, the fact that Plaintiffs classified themselves as independent contractors on their tax returns and took

business deductions certainly weighs in favor of independent contractor status.") ("*Saleem I*"),

*aff'd*, 854 F.3d 131 (2d Cir. 2017); Defendants' Responses to 56.1 ¶ 71-72; 56.1 ¶ 572-576.

Agerbrink's ability to realize profit and loss from her profession, as well as her filing her

tax returns as an independent contractor and deducting her business expenses on those tax returns

support contractor status.  "A worker may be considered an independent contractor if he has the

ability to seek work from other employers, while continuing his relationship with the defendant-

employer." *Preacely*, 2014 U.S. Dist. Lexis 182946, at *16 (citations omitted).  Here, Agerbrink

could seek work from other employers in several ways: (1) she could work with other model

management companies where MSA would become a "mother agency" under the Agreement, (2)

she could find her own work, in which case, MSA would merely collect its management fee (3)

she could do  types of modeling other than fit modeling, such as fashion or runway modeling,

and (4) she could work in another profession, such as when she worked as an actor, at a spa or as

a real estate agent. 56.1 ¶ 588, 603-605.

### 3.    Plaintiff Exercised A Significant Degree Of Skill and Independent Initiative

Fit modeling requires significant skill to model clothing effectively and to provide

feedback to Apparel Companies regarding the look, feel and movement of the clothing being

modeled. Defendants' Response to 56.1 ¶ 3-4, 321, 585-586.  Many fit models study fashion in

technical schools, such as Parsons School of Design or the Fashion Institute of Technology, so

that they may understand and effectively communicate the technical aspects of garment

construction. 56.1 ¶ 584.   In addition, fit models provide significant value during the

manufacturing process and are typically the first individuals blamed by Apparel Companies

when apparel being modeled by fit models fails to generate expected revenue. 56.1 ¶ 595-597,

602.  Furthermore, fit models are often replaced by the Apparel Company when they perceive

that a clothing line is not selling as well as it should. 56.1 ¶ 598.

Agerbrink was an experienced fit model having worked in the industry for almost 20 years. 56.1 ¶ 376.  "If a worker learned his craft through years of experience, 'then it is more likely that the worker's compensation varies with his unique skill and talent.'" *Off Duty Police Servs. Inc.*, 2015 U.S. Dist. LEXIS 86377, at *16 (citations omitted).

In addition, fit models' success is largely dependent on their independent initiative in promoting themselves to Apparel Companies.  For example, Plaintiff requested MSA to market her on its website by including her images and physical dimensions on a dedicated webpage so that Apparel Companies could view and consider Plaintiff for fit modeling opportunities. *See Saleem*, 52 F. Supp. 3d at 542 (taking affirmative steps is a sign of independent initiative); Defendants' Responses to 56.1 ¶ 517.  In addition, MSA informed Plaintiff that she should, like other models, try to enhance her fit modeling career by engaging in market research. 56.1 ¶ 570. Agerbrink should have, as MSA counseled, privately modeled and assessed clothes of various designers at retail stores, such as department stores, to determine whether there were any particular designers or Apparel Companies that she thought MSA might target on her behalf, based on the look, fit and feel of a particular wardrobe. 56.1 ¶ 569-571.  MSA also counselled Plaintiff to undertake other self-promoting and marketing measures, such as maintaining active social media accounts. 56.1 ¶ 344.  Plaintiff's fit modeling career likely suffered because she decided against using social media and declined to take other independent steps as a means of promoting her fit modeling career, notwithstanding MSA's recommendations as her career manager.

## C.  PLAINTIFF WAS PAID BY APPAREL COMPANIES AS AN INDEPENDENT CONTRACTOR

Consistent with independent contractor status, Plaintiff was paid by Apparel Companies on an hourly basis per appointment based on her own quoted rates. 56.1 ¶ 347.  She reported her pay

on IRS Form 1099s (not Form W-2s) and did not have taxes or social security deducted from her pay; and, she did not receive any fringe benefits from Apparel Companies or MSA, such as health insurance or retirement benefits. 56.1 ¶ 573-576.

Plaintiff was never on MSA's payroll. 56.1 ¶ 364, 412, 425, 440.  MSA's only involvement in Agerbrink's transactions with Apparel Companies was to facilitate scheduling at Agerbrink's direction, and the Apparel Companies' payment to her after MSA deducted its agreed-upon management fee. *Morgenweck v. Vision Capital Advisors, LLC*, No. 08-2969, 2010 U.S. Dist. LEXIS 141637, at *7-8 (S.D.N.Y. June 3, 2010), *aff'd*, 410 F. App'x 400 (2d Cir. 2011); 56.1 ¶ 425-442.  The fact that MSA collected money from Apparel Companies as part of the services it provided to Agerbrink does not negate independent contractor classification. *See Saleem*, 854 F.3d at 135; *Browning*, 885 F. Supp. 2d at 605.

## D.     PLAINTIFF CLASSIFIED HERSELF AS AN INDEPENDENT CONTRACTOR

Plaintiff declared, under penalty of perjury on her tax returns that she was, and continued to be, an independent contractor. 56.1 ¶ 572-575.  In the process she enjoyed significant tax advantages through deductions consistent with her self-affirmed independent contractor status. Accordingly, Plaintiff should not now be able to claim she is entitled to benefits as an employee. *Saleem I*, 52 F. Supp. 3d at 540; *Browning*, 885 F. Supp. 2d at 605 ("though not quite rising to the level of estoppel, if a plaintiff signs a tax return 'under penalty of perjury' that declares independent contractor status and seeks 'numerous deductions for business purposes associated with independent contractor status, such as travel, entertainment, lodging, supplies, telephone and depreciation of business assets,' such a tax return may significantly impede the plaintiff's ability to claim employee status for purposes of filing an overtime or minimum wage claim.") (quoting *Deboissiere v. Am. Modification Agency*, No. 09 Civ. 2316, 2010 U.S. Dist. LEXIS

113776, at *8-9 (E.D.N.Y. Oct. 22, 2010)); *see also Meyer*, 607 F. App'x 123 (tax status is relevant under the NYLL).

E.      **PLAINTIFF WORKED WITH MSA FOR ONLY 15 MONTHS**

"Even a lengthy work relationship may result in a finding that the worker was an independent contractor." *Preacely*, 2014 U.S. Dist. Lexis 182946, at *18-19 (working "intermittently for fifteen months" suggests independent contractor status); *see also Velu*, 666 F. Supp. 2d 300 (finding independent contractor status where relationship lasted five years).  Here, while her Management Agreement with MSA contemplated a term of three years, in fact, Plaintiff used MSA's services for only 15 months before terminating the contract. 56.1 ¶ 582.

F.      **AGERBRINK'S FIT MODELING CAREER WAS NOT INTEGRAL TO MSA'S BUSINESS**

Whether Agerbrink's services were an integral part of MSA's business, "and the weight to be assigned to that factor, appears to depend in large part on the definition of the business." *Chebotnikov*, 2017 U.S. Dist. Lexis 104577, at *38.  MSA's business is providing model management services to models, not providing staffing for Apparel Companies. 56.1 ¶ 339-340, 342.  Thus, although fit models are "necessary to the success of the entire enterprise, the same could be said of many independent contractors or subcontractors." *Id.*  Clients are integral to the business of law firms and accounting firms, patients to doctors, nurses and hospitals and home owners to electricians, carpenters and plumbers; yet in none of those examples is there commonly an employee-employer relationship.

To the extent there is any degree of integrality, this factor is swallowed by the overwhelming tide of other factors supporting independent contractor status, as discussed above. *See Browning*, 885 F. Supp. 2d at 610 ("while . . . Plaintiffs' work was integral to [Defendant company], this factor only weighs slightly in favor of finding that the Plaintiffs should qualify as

employees under the FLSA, and would not prevent this Court from finding, as a matter of law, that the Plaintiffs are independent contractors.").

## G.   UNDER THE TOTALITY OF THE CIRCUMSTANCES PLAINTIFF WAS PROPERLY CLASSIFIED AS AN INDEPENDENT CONTRACTOR

A Court should examine "whether, as a matter of economic reality, the worker depends upon someone else's business for the opportunity to render service or is in business for himself." *Preacely*, 2014 U.S. Dist. Lexis 182946, at *18 (citations omitted).  Here, Plaintiff did not rely on MSA in order to perform fit modeling services for Apparel Companies.  She actively sought out jobs on her own, and was encouraged by MSA personnel to do just that. 56.1 ¶ 580-581.  Her work with Caché, which she claims MSA had no part in helping her obtain, is proof that she did not rely on MSA in order to "render service." *See id.* at *21; 56.1 ¶ 503-504, 606.

## H.   MSA IS NOT PLAINTIFF'S EMPLOYER UNDER THE FLSA AND NYLL

We have shown above that Plaintiff was not MSA's employee.  It would seem obvious that if she were not MSA's employee, MSA could not have been her employer. Notwithstanding, citing *Barfield*, *Carter* and *Zheng* in her brief, Plaintiff continues to argue that MSA was Agerbrink's  "employer."[2] *Barfield,* 537 F.3d 132; *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984); *Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003). The Second Circuit in *Saleem* articulated that the correct legal test is the economic realities "actual exercise of control" and not the joint employer "power to control" test articulated in *Barfield*.  *Saleem*, 854 F.3d at 148-149 n.37.  If the Court finds that, as we submit, MSA properly classified Plaintiff as an independent contractor, the Court need not engage in any analysis under the *Carter* and *Zheng* factors.

---

[2] MSA concedes it is an employer of the model managers and other clerical staff who work full-time in its offices.

In any event, MSA is not an employer or joint-employer of Agerbrink.[3]   As discussed above, MSA did not have the power to hire or fire Agerbrink. 56.1 ¶ 371. The Agreement between Agerbrink and MSA guaranteed no actual work because MSA could not provide work for Agerbrink as a fit model. 56.1 ¶ 343-344.  MSA did not produce clothing. 56.1 ¶ 314, 362. Arguendo, Agerbrink could have gone the entire MSA contract term without ever working as a fit model and without ever being hired by an Apparel Company. And, when Agerbrink did work as a fit model, MSA did not supervise Agerbrink's working conditions or performance. 56.1 ¶ 528, 547-548.  MSA did not control the conditions of her work nor determine her rate of pay. 56.1 ¶ 538, 541.  MSA did not maintain employment records. 56.1 ¶ 357. And MSA had no involvement in the determination of the number of hours Plaintiff worked.

### IV       MSA'S COUNTERCLAIMS AND PLAINTIFF'S AFFIRMATIVE DEFENSES

### A.       AGERBRINK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE UNJUST ENRICHMENT CLAIM IS PREMATURE

Plaintiff's brief is devoted to arguing plaintiff is entitled to receive *at least* $13,768.15. While the $13,768.15 amount may be undisputed, any larger amount is in dispute. 56.1 ¶ 112, 116-11, 135. Moreover, whatever amount is ultimately proven as due, would still be subject to

---

[3] *See Ling Nan Zheng v. Liberty Apparel Co.*, 355 F. 3d 61, 72 (2d Cir. 2003) ("(1) whether Liberty's premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to Liberty's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the Liberty Defendants or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the Liberty Defendants.") (citations omitted); *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) ("(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.") (citations omitted); *Jianjun Chen v. 2425 Broadway Chao Rest., LLC*, No. 1:16-cv-5735, 2017 U.S. Dist. LEXIS 92149, *10-11 (S.D.N.Y. June 15, 2017) ("With respect to 'employer' status,' [t]he NYLL's definitions are nearly identical to the FLSA's.'" (quoting *Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 526 (S.D.N.Y. 2013)); *Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013) ("[d]istrict courts in this Circuit have interpreted the definition of employer under the New York Labor Law coextensively with the definition used by the FLSA,") (internal citations and quotations omitted).

setoff for MSA's entitlements on its breach of contract claims.  As such, it would appear to be premature for the Court to grant summary judgment on this to either party.

**B.    DEFENDANT'S COUNTERCLAIM FOR**
**<u>TORTIOUS INTERFERENCE SHOULD PROCEED</u>**

Two facts are crucial here, as to when Plaintiff contacted Caché about work there and whether MSA had contacted Plaintiff earlier about placing Plaintiff with Caché.  The timeline is in dispute.  MSA had a conversation with Agerbrink seeking her permission to submit her for consideration for the in-house position at Caché. 56.1 ¶ 506.  On or around Friday May 9, 2014, Agerbrink contacted Caché regarding the position. Spelfogel Decl. Ex. FF.  MSA submitted Agerbrink to Caché on Monday, May 12, 2014. Spelfogel Decl. Ex. M.  It is not clear from the record, however, whether Agerbrink applied for the position after MSA discussed the opportunity with Agerbrink and sought her permission to submit her to Caché, or if she did so independently.  The temporal proximity of these events suggests she attempted to circumvent MSA's involvement and deprive MSA of a commission it might otherwise have obtained from Caché for placing Agerbrink there.

Much of Plaintiff's brief on this point is devoted to arguing Plaintiff did not have the requisite knowledge or wrongful purpose to interfere with the business relationship between MSA and Caché.  Because she has not established that she applied to Caché before MSA notified her of the opportunity, she has not established that her direct application to Caché was not an attempt to circumvent MSA.  The timeline suggests the opposite.

Furthermore, Agerbrink cannot establish that she would not have been offered the position at Caché had she allowed MSA to represent her in the application process.  As such, she cannot show her economic-self interest in earning a living was threatened by MSA's potential involvement.  In fact, just the opposite occurred when MSA helped Agerbrink secure an in-house

position at New York & Co. a number of years earlier. 56.1 ¶ 373-374.  By circumventing MSA, Agerbrink used dishonest means to procure the position at Caché.  *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (N.Y. 2004).  At the very least, this is a factual issue in dispute that precludes summary judgement for either party.

## C.     AGERBRINK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER SETOFF AND/OR RECOUPMENT AFFIRMATIVE DEFENSE IS PREMATURE

Plaintiff attempts to describe MSA's setoff claim as a straightforward high school math problem.  *See* Pl. Br. 43 (40% of 20% of $80,289.03= $6,423.12).  This math belies common sense.  It is undisputed that Plaintiff's salary from Caché was $135,000 per year. 56.1 ¶244.  She worked there for approximately seven months. 56.1 ¶237.  Plaintiff was not paid at the rate of $135,000 a year to do secretarial work.  In fact, according to the Bureau of Labor Statistics, the average salary for a secretary in the field in the state of New York is around $40,000 per year.[4] Regardless of how many hours a week Plaintiff spent providing fit modeling services to Caché, the majority of her salary was devoted to paying for those fit modeling services.  At most, there is a factual issue over the correct amount that MSA is entitled to collect under the contract.  Until evidence can be introduced and a calculation can be made as to the appropriate amount of her salary that can be attributed to fit modeling work, it would be premature to attempt to calculate damages on that issue.

## D.     AGERBRINK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER UNCONSCIONABILITY DEFENSE IS LEGALLY AND FACTUALLY INCORRECT

MSA's model management contract is not unconscionable.  "Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *Rowe v*

---

[4]  Spelfogel Decl.  https://www.bls.gov/oes/current/oes_ny.htm (Occupation Code: 43-6014: Secretaries and Assistants except in the Legal, Medical and Executive Fields).

*Great Atl. & Pacific Tea Co.*, 46 N.Y.2d 62, 67 (N.Y. 1978).  Ordinarily, in order for a court to find a contract unconscionable, it must find both procedural and substantive unconscionability. *See Lawrence v Miller*, 11 N.Y.3d 588, 595 (N.Y. 2008).

While there have been cases in which contracts have been deemed unenforceable due to substantive unconscionability alone, those exceptional cases feature outrageous contract terms that are so oppressive as to warrant a finding of unconscionability irrespective of the contract formation process. *See, e.g., Jones v. Star Credit Corp.*, 59 Misc. 2d 189, 191-192 (Sup. Ct. Nassau Cty. 1969) (holding a charge of $1,439.69 for a $300 item was unconscionable given the limited means and lack of sophistication of the buyer). Nevertheless, mere inadequacy of consideration, unequal bargaining positions, or even the allocation of risks to the weaker party does not render a bargain unconscionable. *See State v. Wolowitz*, 96 A.D.2d 47, 67 (2d Dep't 1983) (unconscionability requires a lack of meaningful choice).  Unlike *Jones,* the provisions in the contract between Plaintiff and MSA are not unreasonable on their face, nor are they a violation of public policy, and are certainly not so outrageous as to rise to the level of unconscionability.

Plaintiff contends there are six specific terms that create substantive unconscionability here: (1) the Agreement's provision that this Court has previously found unenforceable can be severed from the contract pursuant to the severability provision of the Agreement in paragraph 15; (2) The Agreement could be terminated by written notice by either party.  Thus, the imaginary "potentially indefinite nature" of the Agreement asserted by Plaintiff does not create any one sided obligation; (3) The right to cure language in the Agreement was, in fact, enforced in both directions.  MSA's lawyer contacted Agerbrink in writing putting her on notice of her breach.  He gave her the opportunity to resolve the issue.  56.1 ¶ 504.  (4) The provision Plaintiff

cites to is the same one the Court already ruled on (see (1) above). *See* Pl. Br. at 45. (5) The

provision in (5) is the same already ruled on by the Court in (1). *See* Pl. Br. at 45. (6) This

provision grants fees to the prevailing party, and thereby by definition is not a one-sided

obligation.

The Agreement states in part that "[e]ach party represents and warrants that such party is

wholly free to enter into this Agreement." Models. Third. Am. Comp, ECF No. 223 Ex. A ¶18.

The Agreement also states:

> "[m]odel acknowledges and agrees that Model is executing this Agreement
> voluntarily and without any duress or undue influence by MSA or any third party.
> Model further acknowledges and agrees that Model has carefully read this
> Agreement and has any questions needed to fully understand its terms,
> consequesnces and binding effect.  Model hereby acknowledges that Model has
> been afforded an opportunity to consult with an attorney of Model's choosing,
> and that Model has either consulted with such attorney or has knowingly waived
> such right prior to entering into this Agreement."  [Models. Third. Am. Comp,
> ECF No. 223 Ex. A  ¶17].

Agerbrink initialed the Agreement on page five under paragraphs 17 and 18.  Models.

Third. Am. Comp, ECF No. 223 Ex. A. at 5.

Agerbrink's characterization of the Agreement as unconscionable also ignores the fact

that she sought out MSA's services on multiple occasions over the years, and in 2013. 56.1 ¶

372, 389, 391.  She came into the office multiple times before signing the Agreement seeking

MSA's representation. 56.1 ¶ 389, 391.   Thus, her factual statements regarding the contract

formation and her arguments that it was an unconscionable agreement are misplaced.   Other

courts have previously dismissed the argument that MSA's Agreement was unconscionable. *See*

*Model Serv., LLC v. MC2 Models Mgmt., LLC*, No. 160519/13, 2015 Misc. LEXIS 4766, at *26

(N.Y. Sup. Ct. N.Y. Cty. Sept. 18, 2015).

### E.   AGERBRINK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER AFFIRMATIVE DEFENSE OR REPUDIATION IS LEGALLY AND FACTUALLY INCORRECT

In support of her argument here, Plaintiff references a one-time statement by the Defendant Susan Levine during the course of a heated discussion with Plaintiff involving Plaintiff's alleged breach of contract concerning her taking the Caché position. 56.1 ¶ 243.  In that statement, Levine purportedly told Plaintiff she would not work in New York City again. Even if the statement attributed to Levine was uttered, Levine's alleged statement was not a repudiation of the contract.

First, Plaintiff was already in breach of her Agreement when Levine made the alleged statement.  Plaintiff repudiated her contract before this statement was made, as evidenced by her email Spelfogel Decl. 56.1 ¶ 245.  This effectively terminated MSA's contractual duties.  *See Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (N.Y. 1989); *Kaplan v. Madison Park Grp. Owners, LLC*, 94 A.D.3d 616, 619 (1st Dep't 2012) (repudiation relieves the non-repudiating party of its obligation of future performance).

Second, Levine's statement was in the heat of a discussion with Agerbrink and should be dismissed as such. 56.1 ¶ 243.  Levine never acted upon the statement. 56.1 ¶ 253, 547-548.  She never interfered with Agerbrink's career in any way. 56.1 ¶ 547. In fact, Agerbrink continued to provide fit modelling services to Caché and then subsequently hired a competitor of MSA, True Model Management. 56.1 ¶ 546.

### F.   AGERBRINK'S CLAIM FOR PARTIAL SUMMARY JUDGMENT ON HER PRIOR MATERIAL BREACH DEFENSE IS LEGALLY AND FACTUALLY INCORRECT

MSA did not materially breach the Agreement.  MSA paid Agerbrink what she was owed pursuant to the terms of the Agreement. 56.1 ¶ 457.  Any alleged breach is not supported by factual record.  Additionally, Agerbrink failed to put MSA on notice of its alleged breach. 56.1 ¶

461.  The contract states that no breach shall be material unless reported within ten days. 56.1 ¶ 136.  The notice and cure clauses are typically found in many contracts and are generally enforceable as valid contract terms.  *See Karabu v. Pension Benefit Guar. Corp.*, No. 96 Civ. 4960, 1997 U.S. Dist. LEXIS 19582, at *23 (S.D.N.Y. Dec. 10, 1997); *see also Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989) (failure to give contractually-secured opportunity to cure constituted fatal defect of contract termination).

While Plaintiff's brief suggests that such notice would have been futile, courts are reluctant to hold that a breach renders futile any potential cure. *See Sinco, Inc. v. Metro-North Commuter R.R.*, 133 F. Supp. 2d 308, 311 (S.D.N.Y. 2001).  Furthermore, providing notice would have served the very specific purpose of reminding MSA of the Agreement's obligations to the plaintiff "to make commercially reasonable efforts" to advise and counsel Agerbrink. Models. Third. Am. Comp, ECF No. 223 Ex. A, ¶2. These are tasks that MSA had always performed in the past even while Plaintiff worked other full-time jobs.

Further, Plaintiff cannot claim the alleged misrepresentation by Pinto regarding the function of the exclusivity provision in the Agreement was a material breach, as she chose to ignore it and seek out other opportunities with competing agencies as she saw fit. Spelfogel Decl. 56.1 ¶ 531.

## G.  AGERBRINK'S CLAIM FOR PARTIAL SUMMARY JUDGMENT ON HER BREACH IS WITHOUT SUPPORT IN THE RECORD OR UNDER LAW

Agerbrink claims that her breach (taking the Caché position without notifying MSA of the offer of employment or subsequently failing to pay over agreed upon management fees) was not material because there was no deadline by which she was required to provide notice of the breach to MSA. *See* Pl. Br. 48.  In fact, there is a provision in the Agreement that states she should "communicate promptly to MSA with respect to all information that MSA may

reasonably request." Third Am. Compl., ECF No. 223, Ex. A ¶ 4.  MSA's obligations under the

Agreement were, in part, to represent her to third parties. Third Am. Compl., ECF No. 223, Ex.

A ¶. 2.  By frustrating MSA's ability to perform its obligations under the contract, Agerbrink was

materially breaching.  *See Plainview S. & S. Concrete Co. v. NVNG Dev. Corp.*, 151 A.D.2d 654

(2d Dep't 1989); *see also WPA/Partners LLC v. Port Imperial Ferry Corp.*, 307 A.D.2d 234, 237

(1st Dep't 2003) ("one who frustrates another's performance may not hold the frustrated party in

breach of contract") (citation omitted).


**H.     AGERBRINK'S CLAIM FOR PARTIAL
        SUMMARY JUDGMENT ON HER UNLICENSED
        EMPLOYMENT AGENCY DEFENSE IS LEGALLY
        AND FACTUALLY INCORRECT**

This Court previously ruled on June 16, 2015, that there is no private right of action

under GBL § 171 *et seq.  Agerbrink v. Model Serv. LLC*, No. 1:14-cv-07841, 2015 U.S. Dist.

LEXIS 77821 (S.D.N.Y. June 16, 2015) (ECF#25).  Only a government agency may bring such a

cause of action. In its opinion, the Court also dismissed Plaintiff's unlicensed employment

agency claims for declaratory relief, noting that to allow that cause of action would be to

circumvent the statutory bar to a private right of action.

Similarly, Plaintiff's affirmative defense predicated on the enforcement of the same

alleged statutory right should be barred.  Arguendo, to the extent that there is a  factual dispute as

to whether MSA is an employment agency covered under the NYGBL, Plaintiff's claim for

summary judgment would be precluded here.

## CONCLUSION

This case primarily involves a misclassification claim.  Based on the facts and the

undisputed record established, Agerbrink was not an MSA employee and MSA was not

Agerbrink's employer.  To the extent there are any open factual issues on aspects of this, those

issues are *de minimis* and do not preclude a finding of summary judgment for Defendants on this main employee-independent contractor issue.

Should the Court grant Defendants summary judgment on the independent contractor-employee issue, a few tangential issues may remain involving Defendant's counterclaims and Plaintiff's motion for summary judgment dismissing those counterclaims.  They may need to be separately addressed.  The amount in controversy as to those remaining claims and counterclaims is relatively small.   Such a small sum may be prone to resolution without the Court's involvement, given the economics for either side to go to trial over such a small amount.  The fact that the counterclaims and plaintiff's affirmative defenses on them may not be ripe for summary judgment now should not impede the court from granting Defendants summary judgment on the primary independent contractor-employee classification issue.

New York, New York
September 25, 2017

By:  / s/ Evan J. Spelfogel
      Ronald M. Green
      Evan J. Spelfogel
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York  10177-1211
Phone:  (212) 351-4500
*Attorneys for Defendants*

To:  Cyrus E. Dugger
     The Dugger Law Firm, PLLC
     154 Grand Street
     New York, New York 10013