UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA AGERBRINK,

Plaintiff,

-v-

MODEL SERVICE LLC et al.,

Defendants.

14-CV-7841 (JPO)

<u>OPINION AND ORDER</u>

J. PAUL OETKEN, District Judge:

Plaintiff Eva Agerbrink is a fit model.  She signed a representation contract with Defendant Model Service LLC ("MSA"), but left on bad terms.  Agerbrink claims that MSA misclassified her as an independent contractor when she was really an employee.  She also sues for unjust enrichment because MSA withheld some of her earnings after she left.  MSA counterclaims for breach of contract and tortious interference with a business relationship.

Before the Court are the parties' cross-motions for summary judgment.  Both Agerbrink and MSA move for summary judgment on the employee-versus-independent-contractor issue.  Agerbrink also moves for summary judgment as to MSA's counterclaims.  Finally, Agerbrink moves for summary judgment that she is entitled to $13,768.15 withheld by MSA.

For the reasons that follow, the Court grants summary judgment for MSA on the misclassification issue, concluding that Agerbrink was not an employee of MSA.  The Court also grants summary judgment for Agerbrink on MSA's tortious interference counterclaim, but denies summary judgment as to MSA's breach of contract counterclaim.  Finally, the Court grants summary judgment on the withheld earnings, concluding that Agerbrink is entitled to at least $13,768.15.

1

## I.    Background

The following facts are taken from the parties' consolidated Rule 56.1 Statements and are not disputed unless otherwise noted.  (*See* Dkt. No. 265 ("CSUF").)

Plaintiff:  Plaintiff Eva Agerbrink is a fit model.  Fit models are used by fashion designers and manufacturers to check the fit, drape, and look of clothes.  (CSUF ¶ 3.)

Defendants:  Defendant Model Service LLC, also known as MSA Models, is a model management company.  Defendant Susan Levine is MSA's owner and president.  (CSUF ¶ 325.) Defendant William Ivers is MSA's chief operating officer.  (CSUF ¶ 327.)  For simplicity, "MSA" in this opinion refers to all three Defendants.

The fit-model hiring process:  Apparel companies hire models primarily on the basis of the model's physical measurements and proportions.  MSA employed "model bookers" whose job was to find work for MSA's models.  (CSUF ¶ 46.)  When a client wanted to hire a fit model, it would contact MSA.  (CSUF ¶ 16.)  MSA would respond with suggestions of specific models, including body measurements and photos.  (CSUF ¶ 16.)  MSA would then send models to the clients for a free "go-see."  (CSUF ¶ 16.)  A go-see is a cross between a job interview and an audition: the model tries on clothing and the client decides if it wants to hire the model.  (CSUF ¶ 17.)  If the go-see went well, the client would contact MSA and hire the model.  (CSUF ¶ 18.)

MSA's communication structure:  MSA acted as an intermediary between the models and clients on matters of scheduling and pricing, though the parties dispute the extent to which the models communicated directly with clients.  (CSUF ¶¶ 47, 49, 52, 151.)  MSA kept records of appointments, hours worked, and model availability.  (CSUF ¶¶ 48–51.)  MSA bookers would typically send Agerbrink her daily schedule about a day in advance.  (CSUF ¶¶ 55, 59.)

Payment:  Agerbrink worked on an hourly basis.  (CSUF ¶ 262.)  After a job, Agerbrink would submit vouchers to MSA listing the hours worked, and MSA would then bill the client.  (CSUF ¶¶ 160–61.)  Clients would send payment to MSA, MSA would deduct its fee, and MSA would pay the remainder to Agerbrink.  (CSUF ¶ 110.)  The clients' checks were made out to MSA.  (CSUF ¶ 174.)

Agerbrink's obligations under the contract:  Agerbrink entered into a three-year "exclusive" contract with MSA in March of 2013.  (CSUF ¶¶ 371, 392.)  The contract required Agerbrink to use her "best efforts" to further her fit-modeling career.  (Dkt. No. 223-1 ¶ 4.)  Agerbrink also agreed to seek MSA's counsel regarding all fit-modeling matters and to refer any fit-modeling inquiries to MSA.  (*Id.*)  Agerbrink also agreed to perform her services in a professional and timely manner.  (*Id.*)  The contract provided that MSA would receive a commission of twenty percent of Agerbrink's hourly rate, including payments from clients to which Agerbrink was introduced by MSA.  (CSUF ¶ 369; Dkt. No. 223-1 ¶¶ 5, 14.)  MSA agreed to advise Agerbrink regarding public relations and the general practices of the modeling industry.  (Dkt. No. 223-1 ¶ 2.)

Contractual references to employees or independent contractors:  The contract loudly exclaimed that "[Agerbrink] IS AN INDEPENDENT CONTRACTOR, AND NOTHING HEREIN SHALL CREATE A PARTNERSHIP OR FIDUCIARY OR EMPLOYER/EMPLOYEE RELATIONSHIP BETWEEN MSA AND [Agerbrink]."  (Dkt. No. 223-1 ¶ 6.)  It further provided that MSA would not supervise Agerbrink's professional activities and would not control the terms and conditions that govern Agerbrink's relationships with clients.  (Dkt. No. 223-1 ¶ 5.)  Agerbrink's payment vouchers referred to the apparel companies as "employers."  (CSUF ¶¶ 165–66.)

Agerbrink's tenure with MSA:  Agerbrink signed a three-year contract with MSA in March of 2013.  (CSUF ¶¶ 371, 392.)  Agerbrink worked with MSA for fifteen months, until June of 2014.  (CSUF ¶ 395.)  During that time, Agerbrink booked only two jobs: a standing booking with a company called QVC for every Wednesday, Thursday, and Friday, and a standing booking with a company called Carol Hochman for Tuesdays.  (CSUF ¶¶ 39–41, 417.)  A standing booking is a repeating appointment which the model was to keep free for a specified client.  (CSUF ¶ 39.)

The QVC job:  QVC is located in Westchester, Pennsylvania.  (CSUF ¶ 462.)  QVC offered Agerbrink a $105 hourly rate, which was lower than her usual rate.  (CSUF ¶¶ 158, 465.)  MSA's attempts to negotiate a higher rate were unsuccessful.  (CSUF ¶ 467.)  Due to the lower-than-usual hourly rate, MSA agreed to lower its commission from twenty percent to fifteen percent.  (CSUF ¶ 471.)  Agerbrink usually worked for QVC between twelve and twenty-two hours per week.  (CSUF ¶ 473.)  The parties dispute the extent to which Agerbrink communicated directly with QVC, but they agree that Agerbrink and QVC communicated at times without MSA serving as an intermediary.  (CSUF ¶ 475.)  In June of 2014, Agerbrink decided that the QVC rate was too low, and she stopped working for QVC.  (CSUF ¶¶ 490, 496–98.)

Agerbrink's expenses:  Agerbrink paid $750 for professional photographs.  (CSUF ¶¶ 549–51.)  Agerbrink also paid $240 per year to be featured on MSA's website.  (CSUF ¶ 205.)  While working for QVC, Agerbrink paid for her own travel expenses and for a rental apartment in Pennsylvania.  (CSUF ¶¶ 559–60.)

Agerbrink's departure from MSA for Caché:  Agerbrink last did work through MSA in June of 2014, though her contract ran until March of 2016.  (CSUF ¶¶ 109, 114.)  In June of

2014, Agerbrink took a permanent job with a company called Caché. (CSUF ¶¶ 244–45.)

MSA's attorney wrote to Agerbrink claiming that Agerbrink was still under contract with MSA

and that MSA was entitled to twenty percent of her earnings from her job with Caché. (CSUF

¶ 114.) MSA threatened to withhold $17,946.41 in client payments held by MSA. (CSUF

¶ 116.) Agerbrink stopped working at Caché in February of 2015. (CSUF ¶ 507.)

This lawsuit:  A full retelling of this case's history would take a while. The background

necessary for this opinion, however, is minimal. While this suit started off as a putative class

action, the only remaining claims are Agerbrink's individual claims and MSA's counterclaims.

The thrust of Agerbrink's claim is that, as an employee, she was covered by the Fair Labor

Standards Act ("FLSA") and the New York Labor Law ("NYLL"). The threshold issue—and

the key issue in this opinion—is whether Agerbrink was an employee of MSA.

## II.    Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is

material if it "might affect the outcome of the suit under the governing law." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "On summary judgment, the party bearing the

burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen

Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of

proof makes the requisite initial showing, the burden shifts to the opposing party to identify

specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ

about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ.

5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The court views all "evidence in the

light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)) (internal quotation marks omitted).

## III. Discussion

Both Agerbrink and MSA move for summary judgment on the employee-versus-independent-contractor issue. Agerbrink also moves for summary judgment as to MSA's counterclaims. Finally, Agerbrink moves for summary judgment as to the money withheld by MSA. Each is discussed in turn.

### A. The Competing Motions for Summary Judgment on the Employee-Versus-Independent-Contractor Issue

The principal issue in this case is whether Agerbrink was an employee of MSA. Both parties move for summary judgment on this point. Since the FLSA standard is somewhat different than the NYLL standard, each statute is discussed separately.

### 1. Was Agerbrink an Employee Under the FLSA?

In assessing whether an individual is an employee under the FLSA, courts consider the following factors:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 535 (S.D.N.Y. 2014) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988)), *aff'd*, 854 F.3d 131 (2d Cir. 2017). However, the Second Circuit has cautioned that courts should not focus narrowly on these factors, because doing so risks losing sight of the "ultimate concern," which is "whether, as a

matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059. The Court discusses each factor separately, though there is significant overlap among them.

### i.      Degree of Control

The first factor is "the degree of control exercised by the employer over the workers." *Saleem*, 854 F.3d at 139 n.19 (quoting *Brock*, 840 F.2d at 1058). For this factor, *Saleem* is particularly instructive, since it is recent, binding precedent that deals with an analogous fact pattern. There, a group of livery-cab drivers claimed that they were misclassified as independent contractors. The Second Circuit affirmed a grant of summary judgment in favor of the defendants, based in large part on the degree-of-control factor. Here, too, this factor weighs in favor of MSA.

First, Agerbrink could set her own work schedule and choose how much to work, if at all. (CSUF ¶ 607.)[1] An important factor in *Saleem* was that the drivers "wielded considerable independence and discretion when working under [defendant's] umbrella," including the ability to choose when to drive. *Id.* at 143. The *Saleem* court contrasted this arrangement with cases in which the employer prescribed minimum or maximum hourly requirements, which are indicative of an employer-employee relationship. *Id.* at 146–47. As the district court in *Saleem* noted: "Particularly relevant to the control factor is whether a worker is 'free to set his own schedule and take vacations when he wished,' and it is undisputed that [the drivers] could do so." *Saleem*, 52 F. Supp. 3d at 537 (citation omitted) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 171

---

[1]      Agerbrink contends that she had to keep her scheduled standing appointments, and might have been penalized if she did not show up at the scheduled time. (CSUF ¶ 607.) However, she also had the freedom to end her standing appointments, as she did with QVC. (*See* CSUF ¶¶ 490, 496–98.)

(2d Cir. 1998)); *cf. Brock*, 840 F.2d at 1060 (holding that nurses were employees of nursing agency which limited working hours to forty per week).

Second, Agerbrink had the final word on which clients to work for. For example, when QVC offered Agerbrink a job paying a lower-than-usual hourly rate, she accepted the job because it promised steady work. (CSUF ¶¶ 465–68.) When Agerbrink later decided that the QVC job was not worth the high travel expenses, she stopped working for QVC. (*See* CSUF ¶¶ 490, 496–98.) These decisions were Agerbrink's, not MSA's. *See Saleem*, 854 F.3d at 148 (noting that the drivers could choose "when, where, and with what regularity" to drive).

Third, as the QVC job illustrates, Agerbrink had the ultimate say about her hourly rate. If she really wanted a certain job, she could charge a lower hourly rate. If she wanted, she could hold out for her usual rate. *Cf. Brock*, 840 F.2d at 1060 (holding that nurses were employees of nursing agency which "unilaterally dictated the nurses' hourly wage"); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 919–20 (S.D.N.Y. 2013) (holding that strip-club dancers were employees because the club set the cover charge and the price charged per dance).

Fourth, the contract between Agerbrink and MSA expressly said that Agerbrink was an independent contractor. (Dkt. No. 223-1 ¶ 6.) In *Saleem*, the court gave weight to the fact that the contracts designated the plaintiffs as independent contractors. The court noted that "[t]hough an employer's self-serving label of workers as independent contractors is not controlling, such a designation in the franchise agreement is pertinent to the parties' beliefs about the nature of the relationship." *Saleem*, 854 F.3d at 141 (citations omitted) (first quoting *Brock*, 840 F.2d at 1059, then quoting *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 564 (7th Cir.

2009)) (internal quotation marks omitted). Here, the contract proclaimed that Agerbrink was an independent contractor, which weighs in favor of MSA's position.

Finally, MSA did not train Agerbrink (CSUF ¶¶ 213–14), and Agerbrink did not have an MSA email address (CSUF ¶ 352). While these factors would not be dispositive on their own, they both tend to indicate independent contractor status. *Cf. Brock*, 840 F.2d at 1060 (holding that nurses were employees of nursing agency which monitored their patient care notes and visited job sites once or twice a month).

Agerbrink argues that MSA exercised control by requiring her to perform her services in a timely and professional manner. The *Saleem* plaintiffs similarly argued that the defendants exerted influence over drivers by enforcing its rulebook, which mandated a dress code and standards of conduct. However, the *Saleem* court concluded that while engaging in monitoring and discipline "may reflect a degree of control over [p]laintiffs' conduct . . . the 'opportunity for profit and loss was determined by the drivers to a greater degree than it was by [d]efendants.'" *Saleem*, 854 F.3d at 149 (quoting *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998)) (some brackets removed); *cf. Hart*, 967 F. Supp. 2d at 916 (holding that strip club's exhaustive list of work rules, coupled with fines for non-compliance, indicated that dancers were employees). The result is the same here.

Agerbrink's strongest argument on the degree-of-control factor is that MSA exerted control over her through its informal practices and through the implicit (and, according to Agerbrink, explicit) threat that if she did not abide by MSA's wishes, she would be blacklisted from the New York City fit-modeling industry. The plaintiff in *Saleem* similarly argued that "[d]efendants exercised control over all significant aspects of its black car business" through, among others mechanisms, its roll of organizational clients, its dispatch system, and the fact that

it negotiated rates with clients.  *Saleem*, 854 F.3d at 148–49 (internal quotation marks omitted).

But the court held that "[w]hile [d]efendants did exercise direct control over certain aspects of

the [business], they wielded virtually no influence over other essential components of the

business, including when, where, in what capacity, and with what frequency [p]laintiffs would

drive."  *Id.* at 149.  The result is the same here:  MSA's informal practices weigh slightly in favor

of employee status, but not enough to negate the other indicia showing lack of control.

 In sum, this factor weighs strongly in favor of independent contractor status.

## ii.        Opportunity for Profit or Loss

The second factor is "the workers' opportunity for profit or loss and their investment in

the business."  *Saleem*, 52 F. Supp. 3d at 535.  The more entrepreneurial the work, the more it

points to independent contractor status.  This factor, too, weighs in favor of MSA.

First, as discussed above, Agerbrink had significant leeway in deciding whether to work,

when to work, for whom to work, and for how much to work.  *See Saleem*, 854 F.3d at 143–44

(concluding that drivers were independent contractors in part because they "possessed

considerable independence in maximizing their income through a variety of means").  This

flexibility gave Agerbrink significant entrepreneurial opportunities to maximize her profit if she

wanted.

Second, Agerbrink negotiated financial terms with both clients and MSA.  It is

undisputed that Agerbrink had the power to accept job offers that paid lower than her hourly rate.

(CSUF ¶ 465.)  It is likewise undisputed that Agerbrink got MSA to lower its commission on

Agerbrink's QVC earnings because QVC paid less than Agerbrink's normal rate.  (CSUF ¶ 468).

Again, there is a capability for entrepreneurship that is uncharacteristic of a mere employee.

Third, there is the relative investment by Agerbrink and MSA. "In the economic reality test, 'large capital expenditures'—as opposed to 'negligible items, or labor itself'—are highly relevant to determining whether an individual is an employee or an independent contractor." *Saleem*, 854 F.3d at 144 (quoting *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989)). Here, Agerbrink paid for her own travel expenses and, while working for QVC, paid for a rental apartment in Pennsylvania. (CSUF ¶¶ 559–60.) She also paid $750 for professional photographs and $240 per year to be featured on MSA's website. (CSUF ¶¶ 205, 549–51.) While these investments are not equal to, say, acquiring a livery cab, they nevertheless weigh in favor of independent contractor status. *See Kirsch*, 148 F.3d at 171 (holding that the fact that "[plaintiff] was not reimbursed for his expenses" points toward independent contractor status).

Accordingly, this factor weighs in favor of independent contractor status.

### iii.    Degree of Skill Required

The third factor is "the degree of skill and independent initiative required to perform the work." *Saleem*, 52 F. Supp. 3d at 535. The parties dispute the exact role played by fit models: Agerbrink portrays her role as that of a human mannequin, while MSA insists that models must be literate in the industry and provide substantive feedback to the designer about the clothes. (CSUF ¶¶ 3–4.) However, MSA's advertisements expressly said that no experience was necessary to be a fit model. (CSUF ¶ 211.) As such, this factor weighs in favor of employee status. *See Hart*, 967 F. Supp. 2d at 920 (concluding that the fact that the strip club did not require dancers to have prior experience points to employee status).

### iv.    Permanence or Duration

The fourth factor is "the permanence or duration of the working relationship." *Saleem*, 52 F. Supp. 3d at 535. Agerbrink signed a three-year contract, but she worked with MSA for

fifteen months. (CSUF ¶ 395.) This factor leans toward employee status, but it is unclear whether Agerbrink's tenure is long or short relative to others in the industry. In any event, courts have given this factor limited weight. *See Hart*, 967 F. Supp. 2d at 921 (collecting cases).

### v. Whether the Work is an Integral Part of Employer's Business

The fifth and final factor is "the extent to which the work is an integral part of the employer's business." *Saleem*, 52 F. Supp. 3d at 535. This factor is a toss-up. Obviously, model services are an integral part of a company called Model Services. However, MSA makes a strong counterargument that its business provides services *to* models rather than providing model services to apparel companies.

### vi. The Overall Economic Reality

Notwithstanding the specific factors, the "ultimate concern," is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059. Here, the Court concludes that no reasonable juror could find that Agerbrink was an employee. Even after resolving all disputed facts in favor of Agerbrink, the Court concludes as a matter of economic reality that Agerbrink was a self-employed fit model who hired MSA to manage her career. While not all factors point this way, the degree-of-control and opportunity-for-profit-and-loss factors are the most accurate indicators of Agerbrink's economic reality.

The QVC job illustrates this economic reality. When deciding whether to accept the QVC job, Agerbrink tried—through MSA—to negotiate a higher offer from QVC. (CSUF ¶¶ 465–67.) At the same time, Agerbrink got MSA to lower its commission on her QVC earnings to offset the lower rate paid by QVC. (CSUF ¶¶ 471, 478.) She ultimately decided to accept the job and made significant investments for which MSA did not reimburse her, including

renting an apartment in Pennsylvania.  (CSUF ¶¶ 559–60.)  And when Agerbrink later decided that the QVC job was not worth the reduced pay, she left that job.  (CSUF ¶¶ 490, 496–98.)  These are the actions of an entrepreneurial businessperson rather than a passive employee.

Accordingly, MSA is entitled to summary judgment on Agerbrink's FLSA claims.

## 2. Was Agerbrink an Employee Under the NYLL?

The NYLL test is similar to the FLSA test, although it focuses more on degree of control rather than economic reality.  *See Hart*, 967 F. Supp. 2d at 922–24 (collecting cases).  The New York Court of Appeals has held that "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  *Bynog v. Cipriani Grp.*, 1 N.Y.3d 193, 198 (2003).  The following factors apply:

> [W]hether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule.

*Id.* (citations omitted)

The result here is the same as under the FLSA, for largely the same reasons.  As discussed above, Agerbrink had significant leeway in setting her schedule, choosing her clients, and negotiating her rate of pay.  As to the remaining factors, Agerbrink does not contend that she was on MSA's payroll or that she received fringe benefits.  And as to the "critical inquiry"—i.e. degree of control—the Court has already concluded that MSA exerted little control over Agerbrink.  Indeed, Agerbrink concedes that the definition of "employee" under the FLSA and the NYLL is "near-identical."  (Dkt. No. 248 at 40.)

Accordingly, MSA is entitled to summary judgment on Agerbrink's NYLL claims.

### B.    Agerbrink's Motion for Summary Judgment as to MSA's Counterclaims

In its answer, MSA asserts counterclaims for breach of contract and tortious interference with a business relationship.  Agerbrink now moves for summary judgment, seeking dismissal of the two counterclaims.

### 1.    MSA's Breach of Contract Counterclaim

MSA's first counterclaim alleges that Agerbrink breached her contract with MSA by working in-house for Caché—a fashion company—without telling MSA, and without giving MSA its twenty-percent cut.  MSA alleges that the contract between Agerbrink and MSA required Agerbrink to notify MSA of all job offers and to pay MSA a twenty percent commission for any work Agerbrink performed during the contract term.  (*See* Dkt. No. 232 ¶¶ 355–78.)

Agerbrink moves for summary judgment, arguing that there is no genuine dispute that she should prevail on her affirmative defenses.  Each affirmative defense is discussed in turn.

### i.    Affirmative Defense 1—Setoff and Recoupment

Agerbrink first argues that even if she does owe money to MSA, the amount due is less than $13,768.15.  And since MSA is currently withholding $13,768.15 of Agerbrink's earnings, Agerbrink argues that she does not owe MSA anything.

But Agerbrink's argument is undermined by the fact that Agerbrink moves for summary judgment—which the Court grants below—on the issue of the $13,768.15.  In other words, she wants to be paid the $13,768.15, but, at the same time, asserts that she does not owe anything to MSA because MSA already has her money.  She cannot have it both ways, and summary judgment is therefore unwarranted as to this affirmative defense.[2]

---

[2]    In any event, MSA disputes the amount that Agerbrink allegedly owes MSA, arguing that the amount owed exceeds the amount withheld.

### ii.    Affirmative Defense 2—Unconscionability

Agerbrink next argues that her contract with MSA is invalid as unconscionable.  She argues that the obligations under the contract were lopsided because Agerbrink owed a host of obligations to MSA (including hefty commissions), while MSA's only real obligation was to provide commercially reasonable advice about the modeling industry.

Under New York law, a contract is unconscionable when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms."  *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988).  Generally, there must be a showing that the contract is both procedurally and substantially unconscionable.  *See id.*  "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract."  *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (App. Div. 2d Dept. 1983); *see also Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999) ("A contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (quoting 8 Samuel Williston, *A Treatise on the Law of Contracts*, § 18:9 (Richard A. Lord ed., 4th ed.1998) (internal quotation marks omitted)).

Agerbrink does not argue that the formation of the contract was procedurally unconscionable.  Instead, she asserts that "New York law allows for a finding of unconscionability, in exceptional cases, even where there was no procedural unconscionability." *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 342 (W.D.N.Y. 2017).  Agerbrink argues that hers is an exceptional case because the contract was structured so that MSA benefits from its own breach of the contract.  She argues that by neglecting to find work for its models, MSA leaves

the models with no option but to work for other companies and give MSA a percentage cut for doing nothing. However, there is very little in the record to support this claim, and the issue of MSA's efforts to find work for Agerbrink is disputed. Thus, summary judgment is inappropriate on this affirmative defense.

### iii.    Affirmative Defense 3—Repudiation

Agerbrink next argues that, after Susan Levine found out about her job with Caché, she threatened Agerbink that "[i]f you show up at on Monday morning at Caché you will never work in this town again." (CSUF ¶ 137.) Agerbrink argues that by making this statement, MSA repudiated the contract between it and Agerbrink, and Agerbrink was no longer bound by the contract.

Under New York law, repudiation occurs either through "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach" or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998) (quoting Restatement [Second] of Contracts § 250) (internal quotation marks omitted). Repudiation occurs "when a breaching party's words or deeds are unequivocal." *Id.*; *see also Palazzetti Import/Export, Inc. v. Morson*, No. 98 Civ. 722, 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001) ("The renunciation . . . must rise to the level of a clear and unqualified refusal to perform the entire contract.").

Agerbrink's argument is unavailing. First, Levine denies making the threat. (CSUF ¶ 137.) And second, whether this one threat constitutes a clear refusal to perform on the entire contract is a disputed issue, and is ultimately for the jury to decide.

### iv.    Affirmative Defense 4—Prior Material Breach

Agerbrink next argues that MSA breached the contract before she did.  Those alleged breaches are (1) that Levine threatened Agerbrink that she would be blacklisted from the New York fit-modeling industry, (2) that MSA personnel told Agerbrink that she was contractually prohibited from working for other companies when in reality the contract did allow it, and (3) that MSA breached the implied covenant of good faith and fair dealing by representing itself in the contract as not being an employment agency, when in reality it was an unlicensed employment agency under New York law.

But these arguments rely on facts that are heavily disputed by the parties.  Levine denies making the threat.  (CSUF ¶ 137.)  MSA denies telling Agerbrink about being prohibited from working for other companies.  (*See, e.g.*, CSUF ¶ 8.)  And the unlicensed-employment-agency argument has already been rejected by the Court in an earlier opinion.  *See Agerbrink v. Model Serv. LLC*, No. 14 Civ. 7841 JPO, 2015 WL 3750674, at *5 (S.D.N.Y. June 16, 2015); *see also Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.*, No. 05 Civ. 7314, 2008 WL 4387808, at *8 (S.D.N.Y. Sept. 24, 2008) ("Where there is no private right of action for [an Article 11] claim, a party cannot assert that same violation as grounds for an affirmative defense.")  Accordingly, summary judgment is not warranted as to this defense.

### v.    Affirmative Defense 5—Non-Material Breach

Agerbrink next argues that there was no material breach prior to the alleged threat by Levine.  And since Agerbrink maintains that the threat repudiated the contract, she argues that there was never a material breach.  But given that the Court has already denied summary judgment on the issue of whether the threat constituted repudiation, summary judgment is likewise denied on this affirmative defense.

17

### vi. Affirmative Defense 6—Unlicensed Employment Agency

Finally, Agerbrink argues that the contract is unenforceable because MSA is an illegal employment agency under New York law. But, as noted above, the Court has already rejected this claim in a prior opinion. *See Agerbrink*, 2015 WL 3750674, at *5.

In sum, because Agerbrink is not entitled to summary judgment on any of her six affirmative defenses, MSA's breach-of-contract counterclaim survives.

### 2. MSA's Tortious Interference Counterclaim

MSA's second counterclaim is that Agerbrink tortiously interfered with a business relationship between MSA and Caché. It alleges that Caché had previously hired models represented by MSA, which created an "economic expectancy" by which MSA expected that Caché would pay MSA if it hired one of MSA's models. (Dkt. No. 232 ¶¶ 380–82.) It further alleges that Agerbrink solicited Caché for a job without telling MSA, thus interfering with this expectancy. (*See* Dkt. No. 232 ¶¶ 379–87.)

To prevail on a claim for tortious interference with business relations, a plaintiff in New York must prove that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort" or the defendant must have acted "for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) (second quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 628 N.Y.S.2d 408, 410 (App. Div. 3d Dept. 1995)).

Agerbrink correctly points out that MSA has not adduced evidence that Agerbrink's conduct was an independent crime or tort or that she acted *solely* with the purpose of inflicting emotional harm.  Even if Agerbrink intended to go behind MSA's back in working for Caché, such conduct may amount to breach of contract, but not tortious interference.  Accordingly, Agerbrink is entitled to summary judgment on the tortious interference counterclaim.

### C.    Agerbrink's Motion for Summary Judgment as to Initial Damages on Her Unjust Enrichment Claim

When Agerbrink left MSA, MSA withheld some of Agerbrink's earnings as security for any judgment MSA might obtain.  In 2016, this Court granted summary judgment in favor of Agerbrink on the issue of the liquidated damages clause in her contract with MSA.  *See Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 419 (S.D.N.Y. 2016).  The clause provided that if Agerbrink breached the contract, MSA could retain money MSA was holding on Agerbrink's behalf.  *Id.* at 414–15.  The Court held that the liquidated damages clause was an unenforceable penalty under New York law.  *Id.* at 418–19.  And because the provision was invalid, the Court held that MSA's retention of Agerbrink's money constituted unjust enrichment.  *Id.* at 419.  Because the Court only addressed the issue of liability, it did not address the exact amount due.  *Id.* at 415 n.2.

The parties agree that, as of June 30, 2014, MSA had not paid Agerbrink at least $13,768.15 of her earnings.  (CSUF ¶ 112.)  Agerbrink therefore moves for summary judgment as to that amount, plus prejudgment interest, on the theory that the only issue for trial is whether MSA owes Agerbrink *more* than that amount.  MSA responds that summary judgment on the $13,768.15 is premature, since Agerbrink may end up owing money to MSA if MSA prevails on its counterclaims.  (Dkt. No. 260 at 26–27.)

Agerbrink is right on this front. The Court has already held that MSA was not entitled to withhold Agerbrink's earnings, and that MSA is therefore liable for unjust enrichment. That Agerbrink may end up owing MSA is of no import right now. Since there is no dispute that MSA is unlawfully holding $13,768.15 of Agerbrink's money, Agerbrink is entitled to summary judgment for this amount, plus prejudgment interest.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for partial summary judgment is GRANTED, and Plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part, as follows:

MSA's motion for summary judgment on the misclassification issue is GRANTED, and Agerbrink's motion for summary judgment on that issue is DENIED. The Court concludes that it is beyond genuine dispute that Agerbrink was an independent contractor and not an employee with respect to MSA.

Agerbrink's motion for summary judgment as to MSA's tortious-interference counterclaim is GRANTED.

Agerbrink's motion for summary judgment as to MSA's breach-of-contract counterclaim is DENIED.

Agerbrink's motion for summary judgment on her unjust enrichment claim is GRANTED as to the undisputed portion of her withheld earnings. Agerbrink is entitled to judgment in the amount of $13,768.15 plus prejudgment interest on that claim.

All told, two issues remain: (1) what sum above $13,768.15, if any, MSA owes Agerbrink, and (2) MSA's breach-of-contract counterclaim. The parties shall submit a joint

letter within two weeks of the date of this order, outlining their proposals on how to proceed with the case.

The Clerk of Court is directed to close the motions at Docket Numbers 239, 242, and 254.

SO ORDERED.

Dated: March 14, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge